2024 WL 4108012
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jimmy AVILA, Plaintiff,

v.

ACACIA NETWORK, INC.; Basics, Inc.; Trevor Griffiths, Program Director; Aja Douglas, Manager, PMP; Jamar Crow, Alleged Social Worker; Charles Staten, Alleged Social Worker; NYSOMH; Kim F. Ben-Atar, Deputy Director of Housing; Adult Protective Services; Thomas Glenoy, APS Senior Supervisor; 1212 Grant Realty, LLC; 1412 Col LLC., Defendants.

1:24-CV-0884 (LTS)
|
Signed August 26, 2024

**Attorneys and Law Firms**

Jimmy Avila, Bronx, NY, Pro Se.

ORDER OF DISMISSAL

LAURA TAYLOR SWAIN, Chief United States District Judge:

**\*1** By order dated April 15, 2024, the Court dismissed this *pro se* action, in which Plaintiff Jimmy Avila proceeds *in forma pauperis* ("IFP"), but granted him 30 days' leave to file an amended complaint, as specified in that order. (ECF 4.) On May 13, 2024, Plaintiff filed an amended complaint in response to that order; it is the operative pleading for this action. (ECF 5.)

In his amended complaint, Plaintiff asserts claims under the Fair Housing Act ("FHA"), the Rehabilitation Act, the Americans with Disabilities Act ("ADA"), and 42 U.S.C. § 1983. Named as defendants are: (1) Acacia Network, Inc. ("Acacia"), which Plaintiff describes as "a non-profit organization that may act as the sublessor of Plaintiff's apartment" and receives federal funding; (2) Basics, Inc. ("Basics"), which Plaintiff describes as also "a non-profit organization that may act as the sublessor of Plaintiff's apartment" and receives federal funding; (3) Trevor Griffiths, Acacia's Program Director of its "PMP" program; (4) Aja Douglas, Acacia's Quality Assurance Director of Supportive Housing; (5) Jamar Crow, "a Self-Described Social Work[er]

under the jurisdiction of ... Aja Douglas"; (6) Charles Staten, "as Self-Described Social Work[er] under the jurisdiction of ... Aja Douglas"; (7) the New York State Office of Mental Health ("NYSOMH"); (8) Kim F. Ben-Atar, NYSOMH's Deputy Director of Housing; (9) Adult Protective Services ("APS"), a program of the New York City Human Resources Administration ("HRA"); (10) Thomas Glenoy, an APS Senior Supervisor; (11) 1212 Grant Realty LLC, the owner of Plaintiff's previous apartment building located at 1212 Grant Avenue, Bronx, New York ("1212 Grant Avenue"); and (12) "1412 Col LLC," the owner of Plaintiff's current apartment building located at 1412 College Avenue, Bronx, New York ("1412 College Avenue"). [1] (ECF 5, at 2-4) Plaintiff seeks declaratory relief, injunctive relief, and monetary damages.

For the following reasons, the Court dismisses this action.

**STANDARD OF REVIEW**

The Court must dismiss an IFP complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the Court lacks subject matter jurisdiction of the claims raised. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted, emphasis in original). But the "special solicitude" in *pro se* cases, *id.* at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

**\*2** Rule 8 requires a complaint to include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing the complaint, the Court

Avila v. Acacia Network, Inc., Not Reported in Fed. Supp. (2024)

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 2 of 63

must accept all well-pleaded factual allegations as true. *Id.* But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Id.* (citing *Twombly,* 550 U.S. at 555). After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. *Id.* at 679.

## BACKGROUND

### A. The Court's April 15, 2024 order

The Court, in its April 15, 2024 order, dismissed this action but granted Plaintiff 30 days' leave to replead his claims in an amended complaint, as specified in that order. (ECF 4.)

Because Plaintiff, in his original complaint, seemed to have been reasserting claims against Acacia, Douglas, and Griffiths that he has asserted in two of his other previously filed *pro se* actions that are pending in this court that are known as *Avila v. Acacia Network, Inc.,* 1:23-CV-7834 (PAE) (KHP) ("*Avila I*"), and *Avila Acacia Network,* 1:23-CV-10260 (PAE) ("*Avila II*"), the Court dismissed, without prejudice, "any claims against Acacia, Douglas, and Griffiths that Plaintiff is asserting in this action that he is also asserting in *Avila I* and *Avila II.*" (*Id.* at 7.)

With respect to Plaintiff's claims of disability discrimination under the FHA against Acacia, 1412 College Avenue LLC,[2] Douglas, and Griffiths, the Court held that Plaintiff had alleged no facts in his original complaint "showing that his disability was at least a motivating factor with regard to his allegations of discrimination by" those defendants. (*Id.* at 9.) The Court thus dismissed, for failure to state a claim on which relief may be granted, Plaintiff's claims of intentional disability discrimination under the FHA against those defendants. (*Id.*) The Court, however, granted Plaintiff leave to replead those claims in an amended complaint in which he was to allege facts sufficient to state such a claim. (*Id.*)

The Court also dismissed, for failure to state a claim, but with leave to replead, Plaintiff's claims of retaliation under the FHA against those defendants arising from Plaintiff's bringing a previous lawsuit against Acacia and/or, perhaps, against those other defendants. (*Id.* at 9-11.)

As to Plaintiff's claims of disability discrimination under the Rehabilitation Act against Acacia, the NYSOMH, the APS (construed to be the City of New York), and 1412 College Avenue LLC, the Court held that Plaintiff had alleged no facts, in his original complaint, that those defendants receive federal funding and that, even if any of them did, "Plaintiff's allegations [were] insufficient to show that any of those defendants denied him the opportunity to participate in or benefit from its services, programs, or activities, or has otherwise discriminated against him, by reason of his disability." (*Id.* at 11-13.) Thus, the Court also dismissed those claims for failure to state a claim, but it granted Plaintiff leave to replead those claims against those defendants in amended complaint. (*Id.* at 13.)

The Court further dismissed, for failure to state a claim, Plaintiff's claims of retaliation under the Rehabilitation Act against those defendants, but granted Plaintiff leave to replead those claims against those defendants as well. (*Id.* at 13-14.)

**\*3** The Court construed Plaintiff's claims of disability discrimination brought under the ADA as brought under Title II of the ADA against the NYSOMH and the City of New York. (*See id.* at 14-15.) Noting the virtually identical pleading standard for a claim of disability discrimination under the Rehabilitation Act and for such a claim under Title II of the ADA, the Court dismissed, for failure to state a claim, Plaintiff's claims of disability discrimination under Title II of the ADA against those defendants for the same reasons it dismissed Plaintiff's claims of disability discrimination under the Rehabilitation Act against those same defendants. (*Id.* at 15.) The Court, however, granted Plaintiff leave to replead his claims of disability discrimination under Title II of the ADA against those defendants. (*Id.*)

In addition, for the same reasons that the Court dismissed Plaintiff's claims of retaliation under the FHA and the Rehabilitation Act, it dismissed Plaintiff's claims of retaliation under the ADA against the NYSOHM and the City of New York, for failure to state a claim; the Court, however, granted Plaintiff leave to replead those claims against those defendants. (*Id.* at 15-16.)

The Court construed Plaintiff's claims under 42 U.S.C. § 1983 against APS as brought against the City of New York (*id.* at 16), and dismissed those claims, for failure to state a claim, because Plaintiff, in his original complaint, had alleged "no facts showing that a policy, custom, or practice of the City of New York contributed to the violation of his federal

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 3 of 63

Avila v. Acacia Network, Inc., Not Reported in Fed. Supp. (2024)

constitutional rights" (*id.* at 17). The Court, however, granted Plaintiff leave to replead those claims against the City of New York. (*Id.*)

The Court also dismissed, for failure to state a claim, Plaintiff's claims under Section 1983 against Ben-Atar (referred to as "Benatar" in the Court's April 15, 2024 order) and Glenoy because Plaintiff had not shown, in his original compliant, "how either Benatar or Glenoy was directly and personally involved with the alleged violations of his federal constitutional rights." (*Id.* at 18.) The Court, however, granted Plaintiff "leave to amend his complaint to name as defendants those individual state actors who were directly and personally involved in the alleged violations of federal constitutional rights and to allege facts showing how those individuals were each personally and directly involved in those alleged violations." (*Id.*) (footnote omitted).

The Court construed Plaintiff's allegations "that individual APS officials retaliated against him for posting his previous interactions with them on the internet, including on YouTube, by attempting to involuntarily hospitalize him" as asserting claims of First Amendment retaliation under Section 1983. (*Id.* at 19.) Because Plaintiff failed to allege, in his original complaint, "facts sufficient to show that any APS official's actions was motivated or was substantially caused by [Plaintiff's] ... exercise of his First Amendment rights" and "facts showing that the APS officials' actions chilled the exercise of [Plaintiff's] abovementioned First Amendment rights," the Court dismissed those claims for failure to state a claim. (*Id.*) The Court, however, granted Plaintiff leave to replead those claims. (*Id.* at 19-20.)

The Court declined to consider Plaintiff's claims under state law under its supplemental jurisdiction. (*See id.* at 20.)

## B. Plaintiff's allegations in his amended complaint

Plaintiff, in his amended complaint filed in response to the Court's April 15, 2024 order, specifically asserts claims under the FHA, the Rehabilitation Act, the ADA, and Section 1983, arising from the alleged actions of the defendants named in the amended complaint that "have egregiously impacted his housing stability, personal liberty, and health." (ECF 5, at 1.) He alleges that he currently resides in the apartment building located at 1412 College Avenue. (*Id.* at 2.) Plaintiff also alleges that he "suffers from ... schizoaffective disorder, bipolar type, along with other physical ailments including periodontal disease and stage 2 kidney disorder. These conditions substantially limit his major life activities and

qualify him as disabled under the [FHA], the [ADA], and other pertinent statutes." (*Id.*)

**\*4** Plaintiff further alleges that Acacia and Basics, which, he alleges, may both be sublessors with regard to his current apartment at 1412 College Avenue, are "responsible for the actions that led to [his] illegal lockout" from that apartment. (*Id.*) He states that Griffiths, the Acacia Program Director of its "PMP" program, has "administrative oversight and operational management of housing programs that directly impact [him]." (*Id.*) Plaintiff asserts that Douglas, Acacia's Quality Assurance Director of Supportive Housing, "played a direct role in the misrepresentations to law enforcement that led to Plaintiff's false arrest and wrongful hospitalization." (*Id.* at 3.) He also asserts that Crow and Staten are social workers that are "under the jurisdiction of ... Douglas [and] who [both] had [him] arrested for entering [his] apartment." (*Id.*) According to Plaintiff, NYSOMH, via its New York City Field Office, "oversees mental health services within New York City, including those that directly affect [him]. This entity is involved [in this action] due to its oversight role and the implications of its actions and inactions on Plaintiff's housing and mental health support." (*Id.*) Plaintiff alleges that Ben-Atar, NYSOMH's Deputy Director of Housing, "is responsible for the administrative oversight of housing programs that are intended to provide support to individuals with mental health issues, including [him]." (*Id.*) He also alleges that APS "is involved in this case due to actions taken by its staff that adversely impacted [him]. These actions include the involvement in the events leading to and following [his] wrongful arrest and hospitalization." (*Id.*) Plaintiff further alleges that Glenoy, an APS Senior Supervisor, "is implicated in this case due to his direct or indirect involvement in the decisions and actions taken by APS that affected [him]." (*Id.*) Plaintiff states that 1212 Grant Realty LLC, the owner of his former apartment at 1212 Grant Avenue, and "1412 COL LLC," the owner of his current apartment at 1412 College Avenue, both "may have responsibilities concerning the management and maintenance of the[ir] [respective] propert[ies]. [They are] included [in this action] due to [their] role in the eviction process and the alleged illegal actions taken against [him]." (*Id.* at 4.)

Plaintiff alleges that his "severe mental and physical health conditions substantially limit major life activities, qualifying him as disabled under relevant federal laws. [His] conditions require stable housing and specific accommodations to prevent severe mental health crises." (*Id.*) Plaintiff also

Avila v. Acacia Network, Inc., Not Reported in Fed. Supp. (2024)

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 4 of 63

alleges that, on November 16, 2023, Griffiths, "with the assistance of BASIC[S] ... employees[,] physically assaulted and attacked [P]laintiff while Plaintiff[ ] was trying to pay his monthly rent and provide [a] budget letter[,] which [caused] Plaintiff [to be] [h]ospitalized." (*Id.*) He also alleges that the November 16, 2023 incident was reported to Glenoy, "who is assigned to protect ... him] from neglect and abuse as a person who suffers from impairment." (*Id.*)

Plaintiff alleges that, on February 20, 2024, Crow, Staten, Basics, and Acacia, with the assistance of the 1212 Grant Avenue Superintendent, illegally changed the locks on Plaintiff's former apartment at 1212 Grant Avenue. (*Id.* at 4-5, 7.) He also alleges that Acacia, Douglas, and APS caseworker "Ms. Williams" "[n]ever provided [him] with [k]eys on January 3, 2024, during the [l]ease signing [for his] ... [n]ew [a]partment [at] 1412 College Avenue." (*Id.* at 5.) Plaintiff states that he made several complaints to APS, specifically, to Glenoy, which were "neglected and ignored[,] in violation of [a] relocation agreement." (*Id.*) Since January 3, 2024, Acacia and 1412 College Avenue, LLC have "refus[ed] to collect [his] rent payments[,] ... [thus, he has been] partially evicted from ... 1412 College Avenue." [3] (*Id.*)

Plaintiff seems to state that, on February 20, 2024, Crow, Staten, Basics, and Acacia "misled law enforcement officers from the [New York City Police Department's] 44th Precinct into arresting Plaintiff for trespassing, breaking and entering, and assault. These charges were predicated on fraudulent claims and a profound misunderstanding or deliberate misrepresentation of Plaintiff's legal right to occupy his apartment." [4] (*Id.* at 5; *see id.* at 7.) He also states that this "false arrest led to [his] wrongful hospitalization in a psychiatric unit, exacerbating his mental health condition and resulting in severe emotional distress." (*Id.* at 6.) "During the wrongful hospitalization, [his] apartment was entered without his consent, and personal belongings, including $20,000, were stolen." (*Id.*) Plaintiff alleges that the NYSOMH and Ben-Atar failed "to oversee and regulate the actions of their funded agencies adequately[ ] [and] neglected their duties to ensure that [he] received the necessary accommodations for his disabilities. This oversight failure led directly to the violations experienced by Plaintiff." (*Id.*) He further alleges that "[t]he collective actions of [the] [d]efendants not only breached specific statutes[,] but also represented a systemic failure to protect and uphold the civil rights of a disabled individual, directly leading to [his] unlawful eviction, false imprisonment, and emotional and physical harm to [him]." (*Id.*)

## DISCUSSION

**\*5** The Court construes Plaintiff's amended complaint as asserting claims of disability discrimination under the FHA, the Rehabilitation Act, and Title II of the ADA, claims of federal constitutional violations under 42 U.S.C. § 1983, as well as claims under state law.

### A. Possible overlap with Plaintiff's claims in *Avila I* and/ or in *Avila II*

The Court understands that Plaintiff, in his amended complaint in this action, is asserting claims against Acacia, Douglas, Griffiths, and/or 1212 Grant Realty LLC that he is also asserting in *Avila I* and/or in *Avila II*, his previously filed actions that are also pending in this court. Accordingly, for the reasons discussed in the Court's April 15, 2024 order, the Court dismisses, without prejudice, any claims in this action against Acacia, Douglas, Griffiths, and 1212 Grant Realty LLC that he is also asserting in *Avila I* and/or in *Avila II*. (*See* ECF 4, at 7.)

### B. Claims of disability discrimination under the FHA against Acacia, Basics, Griffiths, Douglas, Crow, Staten, 1212 Grant Realty LLC, and 1412 COL LLC

While the Court assumes that Plaintiff has a disability for the purposes of his claims under the FHA, it must dismiss what appear to be his claims of disparate-treatment disability discrimination under that statute against Acacia, Basics, Griffiths, Douglas, Crow, Staten, 1212 Grant Realty LLC, and 1412 COL LLC. The Court refers to the pleading standard for such claims, which the Court articulated in its April 15, 2024 order. (*See* ECF 4, at 7-9.) The Court dismisses these types of claims for the same reasons it did in that order – because Plaintiff "alleges no facts ... showing that his disability was at least a motivating factor" (*id.* at 9) for the conduct underlying his claims of discrimination under the FHA against Acacia, Basics, Griffiths, Douglas, Crow, Staten, 1212 Grant Realty LLC, and 1412 COL LLC. Plaintiff's allegations are, at best, conclusory and, therefore, do not suffice to state viable claims of disparate-treatment disability discrimination under the FHA. *See Palmer v. Fannie Mae,* 755 F. App'x 43, 46 (2d Cir. 2018) (summary order) (holding, in the FHA context, that the plaintiff had "failed to provide facts that could plausibly support even a minimal inference of discriminatory motivation. [Her] complaint merely raises conclusory allegations that Fannie

Mae 'discriminated against [her],' a pregnant woman,' but fails to offer any facts to support such allegations."). The Court therefore dismisses these claims for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

## C. Claims of disability discrimination under the Rehabilitation Act against Acacia, Basics, the NYSOMH, APS, 1212 Grant Realty LLC, and 1412 COL LLC

The Court also assumes that Plaintiff has a disability for the purposes of his claims of disability discrimination under the Rehabilitation Act against Acacia, Basics, the NYSOMH, APS, [5] 1212 Grant Realty LLC, and 1412 COL LLC. Yet, the Court must still dismiss these claims. The Court refers to the pleading standing for these claims as set out in its April 15, 2024 order. (ECF 4, at 11-13.) Plaintiff specifically alleges, in his amended complaint, that Acacia and Basics receive federal funding (ECF 5, at 2), which is one of the pleading requirements for these types of claims (ECF 4, at 12). He does not specify, however, whether the NYSOMH, APS (the City of New York), 1212 Grant Realty LLC, and 1412 COL LLC receive federal funding. (ECF 5, at 3-4.)

**\*6** More importantly, however, even if all of these defendants do receive federal funding, Plaintiff's allegations in his amended complaint, as in his original complaint, "are insufficient to show that any of th[e]se defendants denied him the opportunity to participate in or benefit from its services, programs, or activities, or has otherwise discriminated against him, by reason of his disability." (ECF 4, at 12-13.) Again, Plaintiff allegations, in his amended complaint, are conclusory and without factual support, and therefore do not satisfy the pleading requirements to state a claim of disability discrimination under the Rehabilitation Act. *See, e.g., Vasquez v. Reece Sch.*, No. 22-CV-5986 (GHW) (JW), 2024 WL 497435, at \*9 (S.D.N.Y. Jan. 24, 2024) ("Plaintiffs allege only in a conclusory fashion that 'Defendant excluded J.V. from participation in, and denied J.V. the benefits of, services, programs, and activities ... because of J.V.'s disabilities.' This is insufficient to state a claim [of disability discrimination under the Rehabilitation Act] under Federal Rule of Civil Procedure 12(b)(6)." (citation omitted)), *report & recommendation adopted*, 2024 WL 497433 (S.D.N.Y. Feb. 8, 2024); *Suarez v. Annucci*, No. 20-CV-7133 (VB), 2021 WL 6065765, at \*11 (S.D.N.Y. Dec. 21, 2021) (noting, in the context of claims of discrimination under the Rehabilitation Act, that the "plaintiff merely alleges in conclusory fashion that defendants discriminated against him 'on the basis of his

disability,' " and holding that "[s]uch a threadbare recital of a cause of action is insufficient to withstand a motion to dismiss [for failure to state a claim]" (citation omitted)). Accordingly, the Court also dismisses these claims for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii).

## D. Claims of disability discrimination under Title II of the ADA against the NYSOMH and the City of New York

The Court must further dismiss Plaintiff's claims under Title II of the ADA against the NYSOMH and the City of New York. As discussed in the Court's April 15, 2024 order, "Title II of the ADA forbids discrimination against persons with disabilities in, among other areas of public life, public services, programs, and activities" by a public entity, such as a state or local government agency. (ECF 4, at 14; *see id.* at 14 n.13.) Again, the Court assumes, for the purposes of Plaintiff's claims of disability discrimination under Title II of the ADA, that Plaintiff has a disability. The Court notes, as it did in its April 15, 2024 order, that "[t]he [pleading] standard to state a claim of discrimination under Title II of the ADA is the same as the standard to state a claim of discrimination under the Rehabilitation Act, though without the additional requirement that the defendant must ... receive federal funding." (*Id.* at 15.) The Court, however, dismisses the claims of disability discrimination against the NYSOMH and the City of New York that Plaintiff asserts in his amended complaint for the same reasons that it dismissed his claims in his original complaint – because the conclusory allegations in Plaintiff's amended complaint lack factual support to state a claim of disability discrimination against these defendants under Title II of the ADA. *See, e.g., Murray v. Lakeland Cent. Sch. Dist. Bd. of Educ.*, No. 16-CV-6795 (KMK), 2017 WL 4286658, at \*9 (S.D.N.Y. Sept. 26, 2017) ("Plaintiff's allegations again amount to nothing more than conclusory statements of discrimination, which are insufficient to state a claim [of discrimination under Title II of the ADA].""); *Woodhouse v. City of Mount Vernon*, Nos. 1:13-CV-0189 (ALC) (HBP), 1:13-CV-1165 (ALC) (HBP), 2016 WL 354896, at \*13 (S.D.N.Y. Jan. 27, 2016) (granting a motion to dismiss for failure to state claims of disability discrimination under the Rehabilitation Act and Title II of the ADA, and noting that the "complaint includes a single passing reference, alleging, 'defendants violated [the ADA and the Rehabilitation Act].' This is the very definition of a conclusory allegation."); *see also Lewis v. S. Conn. State Univ.*, No. 3:19-CV-0011, 2020 WL 3619546, at \*4 (D. Conn. July 20, 2020) ("[T]he plaintiff has failed to allege a causal connection between his disability and the defendants'

actions. The complaint does not suggest that the defendants made any statements or engaged in any conduct reflecting animus towards people with disabilities. The complaint does not allege that the plaintiff received different treatment or consideration than non-disabled applicants because of his disability....[His] allegations are insufficient to state a plausible claim for relief under Title II [of the ADA].”), *appeal dismissed*, No. 20-2626, 2020 WL 8458962 (2d Cir. Dec. 17, 2020) (unpublished opinion). The Court therefore dismisses these claims for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii).

### E. Claims under 42 U.S.C. § 1983 and under state law against the NYSOMH and Ben-Atar in her official capacity

**\*7** The Court must dismiss Plaintiff's claims of federal constitutional violations under 42 U.S.C. § 1983 and under state law against the NYSOMH and against Ben-Atar, an NYSOMH official, in her official capacity. “[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogate[d] the states' Eleventh Amendment immunity....” *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (internal quotation marks and citation omitted, second alteration in original). “[T]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state.” *Id.* (internal quotation marks and citation omitted). This immunity shields States from claims for money damages, injunctive relief, and retrospective declaratory relief. *See Green v. Mansour*, 474 U.S. 64, 72-74 (1985); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984). Congress has not abrogated the States' immunity for claims under Section 1983, *see Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990), and the State of New York has not waived its immunity to suit in federal court, *see Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977).

The Eleventh Amendment therefore precludes Plaintiff's claims for damages against the NYSOMH, which is a state agency and an arm of the State of New York. *See Iwelu v. N.Y.S. Off. of Mental Health*, No. 22-3096, 2024 WL 2175938, at *2 n.4 (2d Cir. May 15, 2024) (summary order); *Nieves v. N.Y.S. Off. of Mental Health*, No. 20-CV-9502 (GHW), 2021 WL 982297, at *2 (S.D.N.Y. Mar. 16, 2021); *DeLeon v. Sergio*, No. 18-CV-11821 (LLS), 2019 WL 2409681, at *2 (S.D.N.Y. June 3, 2019). The

Eleventh Amendment also precludes Plaintiff's claims under Section 1983 for damages against Ben-Atar, in her official capacity as a NYSOMH official. *See, e.g.*, *Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 392 (2d Cir. 2022) (“[T]he Eleventh Amendment bars the award of money damages against state officials in their official capacities.”); *Miller v. Carpinello*, No. 06-CV-12940 (LAP), 2007 WL 4207282, at *2 (S.D.N.Y. Nov. 20, 2007) (“All of the individual State Defendants are employees of [NYS]OMH, and plaintiff sues them in their official and individual capacities. As part of the relief sought, plaintiff demands compensatory and punitive damages. Based on Eleventh Amendment immunity, all claims for compensatory and punitive damages against the individual State Defendants in their official capacities are dismissed.” (citations omitted)). The Eleventh Amendment further precludes Plaintiff's claims under Section 1983 against the NYSOMH and against Ben-Atar, in her official capacity, for injunctive relief and retrospective declaratory relief. [6] *See Green*, 474 U.S. at 72-74; *Halderman*, 465 U.S. at 101-02.

**\*8** The Eleventh Amendment additionally precludes Plaintiff from seeking here, in federal court, injunctive or declaratory relief against the NYSOMH or against Ben-Atar, in her official capacity, under state law. *See Halderman*, 465 U.S. at 106; *Li v. Lorenzo*, 712 F. App'x 21, 23-24 (2d Cir. 2017) (summary order). Moreover, this Court lacks subject matter jurisdiction to consider Plaintiff's claims for damages against the NYSOMH, and against Ben-Atar, in her official capacity, under state law; Plaintiff may only pursue such claims for damages in the New York Court of Claims. *Bertoldi v. State*, 275 A.D.2d 227, 228 (1st Dep't 2000) (“It is well settled that the [New York] Court of Claims has exclusive jurisdiction over actions for money damages against the State [of New York], [New York] State agencies, or [New York] State officials acting in their official capacities in the exercise of governmental functions.”).

Accordingly, the Court dismisses Plaintiff's claims of federal constitutional violations under Section 1983 and under state law against the NYSOMH, ultimately, for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(h)(3); *Close v. New York*, 125 F.3d 31, 38-39 (2d Cir. 1997) (“[U]nless New York waived its immunity, the district court lacked subject matter jurisdiction.”); *Atl. Healthcare Benefits Tr. v. Googins*, 2 F.3d 1, 4 (2d Cir. 1993) (“Although the parties do not address the Eleventh Amendment in their briefs, we raise it *sua sponte* because it affects our subject matter jurisdiction.”); *see* 28 U.S.C. § 1915(e)(2)(B)(iii). The Court does the same with regard to Plaintiff's claims under Section 1983 and under

state law against Ben-Atar, in her official capacity, with the exception of those claims for prospective injunctive relief under *Ex Parte Young*, which the Court dismisses for failure to state a claim upon which relief may be granted. *See supra* at 15 n.6.

### F. Claims under Section 1983 against APS, the City of New York, and against Glenoy in his official capacity

The Court further dismisses Plaintiff's claims under Section 1983 against APS and against Glenoy, in his official capacity as an APS Senior Supervisor. With respect to all of Plaintiff's claims against APS, which is an agency of the City of New York, APS is not a separate entity that can be sued. N.Y. City Charter ch. 17, § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007); *Morris v. NYC HRA*, No. 13-CV-1845, 2013 WL 3148664, at *3 (E.D.N.Y. June 19, 2023) (discussing HRA and APS); *see also Emerson v. City of New York*, 740 F. Supp. 2d 385, 395 (S.D.N.Y. 2010) ("[A] plaintiff is generally prohibited from suing a municipal agency."). The Court therefore dismisses all of Plaintiff's claims against APS for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii). In light of Plaintiff's *pro se* status, however, the Court understands these claims, and any claims under Section 1983 brought against Glenoy, in his official capacity as an APS official, as brought against the City of New York.[7]

**\*9** The Court, in its April 15, 2024 order, recounted the pleading standard to state a claim under Section 1983 against a municipality, such as the City of New York, and the Court granted Plaintiff leave to amend his complaint to allege facts sufficient to state such a claim against that defendant. (ECF 4, at 16-17.) Plaintiff, in his amended complaint, fails to do so because he does not allege facts showing how a policy, custom, or practice of the City of New York caused a violation of federal constitutional rights. (*See id.* at 17.) The Court therefore dismisses Plaintiff's claims under Section 1983 against the City of New York for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii).

### G. Claims under Section 1983 against Ben-Atar and Glenoy in their individual capacities

The Court additionally dismisses Plaintiff's claims under Section 1983 against Ban-Atar and Glenoy in their individual

capacities. The Court, in its April 15, 2024 order, dismissed Plaintiff's claims under Section 1983 against these defendants because he did not allege facts showing "how either Benatar or Glenoy was directly and personally involved with the alleged violations of his federal constitutional rights," as is required to state a claim under Section 1983 against an individual state-actor defendant. (*See* ECF 4, at 17-18.) The Court, however, granted Plaintiff "leave to amend his complaint to name as defendants those individual state actors who were directly and personally involved in the alleged violations of federal constitutional rights and to allege facts showing how those individuals were each personally and directly involved in those alleged violations." (*Id.* at 18.)

In his amended complaint, Plaintiff alleges facts insufficient to show that Ben-Atar and Glenoy were directly and personally involved in violations of his federal constitutional rights. Any allegations regarding their involvement are conclusory and without factual support, which is insufficient to state such a claim. *See, e.g., Medina v. DuBois*, No. 22-CV-8051 (NSR), 2024 WL 1158456, at *3 (S.D.N.Y. Mar. 18, 2024) ("[T]o plead Section 1983 liability, Plaintiff needs to allege the Defendants were 'present' for the alleged violation or 'participated directly' in or 'somehow permitted' the alleged violation. As they stand, Plaintiff's accusations are conclusory and fail to raise the specter of relief beyond the speculative level." (citations omitted)); *Brown v. Cnty. of Westchester*, No. 22-CV-6146 (PMH), 2024 WL 21937, at *9 (S.D.N.Y. Jan 2, 2024) ("The vague and conclusory allegations that Scarpino aided and abetted unlawful conduct by failing to reprimand Mirza and that Rocah aided and abetted unlawful conduct by failing to discipline Adimari 'without more, are insufficient to allege [Scarpino's and Rocah's] personal involvement under [S]ection 1983." (alterations in original, citation omitted)); *Adams v. Annucci*, No. 17-CV-3794 (KMK), 2023 WL 2664301, at *10 (S.D.N.Y. Mar. 28, 2023) (With respect to claims under Section 1983, "[a] plaintiff cannot merely assert the involvement of high-ranking officials in designations and assignments to sufficiently demonstrate personal involvement."). Even if the Court were to construe Plaintiff's allegations regarding these defendants as asserting that these defendants failed to protect Plaintiff from the other defendants, such assertions would also fail to state a claim because a government official has no general federal constitutional duty to protect an individual from harm. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195-96 (1989) ("[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where

such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."). The Court therefore dismisses these claims for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii).

**H. Claims under Section 1983 against Acacia, Basics, Griffiths, Douglas, Crow, Staten, 1212 Grant Realty, LLC, and 1412 COL LLC**

**\*10** Plaintiff's claims under Section 1983 against Acacia, Basics, Griffiths, Douglas, Crow, Staten, 1212 Grant Realty, LLC, and 1412 Col LLC must be dismissed. A claim for relief under Section 1983 must allege facts showing that a defendant acted under the color of a state "statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983. Thus, to state a claim under Section 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor." *West v. Atkins*, 487 U.S. 42, 48-49 (1988); *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020) ("State action [for the purpose of Section 1983 liability] requires both ... the exercise of some right or privilege created by the State ... and the involvement of a person who may fairly be said to be a state actor." (internal quotation marks and citation omitted, emphasis in original)). Private entities are not generally considered to be state actors. *Sykes v. Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he United States Constitution regulates only the Government, not private parties...." (internal quotation marks and citations omitted)).

The activity of a private entity may be considered to be state action for the purpose of Section 1983 liability, however, in the following three situations: (1) when the entity acts using the coercive power of the State or is controlled by the State (the "compulsion test"); (2) when the State provides significant encouragement to the entity, the entity willfully participates in joint activity with the State, or the entity's functions are entwined with State policies (the "joint action" or "close nexus" test); or (3) when the State has delegated a public function to the entity (the "public function" test). *See Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (citation omitted).

The fundamental question under each test is whether the private entity's challenged actions are " 'fairly attributable'

" to the State. *Id.* (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)). In analyzing whether a private entity has acted as a state actor for the purpose of Section 1983 liability, a court must first "identify[ ] the specific conduct of which the plaintiff complains, rather than consider the general characteristics of the entity." *Id.* (internal quotation marks and citation omitted). The fact that an entity receives public funds does not turn private action into state action, and acts of private contractors do not become acts of the government because of the contractors' engagement in government contracts. *See Rendell-Baker*, 457 U.S. at 840-41. Furthermore, a private entity does not become a state actor merely by acting in accordance with state regulations. *See id.* at 841. Thus, "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999).

Plaintiff has asserted no facts showing that Acacia, Basics, Griffiths, Douglas, Crow, Staten, 1212 Grant Realty, LLC, or 1412 COL LLC, all private entities or individuals, acted as state actors when they allegedly violated Plaintiff's federal constitutional rights. [8] The Court therefore dismisses Plaintiff's claims under Section 1983 against these defendants for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii).

**I. Remaining claims under state law**

The Court understands Plaintiff's claims under state law as brought under the court's supplemental jurisdiction. A federal district court may decline to exercise supplemental jurisdiction of claims under state law when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (footnote omitted). Having dismissed Plaintiff's claims of which the Court has original subject matter jurisdiction, the Court declines to exercise its supplemental jurisdiction of any of his claims under state law that have not already been dismissed in this order. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise.' " (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997))).

## J. Further leave to amend is denied

**\*11** District courts generally grant a *pro se* plaintiff leave to amend a complaint to cure its defects, but leave to amend may be denied if it would be futile or when the plaintiff has already been given an opportunity to amend but has failed to cure the complaint's deficiencies. *See Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Because Plaintiff has failed to cure the deficiencies mentioned in the Court's April 15, 2024 order, and because the defects in Plaintiff's amended complaint cannot be cured with a further amendment, the Court declines to grant Plaintiff another opportunity to amend.

### CONCLUSION

The Court dismisses this action for the reasons set forth in this order.

The Court certifies, under 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith and, therefore, IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Court directs the Clerk of Court to enter a judgment dismissing this action for the reasons set forth in this order.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4108012

---

### Footnotes

1    Plaintiff appears to assert, in his amended complaint, claims against the individual defendants in their individual and official capacities. (ECF 5, at 4.) The Court understands that Plaintiff does so as to his claims against the individual state-actor defendants, which include Ben-Atar and Glenoy.

2    The Court understands that Plaintiff's reference to "1412 COL LLC" in his amended complaint is a reference to 1412 College Avenue LLC.

3    Plaintiff also alleges that his current apartment at 1412 College Avenue has bedbugs and has no electricity in its living room. (ECF 5, at 5.)

4    Plaintiff alleges that, upon the changing of the locks at his former apartment at 1212 Grant Avenue on February 20, 2024, Crow, Staten, Basics, and Acacia "falsely represented Plaintiff's legal and tenancy status to law enforcement officials, leading to his wrongful arrest and eviction." (ECF 5, at 7.) Plaintiff, however, does not specify whether he was arrested with regard to his tenancy status as to his former apartment, at 1212 Grant Avenue, or as to his current apartment, at 1412 College Avenue.

5    For the reasons articulated in the Court's April 15, 2024 order, the Court construes Plaintiff's claims against APS as brought against the City of New York. (*See* ECF 4, at 12 n.11.)

6    Under the exception to Eleventh Amendment immunity articulated in *Ex Parte Young*, 209 U.S. 123 (1908), "[a] plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as opposed to the state, in their official capacities, provided that his complaint (a) 'alleges an ongoing violation of federal law' and (b) 'seeks relief properly characterized as prospective.' " *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (citations omitted). Plaintiff's requests for declaratory relief against Ben-Atar are retrospective (ECF 5, at 16), and thus, such claims for relief under Section 1983 against the NYSOMH and against Ben-Atar, in her official capacity, are precluded by the Eleventh Amendment. To the extent that Plaintiff seeks prospective injunctive relief under Section 1983 against the NYSOMH and against Ben-Atar, in her official capacity, specifically, an order from this Court directing those defendants "to relocate Plaintiff from Acacia ... to a different Housing agency that [provides a] safe and habitable ... apartment, or provide[s]

**Avila v. Acacia Network, Inc., Not Reported in Fed. Supp. (2024)**

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 10 of 63

equivalent housing that meets Plaintiff['s] medical needs as a disabled individual" (*id.* at 17), the Court must dismiss such claims. This is because "[t]here is no right under the United States Constitution to housing benefits or to assistance with obtaining housing." *Lee v. N.Y.C.H.A. N.Y.C. Hous. Auth.*, No. 1:23-CV-11322 (LTS), 2024 WL 455203, at *2 (S.D.N.Y. Feb. 5, 2024) (citing and quoting *Lindsey v. Normet*, 405 U.S. 56, 74 (1972)). The Court therefore dismisses such claims for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii).

7      Because Plaintiff's Section 1983 claims regarding APS and/or Glenoy, in his official capacity, are only properly brought against the City of New York, the Court also dismisses, for failure to state a claim, Plaintiff's claims under Section 1983 against Glenoy, in his official capacity, and construes them as also brought against the City of New York, *see* § 1915(e)(2)(B)(ii) *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials ... [because] local government units can be sued directly for damages and injunctive or declaratory relief."); *Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 687 (2d Cir. 2005) ("[A] § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself.").

8      *See*, *e.g.*, *Brock v. City of New York*, No. 21-CV-3087 (PGG) (GWG), 2023 WL 3512973, at *4-6 (S.D.N.Y. May 18, 2023) (determining that Acacia is not a state actor), *report & recommendation adopted*, 2023 WL 5217933 (S.D.N.Y. Aug. 14, 2023).

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 1707174

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Geoffrey BOWSER, individually and on
behalf of all others similarly situated, Plaintiff,

v.

The CITY OF NEW YORK, Dermot F. Shea,
in his individual capacity, Keechant Sewell,
in her individual capacity, and Edward A.
Caban, in his individual capacity, Defendants.

23 Civ. 6183 (DG) (VMS)
|
Signed February 25, 2025

**Attorneys and Law Firms**

Janet Walsh, Pfister Energy, Inc., Hawthorne, NJ, Anthony P. Mastroianni, Locks Law Firm PLLC, New York, NY, Jeffrey A. Klafter, Jessica Rado, Seth R. Lesser, Klafter Lesser LLP, Rye Brook, NY, for Plaintiff.

Samantha Michelle Schonfeld, James Faust Cullen, Taylor Anvid, New York City Law Department, New York, NY, Mary O'Flynn, Corporation Counsel of the City of New York, New York, NY, for Defendants.

## REPORT AND RECOMMENDATION

Vera M. Scanlon, United States Magistrate Judge:

**\*1** Before the Court is a motion filed by Defendants The City of New York (the "City"), Dermot F. Shea ("Mr. Shea") in his individual capacity, Keechant Sewell ("Ms. Sewell") in her individual capacity, and Edward A. Caban ("Mr. Caban") in his individual capacity (Mr. Shea, Ms. Sewell and Mr. Caban, collectively, the "Commissioners" and, with the City, "Defendants") to dismiss the amended complaint filed by Geoffrey Bowser ("Plaintiff"), individually and on behalf of all others similarly situated. For the reasons discussed below, the Court respectfully recommends that the motion be granted in part and denied in part.

## I. FACTUAL BACKGROUND [1] [2]

Each day, "hundreds of cars are towed in New York City" by the City's Marshals because of unpaid parking tickets or by the NYPD for parking violations. ECF No. 22 ¶ 11.

As to the process used by the City's Marshals in relation to unpaid parking tickets, the boots "contain a keyboard that accepts a code to unlock the boot," with the necessary code being provided for immediate release of the boots after the "vehicle owners ... pay the outstanding parking tickets and the boot fee online or via phone." Id. ¶ 22. The City's Marshals allow forty-eight hours from the time of booting to engage in this boot-release process prior to towing and to provide "a meaningful opportunity to obtain a pre-deprivation hearing." Id. ¶¶ 22, 49.

**\*2** As to the process used by the NYPD in relation to parking violations, on which Plaintiff's claims are based, the process is one in "which the NYPD boots motor vehicles and then by written policy[,] ... within two hours, causes them to be towed to a tow pound ([ ] in the Bronx, in Brooklyn, or in Queens, depending on the location of the motor vehicle at the time the boot is placed." Id. ¶¶ 3, 15. The process "afforded by the NYPD for avoiding a tow and tow fee was designed to collect both a boot fee and a tow fee," as well as "potentially related expenses such as storage," in a "substantial number of, if not virtually all, booting situations." Id. ¶¶ 19, 24.

As to Plaintiff's personal experience, on April 3, 2023, at approximately 7:16 AM, NYPD Officer D. Thomas issued a Notice of Parking Violation (the "Ticket") [3] [4] for Plaintiff's vehicle (the "Vehicle"), which was "parked opposite 395 Cumberland St., Brooklyn, New York." [5] Id. ¶ 12. The Ticket "only referred to the underlying traffic violation and did not provide specific notice of the right to a hearing at which booting or tow fees could be challenged." Id. ¶ 13.

On April 3, 2023, at approximately 7:18 AM, a Warning (the "Warning") was placed on the windshield of the Vehicle, informing Plaintiff (1) that "[t]his vehicle violate[d] the NYC Traffic Rules & Regulations section 4-08," (2) that "[t]he resulting obstruction of traffic cause[d] unnecessary delays," (3) that "this vehicle [was] ... immobilized" pursuant to the same provision, (4) that "[a]ny attempt to move this vehicle may result in damage to the vehicle." Id. ¶¶ 12-13. The Warning instructed Plaintiff to pay $185.00 "at the Brooklyn Tow Pound within TWO (2) HOURS of the boot time listed above" at the address listed above and warned that, if Plaintiff did not do so, his "vehicle w[ould] be towed for an additional fee of $185.00." [6] Id. ¶ 12.

**\*3** Prior to having the opportunity to retrieve the Vehicle or review the Ticket, on April 3, 2023, at approximately 9:55 AM, the Vehicle was towed. Id. ¶ 14. Plaintiff paid $499.80, consisting of a $185.00 boot fee, a $185.00 tow fee, and the remainder for storage fees, for which he was provided a receipt, at the tow pound. See id. ¶¶ 13, 25-26. [7] Plaintiff did not see the Warning because it had been "taken away with the towed" Vehicle. Id. ¶ 15. Plaintiff was not provided with "notice of an ability to challenge the boot or tow fines at a hearing before or after paying the outstanding fees." Id. ¶ 26.

The conduct of the NYPD was "adopted and/or maintained" by the Commissioners "and/or by other agents of the NYPD and/or the City of New York on behalf of New York City" and was "a conscious and calculated choice" that is "routinely carried out by NYPD officers or other agents of the NYPD and/or the City" and "permitted" by the City. Id. ¶¶ 2, 15, 21, 31.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a party to assert the defense of failure to state a claim upon which relief can be granted by motion. Courts addressing motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) must "accept[ ] all factual allegations as true and draw[ ] all reasonable inferences in favor of the" plaintiff. New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo, 122 F.4th 28, 39 (2d Cir. 2023) (citation omitted), reh'g denied, No. 20-1643, 2025 WL 47744 (2d Cir. Jan. 7, 2025). A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Sierra Club v. Con-Strux, LLC, 911 F.3d 85, 88 (2d Cir. 2018) (citation & quotations omitted).

## III. DISCUSSION

The Court first discusses Plaintiff's federal claims then discusses Plaintiff's state claims.

### A. Plaintiff's Federal Claims

The Court first discusses Defendants' contention that the federal claims against the Commissioners should be dismissed for failure to sufficiently allege personal liability then discusses the substance of each of the federal claims.

### 1. Personal Liability Of The Commissioners [8]

**\*4** As a preliminary matter, Defendants seek to dismiss Plaintiff's federal claims, brought pursuant to 42 U.S.C. § 1983, against the Commissioners because, in their view, "the [a]mended [c]omplaint is completely devoid of any specific allegations of wrongdoing by any of the individually-named defendants." ECF No. 33 at 31. Plaintiff opposes this request. See ECF No. 34 at 28.

Plaintiff's allegations as to the Commissioners are as follows: (1) that "[t]his is a putative class action arising out of the illegal conduct on the part of the NYPD, adopted and/or maintained by each successive NYPD Commissioner Defendant, and permitted by the City of New York," ECF No. 22 ¶ 2; (2) that "[t]he NYPD Commissioner Defendants ... were the NYPD Commissioners during the time periods relevant herein, and each was, during their tenure in office as Commissioner, responsible for the booting and towing policies and/or customs of the NYPD at issue here," having "policy-making authority, including, as relevant herein, establishing and/or maintaining the boot-and-tow policy at issue"; (3) that "[t]he Warning placed on Plaintiff's windshield by the NYPC, which was taken away with the towed car, was pursuant to a written NYPD policy in effect at all times relevant hereto adopted and/or maintained by the relevant NYPD Commissioner Defendants, and/or by other agents of the NYPD and/or the City of New York on behalf of New York City," id. ¶ 15; (4) that the "NYPD's policy is a conscious and calculated choice by the NYPD, the City of New York and/or the NYPD Commissioner Defendants, and/or by other agents of the NYPD and/or the City of New York, who, during all relevant time periods hereto, have ignored possible lawful alternatives to enforce New York City's parking regulations without trampling on the Constitutional rights of motor vehicle owners," id. ¶ 21; (5) that "the NYPD Commissioner Defendants, or other agents of the NYPD have adopted and/or maintained a policy which violates two provisions of the New York City Administrative Code, in order to ensure that for each act of booting they will receive both the boot fee and the towing fee and potentially related expenses such as storage," id. ¶ 24; (6) that "[t]he boot-and-tow policy utilized by the NYPD is an official, written policy of the NYPC, authorized or maintained by the NYPD Commissioner Defendants as an agent of New York City, and/or by other agents of the NYPD and/or the City, and routinely carried out by NYPD officers or other agents of the NYPD and/or the City, in the deliberate indifference of the Defendants," id. ¶ 31; and (7) that "the NYPD Commissioner Defendants on behalf of the City of

New York and/or by other agents of the NYPD and/or the City of New York" had "adopted and maintained" the "policy, practice, and custom [of the NYPD] of seizing vehicles[, without warrants,] without judicial process in connection with issuing notices of parking violation," id. ¶¶ 50, 55.

The imposition of individual supervisory liability pursuant to 42 U.S.C. § 1983 requires that each such individual violated the Constitution though his or her own actions. See Tangreti v. Bachmann, 983 F.3d 609, 615-16, 618 (2d Cir. 2020) (deciding the "question[ ] of law" of whether, "following the Supreme Court's decision in Iqbal, the level of personal involvement necessary to establish that a prison supervisory official violated the Eight Amendment through deliberate indifference is not clearly established"; noting that "[t]his court articulated standards for supervisory liability in Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995), but the Supreme Court's decision in Iqbal called those standards into question and this court has not clarified whether or to what extent the Colon standards continue to apply"; interpreting Iqbal as "hold[ing] that a plaintiff may not rely on a special test for supervisory liability" and, instead, "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," with "[t]he factors necessary to establish a [§ 1983 violation] [to] ... vary with the constitutional provision at issue because the elements of different constitutional violations vary" (citations & quotations omitted)).

*5 Plaintiff's repeated use of "and/or" connectors and combining the allegations as to the Commissioners, among others, together, instead of making specific allegations against Mr. Shea, Ms. Sewell and Mr. Caban, runs afoul of Federal Rule of Civil Procedure 8(a). See Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001) (holding that "the district court did not abuse its discretion in dismissing the complaint because, "[a]lthough Fed.[ ]R.[ ]Civ.[ ]P. 8 does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests" such that "lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct ... failed to satisfy this minimum standard" (citations & quotations omitted)); Gigetts v. Cnty. of Suffolk, No. 2:19 Civ. 4885 (DRH) (ST), 2022 WL 1046311, at *3 (E.D.N.Y. Apr. 7, 2022) (reasoning that "[a] complaint that lumps all the defendants together by means of a sweepingly general allegation of wrongdoing does not plausibly allege a claim for

relief against any one defendant and denies each individual defendant fair notice of what the plaintiff alleges that the individual defendant did wrong" (citation & quotations omitted)). As such, this Court respectfully recommends that Plaintiff's federal claims against the Commissioners, which are the only claims that are the subject of this portion of this motion pertaining to the Commissioners, should be dismissed without prejudice, allowing Plaintiff the opportunity to replead these claims with sufficient clarity.

**2. Substance Of The Federal Claims**

The Court discusses each of Plaintiff's claims, pursuant to 42 U.S.C. § 1983, in turn below: first, violation of the right to procedural due process in violation of the Fourteenth Amendment to the U.S. Constitution (the "Fourteenth Amendment"); second, warrantless seizure in violation of the Fourth Amendment to the U.S. Constitution (the "Fourth Amendment"); and, third, excessive fines in violation of the Eighth Amendment to the U.S. Constitution (the "Eighth Amendment"). [9]

**a. Claim For Violation Of The Right To Procedural Due Process In Violation Of The Fourteenth Amendment, Pursuant To 42 U.S.C. § 1983**

The Court discusses the arguments of the parties and its analysis in turn below.

**i. Arguments Of The Parties**

In Defendants' memorandum of law accompanying their moving papers, Defendants' arguments related to procedural due process relate entirely to the opportunity for a hearing and not at all to the right to notice of such a hearing. See ECF No. 33 at 13-21.

In his opposition, Plaintiff contends (1) that "Defendants ... ignore Plaintiff's allegations that none of the information he received apprised him of any [right] ... to challenge the boot or tow fees" [10] and (2) that Defendants "misrepresent the very documents they proclaim provided such notice," as (a) the Ticket "only provides for the ticket fine (in this case $80) [11] to be paid or disputed by the NYC Mobile App" and "advises that a hearing can be requested to challenge the ticket fine," with "no reference on the ticket to paying, challenging or requesting any hearing with regard to booting or towing fees," and as (b) the Warning also failed to provide Plaintiff with

notice of the right to challenge the boot and tow fees. ECF No. 34 at 11-12 (emphasis in original).

In reply, Defendants argue that the notice of the right to a hearing provided to Plaintiff was sufficient, as (1) "the summons he received and paid sets forth the procedure for requesting a hearing before PVB" and as (2) "the underlying parking violation is inextricably intertwined with the related booting and towing fees," such that, "[i]f Plaintiff were to challenge the underlying violation at PVB and [be] found not guilty, the booting and towing fees paid would be refunded to Plaintiff." ECF No. 35 at 6 (citations omitted).

### ii. Analysis [12]

**\*6** The Court respectfully recommends denial of Defendants' motion to dismiss Plaintiff's notice-related procedural due process claim.

The Fourteenth Amendment "provides that [n]o state shall ... deprive any person of ... property, without due process of law." Nnebe v. Daus, 931 F.3d 66, 80 (2d Cir. 2019) (quotations omitted). In conjunction with such a deprivation, the state government taking action must "provide the owner notice and opportunity for hearing appropriate to the nature of the case." Oneida Indian Nation of N.Y. v. Madison Cnty., 665 F.3d 408, 428 (citation & quotations omitted); see Jones v. Flowers, 547 U.S. 220, 226 (2006) (reasoning that, to comport with the procedural due process requirements of the Fourteenth Amendment, a state government must "provide notice reasonably calculated, under all the circumstances, to apprise the interested parties of the pendency of the action and afford them an opportunity to present their objections" (citation & quotations omitted)). [13]

Fundamental to "due process of law is the opportunity to be heard," and "[t]his right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (citation & quotations omitted). Such "notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance." Id. (citations omitted); see Oneida Indian Nation of N.Y., 665 F.3d at 428 (reasoning that notice that complies with due process requirements "must be of such nature as reasonably to convey the required information" and that "[t]he notice provided must afford a reasonable time for those interested to make

their appearance" (citations & quotations omitted)). Inherent in this assessment is a balancing of "the interest of the State against the individual interest sought to be protected by the Fourteenth Amendment." Oneida Indian Nation of N.Y., 665 F.3d at 428-29 (citation & quotations omitted). The constitutional requirements are satisfied if, "with due regard for the practicalities and peculiarities of the case[,] these conditions are reasonably met." Mullane, 339 U.S. at 314. The means for providing such notice "must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." Id. at 314-15.

**\*7** Neither the Ticket nor the Warning that was presented to the Court provided Plaintiff with notice of the right to challenge the boot fees or the tow fees at a hearing.

As to the Ticket, the only reference pertaining to the notice of a right to a hearing on the Ticket is the instructions "to plead not guilty and request a hearing," which instructions only include references to disputing a ticket for a parking violation. ECF No. 32-1 at 3 (capitalization altered) (quotations omitted). The only references on the Ticket to booting and towing are to potential booting and towing as a consequence for failing to respond to the Ticket, which appears to be a reference to the booting and towing process used by the City's Marshals in relation to accumulated past unpaid parking tickets. See ECF No. 32-1 at 2 (stating that "you must answer within 30 days of the date of this ticket" and that, "if you do not respond, penalties and interest will be added and your vehicle may be booted or towed" (capitalization altered)); id. at 3 (stating that "[f]ailure to answer as required shall be deemed an admission of liability," that "[a]dditional penalties will be charged and a default judg[ ]ment may be entered against you," and that "[v]ehicles with outstanding judg[ ]ments may be booted or towed"). The Ticket does not contain any reference to the boot and tow fees assessed against Plaintiff for an alleged recent parking violation. See ECF No. 32-1 at 2-3. The Ticket only refers to the $60.00 fine for the parking violation. See id. at 2 (referring to the "fine amount" of $60.00 (capitalization altered)).

As to the Warning, the Warning does not contain a notice of a right to a hearing. See ECF No. 22 ¶ 12. [14]

The Court rejects Defendants' argument that the Court should construe the notice of the right to a hearing as to the fine for the Ticket as notice of the right to challenge the boot and tow fees at the same hearing. Notice that a person can challenge one particular fee or violation cannot reasonably

be understood to be notice of a right to challenge other fees. The omission of a notice may have very real consequences for the person accused of the violation. An individual, such as Plaintiff, may make the calculus that challenging a $60.00 fine for a ticket may not be worthwhile but may decide, if given notice of the right to a hearing to challenge a $185.00 boot fee, $185.00 tow fee, and/or related storage fees, that engaging in such hearing process would be worthwhile. If notice of the right to a hearing provides the recipient with notice of the right to challenge only some, but not all, of the subject matters at issue, the notice is of no value to the recipient as to the subject matter not included in the notice, such that Defendants' argument is unpersuasive.

### b. Claim For Warrantless Seizure In Violation Of The Fourth Amendment, Pursuant To 42 U.S.C. § 1983

The Court discusses the arguments of the parties and its analysis in turn below.

#### i. Arguments Of The Parties

In their memorandum of law accompanying their moving papers, Defendants contend that "there is no doubt that the NYPD was acting pursuant to its community caretaking functions when it towed [P]laintiff's illegally parked vehicle from a busy street in Brooklyn at 7:18" AM, such that "the NYPD was clearly within its authority to tow the illegally parked vehicle as it was acting pursuant to applicable law and in the interest of public safety." ECF No. 33 at 24-25.

**\*8** In his opposition, Plaintiff argues that Defendants' invocation of the community caretaking exception "is predicated on ignoring and directly controverting paragraphs 20 and 54 of the" amended complaint, ECF No. 34 at 21, which state that "[t]here are no exigent circumstances requiring the towing of a booted vehicle in two hours as there is no safety or traffic concern that would require a towing within two hours because, if there was, the vehicle would have been towed immediately without first booting it," ECF No. 22 ¶ 20, and that "[t]he warrantless seizure of the vehicle performed two hours after the boot is placed is not justified by any 'community caretaking function' as a booted car presents no safety, traffic issues or other exigent circumstances, as[,] had any been the case, the NYPD would have towed the vehicle as soon as possible and not booted it first," id. ¶ 54. Plaintiff also urges the Court to reject Defendants' allegations that Plaintiff was parked on a busy and highly trafficked street during rush hour. See ECF No. 34 at 21.

In their reply, Defendants assert that the factual allegations in the amended complaint referenced by Plaintiff are "false," in view of the "obvious safety risks and traffic concerns." ECF No. 35 at 11. Defendants also argue that "overwhelming amounts of case law in this [C]ircuit supports [sic] the NYPD's ability to remove vehicles from the streets in the interest of public safety and to keep traffic moving in an already crowded City." Id. at 12 (citations omitted).

#### ii. Analysis

The Court respectfully recommends denial of Defendants' motion to dismiss Plaintiff's Fourth Amendment claim.

The Fourth Amendment provides "that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Collins v. Virginia, 584 U.S. 586, 591 (2018) (quotations omitted). The Fourth Amendment therefore "prohibits only unreasonable searches and seizures," with "[t]he relevant test" not being "the reasonableness of the opportunity to procure a warrant" but rather "the reasonableness of the seizure under all the circumstances." South Dakota v. Opperman, 428 U.S. 364, 372-73 (1976) (emphasis in original) (citation & quotations omitted); see U.S. v. Lyle, 919 F.3d 716, 730-31 (2d Cir. 2019) (noting that "[t]he Supreme Court has repeatedly held that the touchstone of the Fourth Amendment is reasonableness, which[,] in turn, is measured in objective terms by examining the totality of the circumstances" (citations & quotations omitted)). Such test "cannot be fixed by per se rules; each case must be decided on its own facts." Opperman, 428 U.S. at 373 (citation & quotations omitted).

Vehicles "are 'effects' and [are] thus within the reach of the Fourth Amendment." Id. at 367 (citation omitted). As such, "whether a decision to impound is reasonable under the Fourth Amendment is based on all the facts and circumstances of a given case." Lyle, 919 F.3d at 731 (citation & quotations omitted). Although not necessary, "the existence of and an officer's adherence to a standardized criteria may be helpful in evaluating the reasonableness of an impoundment." Id. Nonetheless, "[i]n the interests of public safety and as part of what the Court has called 'community caretaking functions,' automobiles are frequently taken into police custody." Opperman, 428 U.S. at 368 (citation omitted). One reason for police to "remove and impound automobiles" is to do so when they "violate parking ordinances and ... thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from

the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." Id. at 368-69 (footnote omitted); see Lyle, 919 F.3d at 728 (stating that "[i]t is well established that police have the authority, despite the absence of a warrant, to seize and remove from the streets automobiles in the interests of public safety and as part of their community caretaking functions – an authority that is beyond reasonable challenge" (citation omitted)). The court must evaluate the reasonableness of the exercise of authority under the community caretaking function. Miranda v. City of Cornelius, 429 F.3d 858, 864 (9th Cir. 2005) (citation omitted).

**\*9** Determining the reasonableness of the seizure of the Vehicle at this juncture and based on the amended complaint would be inappropriate and premature. See Owens v. Fitzgerald, No. 23 Civ. 1280, 2024 WL 2315335, at \*1-2 (D. Conn. May 22, 2024) (assessing the reasonableness of the impoundment pursuant to the community caretaking function on a motion for summary judgment (citation omitted)). The Court lacks the necessary information to make the required case-specific reasonableness determination. Most importantly, and despite Defendants' assertions to the contrary, see supra, n.5, the amended complaint does not allege whether the Vehicle was, in fact, parked in an impermissible place and in violation of applicable parking laws or whether Plaintiff paid the Ticket and admitted to such a violation. For example, the Court may be called upon to consider the reasonableness of the seizure effectuated by the booting policy when, even by Defendants' own terms, the removal of the Vehicle from its allegedly unlawful and dangerous location would not occur for at least two hours after the Ticket was first left on the Vehicle. See Miranda, 429 F.3d at 964 (citation omitted); U.S. v. Duguay, No. 95 Crim. 1768, 93 F.3d 346, 353-54 (7th Cir. 1996) (citations omitted). This raises the question of whether the booting advances the alleged caretaking, safety and traffic concerns. The cases cited by Defendants relate to circumstances in which a vehicle is moved by towing, not where movement is purposefully prevented by booting or another mechanism before towing. See generally Opperman, 428 U.S. at 365-66 (describing the issuance of two tickets to an illegally parked vehicle, approximately seven hours apart, and the subsequent towing of the vehicle); Santander Consumer USA, Inc. v. Port Auth. of N.Y. & N.J., No. 20 Civ. 1997 (MKB) & No. 20 Civ. 1998 (MKB), 2022 WL 3099239, at \*1-2 (E.D.N.Y. Aug. 4, 2022) (describing the towing of four vehicles deemed abandoned by the Port Authority Police Department (citations omitted)); U.S. v. Colon, No. 10 Crim. 498 (RPP), 2011 WL 569874,

at \*14 (S.D.N.Y. Feb. 8, 2011) (noting the impoundment of a vehicle following an arrest (citation omitted)); U.S. v. Barrios, No. 7 Crim. 658 (DLC), 2007 WL 3256945, at \*2 (S.D.N.Y. Nov. 1, 2007) (noting the impoundment of a vehicle following an arrest), aff'd, 374 F. App'x 56 (2d Cir. 2010); Rackley v. City of N.Y., 186 F. Supp. 2d 466, 468 (S.D.N.Y. 2002) (describing the seizure of a vehicle in two separate instances to satisfy multiple default judgments for alleged failure to pay fines and penalties arising from violations of parking rules and regulations (citation omitted)). If the Vehicle were permissibly parked when booted and towed, seizing and impounding the Vehicle, without another justification, may have been unreasonable.

### c. Claim For Excessive Fines In Violation Of The Eighth Amendment, Pursuant To 42 U.S.C. § 1983

The Court discusses the arguments of the parties and its analysis in turn below.

### i. Arguments Of The Parties

In their memorandum of law accompanying their moving papers, Defendants "[a]ssum[e] arguendo that the two fees paid by [P]laintiff (totaling $370 combined) were at least partly punitive." ECF No. 33 at 26. Defendants then assert (1) that, "[w]hether or not [P]laintiff views his own offense as minor, [P]laintiff acknowledges that the City tows 'hundreds of cars' every day and that many of those are for 'parking violations' "; (2) that "Plaintiff fits squarely within the class of people for whom 34 RCNY § 4-08(d) was principally designed," namely "those who are illegally parked"; (3) that "Defendants have no discretion to issue a lesser fine than what is set by [R]ule," namely $185.00 for booting and $185.00 for towing; and (4) that "[a] person remaining illegally parked causes harm to the City" in the form of increased congestion, blocking traffic, and undermining compliance with laws. Id. at 26-28 (citations omitted).

In his opposition, Plaintiff contends that Defendants' arguments "ignore the gravamen of Plaintiffs' [sic] Eighth Amendment Claim – that there is no reasonable opportunity to avoid paying both a boot and tow fee." ECF No. 34 at 22. Plaintiff also argues, without citation, that "determination of what is 'grossly disproportionate' is plainly a matter not determinable on a motion to dismiss." Id. The Court rejects this argument. See, e.g., Lewis v. City of New York, No. 24 Civ. 2336 (AT) (RWL), 2025 WL 50291 (S.D.N.Y. Jan. 8, 2025); Beatty v. Gilman, 718 F. Supp. 3d 166 (D. Conn. 2024).

Plaintiff also contends (1) that Defendants "erroneously try to relate the two $185 fees to the underlying parking violation; (2) that, as to Plaintiff's culpability, the applicable provision for the parking violation "does not specify the mere two-hour window in which a booted vehicle owner has to find out what has happened to his vehicle and then make it to the correct tow pound within two hours to avoid a tow and resulting tow fee"; (3) that application of predetermined, codified fees does not render such application "appropriate" and that the codified provisions do "not say anything about or specify the mere two-hour window"; and (4) that Plaintiff was not a "frequent violator[ ]," minimizing harm to the City. Id. at 22-24 (citation omitted).

**\*10**  In their reply, Defendants assert that Plaintiff could have avoided the imposition of the tow fee by either "not violating the law in the first place" or "by paying a booting fee of $185 ... at the Brooklyn Tow Pound within two (2) hours of the boot time listed on the Warning." ECF No. 35 at 13 (citation & quotations omitted). Defendants also reiterate arguments made in their moving papers. See id. at 13-14.

**ii. Analysis**

The Court respectfully recommends that Defendants' motion to dismiss Plaintiff's claim for excessive fines in violation of the Eighth Amendment be denied.

The Excessive Fines Clause in the Eighth Amendment "guards against abuses of government's punitive or criminal-law-enforcement authority and limit[s] the ability of the sovereign to use its prosecutorial power, including the power to collect fines, for improper ends." Reese v. Triborough Bridge and Tunnel Auth., 91 F.4th 582, 589 (2d Cir. 2024) (citations & quotations omitted). Assessing a claim for excessive fines is "a two-step inquiry." U.S. v. Viloski, 814 F.3d 104, 108 (2d Cir. 2016). First, a court must "determine whether the Excessive Fines Clause applies at all," id. at 109 (citation omitted), as "[t]he Excessive Fines Clause applies only to protect against 'punitive,' rather than 'remedial,' payments to the government." Reese, 91 F.4th at 589 n.2 (citation omitted). Punitive fines, of which a fine must be at least in part for the Excessive Fines Clause to apply, are "forfeitures for which a defendant is personally liable," whereas remedial fines are "those in rem forfeitures intended not to punish the defendant but to compensate the Government for a loss or to restore property to its rightful owner." Viloski, 814 F.3d at 109 (citations omitted). Second, if the response to the first question is affirmative, the court

must "proceed to the second step and determine whether the challenged forfeiture is unconstitutionally excessive," meaning that "it is grossly disproportional to the gravity of a defendant's offense." Viloski, 814 F.3d at 109-10 (citations & quotations omitted). Making such a determination requires an analysis of four factors:

> (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

Id. at 110 (citation & quotations omitted). A fifth factor that may be considered is "whether the forfeiture would deprive the defendant of his livelihood." Id. at 111 (footnote & citation omitted).

**(a) First Question**

As to the first question as to the applicability of the Excessive Fines Clause, Defendants do not contest its applicability, at least for purposes of this motion. As such, the Court assumes, without deciding, that the Excessive Fines Clause applies to the circumstances of this case for purposes of this motion. [15]

**(b) Second Question**

**\*11**  As to the second question, an analysis of the factors leads to the conclusion that the challenged booting and towing fees may be grossly disproportionate to the gravity of Plaintiff's alleged offense.

As to the first factor, namely "the essence of the crime of the defendant and its relation to other criminal activity," Viloski, 814 F.3d at 110 (citation & quotations omitted), Plaintiff allegedly engaged in a parking violation for at least two hours and thirty-nine minutes, having been issued the Ticket at 7:16 AM on April 3, 2023, see ECF No. 22 ¶ 12, and having had the Vehicle towed at 9:55 AM on April 3, 2023, see id. ¶ 14. A "negligent or reckless parking violation [itself] may not entail a great degree of moral culpability." Tsinberg v. City of N.Y.,

No. 20 Civ. 749 (PAE), 2021 WL 1146492, at *8 (S.D.N.Y. Mar. 15, 2021).

As to the second factor, namely "whether the defendant fits into the class of persons for whom the statute was principally designed," Viloski, 814 F.3d at 110 (citation & quotations omitted), Plaintiff is plainly within the class of persons that the City's parking laws are designed to address, which is persons who allegedly violate the City's parking laws.

As to the third factor, namely "the maximum sentence and fine that could have been imposed," Viloski, 814 F.3d at 110 (citation & quotations omitted), 34 NYCRR § 4-08 does not provide discretion with regard to booting and towing fees and storage fees, as 34 NYCRR § 4-08(9)(iii) and 34 NYCRR § 4-08(9)(vi)(A) each provide for a fee of $185.00 for booting and towing, respectively, and as 34 NYCRR § 4-08(9)(vii) provides for a fee of $20.00 per day for vehicle storage, up to and including the date of release. Nonetheless, some degree of discretion necessarily lies with the NYPD officers who decide how to enforce alleged parking violations. Here, the booting fee, for $185.00, was applied only two minutes after the Ticket for $60.00 was issued, see ECF No. 22 ¶¶ 12-13, such that the initial cost of the alleged parking violation was effectively converted from $60.00, with such fine being prescribed by 19 NYCRR § 39-05, to $245.00; this conversion implicates the "[j]udgments about the appropriate punishment for an offense," which "belong in the first instance to the legislature." Oles v. City of N.Y., No. 21 Civ. 9393 (LGS), 2022 WL 1808905, at *8 (S.D.N.Y. June 2, 2022) (citation & quotations omitted), aff'd, No. 22 Civ. 1620, 2023 WL 3263620 (2d Cir. May 5, 2023). With the addition of towing fees, the cost of the alleged parking violation becomes $430.00. storage fees are on top of these costs.

As to the fourth factor, namely "the nature of the harm caused by the defendant's conduct," Viloski, 814 F.3d at 110 (citation & quotations omitted), prolonged illegal parking harms the City in its management of congestion and traffic flow.

Finally, Plaintiff has not invoked the potential fifth factor, namely "whether the forfeiture would deprive the defendant of his livelihood." Id. at 111 (footnote & citation omitted).

On balance, application of the aforementioned factors leads to the conclusion that such booting and towing fees may be grossly disproportionate to the gravity of the offense alleged. Plaintiff adequately pleaded that the NYPD's policy

for addressing parking violations at issue is such that the "NYPD boots motor vehicles and then by written policy[,] ... within two hours, causes them to be towed to a tow pound ([ ] in the Bronx, in Brooklyn, or in Queens, depending on the location of the motor vehicle at the time the boot is placed," with such process being "designed to collect both a boot fee and a tow fee," as well as "potentially related expenses such as storage," in a "substantial number of, if not virtually all, booting situations." ECF No. 22 ¶¶ 3, 15, 19, 24. See Farina v. Met. Trans. Auth., 409 F. Supp. 3d 173, 202-03 (S.D.N.Y. 2019) (reasoning that, "[a]t the motion to dismiss stage, the [defendant] ... has not had a full opportunity to detail the nature and magnitude of the harm caused by an E-Z Pass enrollee who ahs failed to replenish her account or update her credit card," with "[p]romoting deterrence, minimizing administrative expenses and obtaining reimbursement from those who increase expenses [being] ..., in the abstract, worthy goals," and holding that, "at the pleading stage and without the benefit of discovery, the Court is unable to conclude as a matter of law that fines of $1,305 are not grossly disproportional to the underlying offense (footnote omitted)); but see Tsinberg, 2021 WL 1146942, at *9 (reasoning that, "as to the booting, towing, and storage fees associated with the [v]ehicle – including the mandatory $20 daily storage fee that has been amassing since January 2019 as a result of Tsinberg's refusal to pay his debts to the City – Tsinberg fails to explain, except in conclusory terms, why those essential compensatory fees are unconstitutional," whereas, here, Defendants have accepted, for purposes of this motion, that the fees are at least partially punitive, and Plaintiff has explained in the amended complaint why the policy supporting the combination of fees, rather than the each individual fee, is unconstitutional). On the limited record here, on a motion to dismiss, the Court cannot conclude that the monies assessed are reasonable fees rather than excessive fees. In alleging that the NYPD's policy is designed to collect the amount of the ticket, a booting fee, a towing fee and storage fees, where either the amount of the ticket and a booting fee or the amount of the ticket, a towing fee and storage fees could be appropriate, Plaintiff sufficiently pleads that the combination of such fines is grossly disproportionate to a single parking violation.

### B. Plaintiff's New York Claims

**\*12** The Court first addresses Plaintiff's state law claims then addresses Plaintiff's local law claims.

### 1. State Law Claims

The Court first addresses Plaintiff's claim for violation of Article I § 12 of the New York State Constitution then addresses Plaintiff's claim for unjust enrichment.

### a. Claim For Violation Of Article I § 12 Of The New York State Constitution

The only basis upon which Defendants seek to dismiss Plaintiff's claim for violation of Article I § 12 of the New York Constitution is that "[P]laintiff's federal claims fail" and that, as a result, the Court "should decline to exercise supplemental jurisdiction." ECF No. 33 at 29. Given that the Court recommends denial of Defendants' motion as to Plaintiff's federal claims, the Court rejects this argument and respectfully recommends denial of Defendants' motion as to this claim.

The protections afforded by Article I § 12 of the New York State Constitution to be free from unreasonable searches and seizures are broader than those afforded by the Fourth Amendment, see, e.g., Airbnb, Inc. v. City of N.Y., 373 F. Supp. 3d 467, 480, 480 n.5 (S.D.N.Y. 2019) (describing the two constitutional provisions as "largely parallel" but noting that "[c]ourts have held that this provision of the New York Constitution affords greater protection against warrantless searches than the U.S. Constitution" (citation & quotations omitted)), such that, given that the Court recommends that the motion to dismiss the Fourth Amendment claim be denied, the Court also recommends that the motion to dismiss this claim be denied. [16]

### b. Claim For Unjust Enrichment [17]

The only basis upon which Defendants seek to dismiss Plaintiff's claim for unjust enrichment is that "[P]laintiff's federal claims fail" and that, as a result, the Court "should decline to exercise supplemental jurisdiction." ECF No. 33 at 29. Given that the Court recommends denial of Defendants' motion as to Plaintiff's federal claims, the Court rejects this argument and respectfully recommends denial of Defendants' motion as to this claim.

### 2. Local Law Claims

The Court first addresses Plaintiff's claim for violation of New York City Administrative Code § 19-169.2(h) then addresses Plaintiff's claim for violation of the Rules of the City of New York, Title 34, § 4-08(9)(v).

### a. Claim For Violation Of New York City Administrative Code § 19-169.2(h)

The Court respectfully recommends that Defendants' motion to dismiss Plaintiff's claim for violation of New York City Administrative Code § 19-169.2(h), on consent. See supra, n.1.

### b. Claim For Violation Of The Rules Of The City Of New York, Title 34, § 4-08(9)(v)

**\*13** The Court discusses the arguments of the parties and its analysis in turn below.

### i. Arguments Of The Parties

In their memorandum of law accompanying their moving papers, Defendants contend that "[D]efendants do provide individuals with an opportunity to challenge a parking violation and any underlying booting or towing fees at PVB" and that "the law does not require that the City provide a pre-deprivation hearing in impractical situations such as this, so long as there is meaningful post[-]deprivation process, which there is." ECF No. 33 at 30-31.

In his opposition, Plaintiff argues that "Defendants cannot pick and choose ... which provisions of 34 RCNY § 4-08(9) they have to comply[,] ... including subsection (9)(v), which guarantees the right to an immediate hearing to the owner of a booted vehicle." ECF No. 34 at 27.

Defendants do not make any related arguments in their reply.

### ii Analysis

34 NYCRR § 4-08(9)(v) provides that "[t]he registrant, title holder or operator of any vehicle that has been immobilized shall have the right to an immediate hearing during regular business hours at the Parking Violations Bureau in relation to the immobilization."

The Court respectfully recommends that Defendants' motion to dismiss Plaintiff's claim for violation of 34 NYCRR § 4-08(9)(v) be denied.

The Vehicle was towed before an immediate hearing could be held as to the immobilization or the booting. See ECF No. 22 ¶¶ 12-15. From the amended complaint, it appears that the City does not have a structure available within which to conduct these immediate hearings, and it does not

give any notice of this hearing right to those accused of parking violations. The Court rejects Defendants' argument as to the absence of a requirement for an immediate hearing and the legal sufficiency of a meaningful post-deprivation process, as Defendants appear to conflate the procedural due process requirements with the requirements of this provision of local law clearly entitling to individuals such as Plaintiff to an immediate hearing during business hours related to the booting.

Plaintiff alleges that he was not provided with "notice of an ability to challenge the boot or tow fines at a hearing before or after paying the outstanding fees," id. ¶ 26, let alone an immediate hearing, such that the City does not appear to have made available in such a hearing process and was denied a hearing under this provision of the City Code.

## IV. CONCLUSION

For the reasons discussed above, the Court respectfully recommends that the motion be granted in part and denied in part, as discussed more specifically herein: granted as to the injunctive relief, granted as to the federal claims asserted against the Commissioners with leave to replead as to the damages claim, denied as to the Fourteenth Amendment claim, denied as to the Fourth Amendment claim, denied as to the Eighth Amendment claim, denied as to the New York State Constitution Claim, denied as to the unjust enrichment claim, granted as to the New York City Administrative Code claim,

and denied as to the Rules of the City of New York claim. The Court further respectfully recommends that Plaintiff be given leave to replead to remedy the deficiencies addressed herein, except as to the New York City Administrative Code claim, which Plaintiff has abandoned.

## V. OBJECTIONS

**\*14**  Any written objections to this report and recommendation must be filed with the Clerk of the Court within fourteen days of service. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file objections within fourteen days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. See Miller v. Brightstar Asia, Ltd., 43 F.4th 112, 120 (2d Cir. 2022) (reasoning that, "although Rule 72 applies only to the district court's review of a report and recommendation, this court has adopted the rule that when a party fails to object timely to a magistrate's recommended decision, it waives any right to further review of that decision" (citation & quotations omitted)). Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen-day period for filing objections.

## All Citations

Slip Copy, 2025 WL 1707174

---

## Footnotes

1    The facts recited herein are drawn directly from the amended complaint and are assumed to be true for purposes of this motion. Plaintiff states that, "except for the facts specifically alleged regarding Plaintiff," the allegations are made on information and belief. ECF No. 22 ¶ 1.

The Court has not included in its factual recitation Plaintiff's allegations that amount to legal conclusions.

The Court has also not included in its factual recitation any hypothetical situations raised by Plaintiff. See, e.g., ECF No. 22 ¶ 19 (referring to a hypothetical vehicle owner whose vehicle is "booted" on West 58th Street, who must then travel to the tow pound in Brooklyn, wait on long lines, and pay the boot fee within two hours to resolve the violation and avoid towing).

The Court has not included Plaintiff's allegations related to the first claim in the amended complaint asserted pursuant to New York City Administrative Code § 19-169.2(h), as Plaintiff has abandoned that claim. See ECF No. 34 at 9 n.2 (stating that, "[u]pon consideration of the authorities set forth in Defendants' memorandum,

Plaintiff does not challenge their motion to dismiss his First Cause of Action for violation of New York Administrative Code § 19-169.2(h)"). As such, the Court respectfully recommends dismissal thereof.

2    Defendants include a section entitled "Applicable Law and Rules," which cites to a City website and a sample parking ticket, as opposed to applicable law, in their memorandum of law accompanying their moving papers. See ECF No. 33 at 11-12. Information from and citations to this extrinsic material are peppered elsewhere throughout Defendants' memorandum of law. Defendants have not provided the Court with a legal basis to support consideration of this extrinsic material at this juncture, and, as such, the Court has not considered this extrinsic material in issuing this report and recommendation. Defendants' subsequent citations to legal provisions relating to appeals of hearing determinations, see id. at 14, are not cited as they are not relevant, as at issue is an initial hearing, rather than the process to appeal any adverse decision reached at such hearing.

3    Defendants include a copy of the Ticket with their moving papers, see generally ECF No. 32-1, which the Court may consider, as the Ticket is integral to the amended complaint and is referenced and relied upon therein. See Lively v. WAFRA Invest. Advisory Grp., 6 F.4th 293, 305 (2d Cir. 2021) (reciting the general rule that "courts may on a Rule 12(c) motion – just as on a Rule 12(b)(6) motion – consider extrinsic material that the complaint incorporate[s] by reference, that is integral to the complaint, or of which courts can take judicial notice" (citation & quotations omitted)).

4    The Ticket, entitled "Notice of Parking Violation," provides information about the Vehicle, cites the violation of "NYC Traffic Rules, Section: 4-08(d)," notes the place of the violation, lists the date and time of the violation, provides for a fine of $60.00, contains the name of the officer issuing the Ticket and the signature of the officer who issued the Ticket indicating that he observed the violation and properly served the Ticket, states that the recipient of the Ticket must answer it within thirty days, provides instructions for pleading guilty to the violation and paying the Ticket or pleading not guilty to the violation and requesting a hearing, and warns the recipient of the consequences of failure to respond to the Ticket, namely that failure to respond will be deemed an admission of liability, that penalties and interest will be added to the Ticket amount, that a default judgment may be entered, and that booting or towing may occur.

5    Defendants' memorandum of law and reply state in various places, either without citation, with citation generally to the entirety of the amended complaint, or with citation to inapplicable portions of the amended complaint, that "Plaintiff does not dispute that he violated the City's parking laws." ECF No. 33 at 9, 12, 17; ECF No. 35 at 5 n.1. The Court's review of the amended complaint has not revealed any concession by Plaintiff that he violated one or more parking laws or that he paid the Ticket.

6    The Court notes that the Warning provided by Plaintiff in the amended complaint appears to be incomplete, as the portion of the Warning contained therein does not list the boot time or the address for the tow pound. See ECF No. 22 ¶ 12.

7    The Court is uncertain as to how the addition of $185.00 each for booting and towing, pursuant to 34 NYCRR § 4-08(9)(iii) and 34 NYCRR § 4-08(9)(vi)(A), respectively, and $20.00 daily increments for storage fees, pursuant to 34 NYCRR § 4-08(9)(vii), can be added to achieve the sum of $499.80. Neither side explained the arithmetic of Plaintiff's situation.

8    The Court notes that, "[i]n an official capacity suit, the real party in interest is the governmental entity and not the named official," whereas, "[b]y contrast, individual capacity suits seek to impose individual liability upon a government officer for [her] actions under color of [ ] law." Tanvir v. Tanzin, 894 F.3d 449, 458-59 (2d Cir. 2018) (citations & quotations omitted), aff'd, 592 U.S. 43 (2020). Claims "against officers in their official capacity ... are directed at the office itself" and "generally seek injunctive relief," whereas claims "against

public officers [in their individual capacities] that seek damages are directed at the particular officer whose allegedly unlawful actions are claimed to have caused damage to plaintiffs." Id. at 459 n.7 (citation omitted).

Here, Plaintiff named the Commissioners only in their individual capacities, and not in their official capacities, such that he may only seek relief in the form of damages, as opposed to injunctive relief, from the Commissioners. Accordingly, to the extent that Plaintiff seeks injunctive relief from the Commissioners, the Court respectfully recommends the denial of such request.

9    Given that the Court recommends denial of Defendants' motion as to each of Plaintiff's federal claims, the Court rejects Defendants' argument that "there can be no Monell liability" because "there is no underlying constitutional violation herein." ECF No. 33 at 28 (citations omitted).

10   The Court understands Plaintiff's claims about boot and tow fees to include a challenge to storage fees as well.

11   This number may be an error, as the Ticket lists the fine as $60.00. See ECF No. 32-1 at 2.

12   Plaintiff's opposition clarifies that he is asserting only a notice-related procedural due process claim and not a hearing-related due process claim. See ECF No. 34 at 7 (stating that "Defendants attempt to avoid the heart of this case by parading decisions addressing incomparable government action" and that "[t]he critical difference is that, here, it is alleged the government provided no notice – either pre-or post-deprivation (towing) – thereby violating due process (emphasis in original)); id. at 12-13 (arguing that "parking violation procedures and the New York judicial system can have no application here in this case where Defendants provided no notice that they can be invoked to challenge a boot or tow fee," rendering "the decisions on which Defendants rely inapposite"); id. at 14, 19 (urging the Court that "[i]t is ... unnecessary for this Court to go through the Mathews balancing factors in these circumstances" and taking the position that "Mathews is not implicated"); Dusenbery v. U.S., 534 U.S. 161, 167-68 (2002) (reasoning that the Mullane reasonableness test should be used "when confronted with questions regarding the adequacy of the method used to give notice" and that the Mathews balancing test should be used to address the adequacy of hearing procedures (citations omitted)).

Fourth Amendment rights are also affected by the nature of Plaintiff's interest. See Santander Consumer USA, Inc. v. Cnty. of Nassau, 623 F. Supp. 3d 6, 16 (E.D.N.Y. 2023) (noting that, "[i]mmobilizing and towing the car interfered with the property interests of anyone with a present possessory interest in the car," such that "the registered owner with a present possessory interest in the car when it was booted and towed ... could potentially assert a due process claim challenging the constitutionality of the defendant's pre-seizure policies (citation omitted)). The Court notes that neither side addresses the question of whether the Court need consider both the Fourth Amendment claim and the Fourteenth Amendment claim, an issue that turns in part on Plaintiff's interest in the Vehicle. On this motion to dismiss, the Court addresses both claims but notes that this may become a significant point as the record develops. Compare Santander Consumer USA, 623 F Supp. 3d at 21 (declining to "decide whether the Boot and Tow Policy violates the plaintiff's Fourth Amendment rights," in view of the conclusion "that the defendant violated the plaintiff's due process rights"), with Santander Consumer USA, Inc. v. Port Auth. of N.Y. & N.J., No. 20 Civ. 1997 (MKB) & No. 20 Civ 1998 (MKB), 2023 WL 12028907, at *5-6 (E.D.N.Y. Dec. 4, 2023) (applying a Fourth Amendment analysis).

13   The necessary antecedent to either a claim that notice of a hearing in relation to a deprivation of property by a state government was not provided or that an appropriate hearing in relation to a deprivation of property by a state government was not provided is, of course, a determination that the state government deprived the complaining party of property. See Nnebe, 931 F.3d at 80 (stating that, with respect to a procedural due process claim pursuant to 42 U.S.C. § 1983, "a court must first determine whether a property interest is implicated, and then, if it is, determine what process is due before the plaintiff may be deprived of that interest" (citation omitted)). In the amended complaint, Plaintiff refers to the Vehicle as "his." See, e.g., ECF

No. 22 ¶ 12 (referring to "Plaintiff Geoffrey Browser's [sic] motor vehicle"); id. ¶ 14 (referring to "Plaintiff's car"); id. ¶ 26 (referring to "his vehicle"). Unclear to the Court from the amended complaint is whether Plaintiff owned the Vehicle, leased the Vehicle, or had another interest in the Vehicle, but neither Plaintiff nor Defendants disputes that Plaintiff had a property interest in the Vehicle sufficient to trigger procedural due process protections or that the Vehicle was booted and towed by the NYPD. As such, the Court accepts the parties' positions.

The Court notes that, in his opposition to the motion, which cannot serve to amend the amended complaint, Plaintiff confirms his property interest in the Vehicle by referring to himself as the owner thereof. See ECF No. 34 at 15 n.6 (describing Plaintiff as "the actual vehicle owner").

14    The Court reiterates that the Warning provided by Plaintiff in the amended complaint appears to be incomplete. See supra, n.5.

15    The Second Circuit has yet to resolve whether the Excessive Fines Clause applies to the circumstances of this case. See Torres v. City of N.Y., 590 F. Supp. 3d 610, 627 n.7 (S.D.N.Y. 2022) (noting that "some courts have determined that the Clause applies to municipal traffic and parking fines" but that "[t]he Second Circuit has yet to resolve this question" (citations omitted)). The Court has doubts as to its applicability here, in that the monies addressed may be fees, not fines, in view of the "Statement of Basis and Purpose in City Record," dated October 22, 2002, in relation to 34 NYCRR § 4-08:

> These rules set forth amendments to existing New York City Department of Transportation rules to raise the fees charged for illegally parked vehicles which are immobilized, towed, stored, and released, and to add new fees for towing or releasing heavy duty vehicles.

> The immobilization (booting) fee would increase from $75 to $185. Regular towing fees would be raised from $150 to $185. The storage fee would increase from $15 to $20. The vehicle release fee would increase from $75 to $100. Two new fees would be added, heavy duty towing and heavy duty release, at $370 and $200 respectively.

> In order to ensure that roadways and traffic lanes are open for efficient traffic flow, and especially to ensure that emergency vehicles such as fire engines, police vehicles and ambulances have swift and unobstructed movement through city streets to sites of emergencies, the City of New York maintains a Violation Tow Program to deter illegal parking and to remove illegally parked vehicles. The fees charged to persons who violate the parking rules were last fixed in 1989 and consequently do not reflect increased personnel and office equipment/space costs. Therefore, at present, the public and not the violator pays the difference between what the fees bring in and what is needed to pay for the program. The fee increases are based on User Service Cost Analyses of the New York City Office of Management and Budget to ensure that the fees charged are commensurate with the administrative costs needed to run the program. The two new fees for[ ]heavy duty towing and heavy duty release reflect the additional expense of utilizing heavier towing equipment, requiring more highly trained and qualified personnel, and the need for more space at the tow pound to store heavy or large vehicles and trucks.

16    Some analysis suggests that a plaintiff cannot bring a Section 1983 claim and another claim, the subject matter of which is the same. See, e.g., Talarico v. Port Auth. of N.Y. & N.J., 367 F. Supp. 3d 161, 171 (S.D.N.Y. 2019) (stating that "[d]istrict courts in this circuit have consistently held that there is no private right of action under the New York State Constitution where, as here, remedies are available under [Section] 1983" (citation & quotations omitted)). This argument was not raised here.

17    The Court notes that Plaintiff asserts this claim only against the City. See ECF No. 22 ¶ 67.

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Decastro v. City of New York, Not Reported in Fed. Supp. (2019)**

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 27 of 63

2019 WL 4509027
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Angel DECASTRO, Susan Calvo, and
Kelly Macon, individually and on behalf
of all others similarly situated, Plaintiffs,
v.
The CITY OF NEW YORK, and the New York
City Taxi and Limousine Commission, Defendants.

No. 16-CV-3850 (RA)
|
Signed 09/19/2019

**Attorneys and Law Firms**

Jonathan Andrew Harris, Joseph Terence Gallagher, Yonaton Aronoff, Andrew M. St. Laurent, Harris, O'Brien, St. Laurent & Chaudhry LLP, Daniel Lee Ackman, New York, NY, for Plaintiffs Angel DeCastro, Susan Calvo.

Joseph Terence Gallagher, Yonaton Aronoff, Andrew M. St. Laurent, Harris St. Laurent LLP, Daniel Lee Ackman, New York, NY, for Plaintiffs Michael Walker, Yong Zhang.

Andrew M. St. Laurent, Harris St. Laurent LLP, New York, NY, for Plaintiff Iosif Mullaev.

Jonathan Andrew Harris, Joseph Terence Gallagher, Andrew M. St. Laurent, Harris, O'Brien, St. Laurent & Chaudhry LLP, New York, NY, for Plaintiff Kelly Macon.

Karen Beth Selvin, Angelie Thomas, New York City Law Department, New York, NY, for Defendants.

OPINION & ORDER

Ronnie Abrams, United States District Judge:

**\*1** Plaintiffs Angel DeCastro, Susan Calvo, and Kelly Macon brought this action against the City of New York and its Taxi and Limousine Commission (together, "the City") alleging that the City's enforcement of its regulations regarding the operation of vehicles for hire violated their constitutional rights. Plaintiffs were previously granted summary judgment on their claims that the City's practice of seizing vehicles belonging to certain groups of vehicle owners, on suspicion that the vehicles were being operated for

hire without a license, was unconstitutional. Now before the Court is Plaintiffs' motion to certify this case as a class action. For the following reasons, the motion is denied.

**BACKGROUND**

This case's factual background was recounted in detail in the Court's prior decision granting in part and denying part the parties' cross-motions for summary judgment. *See DeCastro v. City of New York*, 278 F. Supp. 3d 753, 756–63 (S.D.N.Y. 2017) ("*DeCastro I*"). Familiarity with that opinion is assumed. Only those facts that are relevant to resolving the instant motion are set forth in this section.

**I. Regulatory Background**

Central to this case are regulations promulgated by the New York City Taxi and Limousine Commission ("TLC") governing the use of vehicles "for hire" in New York City. *See* N.Y.C. Admin. Code §§ 19-506(b), (h). Section 19-506(b)(1) makes it a violation to knowingly operate or allow another to operate "for hire any vehicle as a taxicab, coach ... or for-hire vehicle in the city, without first having obtained or knowing that another has obtained a license for such vehicle[.]" Section 19-506(b)(2) makes it a violation to knowingly operate or allow another to operate "any vehicle licensed as a taxicab ... or for-hire vehicle in the city in a manner that is beyond the scope of the activities permitted by such vehicle's license[.]" These provisions respectively impose fines, imprisonment, or both, on those found guilty of violating them "upon conviction in criminal court." *See* N.Y.C. Admin. Code § 19-506(b). Section 19-506(e)(1), however, provides for civil penalties "[i]n addition to or as an alternative to the penalties provided for the violation of [§ 19-506(b)(1)]." Section 19-506(e)(2) provides for civil penalties solely "[a]s an alternative to the penalties provided for the violation of [19-506(b)(2)]."

The regulations set forth additional mechanisms to enforce § 19-506(b). As is relevant here, any officer or designated TLC employee may seize a vehicle "which he or she has probable cause to believe is operated ... without a vehicle license" in violation of § 19-506(b)(1), or without the appropriate license for such operation, in violation of § 19-506(b)(2). *See* § 19-506(h)(1). Unless the charges are dismissed, "no vehicle seized pursuant to [§ 19-506(h)(1)] shall be released until all fees for removal and storage and the applicable fine or civil penalty" are paid, or a bond is posted. In addition, an

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 28 of 63

owner's interest in their vehicle, when operated in violation of § 19-506(b)(1) or (b)(2), is "subject to forfeiture" if the owner has been "convicted in the criminal court of, or found liable in accordance with [§ 19-506(e)]" for at least two such violations within a 36 month period. *See* § 19-506(h)(2).

## II. Background of Related Decisions

**\*2** Plaintiffs' motion for class certification exists against the backdrop of various decisions in this case and in Judge Caproni's prior decisions in *Harrell v. City of N.Y.*, 138 F. Supp. 3d 479 (S.D.N.Y. 2015) ("*Harrell I*"), *reconsidered in part sub nom. Harrell v. Joshi*, No. 14-CV-7246 (VEC), 2015 WL 9275683 (S.D.N.Y. Dec. 18, 2015) ("*Harrell II*"); *Calvo v. City of N.Y.*, No. 14-CV-7246 (VEC), 2017 WL 4231431 (S.D.N.Y. Sept. 21, 2017) ("*Calvo I*"); and *Calvo v. City of N.Y.*, No. 14-CV-7246 (VEC), 2018 WL 1633565, at \*3 (S.D.N.Y. Apr. 2, 2018) ("*Calvo II*").

### A. *Harrell* and *DeCastro I*

In *Harrell I*, Judge Caproni held that the City's practice of seizing vehicles without a warrant was unconstitutional as applied to straight-plate vehicle owners (i.e., vehicle owners whose license plates are not issued by the TLC), who had not been convicted of, or found liable for, a violation of § 19-506(b)(1) in the preceding 36 months. 138 F. Supp. 3d at 484. *Harrell I* did not address whether the City's vehicle seizures, as applied to owners who did have such a record of § 19-506(b)(1) violations, were constitutional. Nor did it address the constitutionality of seizing TLC-plated vehicles for violations of § 19-506(b)(2). [1]

On August 26, 2016, Plaintiffs DeCastro, Calvo, and Macon filed the operative complaint in this action, on behalf of the following: straight-plate vehicle owners whose vehicles were seized based on second or subsequent violations of § 19-506(b)(1) within the preceding 36 months; TLC-plated vehicle owners whose vehicles were seized for violations of § 19-506(b)(1) (whether first-time or not); and TLC-plated vehicle owners whose vehicles were seized for violations of § 19-506(b)(2). Plaintiffs asserted that the City's practice of seizing the vehicles of such owners violated the Fourth and Fourteenth Amendments. *See* Am. Compl. ¶ 9 (Dkt. 27).

On February 3, 2017, Plaintiffs moved for summary judgment against the City based on their respective vehicle seizures, each of which occurred as a result of § 19-506(b)(1)

violations. The constitutionality of the City's seizure practices as applied to TLC-licensed drivers who violate their licenses under § 19-506(b)(2) was not adjudicated. *DeCastro*, 278 F. Supp. 3d at 757 n.4. Because the vehicles of second or subsequent violators of § 19-506(b)(1) are subject to civil forfeiture, *see* § 19-506(h)(2), the City argued on its cross-motion for summary judgment that the "forfeiture exception" to the warrant requirement applied to the claims of Calvo and Macon. [2] The City, accordingly, maintained that those seizures were constitutional. *See DeCastro I*, 278 F. Supp. 3d at 769–70.

**\*3** On September 30, 2017, this Court concluded that the City had "provided no evidence that the TLC inspectors who effected the seizures at issue had any reasonable basis for believing that [plaintiffs] had been 'convicted' of or 'found liable' for any prior violations at the time of the seizures." *Id.* at 769. Because the City could not establish that its officers had probable cause to believe that the relevant vehicles were subject to civil forfeiture under § 19-506(h)(2), it could not invoke the "forfeiture exception" to the warrantless seizure of Calvo and Macon's vehicles. Those plaintiffs were therefore granted summary judgment on their Fourth Amendment claims. [3] Pertinent here, the Court further held that Plaintiffs Calvo and Macon had established "not only a violation of their constitutional rights," but also the "existence of a municipal policy" to unconstitutionally seize vehicles of second or subsequent violators of § 19-506(b)(1). That holding was based on the "the undisputed evidence," with respect to such seizures, "showing that TLC inspectors do not have probable cause to believe a vehicle is subject to forfeiture under § 19-506(h)(2)." 278 F. Supp. 3d at 772.

As previously noted, DeCastro's vehicle was seized for a first-time violation of § 19-506(b)(1). The Court thus granted summary judgment as to both his Fourth and Fourteenth Amendment claims. Indeed, the City provided no reason why the fact that his vehicle had a TLC license plate altered the *Harrell* court's holding that warrantless seizures of vehicles based on first-time violations of § 19-506(b)(1) were unconstitutional.

### B. The Denial of Class Certification in *Calvo*

The plaintiffs that successfully obtained summary judgment against the City in *Harrell* filed a motion seeking to certify a class of straight-plate vehicle owners whose vehicles were seized for first-time violations of § 19-506(b)(1). *Calvo I*,

2017 WL 4231431, at *3. [4] The court initially declined to certify the class because Plaintiffs had "failed to propose a class that [was] defined in such a way that everyone within it had standing." *Id.* at *7. Hypothesizing that "[a] class consisting of registered owners who were either operating the vehicles at the time that they were seized or who retrieved the vehicles from the TLC might be sufficient to narrow the class to those who have Article III standing," Judge Caproni permitted the plaintiffs to seek certification of a narrower class. *Id.*

The *Calvo* plaintiffs then filed their second motion for class certification seeking to certify a class of "all registered owners of straight [plate] vehicles seized for alleged first-time violations of [§ 19-506] from September 8, 2011 to the present who were operating the vehicle at the time of the seizure, or who retrieved the vehicle personally or through an agent by paying towing and storage fees." *Calvo II*, 2018 WL 1633565, at *3. This time, although the court found that it was "unclear whether all members of the proposed class would have standing," it "assume[d] without deciding" that plaintiffs had defined a class in which every member had standing. *Id.* at *5. Nonetheless, Judge Caproni ultimately declined to certify the class because individual questions—pertaining primarily to proving membership in the class—predominated over common questions. *See id.* at *8. Concluding that the City's "credible evidence of widespread fraud in the registration of vehicles that were seized for violations of 19-506," precluded a finding that there was any "definable class that would satisfy Rule 23(b)(3)," the court denied plaintiffs' motion with prejudice. *Id.* at *9.

### C. Plaintiffs' Class Certification Motion

 **\*4** On November 8, 2017, Plaintiffs in this action filed a motion seeking to certify a class of "[a]ll registered owners of vehicles seized since September 8, 2011 for alleged second or subsequent violations of [§ 19-506(b)(1)]; or for any violation of Section 19-506 involving a vehicle bearing TLC license plates; who were operating the vehicle at the time of the seizure or who retrieved the vehicle personally or through an agent by paying towing and storage fees." Pls. Mem. at 4 (Dkt. 118). On June 5, 2018, Plaintiffs informed the court that they had filed a petition under Fed. R. Civ. P. 23(f) seeking immediate appellate review of the *Calvo II* decision. This Court subsequently stayed Plaintiffs' class certification motion pending the Second Circuit's decision on whether to grant the *Calvo* plaintiffs' Rule 23(f) petition. After the

Circuit denied the petition, the parties filed supplemental letters addressing if and how Judge Caproni's ruling in *Calvo II* should impact the Court's decision on Plaintiffs' class certification motion here.

### LEGAL STANDARDS

To succeed on their motion for class certification, Plaintiffs must first surpass the threshold requirements of Article III standing and ascertainability. *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017). Plaintiffs must then demonstrate, "by a preponderance of the evidence that each of Rule 23's requirements have been met." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

To establish Article III standing, the "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "The filing of suit as a class action does not relax this jurisdictional requirement." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006). In addition, "Article III's jurisdictional requirements [apply] to each member of a class[—]no class may be certified that contains members lacking Article III standing." *In re Elec. Books Antitrust Litig.*, 12 Civ. 3394(DLC), 2014 WL 1641699, at *8 (S.D.N.Y. Apr. 24, 2014). The class, accordingly, must be "defined in such a way that anyone within it would have [Article III] standing." *Denney*, 443 F.3d at 264. To determine whether Plaintiffs have done so, the Court looks to the class definition and Plaintiffs' allegations. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 532 (S.D.N.Y. 2018).

The ascertainability requirement, which is a "modest threshold requirement ... consider[s] whether [the] proposed class is defined using objective criteria that establish a membership with definite boundaries." *Petrobras*, 862 F.3d at 269. A proposed class fails to be ascertainable only where the "class definition is indeterminate in some fundamental way." *Id.*

Assuming Plaintiffs can establish standing and ascertainability, they must then satisfy the Rule 23(a) requirements, which are that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 30 of 63

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a). More colloquially known as "numerosity, commonality, typicality and adequate representation," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011), "[a] class may be certified only if, 'after a rigorous analysis,' " these requirements are met. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).

In addition to Rule 23(a), the proposed class must also satisfy Rule 23(b). Here, Plaintiffs seek to certify a class under Rule 23(b)(3) which mandates that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In conducting the superiority inquiry, courts may consider: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

## DISCUSSION

### I. Standing

 **\*5** It is ultimately not clear to the Court that Plaintiffs have met their burden of establishing that the threshold requirement of standing has been satisfied with respect to the proposed class, as explained in detail below. The Court nonetheless assumes, without deciding, that the proposed class has standing for purposes of this Opinion.

In assessing whether a plaintiff has Article III standing to challenge a seizure of property, "it is the *injury* to the party seeking standing that remains the ultimate focus." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (emphasis added). Thus, although "ownership and possession [of property] generally may provide evidence of standing" to contest its forfeiture, these attributes do not necessarily confer standing. *Id.* Indeed, where the owner of property merely "hold[s] title to it for somebody else"—often referred to as a "straw owner"—he or she "do[es] not ... suffer an injury when the property is taken." *Id.; see also*

*United States v. One 1982 Porsche 928, Three-Door, License Plate 1986/NJ Temp./534807 (Auto.)*, 732 F. Supp. 447, 451 (S.D.N.Y. 1990) (recognizing that, "especially in the world of drug trafficking and other illegal operations[,]" individuals can arrange for others to serve as the record owner of property in an "attempt to disguise their interests in property by not placing title in their own names."). In other words, "[t]here must be some indicia of reliability or substance to claims of ownership to reduce the likelihood of a false or frivolous claim." *United States v. $829,422.42*, 561 Fed. App'x 100, 100 (2d Cir. 2014).

A court analyzing standing in a case contesting the seizure of property thus "looks beyond the formal title to determine whether the record owner is the 'real' owner or merely a 'strawman' set up either to conceal illegal dealings or to avoid forfeiture." *One 1982 Porsche,* 732 F. Supp. at 451. To do so, courts may consider evidence regarding who purchased the property, the source of funds used to do so, as well as payments to maintain the property. *See United States v. 500 Delaware St.*, 113 F.3d 310, 312 (2d Cir. 1997) (affirming that title holder of property was straw owner and that the real owner "made mortgage, property tax, and insurance payments, paid utility bills, and maintained the property and made repairs").

For the purposes of assessing standing here, Plaintiffs' proposed class of registered owners are analyzed in two groups, consistent with Plaintiffs' class definition: (1) registered owners who were not operating the vehicle when it was seized, but who retrieved the vehicle from the TLC either personally or through an agent; and (2) registered owners who were operating the vehicle when it was seized ("registered owner-operators").

With respect to the first group, Plaintiffs' class definition limits the registered owners to those who "retrieved the vehicle personally or through an agent *by paying towing and storage fees*." Pls. Mem. at 4 (emphasis added). These payments indicate that those registered owners had some financial stake in the seized vehicles, suggesting that they were not merely nominal or straw owners—even though they were not operating the vehicles when they were seized. *See One 1982 Porsche,* 732 F. Supp. at 451 (noting that a true ownership interest in property can be demonstrated by various means including proof of a financial stake in the property). And to the extent these registered owners are the true owners of the vehicles, the payment of towing and storage fees provides evidence that they suffered an injury-in-fact in

**Decastro v. City of New York, Not Reported in Fed. Supp. (2019)**

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 31 of 63

connection with the seizures. *See Maxineau v. City of New York*, No. 11-CV-2657, 2013 WL 3093912, at *11 (E.D.N.Y. Jun. 18, 2013) (concluding that even nominal damages under § 1983 are "sufficient ... redress for the purposes of Article III standing").[5] At the same time, however, the City has submitted the declaration of a handwriting expert (originally submitted to and considered by the *Calvo* court) attesting that the signatures of registered owners did not match across their own documents, suggesting that at least some of these documents were forged. *See* Selvin Decl. Ex. C (Dkt.138-3). This evidence further suggests that the documented registered owner who supposedly paid the towing and storage fees to retrieve seized vehicles may not be the true owner of those vehicles, and would therefore lack standing to contest their seizure. The Court thus has concerns that some members of this subgroup of the class may not actually have standing as the class is defined.[6]

**\*6** With respect to registered owner-operator class members, Plaintiffs contend that "the City's interference with their use of the vehicle at the time of seizure readily establishes indicia of ownership and an injury in fact sufficient to confer standing." Pl.'s Mem. at 9. It is true that a person's exercise of dominion and control over property is evidence of a *bona fide* ownership interest in it, and that an interference with the use of one's property can constitute an injury-in-fact for standing purposes. *See, e.g.*, *500 Delaware St.*, 113 F.3d at 312. But the City has presented evidence that some registered owner-operators may have been straw owners, even though they were operating the vehicles when seized. For example, the City has identified instances where certain owner-operators retrieved their vehicles after they were seized a second time, but then subsequently abandoned the vehicles after they were seized a third time. *See* Murray Decl. Table at ¶ 49 (Dkt. 137). As explained in *Calvo II*, this subsequent abandonment "raises a significant question of fact as to whether [the registered owner] was a straw owner all along and therefore never had a cognizable injury associated with the seizure of the vehicle."[7] 2018 WL 1633565, at *4.

Plaintiffs' class definition does not limit the group of registered owner-operators to those who actually paid the towing and storage fees. It is thus possible that these registered owners (for example, those who abandoned the vehicles after a subsequent seizure) had no financial stake in the vehicles themselves, again raising concerns about the legitimacy of their ownership interest. Even if the Court were to modify the class definition to limit the registered owner-operator group to those who paid the towing and storage fees,

the City's evidence of registration fraud more broadly still raises a concern that members of this group may be nominal owners that suffered no injury from the vehicle seizures.[8] In any event, because the evidence of curious ownership records and fraud are more appropriately addressed in assessing class membership, the Court will, as the *Calvo* court did, assume without deciding that all members of the class have standing.

## II. Ascertainability

Defendants argue that the proposed class is not ascertainable for many reasons, namely, that Plaintiffs have failed to sufficiently define the class; that the class consists of straw owners; that the City has individual defenses to the seizures of putative class members' vehicles; and that individualized proof is required to determine class membership. The Court agrees that Plaintiffs have failed to sufficiently define the class, but only insofar as they have not included an end date to the proposed class period. The remainder of Plaintiffs' arguments do not bear on the question of ascertainability, but rather on whether common questions predominate over individual ones.

**\*7** Plaintiffs have defined the class based on objective criteria. To be a member of the class, a person must be (1) the registered owner of: a straight-plate vehicle that was seized by the City for a second or subsequent violation of § 19-506(b)(1), or a TLC-plated vehicle that was seized for any violation of § 19-506; (2) who paid towing and storage fees to retrieve the vehicle either themselves or through an agent. The challenges Plaintiffs may face in establishing that they actually paid for the towing and storage fees, and that the relevant seizure was unconstitutional, "more clearly weigh on the burden of identification, not the possibility." *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Trust Co.*, 2018 WL 1750595, at *10 (S.D.N.Y. Apr. 11, 2018) (emphasis omitted).

As for the relevant time period, however, Plaintiffs define the class period as beginning in September 8, 2011, but they do not specify a clear end date. This precludes a finding that the ascertainability requirement has been met. *See, e.g.*, *Bauer-Ramazzani v. Teachers Ins. & Annuity Ass'n of America-College Retirement & Equities Fund*, 290 F.R.D. 452, 462 (S.D.N.Y. 2013) ("An end date for the class period is necessary so the class members can be presently ascertained." (quotation omitted)). For the purposes of this Opinion only, the Court will select the date that the Complaint was filed, May 24, 2016, as the end date. *See Hart v. Rick's*

Case 7:25-cv-05861-KMK   Document 37-2   Filed 11/24/25   Page 32 of 63

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

*NY Cabaret Int'l, Inc.*, No. 09 CIV. 3043(PAE), 2013 WL 11272536, at \*5 (S.D.N.Y. Nov. 18, 2013) (citing cases in which district courts used their discretion to set an end date for a class period, including the date the Complaint was filed). Having established a fixed temporal limitation, the class is now ascertainable.

### III. The Statute of Limitations

The City is correct that Plaintiffs' proposed class period is impermissibly overbroad because it encompasses claims that are barred by the statute of limitations.

Plaintiffs' class period, as previously noted, begins on September 8, 2011. But the statute of limitations for § 1983 claims, which is governed here by New York State law, is three years. *See Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015). Plaintiffs filed this action on May 24, 2016. They nevertheless argue that, pursuant to *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), the filing of the *Harrell* action on September 8, 2014, tolled the statute of limitations for later-filed putative class actions on behalf of all persons encompassed by the initial *Harrell* complaint. The Supreme Court recently clarified, however, that "*American Pipe* does not permit the maintenance of a follow-on class action past expiration of the statute of limitations." *China Agritech, Inv. v. Resh*, 138 S. Ct. 1800, 1804 (2018). Rather, *American Pipe* addresses "only putative class members *who wish to sue individually* after a class-certification denial." *Id.* at 1806 (emphasis added) (holding that a putative class representative could not bring his claims as a new class action after the statute of limitations expired). The claims of *all* putative class members here that arose prior to May 24, 2013, are therefore not subject to *American Pipe* tolling.[9]

**\*8** Plaintiffs separately argue that equitable tolling should apply to the claims of second or subsequent violators of § 19-506(b). The Court disagrees. The thrust of the equitable tolling doctrine "is that a statute of limitations does not run against a plaintiff who is unaware of his cause of action." *Lopez v. Nassau Cty. Sheriffs Dep't*, No. 17-CV-3722 (DRH) (GRB), 2018 WL 3321430, at \*4 (E.D.N.Y. July 5, 2018) (quoting *Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir. 1985)). The party seeking to invoke equitable tolling must demonstrate that they "acted with reasonable diligence during the time period [they] seek[ ] to have tolled," and must "prove[ ] that the circumstances are so extraordinary that the doctrine should apply." *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80–81 (2d Cir.

2003); *see also Lopez*, 2018 WL 3321430, at \*5 (E.D.N.Y. July 5, 2018) (citing cases permitting equitable tolling claims based on mental or physical impairments of plaintiffs that prevented them from handling their legal affairs and noting that "only in a limited number of cases do extraordinary circumstances exist" that warrant equitable tolling).

Here, Plaintiffs request equitable tolling on the ground that they "only learned of the uniform application of Defendants' seizure program regardless of prior convictions when the summary judgment motion in *Calvo* was briefed." Pls. Reply Mem. at 9. Essentially, they seek tolling of the claims of second or subsequent violators, because they were unaware that the City would not be able to prove that its officers had probable cause to seize the relevant vehicles until after discovery in the *Harrell* cases. But whether Plaintiffs were aware of the City's probable cause (or lack thereof) as to the seizures at issue is irrelevant to whether they had "actual knowledge' of the facts that comprise [their] caus[e]s of action." *Cerbone*, 768 F.2d at 48. The absence of probable cause is not part of Plaintiffs' *prima facie* Fourth Amendment claims; rather, the existence of probable cause is part of the City's affirmative defense. *See U.S. v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 89 (2d Cir. 2002). Plaintiffs thus fail to offer any reason why they could not have asserted the claims of second or subsequent violators when they initially filed the *Harrell* case that could justify equitable tolling. *See Levy v. BASF Metals Ltd.*, No. 1:15-cv-7317-GHW, 2017 WL 2533501, at \*8 (S.D.N.Y. June 9, 2017) (declining to apply equitable tolling where plaintiff claimed that she was not aware of certain defendants' wrongdoing until a class action complaint was filed in another case because "she did not learn anything new about her injury or any potential claims supporting remuneration for her injury" from that complaint). Absent extraordinary circumstances, which Plaintiffs have not alleged, that could explain why they did not assert the claims of second or subsequent violators of § 19-506(b) when they were aware of those class members' injuries, equitable tolling is not warranted.

Accordingly, the claims of proposed class members existing before May 24, 2013 are barred by the statute of limitations. The Court will now consider whether Plaintiffs' proposed class, with the class period modified to begin on May 24, 2013, and end on May 24, 2016, meets the certification requirements.

### IV. Rule 23 Analysis

Plaintiffs have met the numerosity, commonality, and typicality requirements, and the Court assumes, again without deciding, that adequacy of representation is also satisfied. The proposed class nevertheless fails to satisfy the predominance requirement of Rule 23(b)(3). Plaintiffs' motion is thus denied on that basis.

### A. Numerosity

Numerosity under Rule 23(a)(1) is presumed satisfied when there are more than 40 class members. *See, e.g., Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011). Plaintiffs estimate that the class is comprised of at most 14,000 seizures and presumably thousands of registered owners. [10] Although the Court has narrowed the class period to begin on May 24, 2013, the City does not contest numerosity. Plaintiffs have met this requirement.

### B. Commonality

**\*9**  To establish commonality under Rule 23(a)(2), Plaintiffs must show that class members "have suffered the same injury" and that there is at least one question common to the class that is capable of "classwide resolution." *Wal-Mart*, 564 U.S. at 350. A question is common to the class "if it is susceptible to generalized, class-wide proof." *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006) ("*In re Nassau Cty.*").

Plaintiffs have established commonality. The proposed class members have allegedly suffered the same injuries, primarily, the payment of fees, as a result of "a specific policy promulgated by Defendants, namely that Defendants ... established a practice" of seizing vehicles for violations of § 19-506(b) without a warrant. Common questions of law and fact therefore exist because "the claims of the proposed class stem from the same alleged unconstitutional conduct of the defendants." *Stinson v. City of New York*, 282 F.R.D. 360, 370 (S.D.N.Y. 2012) (commonality satisfied where plaintiffs challenged the constitutionality of the NYPD's alleged practice of issuing summonses without probable cause in order to meet quota requirements). It is true that this Court has already held that "the undisputed evidence shows that TLC inspectors do not have probable cause to believe a vehicle [operated or owned by a second or subsequent violator of § 19-506(b)(1)] is subject to forfeiture under § 19-506(h)(2)," rendering those class members' vehicle

seizures unconstitutional. *DeCastro I*, 278 F. Supp. 3d at 772. But the Court must still consider common questions—even if they have already been resolved in certain Plaintiffs' favor—in the class action analysis. *See Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, No. 96 CV 8414(KMW), 2013 WL 4647190, at \*6 (S.D.N.Y. Aug. 29, 2013); *see also In re Nassau Cty.*, 461 F.3d at 227 (requiring that common question of the constitutionality of defendant's strip search policy be considered in the Court's commonality analysis even though defendant had already conceded the policy was unconstitutional). Simply put, "[t]his cases raises, at a minimum, a common question as to the legality of Defendants' vehicle seizures." *Calvo II*, 2018 WL 1633565, at \*5 n.18. Commonality is, therefore, satisfied.

### C. Typicality

Typicality under Rule 23(a)(3) exists "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Vincent v. Money Store*, 304 F.R.D. 446, 455 (S.D.N.Y. 2015) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). In analyzing typicality, the Court looks "not at the plaintiffs' behavior, but rather at the defendant's actions." *Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 132 (S.D.N.Y. 2014).

Plaintiffs have established typicality. As previously noted, the class members' claims arise from the same course of events—namely, the City's seizure of vehicles for which they were the registered owner, and for which they had to pay towing and storage fees to have them retrieved.

The City argues that class members who violated § 19-506(b)(2) are not similarly situated to class members whose vehicles were seized for second or subsequent violations of § 19-506(b)(1). In support of this argument, it contends that, unlike registered owners of unlicensed vehicles, the owners of TLC-licensed vehicles have: (1) "voluntarily consented to the agency's strict oversight," and (2) fulfilled "requirements pertaining to insurance and other financial responsibilities." Defs. Mem. Opp. at 16. The City does not explain, however, why these differences would impact Plaintiffs' Fourth Amendment arguments with respect to the City's seizure of vehicles that are premised on violations of § 19-506(b)(2). [11]

**\*10** It is true that no Court has yet to address whether the application of the City's seizure policy, as codified in § 19-506(h)(1), to enforce violations of § 19-506(b)(2)— as opposed to (b)(1)—is unconstitutional. Indeed, *Harrell* addressed only the constitutionality of the City's seizure of straight-plate vehicles for first-time violations of § 19-506(b)(1). *DeCastro I* addressed the same only for second or subsequent violations of § 19-506(b)(1), and for first-time violations of § 19-506(b)(1) for TLC-plated vehicles. But as noted, the typicality inquiry focuses on the nature of the putative class members' claims, and whether they arise from the same course of conduct. It does not require a uniform finding of liability as to every class member prior to certification. *Cf. Waggoner v. Barclays PLC*, 875 F.3d 79, 88, 107 (2d Cir. 2017) (affirming certification of class prior to judgment of liability). The fact that a liability determination has not been made as to a subset of the putative class members is, in the Court's view, an issue more appropriately addressed in the predominance requirement. Typicality is satisfied here because: (1) the named Plaintiffs seek to hold Defendants liable for the same conduct that is the basis of the claims of all class members, and (2) the § 19-506(b)(2) violators make the same legal arguments with respect to the constitutionality of the seizures as the § 19-506(b)(1) violators.

### D. Adequacy of Representation

"Adequacy of representation is evaluated in two ways ... by looking to the qualifications of plaintiffs' counsel; and ... by examining the interests of the named plaintiffs." *Flores v. Anjost Corp.*, 284 F.R.D. 112, 128–29 (S.D.N.Y. 2012) (citing *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)). Although Plaintiffs' counsel is qualified to represent the class, it is less clear whether Plaintiffs have satisfied their burden of demonstrating that the same is true for the named Plaintiffs. Because the Court ultimately concludes that the proposed class fails to satisfy Rule 23(b)(3), however, it will assume, without deciding, that the named Plaintiffs are sufficient class representatives.

### 1. Class Counsel

First, the City argues that Plaintiffs' counsel lacks the requisite qualifications to represent the class. In addition to questioning Mr. St. Laurent and Mr. Ackman's experience, the City notes that the Court previously had to order Plaintiffs Calvo and Macon to provide witness contact information requested by

Defendants—over counsel's objections—and that counsel's motions for class certification in the *Calvo* cases were unsuccessful. The Court is not persuaded. Although it is undisputed that Mr. St. Laurent has not previously been personally certified as class counsel, and that Mr. Ackman's experience as class counsel is limited, their firm, Harris, St. Laurent & Chaudhry LLP, has substantial litigation class action experience. *See* Pl.'s Reply, Harris Decl., ¶¶ 5–8. Moreover, based on the quality of the advocacy of Plaintiffs' counsel to date, the Court is satisfied that counsel is sufficiently "qualified, experienced and generally able to conduct th[is] litigation." *Maliarov v. Eros Int'l PLC*, 15-CV-8956 (AJN), 2016 WL 1367246, at \*6 (S.D.N.Y. Apr. 5, 2016).

The City further alleges that Mr. Ackman has falsely represented his class action experience to other federal judges, and that one federal judge noted at oral argument in another matter that he had falsely characterized the holding of a case in his briefing. It is true that Mr. Ackman filed declarations in two unrelated cases attesting that he was "lead counsel" in prior class actions—even though not every one of those prior actions was certified as such. While each of them was either brought as a putative class action, or had a class certification motion pending at some point, Mr. Ackman's declarations could have been more precise. It is also true that another federal judge remarked on the record that Mr. Ackman had mischaracterized the holding of a case in his submissions. But while Defendants' concerns are not entirely without merit, absent more compelling evidence of any prior unethical conduct—and considering that similar evidence has not been produced with respect to his co-counsel in this case —Mr. Ackman will not be disqualified on the current record.

**\*11** Finally, the City argues that Mr. Ackman has a conflict of interest with those members of the class that operate black cars such as Uber and Lyft. Mr. Ackman represents medallion taxi owners in other lawsuits against the TLC and the City, which allege in part that the City's decision to allow Uber vehicles to operate in New York City was unlawful (*see* Selvin Decl., Exs. S, U, V, W). The City thus contends that Mr. Ackman's representation of Uber drivers here is prohibited under Rule 1.7 of the New York State Rules of Professional Conduct. Nothing in the record, however, supports a finding that the relief Mr. Ackman seeks in those actions—which includes compensatory and punitive damages against the City—is adverse to the interests of Uber drivers here. The City also cites no authority in which a court disqualified an attorney under Rule 23 due to an alleged

conflict based on representing different plaintiffs in unrelated actions against the same defendants. To the extent Mr. Ackman seeks damages from the same defendants in different actions may suggest that the "plaintiffs are theoretically in competition with one another to recover on their judgments," such a conflict can be re-visited in the damages phase of these proceedings, if necessary. [12] *See Seijas v. Republic of Argentina*, 606 F.3d 53, 57 (2d Cir. 2010). Plaintiffs have met their burden of demonstrating the adequacy of class counsel.

### 2. Interests of Plaintiffs

In assessing whether the named Plaintiffs can adequately represent the class, the Court considers "whether there is a conflict between the interests of the named plaintiff[s] and the rest of the class[,]" and "whether the named plaintiff[s] have sufficient knowledge of the facts of [their] claim[s]." *See Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 164 (S.D.N.Y. 2014).

#### a. Intra-Class Conflict

At this stage of the litigation, the existence of intra-class conflict, if any, would not preclude a finding that the named Plaintiffs can represent the interests of the absent class members. To defeat a motion for certification, intra-class conflicts "must be fundamental," *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009), and not "hypothetical and speculative," *Cokely v. N.Y. Convention Ctr. Operating Corp.*, No. 00 Civ. 4637 (CBM), 2004 WL 1152531, at *8 (S.D.N.Y. May 21, 2004).

The City contends that, since the named Plaintiffs were issued summonses for violations of § 19-506(b)(1), their interests are not aligned with class members who received summonses for violations of § 19-506(b)(2). In the City's view, because unlicensed for-hire vehicle owners (i.e., the § 19-506(b)(1) violators) "stole trips, customers, and income from licensed for-hire vehicles," (i.e., the § 19-506(b)(2) violators), those class members have conflicting interests. But the interests of § 19-506(b)(1) and (b)(2) violators with respect to the outcome of this litigation are nonetheless aligned—both groups seek to hold the City liable for vehicle seizures and the success of each group's claims does not impact the other. *See In re Flag*, 534 F.3d at 36–37 (affirming decision to permit plaintiffs with claims for violations of the 1933 Securities Exchange Act to represent and proceed in the same class as plaintiffs with

claims for violations of the 1934 Securities Exchange Act where district court had concluded that the "the two sets of claims are not antagonistic to each other because proof of one does not negate an essential element in the other"). [13]

**\*12** Additionally, there is no proposed class settlement "reflect[ing] essential allocation decisions" between the § 19-506(b)(1) and (b)(2) violators in which the lack of a representative of the (b)(2) class members could render their representation inadequate. *Cf. Amchem Prods. Inc.*, 521 U.S. at 627 (holding that, in a class action settlement, class members with manifested injuries from asbestos exposure could not represent class members who were exposed to asbestos but had yet to be injured because "for the currently injured, the critical goal [wa]s generous immediate payments" which "tug[ged] against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future"). In any event, if there were such a settlement pending, the Court could resolve the issue by certifying a subclass of § 19-506(b)(2) violators and appointing their own counsel to ensure their adequate representation. *See Fed. R. Civ. P. 23(c)(5); In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d at 250.

#### b. Knowledge and Credibility of Named Plaintiffs

Although the requirement that the class representative have knowledge of the facts of the case is a "modest one," the Court cannot certify a class representative where they "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possible competing interests of attorneys." *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 203 (S.D.N.Y. 2018). "Where the court finds the class representative is not credible, adequacy of representation is absent." *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 41 (E.D.N.Y. Jan. 31, 2008) (citing *Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983)).

The Court has concerns that the named Plaintiffs may not be sufficiently knowledgeable and credible to represent the class. For example, DeCastro testified that he did not review the Complaint before it was filed, nor Plaintiffs' initial disclosures before they were served on the City. *See Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356 (S.D.N.Y. 2004) (declining to find a named plaintiff could represent a class based in part on him "not ha[ving] seen the complaint prior to his deposition"). Compounding

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 36 of 63

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

this concern, Plaintiffs have not included any deposition testimony in their reply to rebut the City's argument that DeCastro does not have sufficient knowledge of the case to be an adequate representative, suggesting that he might simply be "the willing pawn of counsel." *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 136 (S.D.N.Y. 2008). [14]

As to Calvo and Macon, the City argues that their deposition testimony demonstrates that neither is sufficiently credible to serve as a class representative. The City further argues that Calvo and Macon's purported failure to cooperate in discovery proves that they cannot fulfill their duty as class representatives to comply with discovery requests. Calvo and Macon's deposition testimony, which attests that they were not operating their vehicles for hire, but were merely giving rides to friends, even though they eventually pled guilty to their summonses, may raise questions about their credibility. *See* Selvin Decl. Exs. M, Q. And Macon too testified that he did not review the Amended Complaint before it was filed. *See* Selvin Decl., Ex. Q at 117:1–10. Since the Court declines to certify the class on other grounds, however, it need not decide whether the City has demonstrated that the named Plaintiffs are adequate representatives.

### E. Predominance

**\*13** The essence of the predominance inquiry under Rule 23(b)(3) is whether proposed classes are "sufficiently cohesive to warrant adjudication by representation." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 469 (2013). A putative class satisfies this requirement if (i) "resolution of any material 'legal or factual issues ... can be achieved through generalized proof,' " and (ii) "these [common] issues are more substantial than the issues subject only to individualized proof." *Petrobras*, 862 F.3d at 270 (alterations in original) (quoting *Mazzei v. The Money Store*, 829 F.3d 260, 270 (2d Cir. 2016)). This analysis requires district courts to weigh the prevalence of individual questions (i.e., questions where "members of a proposed class will need to present evidence that varies from member to member") against common questions (i.e., questions where "the same evidence will suffice for each member to make a prima face showing or the issue is susceptible to generalized class-wide proof"). *Id.* In other words, the Court asks "whether issues susceptible to generalized proof outweigh individual issues." *Johnson v. Nextel Comms. Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (quotation omitted). This assessment is "more qualitative than quantitative, and must account for the nature

and significance of the material common and individual issues in the case." *In re LIBOR*, 2018 WL 1229761, at \*5 (alterations and quotations omitted).

In this case, individual questions pertaining to class membership eligibility, to proving liability in light of the City's potential defenses, and to damages, compel the conclusion that common questions do not predominate over individual ones.

### 1. Proving Class Membership

Courts in this Circuit have recognized that the extent to which determining whether someone is a member of a class requires individualized inquiry is an important factor in the predominance analysis. "If too much individual inquiry is required to determine whether someone is a member of the class, then a court could find that class issues do not predominate over individual issues." *Vogel*, 2017 WL 4712791, at \*5; *see also Petrobras*, 862 F.3d at 268 (noting that the issue of whether classes "require highly individualized determinations of member eligibility" belongs to the predominance requirement). Assessing membership eligibility in plaintiffs' proposed class—specifically, whether a putative class member paid the towing and storage fees—entails individualized inquiry. And in light of the City's evidence of registration fraud and straw ownership, discussed further below, proving that registered owners actually paid the towing and storage fees, for many putative class members, will be no easy feat.

### a. Registered Owners Using Third-Party Claimants

First, as to registered owners who were not driving the vehicles when they were seized, and who purportedly authorized third-parties to retrieve their vehicles, the Court is not satisfied that the third-party authorization form establishes that the registered owner paid the towing and storage fees. This is because the City has submitted evidence that these forms were forged. *See* Murray Decl. ¶¶ 32–34; Selvin Decl., Ex. C. For example, the analysis of the City's seizure records shows that some third-party claimants used the same third-party authorization form (i.e., including the same date) more than once to pick up different vehicles on different dates. *See id.* Sometimes the signature of the purported registered owner differed dramatically across the third-party authorization forms; and sometimes the signature

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 37 of 63

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

on the vehicle *registration* forms differed dramatically from the purported signature of the registered owner on the third-party authorization forms. *See id.* Those differences raise questions about the validity or reliability of the forms as evidence of genuine ownership interest in, and of financial injury associated with, the seized vehicles.

Additionally, the City has presented evidence that some of these registered owners are straw owners, who may not have advanced their own fees to retrieve the vehicles, as required for class membership. In one instance, a vehicle seized three times was registered to a John Doe at the time of the first seizure, but was then registered to a corporate entity at the time of the second and third seizures; the same John Doe retrieved the vehicle after each seizure, however, using the same third-party authorization form. *See* Murray Decl. ¶ 36. This suggests that the transfer of ownership to the entity was illusory, and that the funds used to retrieve the vehicle may not have come from the entity. Some individuals also served as serial third-party claimants for the same registered owner of multiple vehicles. *See id.* ¶¶ 25–27. A significant number of seized vehicles with out-of-state registration addresses were similarly retrieved only by third-party claimants, and the registered owners of those vehicles never operated them at the time of the seizure. *See id.* ¶ 35. While not determinative, this too may suggest that certain registered owners lacked a genuine interest in the vehicles, raising questions about whether they actually paid the towing and storage fees. In light of this evidence, relying on the City's records alone to determine who actually paid the towing and storage fees will not suffice. [15]

### b. Registered Owners who
### Personally Retrieved the Vehicles

**\*14** Second, as to registered owners who were not operating the vehicles when they were seized, but who personally retrieved the vehicles, the City's evidence of straw ownership similarly raises doubts that these owners would have advanced their own funds to pay the fees. Some registered owners, for example, after being found guilty of a § 19-506(b)(1) violation, transferred their vehicles to a certain John Doe who is the registered owner of at least 65 vehicles. *See* Murray Decl. ¶ 23. Although this John Doe would retrieve the vehicles after a second or subsequent seizure, they were nonetheless driven by the original registered owners at the time of those seizures. The seemingly illusory transfer of ownership to this John Doe, coupled with the fact that he is

a prolific registered owner, may suggest he is a straw owner, even though he personally retrieved the vehicles. *See* Murray Decl. ¶¶ 37–40. As such, the registered owner may very well not have been the one to pay to retrieve the vehicles.

While credit card records or bank statements could suffice to prove who paid the towing and storage fees, the City's records reflect that they were more commonly paid in cash. Although a putative class member could submit a sworn affidavit testifying that he or she paid the fees, as Judge Caproni previously recognized, *see Calvo I*, 2017 WL 4231431, at *5 n.10, the fact-finder would still need to analyze the individual affidavits. Moreover, to the extent the City contested the credibility of a particular affiant—which is likely, given that many putative class members appear to be involved in the illegal business of unlicensed for-hire vehicle operations—more process would be required before a final conclusion that the affiant is a member of the class could be made.

It is true that the City has shown that they possess copies of various documents—the summonses issued to registered owners, vehicle seizure notices and release forms, and receipts of payments of towing and storage fees—which can show who picked up the vehicle from the tow pound, the amount they paid to retrieve the vehicle, and the method of payment used. *See* Olson Decl. ¶ 4. Nevertheless, for many putative class members, establishing membership in the class will require sworn affidavits. And because their credibility is put into doubt by the City's evidence of fraud, the individualized inquiries entailed in determining whether those registered owners are legitimate class members, threaten to predominate over the common questions of liability. *See Mazzei*, 829 F.3d at 270 (finding plaintiffs failed to meet predominance requirement where "the fact-finder would have to look at every class members' loan documents to determine who did and who did not have a valid claim"); *Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.*, No. 14-CV-09764 (KPF)(SN), 2018 WL 739580, at *14 (S.D.N.Y. Jan. 10, 2018) (noting absence of "class-wide proof" as to which putative plaintiffs had litigation rights as required for class membership "militates against a finding of predominance with regard to issues of who actually has a claim"). Proving class membership thus requires additional evidence to establish that the registered owners paid the towing and storage fees.

### 2. Individual Liability Defenses and Damages

Case 7:25-cv-05861-KMK     Document 37-2     Filed 11/24/25     Page 38 of 63

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

The extent to which Defendants have liability defenses that are unique to certain class members is also an important factor in the predominance analysis. *See In re Visa Check/ Master Money Antitrust Litig.*, 280 F.3d 124, 129 (2d Cir. 2001). "Although a defense may arise and may affect different class members differently, this does not compel a finding that individual issues predominate over common ones." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010) (quotations and alterations omitted). "As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification under Rule 23(b)(3)." *Id.* Similarly, while individual issues pertaining to each class members' damages should be considered "when weighing predominance issues," such "individualized damages determinations alone cannot preclude certification." *Roach*, 778 F.3d at 408–9 (2d Cir. 2015); *Royal Park*, 2018 WL 1831850, at *8 ("[I]ndividualized damages inquiries remain a factor that a court may consider in undertaking the predominance analysis.")

**\*15** Despite the combined holdings in *Harrell I* and *DeCastro I*—that the City's seizure policy encoded in § 19-506(h) as applied to violations of § 19-506(b)(1) is unconstitutional (*see* 138 F. Supp. 3d at 488–92; 278 F. Supp. 3d at 768–72)—the City nevertheless argues that it has individualized probable cause defenses to liability as to specific class members. Because the Court is persuaded that at least some of the City's proffered grounds for a probable cause defense may apply to certain putative class members, some individual inquiry into the circumstances surrounding each seizure will be necessary. While these individual questions do not provide a stand-alone basis to find that the class fails to pass muster under Rule 23(b)(3), they nonetheless contribute to the conclusion that individual issues predominate over common ones.

The City's first argument in this regard is that TLC officers, in some instances, may have had probable cause to believe that a vehicle was subject to civil forfeiture under § 19-506(h)(2), based on knowledge that the registered owner had a prior conviction under § 19-506(b) in the preceding 36 months. The Court disagrees. In *DeCastro I*, the Court found that "the undisputed evidence shows that TLC inspectors do not have probable cause to believe a vehicle is subject to forfeiture under § 19-506(h)(2) when they seize vehicles for suspected violations of § 19-506(b)(1)." 278 F. Supp. 3d at 772. That finding was based in part on deposition testimony of the TLC's Deputy Chief of Enforcement that inspectors "don't

look" at "whether or not [a] vehicle or [a] driver has been cited for a violation of Section 19-506" when seizing vehicles. *See id.* (citing St. Laurent Decl. Ex. 3 at 77:6–13 (Dkt. 61)).

Now, in a second attempt to provide contrary evidence of its policy, the City produces four summonses associated with seizures based on second or subsequent violations of § 19-506(b)(1). *See* Murray Decl. Ex. HH. The City argues that these summonses demonstrate that the officers had knowledge of the registered owners' prior convictions, sufficient to establish probable cause on forfeiture grounds. *See* § 19-506(h)(2). Yet this new evidence does not help the City. Two of the summonses indeed indicate that the registered owners of the vehicles were either an "unlicensed entity" with a "prior record" or had "prior records of unlicensed activity." Murray Decl. Ex. HH, at 7152, 7276. But they do not indicate whether the registered owner had been *convicted* of a § 19-506(b)(1) violation within the preceding 36 months, as would be required for the vehicle to be subject to forfeiture. *See DeCastro I*, 278 F. Supp. 3d at 770 (explaining that a summons "is not a reliable indicator of a conviction or a finding of liability"). Another summons states that the TLC officer "seized th[e] vehicle one month prior" but doesn't state whether the registered owner was convicted. Murray Decl. Ex. HH, at 9856. Although the final summons states that the "[d]river said he has been caught before with the vehicle and the owner went and plead guilty," it doesn't indicate whether the conviction occurred within the preceding 36 months. *See id.* at 3837. Thus, the Court is not persuaded that many individual inquiries would be required to determine whether the officers had probable cause to believe the vehicles were subject to civil forfeiture under § 19-506(h)(2). [16]

**\*16** The Court *is* persuaded, however, that the City may possess other unique probable cause defenses for a certain subset of class members. The City, for example, has shown through Mulero's testimony that some vehicle seizures occurred for purposes other than, or in addition to, suspected violations of § 19-506(b)(1). [17] *See* Selvin Decl. Ex. E at ¶ 4 (asserting that "[it] is not unusual for other illegal activity to be observed at the time of a [§ 19-506] summons" including aggravated unlicensed operation of a vehicle, criminal possession of a weapon, narcotics offenses, prostitution, among others). The presence of such other illegal activity in connection with a § 19-506 violation could conceivably provide the City with additional probable causes defenses to justify a seizure in those circumstances. The seizures of putative class members' vehicles would therefore need to be individually assessed to determine if the seizure

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 39 of 63

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

occurred in conjunction with other activity that provided the City with probable cause to seize the vehicles. This could require individual hearings. *See Vogel*, 2017 WL 4712791, at *6 (determining whether defendants had probable cause for each putative class member's arrest solely for possession of a gravity knife would require "individualized inquiry [ ]in the form of hearings or mini-trials"). And such hearings would further add to the number of individual inquiries necessary to determine which class members are entitled to damages. *See MacNamara v. City of New York*, 275 F.R.D. 125, 144–45 (S.D.N.Y. 2011) (holding that "individualized probable cause inquiries would dictate the course of litigation with respect to" two subclasses because the underlying arrests were "conducted by officers exercising individual discretion rather than following mass arrest orders"). Although Plaintiffs argue that such individuals would not be part of the class, the class definition is not limited to vehicles seized *only* for § 19-506(b) violations: registered owners whose vehicles were seized for additional reasons therefore appear to fit within the class definition. In any event, even if the class definition were modified to specifically exclude such individuals, the Court would then need to assess whether a vehicle seizure occurred in connection with other illegal activity in order to determine membership in the class. [18]

Moreover, with respect to damages, the City correctly notes that claims for lost income, lost use of vehicle, and emotional distress would likely need to be assessed on an individualized basis which further adds to the number of individualized inquiries. *See Augustin v. Jablonsky*, 819 F. Supp. 2d 153 (E.D.N.Y. 2011) (concluding that emotional distress damages of class members subjected to an unconstitutional strip search policy could not be determined on a class-wide basis).

To be clear, the existence of individual defenses based on conduct occurring in conjunction with a § 19-506 violation, and the existence of individual damages would not, independently, preclude a finding that predominance has been satisfied. Where, as here, Plaintiffs have established that Defendants applied a uniform unconstitutional policy, courts in this Circuit have found that individual affirmative defenses, and individual damages, will not outweigh the common questions underlying the defendants' conduct. *See, e.g.*, *In re Nassau Cty.*, 461 F.3d at 229–230. But when combined with the individual issues associated with determining whether someone is a member of the class, in this case, individual questions ultimately predominate over common ones. Plaintiffs have thus failed to satisfy Rule 23(b)(3). [19] *See Vogel*, 2017 WL 4712791, at *6.

Finally, additional issues would need to be addressed as to the subset of class members who were issued summonses for § 19-506(b)(2) violations. As the City highlights, the Court has not decided whether the City's seizure policy encoded in § 19-506(h), as applied to seizures based on § 19-506(b)(2) violations, is unconstitutional. The Court's decision in *DeCastro I* was based on factual evidence concerning the City's enforcement practices only with respect to violations of § 19-506(b)(1). At this time, the Court is skeptical that there are material differences with respect to the City's enforcement practices of § 19-506(b)(2), and with respect to the Fourth Amendment analysis regarding those putative plaintiffs' claims. But the Court cannot rule on whether the City's codified policy in § 19-506(h), as applied to vehicles seized for violations of § 19-506(b)(2), is unconstitutional, let alone as applied to a vehicle seizure of any individual Plaintiff, absent a factual record on that issue. As a result, even though the Court has already found that the proposed class fails the predominance requirement for the reasons sated above, the issues of liability that may apply uniquely to class members with § 19-506(b)(2) violations add to the predominance problem of Plaintiffs' proposed class. [20]

* * *

**\*17** Due to the difficulties of proving class membership based on the evidence of fraud and straw ownership associated with violators of § 19-506(b)(1), it appears unlikely that there is a definable class as to those violators that can satisfy Rule 23. [21] A class of *only* § 19-506(b)(2) violators may have fewer predominance issues given the lack of evidence of fraud and straw ownership with respect to those putative class members. Nevertheless, because there has been no determination as to whether the City has engaged in a pattern or practice of unconstitutionally seizing vehicles of § 19-506(b)(2) violators, it is difficult to predict whether common questions would predominate over individual ones in such a hypothetical class. Moreover, were Plaintiffs to seek certification of a class comprised of only § 19-506(b)(2) violators, they would need to persuade the Court that they should be granted leave to amend the Complaint to add new named plaintiffs, as the current ones would not fit within this narrower class definition. [22]

### CONCLUSION

**Decastro v. City of New York, Not Reported in Fed. Supp. (2019)**

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 40 of 63

For the foregoing reasons, Plaintiffs' motion for class certification is DENIED. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 117. No later than October 4, 2019, the parties shall submit a joint letter to the Court proposing next steps in this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4509027

---

### Footnotes

1    Judge Caproni granted in part and denied in part the City's motion to reconsider *Harrell I*, reaffirming her prior holding that "the City's policy of seizing the [straight tag] vehicles of first time violators" of § 19-506(b)(1) was unconstitutional, but concluding that two of the named plaintiffs were not entitled to summary judgment based on "evidence that they were not first time violators when the complained of seizures occurred." *Harrell II*, 2015 WL 9275683, at *4. She subsequently denied the *Harrell* plaintiffs' motion to amend their complaint to add claims on behalf of second or subsequent violators of § 19-506(b), *see* February 9, 2016 Order, *Harrell v. City of New York*, No. 14-CV-7246 (VEC) (Dkt. 80), as well as the claims of Angel DeCastro, whose vehicle was seized for a first-time § 19-506(b)(1) violation, but which had a TLC license plate. *See* March 31, 2016 Order, *Harrell v. City of New York*, No. 14-CV-7246 (VEC) (Dkt. 96) (explaining that "[t]h[e] case was brought on the theory that straight tag vehicles were being improperly seized; it is too late in the case to alter the fundamental premise of the case.").

2    Only Plaintiffs Calvo and Macon had both been found liable for violations of § 19-506(b)(1) in the preceding 36 months from when the seizures at issue occurred. DeCastro, by contrast, was a first-time violator who was operating a TLC-plated vehicle—not a straight-plate vehicle—at the time it was seized. Because the vehicle had not yet been licensed as a for-hire vehicle by the TLC, however, it was not authorized to bear TLC license plates. DeCastro was therefore issued a summons for violating § 19-506(b)(1), as opposed to § 19-506(b)(2).

3    The Court nonetheless held that the City's post-seizure procedures for second or subsequent violations of § 19-506(b)(1) satisfied due process and thus granted Defendants' motion for summary judgment with respect to the Fourteenth Amendment claims asserted by Calvo and Macon.

4    In 2016, Plaintiff Harrell was dismissed from the *Harrell* actions with prejudice for failure to prosecute and failure to provide discovery, resulting in the opinion on the class certification motion being re-named *Calvo v. City of New York*, although the case remains captioned as *Harrell v. City of N.Y.* on ECF. *See* Order at Dkt. 160, No. 14-CV-7246 (S.D.N.Y. Nov. 14, 2016).

5    Of course, how to determine whether a registered owner actually paid for the towing and storage fees is a more difficult question. But it is one that goes to determining membership in the class, not standing.

6    In their reply, Plaintiffs contend that the City's focus on whether a registered owner is the "beneficial owner" of the vehicle "ignores the parameters of the class definition ... which encompasses only registered owners ... who suffered some cognizable injury-in-fact, be it a seizure while they were operating their own vehicle or their demonstrable payment (direct or through an agent) of towing and storage fees." Olson Decl. ¶ 5. But this misses the point: a straw owner of a vehicle who is operating it when it is seized, or who pays for its retrieval, is not injured in either scenario because he or she is a straw owner. *See Calvo II*, 2018 WL 1633565, at *4–5*; *Cambio Exacto*, 166 F.3d at 527 (explaining that a straw owner of property "do[es] not suffer an injury when the property is taken").

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 41 of 63

7    To be sure, Plaintiffs acknowledge that the claims of a registered owner who abandons a vehicle after it is seized would not be part of the class. Pls. Mem. at 4; Olson Decl. ¶ 8. But this does not address those registered owners that *did* retrieve the vehicle after a second seizure, and then abandoned the vehicle after a *subsequent* seizure. The claims of such registered owners with respect to the second seizure would still be part of the class as Plaintiffs have defined it, even though those registered owners may have been straw owners for the reasons explained above.

8    As additional support for the notion that registered owner-operators may be straw owners, the City asserts that one John Doe was the registered owner of at least 65 vehicles which the TLC seized 97 times between September 2011 and March 2015. *See* Murray Decl. ¶ 21 & Ex. P. The John Doe was the driver during just one of these seizures. He is thus a member of the "registered owner-operator" subclass with respect to that seizure, as it occurred after a previous § 19-506 violation. The City suggests that his ownership record raises questions about the legitimacy of his ownership interest even in the vehicle he was driving. The Court, however, is not so certain. The fact that an individual is the registered owner of a fleet of vehicles, and was operating one of them when they were seized by the City, does not on its face establish that the individual lacked a genuine ownership interest in the vehicle he was driving.

9    The initial complaint in *Harrell* addressed the seizure of vehicles based on first-time violations of § 19-506(b) in connection with the use of a vehicle "as an unlicensed taxi," and therefore did not encompass vehicles seized for first-time violations of § 19-506(b)(2). Nor would putative class members here whose vehicles were seized for second or subsequent violations of § 19-506(b)(1) have been a part of the *Harrell* complaint and thus, the claims of those plaintiffs existing prior to May 24, 2013, would be time-barred even under Plaintiffs' erroneous application of *American Pipe.*

10    Plaintiffs have submitted quarterly reports that the TLC produced pursuant to § 19-506(m) which indicate that over 24,000 summonses for vehicle seizures were issued between the fourth quarter of 2012—not of 2011, as Plaintiffs state—and the first quarter of 2016. *See* Gallagher Decl. Ex. 2 (Dkt. 120-2). Plaintiffs estimate that 10,000 of those seizures are not part of the class because they were associated with straight-plate first-time violations of § 19-506(b)(1).

11    There is a difference in the probable cause analysis between class members who are first-time violators of § 19-506(b)(1) or (2), on the one hand, and class members who are second or subsequent violators of either provision, on the other hand. The vehicles in the latter group are subject to civil forfeiture under § 19-506(h)(2), leaving open the possibility that such an exception to the warrant requirement applies, whereas the vehicles in the former group are not. But it is ultimately the City's burden of demonstrating whether a particular vehicle seizure based on second or subsequent violations of § 19-506(b)(1) or (b)(2) was based on a reasonable belief that the vehicles were subject to civil forfeiture. *See U.S. v. $557,933.89*, 287 F.3d at 89. Thus, the difference between first-time violators of § 19-506(b)(2), and second or subsequent violators of § 19-506(b)(1) or 19-506(b)(2), suggests a difference in the City's available defenses for the seizures, not a difference in whether the claims of these class members "arise from the same course of events." *Cf. Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 CIV. 9936 (LGS), 2017 WL 3868803, at *7 (S.D.N.Y. Sept. 5, 2017) (typicality satisfied where named plaintiffs, who were current or former participants in certain 401(k) plans, sued defendants for mismanagement of the plans under ERISA, including plans for which they were not participants even though absent class members were).

12    Moreover, "most courts ... have directed the defendants to bring any ethical complaints they have in the proper legal disciplinary forums and have not barred class certifications grounded on any determination of the merits of such ethical complaints." 1 Newberg on Class Actions § 3:78 (5th ed. 2018) (citing cases).

13    To be sure, the district court had analyzed the purported conflict between the two groups of plaintiffs in the context of typicality. On appeal, however, the Second Circuit noted that with respect to "any antagonistic

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 42 of 63

interests" between the two groups of plaintiffs, insofar as the plaintiffs with claims under the 1934 Act would have to prove loss causation, while those with claims under the 1933 Act would not, the difference did not "constitute the type of 'fundamental' conflict that renders the class uncertifiable" under grounds of inadequate representation. *In re Flag*, 574 F.3d at 35.

14    The City also suggests that DeCastro is not a class member at all, or at least not representative of class members, because he "was not a multiple violator of ... 19-506, nor was he driving a licensed vehicle that was permitted to have T&LC license plates on it." Defs. Mem. Opp. at 19. But the class definition clearly includes registered owners of vehicles seized "for *any* violation of Section 19-506 involving a vehicle bearing TLC license plates." Pls. Mem. at 4 (emphasis added). Thus, if DeCastro paid the towing and storage fees to retrieve his vehicle he is a member of the class.

15    The City also maintains that some instances in which registered owner-operators authorized third parties to reclaim the vehicles are "questionable." Murray Decl. ¶ 46. Specifically, it provides an example of a vehicle registered in Philadelphia in which the registered owner operated the vehicle during two seizures, but used a third party both times to reclaim the vehicle. The City argues that this example "is suspect" because the vehicle registration address is the same as that of another putative class member, and because the two third-party claimants are also registered owners of other vehicles that were seized. *Id.* But it is not clear to the Court that those facts necessarily suggest that the registered owners did not pay the towing and storage fees or otherwise lacked a legitimate ownership interest in the vehicles.

16    For vehicle seizures occurring after December 2016, the City explains that the software in the handheld devices used by TLC inspectors to issue summonses was updated to allow officers to "personally search the violation history of a vehicle owner at the time of the stop to determine if the owner violated [§ 19-506(b)]" within the preceding 36 months. Murray Decl. ¶ 54. The City claims that, since the new software was introduced, the TLC has seized approximately 50 vehicles that were subject to forfeiture under § 19-506(h)(2) and that the vehicle seizure notice issued with the summons at the time of the violation lists the owners' prior § 19-506(b)(1) violations. While this constitutes persuasive evidence that the City has genuine forfeiture-based probable cause defenses as to vehicle seizures based on § 19-506(b)(1) violations occurring after December 2016, such seizures are beyond the date of the class period that the Court has set for the purposes of this Opinion.

17    Although Mr. Mulero's affidavit cites "19-506" generally, and not § 19-506(b)(1) specifically, the Court construes his testimony to apply only to § 19-506(b)(1) seizures. This is because the testimony references only vehicles seized for "unlicensed for-hire activity" as opposed to activity concerning licensed vehicles acting beyond the scope of their license.

18    The Court is not persuaded by the City's argument that the question of whether the instrumentality of crime exception to the warrant requirement applies as to those class members that were issued criminal (as opposed to civil) summonses for § 19-506(b)(1) violations. For substantially the same reasons provided in *DeCastro I*, and on the record when this Court denied Plaintiffs' motion for reconsideration (*see* Oct. 25, 2018 Hr'g Tr. Dkt. 13), whether or not the City issues a civil summons for a § 19-506(b)(1) violation, as opposed to a criminal one, should not alter the fact that the instrumentality of crime exception does not apply to the underlying vehicle seizure. In any event, the Court need not, and does not, decide the issue as the other individual questions discussed in this Opinion predominate over common questions.

19    Although a Court can certify a liability only class pursuant to Fed. R. Civ. P. 23(c)(4), and have damages proceed individually, the Court is not convinced that doing so could save the fundamental predominance problems with this class.

**Decastro v. City of New York, Not Reported in Fed. Supp. (2019)**

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 43 of 63

20    Because the Court declines to certify the class on predominance grounds, it does not address whether a class action would be a superior method of adjudication.

21    In their supplemental briefing addressing the *Calvo II* decision, Plaintiffs requested that the court also consider a class of: "(a) all registered owners of TLC-plate vehicles and registered owners of straight-plate vehicles with one or more prior Section 19-506 violations within the previous 36 months and (b) whose car was seized by the TLC (c) while the registered owner was driving it, or which was personally retrieved by the registered owner after its seizure." The Court is not persuaded that this definition satisfies the predominance requirement of Rule 23(b)(3), however, for the same reasons addressed above. In addition, the absence of a limitation with respect to the payment of towing and storage fees in that alternative definition amplifies the Court's concerns that not every member of such a class would have standing, again for reasons previously explained.

22    The operative Complaint included named plaintiffs whose vehicles were seized for violations of § 19-506(b)(2). Those plaintiffs have since accepted Rule 68 offers of judgment, however, and are thus no longer part of the case. *See* Dkts. 36, 37.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    17

2022 WL 1046311
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Ramel GIGGETTS, Plaintiff,

v.

COUNTY OF SUFFOLK, Sert. Officer Maxwell
Edwards (Shield No. 1584), Sert. Officer Matthew
Gernemia (Shield No. 1461), Sgt. Sclafani (Shield No.
5-274), Lt. Robret Peraino (Shield No. L-1B), Lt. Adeline
Ayres (Shield No. L112), Lt. Kevin Daley (Shield No.
L118), D/S Moraangio (Shield No. 460), C.O. Michael
DeRosa (Shield No. 1259), C.O. Justin Francis (Shield
No. 1447), C.O. Peter Lambert (Shield No. 1319), C.O.
Jamie Rice (Shield No. 1167), C.O. Alex Mylett (Shield
No. 1378), C.O. Mark Magnani (Shield No. 775), RN
Jadick (I.D. No. 71), LPN Alarcon (I.D. No. 1), Thomas
Troiano M.D., Vincent Geraci D.O., Barunjaiswal M.D.,
and Soumitra Chatterjee M.D. (all in their individual
and official capacities as employees), Defendants.

2:19-cv-4885 (DRH) (ST)
|
Signed 04/07/2022

**Attorneys and Law Firms**

LAW OFFICES OF FREDERICK K. BREWINGTON,
Attorneys for Plaintiff, 556 Peninsula Boulevard, Hempstead,
NY 11550, By: Frederick K. Brewington, Esq.

DENNIS M. COHEN, SUFFOLK COUNTY ATTORNEY,
Attorneys for the County of Suffolk, H. Lee Dennison
Building, 100 Veterans Memorial Highway, P.O. Box 6100,
Hauppauge, NY 11788, By: Stacy A. Skorupa, Esq.

## MEMORANDUM AND ORDER

HURLEY, Senior District Judge:

### INTRODUCTION

**\*1** Plaintiff Ramel Giggetts brings this civil rights action
against the captioned Defendants under 42 U.S.C. § 1983,
the American with Disabilities Act and Rehabilitation Act,
and state law, arising from an alleged assault he suffered
while he was a pretrial detainee at the Riverhead and

Yaphank Correctional Facilities. Presently before the Court
is Defendant Dr. Thomas Troiano, M.D.'s motion to dismiss,
pursuant to Federal Rule of Civil Procedure 12(b)(6), all
causes of action lodged against him. For the reasons below,
Troiano's motion is granted. Plaintiff's request for leave to
amend his Amended Complaint, raised in his opposition, is
respectfully referred to Magistrate Judge Steven Tiscione.

### BACKGROUND

The following facts are taken as true from the Amended
Complaint. (See Am. Compl. ("AC") [DE 38]). Dr. Thomas
Troiano is the only moving defendant and, accordingly, only
those facts necessary to understand his position are included.

At all relevant times, Plaintiff was a pretrial detainee [1]
at Riverhead Correctional Facility suffering from
schizophrenia. (AC ¶¶ 34, 38, 40). His schizophrenic
condition led to his hospitalization at Stony Brook Medical
Center "twice in or about 2017 and 2018." (*Id.* ¶¶ 35, 36).
Despite knowing this, Defendants allegedly "regularly denied
[him] access to his medication to treat his condition without
cause or justification." (*Id.* ¶ 37). On August 30, 2018, several
correction officers allegedly, without provocation, "grabbed
Plaintiff by his shirt and forcefully slammed his body against
the wall" and his "head into the ground multiple times." (*Id.*
¶¶ 43, 45). The alleged attack caused Plaintiff "to bleed
profusely" from "his head, mouth" and other "clearly visible"
areas. (*Id.* ¶ 46). In lieu of providing him immediate medical
treatment, the correction officers handcuffed, shackled, and
mocked Plaintiff. (*Id.* ¶¶ 47, 49–51).

Two nurses—Defendants RN Jadick and LPN Alarcon—
arrived to treat Plaintiff but they "downplayed [his] injuries
and characterized them as minor." (*Id.* ¶¶ 52–54). After three
hours, Plaintiff was brought to Peconic Bay Medical Center;
their staff too failed to treat him. (*Id.* ¶¶ 55–57). He was then
sent to North Shore University Hospital – Northwell Health,
whose doctors diagnosed him with, among other injuries, face
and mouth fractures, fractured ribs, blackened eyes, a broken
nose, and loosened teeth. (*Id.* ¶¶ 58, 60). On September 1,
2018, Plaintiff underwent surgery to, in part, "reconstruct his
face." (*Id.* ¶¶ 61–62).

Plaintiff spent September 2018 at Yaphank Correctional
Facility. (*Id.* ¶¶ 63, 81). Plaintiff advised a sergeant on duty
about "lack of immediate and adequate medical treatment,"
but the Yaphank staff allegedly failed to take any action

in response and even caused him to miss a follow-up appointment with his surgeon. (*Id.* ¶ 64). Plaintiff transferred back to Riverhead Correctional Facility on October 11, 2018, where he spent twenty-three hours a day "in a 'box' alone" and wore a "spit mask" in order to cover "the blood that was continuously flowing from" his mouth. (*Id.* ¶¶ 68, 71, 81).

**\*2** At both facilities, Defendant Dr. Thomas Troiano, M.D. served as one of Plaintiff's healthcare providers. Allegedly, he "regularly denied Plaintiff access to his medication" and "failed to provide proper medical treatment" for Plaintiff's assault-related injuries. (*Id.* ¶¶ 81, 183, 191–92).

On October 22, 2018, Plaintiff was admitted to Kirby Forensic Psychiatric Center, whose medical staff immediately diagnosed him with "serious infections of the wounds located to [his] head, eyes, nose, and face." (*Id.* ¶¶ 74–75). Within twenty-four hours, Kirby transferred Plaintiff to Bronx-Lebanon Hospital Center where he underwent a second surgery. (*Id.* ¶¶ 76–78). He spent more than two weeks in recovery. (*Id.* ¶ 79).

When Plaintiff returned to Riverhead Correctional Facility on April 18, 2019, he was put on suicide watch and placed in isolation for twenty-three-and-a-half hours per day until May 10, 2019. (*Id.* ¶¶ 83–84). On May 31, 2019 Plaintiff was sentenced on the charges for which he was detained. He got probation. (*Id.* ¶ 85).

Plaintiff brought this action on August 26, 2019. [DE 1]. On December 9, 2019, then-presiding Magistrate Judge A. Kathleen Tomlinson entered a scheduling order with a March 5, 2020 deadline to move to amend the pleadings. [DE 12]. She later extended that deadline to May 18, 2020. *See* Order dated May 7, 2020. Plaintiff did so move and the briefing completed on July 13, 2020. [DEs 24, 27–28]. Judge Tomlinson granted in part and denied in part Plaintiff's motion to amend on March 31, 2021, and Plaintiff filed his Amended Complaint on April 16, 2021.

The Amended Complaint identifies several previously unnamed defendants and asserts eleven causes of action: (1) a § 1983 count against all defendants for violations of the right to Equal Protection and Due Process, (2) a § 1983 count against the correction officer defendants for excessive force, (3) a § 1983 count against all defendants for negligent supervision, (4) an American with Disabilities ("ADA") and Rehabilitation Act ("RA") count against all defendants for disability discrimination, (5) a § 1983 count

against all defendants for failure to intervene, (6) a § 1983 count for municipal liability, (7) an assault and battery count against defendant Edwards, (8) a negligence count against all defendants, (9) a negligent infliction of emotional distress count against Defendant Edwards, (10) an intentional infliction of emotional distress count against Defendant Edwards, and (11) punitive damages against all defendants.

Defendant Troiano submitted the instant motion to dismiss on October 5, 2021. [DE 53].

## LEGAL STANDARD

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). The plausibility standard is guided by two principles. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *accord Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009).

First, the principle that a court must accept all allegations as true is inapplicable to legal conclusions. Thus, "threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. A plaintiff must provide facts sufficient to allow each named defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery. *See Twombly*, 550 U.S. at 555.

**\*3** Second, only complaints that state a "plausible claim for relief" can survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that defendant acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line' between possibility and plausibility of 'entitlement to relief.' " *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal citations omitted); *see In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). Determining

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 47 of 63

Giggetts v. County of Suffolk, Not Reported in Fed. Supp. (2022)

whether a complaint plausibly states a claim for relief is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *accord Harris*, 572 F.3d at 72.

**DISCUSSION**

The Court's Memorandum proceeds in the following order. The Court begins with Plaintiff's (I) § 1983 Due Process, Equal Protection, Negligent Supervision, and Failure to Intervene causes of action; (II) ADA and RA cause of action; and (III) negligence cause of action, all as asserted against movant Troiano. The Court ends with (IV) Plaintiff's request for leave to amend his complaint a second time.

**I. § 1983 Claims: Due Process, Equal Protection, Negligent Supervision, and Failure to Intervene**

The nature of the arguments leads the Court to address together Plaintiff's § 1983 Due Process and Equal Protection claims in Count I, his § 1983 negligent supervision claim in Count III, and his § 1983 claim for failure to intervene in Count V.

All three causes of action suffer an infirmity in that they do not mention Troiano or connect any particular action to Troiano. *See* AC ¶¶ 87–116, 130–53, 195–209. Rule 8(a) requires a complaint to "give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.' " *Atuahene v. City of Hartford*, 10 Fed. App'x 33, 34 (2d Cir. 2001) (quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)); *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000) ("[A] plaintiff must disclose sufficient information to permit the defendant 'to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.' " (quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991))). "Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial." *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) (quoting 2A Moore's Federal Practice ¶ 8.13, at 8–58 (2d ed. 1994)).

Not a single allegation names Troiano nor mentions any conduct reasonably attributable to him. Paragraphs 92 and 135 represent an ostensible, but unsuccessful, effort to so allege, in that certain defendants purportedly knew of Plaintiff's schizophrenia and yet "regularly denied access to his medication." AC ¶¶ 92, 135. But those certain defendants do not include Troiano. In Paragraph 92, Plaintiff refers to "the staff members of Defendant Riverhead" – but "Defendant Riverhead" is an undefined term and a related defined term, "Riverhead Medical Staff," included only "Defendants RN Jadick and LPN Alarcon" and not Troiano. *Id.* ¶¶ 7, 92 (capitalization omitted). Paragraph 135 refers to the staff members of "Defendant [Suffolk] County's Sheriff's Department," to which no allegations imply Troiano belonged. *See id.* ¶¶ 13, 55, 135. Accordingly, Paragraphs 92 and 135 do not refer to Troiano's conduct.

"[W]ithout any specification of any particular activities" of Troiano, these causes of actions are deficient as a matter of law. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007); *Atuahene*, 10 Fed. App'x at 34 ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, Atuahene's complaint failed to satisfy [the] minimum standard" of Rule 8.). "[A] complaint that lumps all the defendants together by means of a sweepingly general allegation of wrongdoing does not plausibly allege a claim for relief against any one defendant and denies each individual defendant fair notice of what the plaintiff alleges that the individual defendant did wrong." *Alejandro v. Quiros*, 2021 WL 5324905, at *5 (D. Conn. Nov. 16, 2021).

**\*4** Plaintiff declines to confront Troiano's arguments to this end, instead requesting leave to amend his complaint again. *See* Pl. Opp. at 7, 10. The Court addresses this request in Discussion Section IV. Plaintiff's § 1983 Due Process and Equal Protection, § 1983 negligent supervision, and § 1983 failure to intervene claims against Troiano are dismissed.

**II. Disability Discrimination**

Plaintiff's ADA and RA cause of action contains his most robust allegations against Troiano. Plaintiff contends Troiano discriminated against him because Troiano knew of Plaintiff's schizophrenia and yet regularly denied him access to his medication. AC ¶¶ 160, 192. Troiano also allegedly "failed to provide proper medical treatment" for Plaintiff's injuries suffered on August 30, 2018. *Id.* ¶¶ 183, 185, 191. His allegations fail as a matter of law.

A prima facie violation under the ADA and RA entails showing (1) the plaintiff is a qualified individual with a disability; (2) the defendant is an entity subject to the ADA and RA; and (3) the plaintiff was denied the

opportunity to participate in or benefit from the defendant's services, programs, or activities or the defendant otherwise discriminated against him by reason of his disability. *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). As Troiano correctly observes, Plaintiff's allegations do not satisfy the third element – namely that Troiano discriminated against Plaintiff "by reason of [Plaintiff's] disability." Troiano Opening at 13 [DE 53-5]; Troiano Reply at 9 [DE 55].

In *Tardif v. City of New York*, the Second Circuit decided that the failure "to provide custodial medical services to [a plaintiff] in a timely and adequate manner" did not, "by itself, constitute a failure to make a reasonable accommodation 'by reason of' an individual's disability under the ADA." 991 F.3d 394, 404 (2d Cir. 2021). Tardif's framing of the issue, like Plaintiff's, avoided the question of whether he "was denied medical services *because* [he] has a disability." *Id.* at 405 (emphasis in original). His framing instead revolved around whether he "received adequate medical treatment in police custody *for* [his] disability." *Id.* (emphasis in original). This theory is not cognizable under the ADA or the RA. *Id.* "Neither the ADA nor the [RA] establish an obligation to meet a disabled person's particular needs vis-à-vis the needs of other handicapped individuals, but mandate only that the services provided by [defendants] to non-handicapped individuals not be denied to a disabled person because he is handicapped." *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998) (discussing the holding in *Flight v. Gloeckler*, 68 F.3d 61, 64 (2d Cir. 1995)).

Specific to his medication-related claims, an "unexplained failure to provide medication, by itself, does not allow for a reasonable inference that it was 'by reason of' the individual's disability." *Tardif*, 991 F.3d at 407 (emphasis removed); *McNair v. Harlem Hosp. Med. Dir.*, 2019 WL 3937663 (S.D.N.Y. Aug. 20, 2019), *adhering to* 2019 WL 2176299 (S.D.N.Y. May 17, 2019). Defendant's awareness of Plaintiff's schizophrenia, in and of itself, does not elevate withholding of medication "for" that condition into withholding of medication "because of" it. *See* Pl. Opp. at 8–9.

And no allegations connect Plaintiff's disability—schizophrenia—to Troiano's alleged inaction towards Plaintiff's physical injuries inflicted on August 30, 2018. The Amended Complaint does not suggest Troiano's "decision was motivated by considerations that are unrelated to proper medical decision-making about the case," e.g., discriminatory animus. *See McGugan v. Aldana-Bernier*, 752 F.3d 224, 231–32 (2d Cir. 2014) (discussing *United States v. University*

*Hospital*, 729 F.2d 144 (2d Cir. 1984)); *Schnauder v. Gibens*, 679 Fed. App'x 8, 11 (2d Cir. 2017) ("[B]ecause he has not pleaded facts showing that denial of treatment was attributable to bias based on disability, his pleadings do not admit an inference of proscribed discrimination." (internal citations omitted)). Like a parallel ADA claim in Tate v. City of New York, the failure to treat Plaintiff's injuries "sustained as a result of ... [an] assault" was "not properly brought under the ADA as [P]laintiff has not alleged that [D]efendants' failure to treat his injuries were related to his disability, much less that [D]efendants failed to treat his injuries 'by reason of' his disability." 2017 WL 10186809, at *4 (E.D.N.Y. Sept. 29, 2017) (internal citations omitted) (citing *Wright*, 831 F.3d at 72 and *Henrietta D. v. Bloomberg*, 331 F.3d 261, 278 (2d Cir. 2003)).

**\*5** At bottom, "a doctor who administers a medical treatment to a patient (or withholds it) because the doctor's medical training leads her to conclude that the treatment is medically appropriate (or inappropriate)" does not run afoul of the ADA or RA – "even if the doctor's medical understanding is flawed and her knowledge is deficient." *McGugan*, 752 F.3d at 231–32. The ADA and RA are not avenues to litigate medical malpractice claims. *Tardif*, 991 F.3d at 405.

The ADA and RA claim against Troiano is dismissed.

### III. Negligence

Troiano moves to dismiss Plaintiff's state law cause of action for negligence as time-barred pursuant to Judge Tomlinson's March 31, 2021 decision granting in part and denying in part Plaintiff's motion to amend. *See* Mem. & Order dated March 31, 2021 ("Mar. 31, 2021 Decision") [DE 36]. Judge Tomlinson permitted Plaintiff to bring a "state law negligence claim arising from conduct that occurred in April and May 2019." *Id.* at 11–18. She denied Plaintiff's amendment "as to his remaining state law claims because they are time-barred and do not 'relate-back' to the original Complaint." *Id.*

According to the Amended Complaint, Plaintiff was "severely beaten" on August 30, 2018 and, as a result, suffered "clearly visible" injuries "to his head," mouth, and other areas" – requiring surgery on September 1, 2018. AC ¶¶ 240–45, 255, 258–59. Roughly two months later, on October 22, 2018, Plaintiff was transferred to Kirby Forensic Psychiatric Center, whose medical staff immediately observed "serious infections" in Plaintiff's head, eyes, nose, and face wounds. AC ¶¶ 271–72. Troiano's alleged negligence

traces to this two-month period. *Id.* ¶ 278. In that timeframe, Plaintiff contends, Troiano failed to provide "proper care for [Plaintiff's] surgical wounds" apparent to the Kirby staff. *Id.*

But the "more than two-month" period preceding his October 22, 2018 admission to Kirby covers, at the most, August, September and October 2018. Pursuant to Judge Tomlinson's order, then, negligence occurring in this period is time-barred and Plaintiff may not base his negligence claim against Troiano thereon.

Plaintiff lodges no other allegations of negligence against Troiano. *See* AC ¶¶ 232–86. As the entirety of Plaintiff's negligence claim against Troiano stems from events untimely under the statute of limitations, the claim is dismissed against Troiano *in toto.*

## IV. Leave to Amend

In lieu of responding to many arguments, Plaintiff requests leave to amend his pleading a second time. Pl. Opp. at 7, 10–13. The first amendment "focused on identifying and naming John/Jane Does." *Id.* As to this second amendment, "Plaintiff is only asking for leave to amend as to Defendant Troiano." *Id.*

This second request to amend, like the first, comes after Judge Tomlinson's deadline to amend the pleadings. As chronologized in her March 31, 2021 Memorandum and Order, Judge Tomlinson extended three times the deadline to initiate the process for amendment of pleadings – ultimately to May 18, 2020. Plaintiff's second request to amend comes in his motion to dismiss opposition brief served in September 2021. It is almost sixteen (16) months after the May 18, 2020 deadline, almost fifteen (15) months after Plaintiff served his first proposed amended Complaint on June 1, 2020, and five (5) months after Judge Tomlinson granted Plaintiff leave to amend.

A plaintiff wishing to amend his pleading after the deadline set by a scheduling order "must satisfy both [Rules] 15 and 16 to be permitted to amend." *Pasternack v. Shrader*, 863 F.3d 163, 174 & n.10 (2d Cir. 2017) (internal quotation marks omitted). Under Rule 15, district courts "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Prejudice results from an amendment

requiring "the opponent to expend significant additional resources to conduct discovery and prepare for trial" or an amendment causing significant delay to the resolution of the dispute. *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725–26 (2d Cir. 2010) (internal quotation marks omitted). Under Rule 16, if a scheduling order's deadline to amend pleadings has passed, a plaintiff must show "good cause"—viz. "diligence" in seeking to amend. *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009) (quoting *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2003)).

**\*6** With respect to his disability discrimination and negligence claims against Troiano, Plaintiff is denied leave to amend. The problem there "is substantive; better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). "[R]epleading would thus be futile." *Id.*

But leave to amend his remaining claims against Troiano raises a thornier question. On the one hand, amendments should be freely granted. Fed. R. Civ. P. 15(a). Discovery has not yet closed. *See* Status Report dated Aug. 26, 2021 [DE 50]. And Troiano's strongest argument against permitting Plaintiff to amend—Plaintiff's delay in seeking to amend a second time—alone cannot suffice to deny leave to amend. *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)

On the other hand, Plaintiff offers no Rule 16 "good cause" despite the scheduling order's lapsed deadline. *See* Mar. 31, 2021 at 9–10. Plaintiff is likewise silent on what "new material [he] wishes to plead." *Cuoco*, 222 F.3d at 112; *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (leave to amend may be denied where plaintiff "fails to specify ... how amendment would cure the pleading deficiencies in [his] complaint"). On its own, each omission can be fatal. Additionally, "the longer the period of an unexplained delay," the less required of the nonmoving party "in terms of a showing of prejudice." *Block*, 988 F.2d at 350.

As evidenced by the thorough March 31, 2021 Memorandum and Order, the presiding magistrate has handled leave to amend in this action. It makes sense to stick to that practice, for the present request implicates the magistrate's scheduling order. Accordingly, Plaintiff's request is denied without prejudice to addressing the request directly to now-presiding Magistrate Judge Steven Tiscione.

Case 7:25-cv-05861-KMK    Document 37-2    Filed 11/24/25    Page 50 of 63

## CONCLUSION

For the reasons discussed above, Defendant Troiano's motion to dismiss is granted. Plaintiff's Counts I, III, and V are dismissed for failure to plead allegations against Troiano; Plaintiff's ADA and RA claim is dismissed as it is not cognizable under those statutes; and his negligence claim is dismissed as time barred. These claims are dismissed as against Troiano only.

The Court refers to Judge Tiscione Plaintiff's request for leave to amend his complaint a second time. Within two weeks of this Order, Plaintiff shall re-raise this request directly to Judge Tiscione.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1046311

---

## Footnotes

1    Neither the Amended Complaint nor the parties' briefing identify the crime for which Plaintiff was detained.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 919505

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Annette O. KAMAL and Hany M. Kamal, individually, and on behalf of all others similarly situated, Plaintiffs,

v.

PRESSLER, FELT & WARSHAW, LLP
and LVNV Funding LLC, Defendants.

1:23-cv-10487-MKV
|
Signed March 25, 2025

**Attorneys and Law Firms**

Andrew J. Brown, Law Offices of Andrew J. Brown, San Diego, CA, Karim H. Kamal, The Law Office of Karim H. Kamal, New York, NY, for Plaintiff Annette O. Kamal.

Karim H. Kamal, The Law Office of Karim H. Kamal, New York, NY, for Plaintiff Hany M. Kamal.

Jacquelyn Alena DiCicco, Jonathan M. Robbin, J. Robbin Law PLLC, Armonk, NY, for Defendants.

**OPINION & ORDER GRANTING
MOTION TO DISMISS**

MARY KAY VYSKOCIL, United States District Judge:

**\*1** Plaintiffs Annette O. Kamal and Hany M. Kamal filed a complaint against Defendants Pressler, Felt & Warshaw, LLP ("Pressler"), and LVNV Funding LLC ("LVNV") asserting claims on behalf of Plaintiffs and others similarly situated under the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* ("FDCPA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), and the New York Consumer Fraud Act, NYGBL §§ 349, *et seq.* ("GBL"), arising from the allegedly defective service and subsequent fraudulent default judgment rendered against them in an action in New Jersey state court captioned, *LVNV Funding LLC, Successor in Interest [Citibank, N.A. (AT&T), Original Creditor] v. Annette O. Kamal*, No. MON-DC-009195-22 (the "Collection Action"). This case is in essence a collateral attack on the state court proceeding.

Defendants move to dismiss the operative amended complaint for lack of standing pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, for lack of personal jurisdiction pursuant to Rule 12(b)(2), for failure to state a claim and under the doctrines of res judicata and collateral estoppel pursuant to Rule 12(b)(6), and because the claims are barred by the abstention doctrines of Rooker-Feldman and Colorado River. For the reasons below, the motion to dismiss is GRANTED.

**FACTUAL BACKGROUND** [1]

Defendant Pressler, Felt & Warshaw, LLP ("Pressler") is a law firm that has filed thousands of consumer credit actions, or debt collection actions, throughout New York, New Jersey, and Pennsylvania on behalf of buyers of debt. FAC ¶¶ 2, 52. Pressler represents LVNV, an investor in domestic and international debt, in most of the debt collection lawsuits it brings. FAC ¶¶ 2–3. The vast majority of these lawsuits result in default judgments in favor of LVNV. FAC ¶ 3. [2]

Nearly a decade ago, the Consumer Financial Protection Bureau instituted a $1 million penalty against Pressler's predecessor, Pressler & Pressler LLP, and its two principal partners Sheldon Pressler and Gerard Felt. for their role in filing deceptive debt collection lawsuits on behalf of a debt buyer, New Century Financial Service, Inc. FAC ¶ 4. Pressler & Pressler later reorganized as Pressler, Felt & Warshaw LLP, one of the defendants here. FAC ¶ 4. According to Plaintiffs, Defendants practice "sewer service" by filing lawsuits to collect purchased debt, and failing properly to serve the summons and complaint, and then filing fraudulent affidavits of service to achieve default judgments. FAC ¶¶ 6–7. After Defendants obtain default judgments, they seek to enforce them by restraining bank accounts, garnishing wages, or threatening to seize personal property. FAC ¶ 8.

**\*2** In February 2023, LVNV brought a lawsuit through its attorneys at Pressler against Plaintiff Annette Kamal in Superior Court of New Jersey (the "Collection Action"). FAC ¶ 55. Pressler affirmed that it had sent a copy of the summons and complaint to Annette Kamal via U.S. mail to an address in New Jersey (the "New Jersey address") and affirmed that service was proper. FAC ¶ 57.

Hany and Annette Kamal are a married couple who have lived in New York County since 1968. FAC ¶¶ 14, 54, 56. Annette is 91 and Hany is 83. FAC ¶ 54. Hany and Annette Kamal allege that they have never been residents of New

Jersey and were never served with a summons and complaint in the Collection Action. FAC ¶ 56. They allege that Pressler had "no reasonable basis for claiming valid service would be, could be, or was actually achieved by mailing documents to the New Jersey address." FAC ¶ 57.

When Annette Kamal did not appear in the Collection Action, Defendants obtained a default judgment against her. FAC ¶ 58; [ECF No. 26 ("DiCicco Decl.") Ex. G ("Default Judgment")]. Plaintiffs allege the motion for a default judgment and the resulting default judgment also were not properly served. FAC ¶ 58. Defendants sought to enforce the judgment by attaching Annette's personal account at her NYC Chase Bank account. FAC ¶ 58. This is how Annette and Hany Kamal became aware of the judgment in the Collection Action. FAC ¶ 58.

Several months after the Collection Action was commenced, Plaintiff filed this action bringing claims against Pressler and LVNV. [ECF No. 1 ("Compl.")]. Plaintiffs allege that about a month later Pressler learned Annette Kamal did not and never had resided in New Jersey, rendering false its affidavits of service. FAC ¶ 59. On December 11, 2023, Pressler advised the New Jersey Court that Plaintiff's "address provided on the writ for the defendant *is no longer* valid as the defendant has relocated," and called Kamal's New York City address her "new home address," suggesting that the New Jersey address was valid at the time of service. FAC ¶ 59 (emphasis added); [ECF No. 32 ("Kamal Decl.") Ex. B ("Address Change Notice")]. [3] Rather than notifying the New Jersey Court that Annette Kamal had never lived at the New Jersey address and seeking to have the judgment set aside, Pressler and LVNV asked the Court for leave to serve the default judgment on Annette Kamal at her New York residence. FAC ¶ 59; Address Change Notice.

In March 2024, while briefing on Defendants' motion to dismiss was ongoing in this action, the New Jersey Court granted Annette Kamal's motion to vacate the Default Judgment in the Collection Action. Kamal Decl. Ex. C ("Vacating Order"). The New Jersey Court held that "the Court is convinced that Defendant was not properly served with notice of the legal proceeding." *Id.* at 6. However, soon after, the New Jersey Court held that Annette Kamal's attorney—one of the attorneys who represents Plaintiffs here—had committed unauthorized practice of law by filing the motion to vacate and thus granted a motion filed by LVNV to reconsider the Vacating Order. [ECF No. 33 ("DiCicco Aff.") Ex. 2 ("LVNV Mot. for Reconsideration")]; [ECF No. 35

("Defendants' Supp. Letter"), Ex. A]. The New Jersey Court allowed Annette sixty days to file a proper motion to vacate. Defendants' Supp. Letter Ex. A.

**\*3** In July 2024, the New Jersey Court denied Annette Kamal's second motion to vacate. [ECF No. 35, Ex. A ("July Order")]. In doing so, the Court applied New Jersey Rule of Court 4:50-1 which sets out several permitted reasons for relieving a party from a final judgment including that "the judgment or order is void[.]" The Court ruled that the Default Judgment was not void based on ineffective service. *Id.* at 5–6. In fact, the Court affirmatively found that "[s]ervice was effective." *Id.* at 5–10. The Court held that Kamal came forward with "no admissible proof supporting [her] counsel's contention that she never lived in New Jersey," specifically noting that Annette Kamal provided no certification from her, a family member, friend or neighbor, no documentary proof of her residence at the time the litigation was commenced, no leases, no mail, no driver's license, no utility bills, no voter registration, and no bank statement that showed she lived in New York. *Id.* at 7–8. Instead, the Court found that the record indicated that "Kamal resided in New Jersey at the address in question" and service on her there was proper. *Id.* at 6, 8 (citing billing statements, two credit bureau reports, the fact that initial service was not returned, and that service of the Default Judgment was signed for at the New Jersey address). The Court later denied Annette Kamal's motion to reconsider the order denying the motion to vacate. [ECF No. 37 Ex A. ("Kamal Reconsideration Order")].

## PROCEDURAL HISTORY

Plaintiff initiated this putative class action by filing a Complaint. [ECF No. 1 ("Compl.")]. With leave of Court, Plaintiff filed an Amended Complaint, in response to the issues raised in Defendants' first pre-motion letter seeking leave to move to dismiss the case. [ECF Nos. 15, 17, 21]. Thereafter, Defendants moved to dismiss the Amended Complaint, filing a memorandum of law, [ECF Nos. 25, 27 ("Def. Mem.")], and a declaration in support which attached several exhibits. *See* DiCicco Decl. In opposition, Plaintiff filed a memorandum of law, [ECF No. 31 ("Pl. Opp.")], and a declaration which also attached several exhibits. *See* Kamal Decl. Defendants filed a reply, [ECF No. 34 ("Def. Reply")], and an affidavit in further support which attached two additional exhibits, *see* DiCicco Aff. The parties thereafter filed three letters advising the Court on the status on the Collection Action. [ECF Nos. 35–37].

### LEGAL STANDARD

**I. Federal Rule of Civil Procedure 12(b)(1) – Lack of Standing**

Dismissal of an action under Rule 12(b)(1) is warranted whenever a district court " 'lacks the statutory or constitutional power to adjudicate it,' such as when ... the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). A plaintiff bears the burden of establishing its standing by a preponderance of the evidence. *See Makarova*, 201 F.3d at 113. "In assessing the plaintiff's assertion of standing, '[courts] accept as true all material allegations of the complaint[ ] and ... construe the complaint in favor of the complaining party.' " *Cortlandt St. Recovery*, 790 F.3d at 417 (quoting *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008)). Courts may also consider evidence outside of the pleadings in assessing a Rule 12(b)(1) standing motion. *Cortlandt St. Recovery*, 790 F.3d at 417; *Makarova*, 201 F.3d at 113.

**II. Federal Rule of Civil Procedure 12(b)(2) – Lack of Personal Jurisdiction**

To survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure, the plaintiff must make a *prima facie* showing that the Court has personal jurisdiction over the defendant. *See Penachio v. Benedict*, 461 F. App'x 4, 5 (2d Cir. 2012); *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). To make a *prima facie* showing of personal jurisdiction, a plaintiff "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013); *see also S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010)

In assessing personal jurisdiction, the Court must "construe the pleadings and any supporting materials in the light most favorable" to the plaintiff. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013). Still, the Court cannot "draw argumentative inferences in the plaintiff's favor" and need not accept conclusory legal

statements. *O'Neill v. Asat Trust Reg.*, 714 F.3d 659, 673 (2d Cir. 2013).

**\*4** It is well settled that, in deciding a motion to dismiss a complaint for want of personal jurisdiction, the Court may consider materials outside the pleadings. *Fleming v. ISCO Indus., Inc.*, 750 F. App'x 62, 63–64 (2d Cir. 2019) (citing *Dorchester Fin. Sec.*, 722 F.3d at 86 ("[W]e have made clear that a district court may [consider materials outside the pleadings] without converting a motion to dismiss for lack of personal jurisdiction into a motion for summary judgment.")). Where, as here, jurisdictional discovery has not been conducted, the plaintiff need only make a *prima facie* showing by his pleadings and affidavits that jurisdiction is proper. *Id.* at 85; *see also Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727–28 (2d Cir. 2012). "If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *In re Terrorist Attacks*, 714 F.3d at 673. The court must "construe the pleadings and affidavits in the light most favorable to [the plaintiff], resolving all doubts in [its] favor." *V&A Collection, LLC v. Guzzini Props. Ltd.*, 46 F.4th 127, 131 (2d Cir. 2022).

There are three traditional bases for the exercise of personal jurisdiction over a defendant. First, a court may exercise general jurisdiction over a defendant that is "essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 119 (2014). Second, a court may exercise "specific or conduct-linked jurisdiction" where there is a sufficient link between the defendant's conduct in the forum and the conduct at issue in the case. *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014). Third, a defendant can consent to the exercise of personal jurisdiction. *Rabinowitz v. Kelman*, 75 F.4th 73, 83 (2d Cir. 2023); *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006). In all cases, the exercise of personal jurisdiction must comport with fundamental notions of due process. *See Daimler*, 571 U.S. at 117.

**III. Federal Rule of Civil Procedure 12(B)(6) – Failure to State a Claim**

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "

*Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While the Court "must accept as true all of the allegations contained in a complaint," this "tenet ... is inapplicable to legal conclusions." *Id.*

The "plausibility standard" articulated in *Iqbal* "is not akin to a 'probability requirement,' but it does ask "for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* At bottom, Plaintiff must "nudg[e] [his] claim[ ] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 569. Otherwise, the complaint must be dismissed. *Id.*

## DISCUSSION

### I. Plaintiff Hany Kamal's Claims Must be Dismissed Because He Fails to Allege Standing

Defendants assert that Hany Kamal and Annette Kamal lack standing to pursue their claims. Def. Mem. at 8–9. Defendants assert that Hany Kamal was not a named defendant in the Collection Action and thus he was not damaged in any way by the enforcement of the Collection Action. Def. Mem. at 8. Defendants assert that Annette Kamal lacks standing because, in the Collection Action, one of her attorneys purported to have power of attorney over her and that attorney asserted that she was "an incompetent" as a 91-year-old "in the final stages of ...Progressive Supranuclear Palsy." Def. Mem. at 8–9 (citing DiCicco Decl. Ex. L); Def. Reply at 4 n.5. Thus, Defendants urge that Annette Kamal "cannot proceed without a guardian ad litem." Def. Mem. at 8–9.

**\*5** To have standing to sue, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338 (citing, *inter alia, Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). At the pleading stage, "the plaintiff must 'clearly ... allege facts demonstrating' each element" of standing. *Id.* (citation omitted).

Plaintiff Annette Kamal clearly has standing to pursue her claims. The Amended Complaint alleges the Defendants injured Annette Kamal by fraudulently obtaining and enforcing a judgment procured in the Collection Action against her, attaching her personal bank account in New York. FAC ¶¶ 55, 58, 59. The Amended Complaint makes no allegation that Annette is incompetent and the Court may not take judicial notice of documents filed in the Collection Action for the truth of the statement that Annette Kamal is "an incompetent." *See, e.g., Arkansas Pub. Emps.*, 28 F.4th at 352. Regardless, if Defendants believe that Annette Kamal is incompetent to defend her rights in court, the proper course of action would be to file a motion to appoint a guardian *ad litem* pursuant to Rule 17(c) of the Federal Rules of Civil Procedure, so that she may be properly represented. *Ferrelli v. River Manor Health Care Ctr.*, 323 F.3d 196, 200 (2d Cir. 2003) (quoting Fed. R. Civ. P. 17(c)). No such motion has been filed, and this Court cannot make a finding with the requisite sufficient evidence to establish the mental incompetency of Plaintiff and appoint a guardian *ad litem. Lucido v. U.S. Legal Support, Inc.*, No. 23-CV-1389 (DEH), 2024 WL 687288, at *1 (S.D.N.Y. Feb. 20, 2024) (citing *Neilson v. Colgate-Palmolive Co.*, 199 F.3d 642, 652 (2d Cir. 1999) (affirming the appointment of a guardian *ad litem* for plaintiff where defendant made the motion to appoint such a guardian)). Defendants cite no law to support their outrageous assertion that a Court must dismiss a plaintiff's case, rather than appoint her a guardian *ad litem*, if the plaintiff is truly incompetent to represent herself. *See* Def. Mem. 8–9.

Defendants are correct, however, that Hany Kamal does not have standing to pursue claims in this case. The Amended Complaint includes no allegation that Hany himself was a defendant in the Collection Action or suffered an injury as a result of the Collection Action. *See* FAC. Moreover, the caption of the Collection Action indicates that Annette Kamal was the only defendant. *See* DiCicco Decl. Ex. M. The only factual allegations in the Amended Complaint regarding Hany Kamal involve his marriage to Annette Kamal, his age, languages, employment status, residence, and income. FAC ¶¶ 14, 54, 56. Plaintiffs argue that Hany Kamal has standing because New York divorce laws divide marital property and debt equally and that New York banking laws indicate that when spouses own a joint account, courts presume that the parties are entitled to equal shares of the account. Pl. Opp. at 10–11. However, the Amended Complaint includes no allegation that Hany and Annette Kamal are divorced and no allegation that Hany Kamal was a joint owner of Annette

Kamal's bank account that was attached pursuant to the judgment in the Collection Action. *See* FAC. Hany Kamal does not have standing based solely on an injury to his wife. *See, e.g., Meimaris v. Royce,* No. 19-3339-CV, 2021 WL 5170725, at *2 (2d Cir. Nov. 8, 2021) ("a spouse does not have standing merely on the basis of her marital status to sue for an injury suffered by her spouse"). Accordingly, Hany Kamal lacks standing, and his claims are dismissed. [4]

### II. Personal Jurisdiction Over Defendants

**\*6** In response to Defendants' motion to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure, Kamal asserts that Defendants are subject to both general and specific jurisdiction in New York. *See* Pl. Opp. at 8–10. Kamal fails to make a *prima facie* case for general jurisdiction over defendants but does make a *prima facie* showing that Defendants are subject to specific jurisdiction in New York with respect to her claims.

### A. Plaintiff Fails to Establish General Jurisdiction

General personal jurisdiction subjects a defendant to suit on all claims. *See Daimler,* 571 U.S. at 127. Under the Due Process Clause, a corporation can "be subject to general jurisdiction in a state only where its contacts are so 'continuous and systematic' ... that it is 'essentially at home' in that state." *Gucci America, Inc. v. Weixing Li,* 768 F.3d 122, 135 (2d Cir. 2014) (quoting *Daimler,* 571 U.S. at 139). Under this test, a corporate defendant is "essentially at home" only where it is incorporated or where it maintains its principal place of business "[e]xcept in a truly 'exceptional' case." *Brown v. Lockheed Martin Corp.,* 814 F.3d 619, 627 (2d Cir. 2016) (quoting *In re Roman Catholic Diocese of Albany, N.Y., Inc.,* 745 F.3d 30, 38-39 (2d Cir. 2014)); *Gucci America, Inc.,* 768 F.3d at 135 (quoting *Daimler,* 571 U.S. at 139 & n.19).

Pressler is a New Jersey Limited Liability Partnership with a principal place of business in Morris County, New Jersey and LVNV Funding, LLC, is a Delaware Limited Liability Company with a principal place of business in New Castle County, Delaware. [5] FAC ¶¶ 17–18. Since neither Defendant is "at home" in New York, general jurisdiction in New York over either is improper absent truly exceptional circumstances. *Brown,* 814 F.3d at 627.

Kamal alleges that Pressler markets itself on its website as doing business in New York, has filed thousands of cases in New York, maintains a law office in New York, where one

lawyer works, [6] and works with LVNV which also has an office in New York at the same address. Pl. Opp. at 9 (citing Kamal Decl. Exs. A, D). Kamal alleges that LVNV purchases debts of New York residents, regularly sues those residents in New York court, is licensed to do business in New York and "at least one of those licenses lists" a New York City address, the same address as the Pressler's New York office. Pl. Opp. at 9–10 (Kamal Decl. ¶¶ 7, 8, 10, Ex. F).

These contacts do not establish that either Defendant is "essentially at home" in New York. The fact that Defendants operate some business in New York is insufficient on its own to establish general jurisdiction. *See, e.g., Sonera Holding B.V. v. Cukurova Holding A.S.,* 750 F.3d at 226 (explaining that even a "substantial, continuous, and systematic course of business," including negotiations, transactions, and an office in New York, was insufficient to warrant exercise of general jurisdiction (internal quotation marks omitted)). Further, a foreign defendant does not consent to general personal jurisdiction in New York by registering to do business in the state. *See Chufen Chen v. Dunkin' Brands, Inc.,* 954 F.3d 492, 499 (2d Cir. 2020); *D'Amico Dry D.A.C.* v. *Primera Mar. (Hellas) Ltd.,* 348 F.Supp.3d 365, 387 (S.D.N.Y. 2018) (quoting *Chatwal Hotels & Resorts LLC v. Dollywood Co.,* 90 F. Supp. 3d 97, 105 (S.D.N.Y. 2015)). [7]

**\*7** Instead, Defendants' business in New York must be viewed relative to their overall activity "nationwide and worldwide." *See Daimler,* 571 U.S. at 139 n.20; *Waldman v. Palestine Liberation Org.,* 835 F.3d 317, 333 (2d Cir. 2016); *see also Brown v. Lockheed Martin Corp.,* 814 F.3d 619, 629 (2d Cir. 2016) (finding no general jurisdiction in Connecticut where "[Defendant's] business in Connecticut, while not insubstantial, constitutes only a very small part of its portfolio."); *Gucci America,* 768 F.3d at135 (finding no general jurisdiction over the Bank of China, which had branch offices in New York but was "incorporated and headquartered elsewhere" and conducted only a small portion of its worldwide business within the forum); *Corley v. Vance,* 365 F. Supp. 3d 407, 434 (S.D.N.Y. 2019), *aff'd sub nom. Corley v. Wittner,* 811 F. App'x 62 (2d Cir. 2020) (finding no general jurisdiction where defendant had an office in New York but less than 7% of its global workforce is located that office).

Kamal has alleged no facts about the magnitude and nature of the nationwide or worldwide activity of Pressler and LVNV, except the general assertion that PWF has filed "thousands of 'consumer credit actions,' or debt collection actions,

throughout NY-NJ-PA" and Pressler represents LVNV in most of the debt collection lawsuits they bring. FAC ¶¶ 2–3. Accordingly, the Court has insufficient context with which to determine whether either defendant is "essentially at home" in New York. *See Great W. Ins. Co. v. Graham*, No. 18-CV-6249 (VSB), 2020 WL 3415026, at *11 (S.D.N.Y. June 22, 2020) ("[Plaintiff's allegations] do not provide any detail about WSFS' national business. Without that context, I cannot properly assess the significance of WSFS' New York contacts with respect to its 'overall activity.'"). Plaintiff has failed to meet her burden to demonstrate that this is an "exceptional case" in which a corporation is "essentially at home" in a foreign forum. *See Brown*, 814 F.3d at 627 (quotation marks omitted).

**B. Plaintiff Establishes Specific Jurisdiction over Defendants**

District courts deciding a motion to dismiss for lack of personal jurisdiction engage in a two-part analysis to determine whether there is specific jurisdiction over the defendant. First, the Court must determine whether the law of the forum state, here, New York's long-arm statute, would subject the Defendant to personal jurisdiction. *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128 (2d Cir. 2013); *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) ("To determine personal jurisdiction over a non-domiciliary in a case involving a federal question," the Court first "appl[ies] the forum state's long-arm statute."). If New York law would permit the exercise of jurisdiction over the Defendant, the Court must also evaluate whether the exercise of jurisdiction would comport with due process. *See Daimler AG v. Bauman*, 571 U.S. 117, 117 (2014); *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 90 (2d Cir. 2017).

Though Kamal asserts that this Court has specific jurisdiction over Defendants, she fails to identify the pertinent section of the New York long-arm statute. Since Plaintiff alleges that "Defendants conducted business within the State of New York," *see* FAC ¶ 13, and "avail themselves of the laws and benefits of operating their businesses in the state of New York," *see* Pl. Opp. at 8, the Court analyzes specific jurisdiction under CPLR § 302(a)(1). This subsection permits a court to "exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent: ... transacts any business within the state or contracts anywhere to supply goods or services in the state[.]" CPLR § 302(a)(1).

**\*8**  To determine the existence of jurisdiction under section 302(a)(1) a court must decide (1) whether the defendant

'transacts any business' in New York and, if so, (2) whether this cause of action "aris[es] from" such a business transaction. *American Girl, LLC v. Zembrka*, 118 F.4th 271, 277 (2d Cir. 2024), *cert. denied*, No. 24-653, 2025 WL 247472 (Jan. 21, 2025); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007); *see Deutsche Bank Securities, Inc. v. Montana Bd. of Investments*, 7 N.Y.3d 65, 71, 850 N.E.2d 1140, 1142, 818 N.Y.S.2d 164, 166 (N.Y. 2006). Ordinarily, in evaluating whether the defendant transacts business, "[c]ourts look to 'the totality of the defendant's activities within the forum' to decide whether the defendant engaged in "purposeful activity" in New York. *Best Van Lines*, 490 F.3d at 246 (quoting *Sterling National Bank & Trust Co. of N.Y. v. Fidelity Mortgage Investors*, 510 F.2d 870, 873 (2d Cir. 1975)). The second element of § 302(a)(1) is satisfied "when there exists an articulable nexus or a substantial relationship between transactions occurring within the state and the cause of action sued upon." *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 643 (2d Cir. 2023).

The decision of the Second Circuit in *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015), is instructive here. In that case, defendant, a law firm attempted to collect a New York resident's debt on behalf of a Pennsylvania-based client by filing a suit in Pennsylvania state court. *Id.* at 166–67. When the New York state resident filed suit in New York alleging violations of FDCPA, the Second Circuit reversed the District Court's dismissal for lack of personal jurisdiction under § 302(a)(1). The Second Circuit held that collecting debt constituted "a major aspect of [Defendant's] mission—part of its principal reason for being." *Id.* at 168. (citing *Deutsche Bank Sec.*, 7 N.Y.3d at 72). Further, it found the defendant's conduct in New York—mailing one debt collection notice to Plaintiff, engaging in one debt collection phone call with Plaintiff, and mailing a summons and complaint to Plaintiff—was sufficient to establish personal jurisdiction under § 302(a)(1) because the Defendant "initiated debt collection efforts in an active (rather than responsive) attempt to collect money from two New York residents." *Id.* (citing *Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 377–78, 998 N.Y.S.2d 720 (2014)). Finally, the Second Circuit found that Plaintiffs' FDCPA claims arose directly from those communications into New York. *Id.* (citing *Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 868 (2d Cir. 1992) ("[R]eceipt of a collection notice is a substantial part of the events giving rise to a claim under the [FDCPA].")).

The facts alleged here are very similar. Kamal brings a FDCPA claim—and two other claims based on the same

conduct—against a law firm and its debt investor client that Plaintiff alleges participate in a "fraudulent enterprise" with a shared goal "to obtain default judgments through fraudulent means" by filing thousands of "consumer credit actions" throughout New York, New Jersey, and Pennsylvania. FAC ¶¶ 2, 3, 84. Kamal alleges that, in the Collection Action, Defendant requested service of the Default Judgment to an address in New York and attempted to enforce the Default Judgment through an attachment of Kamal's New York-based bank account. FAC ¶¶ 58–59. Though Defendants initially attempted service in New Jersey and they did not call or write letters to New York residents as the Defendant did in *Eades*, Defendants' conduct here was in deliberate furtherance of debt collection efforts purposefully availing itself of the privilege of transacting business in New York. *See Eades*, 799 F.3d at 168. Further, just as in *Eades*, Plaintiffs' claims of fraudulent debt collection, violations of RICO, and violations of the New York Consumer Fraud Act all arise out of Defendants' pursuit of debt collection from Plaintiff. Accordingly, Kamal has averred facts that, if credited, establish personal jurisdiction over Defendants pursuant to 302(a)(1).

**\*9** The exercise of personal jurisdiction also comports with the Constitution's due process protections. "[D]espite the fact that section 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive, and that personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases to be rare." *Eades*, 799 F.3d at 168 (quoting *Licci*, 732 F.3d at 170). The Due Process Clause of the Constitution requires that (1) the defendant have sufficient "minimum contacts" with the forum and that (2) the exercise of jurisdiction over defendants does "not offend traditional notions of fair play and substantial justice." *Spetner*, 70 F.4th at 644–45.

As for the first requirement, courts assess the "quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test." *Eades*, 799 F.3d at 168 (citing *Licci,* 732 F.3d at 170 (quotation marks omitted)). Defendants have sufficient "minimum contacts" with the forum if they "purposefully availed [themselves] of the privilege of doing business in the forum and could foresee being haled into court there." *Id.* (quoting *Licci,* 732 F.3d at 170) (quotation marks and alterations omitted). Just as with the Defendant in *Eades*, the contacts with New York by Defendants here sufficiently satisfy the "minimum contacts" test. *See Eades*, 799 F.3d at 168. Defendants purposefully

pursued debt collection from a person allegedly residing in New York by serving her in New York with a Default Judgment and attaching her New York-based bank account. FAC ¶¶ 58–59.

As for the second consideration, the inquiry into whether exercising jurisdiction comports with fair play and substantial justice reexamines five factors: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *American Girl*, 118 F.4th at 279 (citing *In re Platinum*, 61 F.4th at 273 (citation omitted)). Here, Defendants are located in New Jersey and Delaware, have offices in New York, routinely litigate in New York to pursue debts, and can easily defend themselves in New York. Moreover, New York has a "manifest interest in providing effective means of redress for its residents," and Kamal has an interest in adjudicating her case in the state where she claims she resides and where her assets are being impacted by Defendants' actions. *Chloé,* 616 F.3d at 173 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 105 S. Ct. 2174, 2182, 85 L. Ed. 2d 528 (1985)). The fourth factor is neutral in this case: the controversy could be resolved efficiently in either New York or New Jersey. Finally, the States share an interest in enabling plaintiffs to litigate FDCPA claims in their states of residence. *See, e.g., Sluys v. Hand,* 831 F.Supp. 321, 324 (S.D.N.Y. 1993) (noting that FDCPA plaintiffs should be able to file suit in their states of residence because "[o]therwise, [debt collectors] could invoke the protection of distance and send violative letters with relative impunity, at least so far as less well-funded parties are concerned"); *see also Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 348 (S.D.N.Y. 2015) (finding the fifth factor in a RICO case to be "neutral"); *Brady v. Anker Innovations Ltd.*, No. 18-CV-11396 (NSR), 2020 WL 158760, at \*7 (S.D.N.Y. Jan. 13, 2020) (finding the fifth factor "neutral" in a case bringing a GBL claim). For these reasons, the Court has personal jurisdiction over Defendants pursuant to the New York long-arm statute and consistent with due process, and their motion to dismiss on the basis of lack of personal jurisdiction is denied.

## III. Kamal is Collaterally Estopped from Asserting her Claims

**\*10** Defendants argue that all of Kamal's claims are precluded under the doctrine of collateral estoppel based

on rulings in the Collection Action. Def. Mem. at 9–11. Defendants argue that the Court in the Collection Action determined the issue of whether service was proper and that finding is preclusive of each of Kamal's claims. Def. Mem. at 10–11. Defendants assert that the initial Default Judgment and a subsequent Writ of Execution Against Goods & Chattels each affirm that service was proper and constitute a final judgment on the merits. *Id.*

In opposing Defendants' motion to dismiss this case, Kamal relies only on the then-current fact that the New Jersey Court had vacated the Default Judgment against her. Pl. Opp. at 11–12 (citing Vacating Order). However, since then, the New Jersey Court ruled Kamal's motion to vacate was improperly filed, permitted Kamal time to file a new motion to vacate, and permitted both parties time to submit additional briefing and evidence related to the vacatur motion. [ECF No. 35, Ex. A ("July Order")]. After reviewing the materials submitted by the parties, the New Jersey Court denied Kamal's request to vacate the Default Judgment and later denied Kamal's motion for reconsideration. *Id.*; Kamal Reconsideration Order. No further motions were filed and no further orders were issued in the New Jersey case. *See* Collection Action. Though the parties in this case notified this Court of these developments in the Collection Action, the parties did not move to file additional briefing in this case based on the subsequent New Jersey Court orders. [ECF Nos. 35–37]. Nevertheless, this Court can take judicial notice of orders in the Collection Action as public records, and analyzes collateral estoppel based on the *current* status of the Collection Action. *Simmons v. Trans Express Inc.*, 16 F.4th 357, 360 (2d Cir. 2021) (finding that a district court "properly took judicial notice of documents" in a state court action to analyze the preclusive effect of that court's holdings).

The doctrine of collateral estoppel, or issue preclusion, precludes a party from relitigating a factual or legal issue that the party previously litigated and lost in an earlier action. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 (1979). Federal courts apply the collateral estoppel rules of the state that rendered the prior judgment. *LaFleur v. Whitman*, 300 F.3d 256, 271 (2d Cir. 2002). Accordingly, the Court applies New Jersey law. Under New Jersey law, the party asserting collateral estoppel—Defendants here—must show that:

(1) the issue to be precluded is identical to the issue decided in the prior proceeding;

(2) the issue was actually litigated in the prior proceeding;

(3) the court in the prior proceeding issued a final judgment on the merits;

(4) the determination of the issue was essential to the prior judgment; and

(5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

*See, e.g.*, *Winters v. N. Hudson Reg'l Fire & Rescue*, 212 N.J. 67, 85, 50 A.3d 649, 659 (N.J. 2012); *Twp. of Middletown v. Simon*, 193 N.J. 228, 236, 937 A.2d 949, 954 (N.J. 2008); *see also W & D Imports, Inc. v. Lia*, 563 F. App'x 19, 22 (2d Cir. 2014) (applying New Jersey collateral estoppel law). In New Jersey, Courts also assess the benefits that flow from the doctrine, namely, "finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness." *New Jersey Div. of Youth & Fam. Servs. v. R.D.*, 207 N.J. 88, 115, 23 A.3d 352, 368 (N.J. 2011).

**\*11** A central issue in this case, central to each of Plaintiff's claims, is whether Defendants fraudulently obtained the Default Judgment they seek to enforce against Plaintiff in New York by falsely contending she had been properly served in the New Jersey Collection Action. *See* FAC ¶¶ 6-8, 55–59, 44, 52–53, 76, 81–101, 104. The dispositive issue of whether service was proper at the New Jersey address meets each of the five elements necessary for a finding of collateral estoppel. First, it was the "identical issue" decided by the New Jersey Court in the July Order deciding not to vacate the Default Judgment. *Olivieri v. Y.M.F. Carpet, Inc.*, 186 N.J. 511, 522, 897 A.2d 1003, 1010 (N.J. 2006) ("A party is precluded by collateral estoppel from relitigating matters or facts which the party actually litigated and which were determined in a prior action, involving a different claim or cause of action."). In its opinion, the New Jersey Court described the issue before it this way—"[b]oiled to its core, Kamal contends that the default judgment should be vacated due to deficient service." July Order at 2. The Court held that the Default Judgment was not void because "[s]ervice was effective." *See* July Order at 6. The Court reached this determination, after briefing by both parties, based on the factual record before it, which showed that initial service was not returned, service of the Default Judgment was signed for at the New Jersey address, and billing statements and two credit bureau reports showed that Annette Kamal lived at the New Jersey address where the affidavit of service attested

she had been served. *Id.* at 5–10. In finding that service was proper, the Court found that "documents in the record indicate that Kamal resided in New Jersey at the address in question." *Id.* at 8.

Second, the issue of the adequacy of service was "actually litigated." In fact, Kamal had three bites at the apple—her first motion to vacate Default Judgment, her second motion to vacate Default Judgment, and her motion to reconsider the Order denying her motion to vacate the Default Judgment. Both parties were permitted to file evidence in support of their positions on the issue of service. July Order at 1, 7–8. Based on a fulsome record, the Court found that Kamal presented "no admissible proof supporting counsel's contention that she never lived in New Jersey" and no proof for the contention that she lived in New York. July Order at 7–8. According to the Collection Action docket, oral argument was held on Kamal's second motion to vacate. *See* Collection Action. Accordingly, she had a "full and fair opportunity" to show that service was improper. See *Gannon v. American Home Prods., Inc.*, 211 N.J. 454, 474, 48 A.3d 1094, 1106 (N.J. 2012); *see also Allesandra v. Gross*, 187 N.J. Super. 96, 105, 453 A.2d 904, 908–09 (N.J. Super. Ct. App. Div. 1982) (stating an issue is "actually litigated" when "an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined").

Third, the New Jersey Court "issued a final judgment on the merits." In assessing whether a final judgment was made in a prior proceeding, a court will assess "whether the parties were fully heard, whether a reasoned opinion was filed, and whether that decision could have been, or actually was, appealed." *Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519, 541 (3d Cir. 2012); *Balik v. City of Bayonne*, No. A-1448-13T2, 2016 WL 3351942, at *2 (N.J. Super. Ct. App. Div. June 17, 2016). Here, the New Jersey Court issued an eleven-page "reasoned opinion" detailing the evidence and rationale supporting the decision that the Default Judgment was not void because service was proper. *See* July Order. New Jersey law permits finding that a Default Judgment was a "final judgment on the merits" where the defendant in the prior case had "ample opportunity" to contest it. *First Union Nat. Bank v. Penn Salem Marina, Inc.*, 190 N.J. 342, 354, 921 A.2d 417, 425 (2007). That is certainly the case here. Further, the Court later denied Kamal's motion to reconsider, reaffirming that the July Order was its final judgment on the issue. *See* Kamal Reconsideration Order. Finally, neither the Collection Action docket nor searches of the New Jersey Superior Court Appellate Division docket reflect that any

order in the Collection Action was appealed. *See* Collection Action; *Free Speech Coal*, 677 F.3d at 541. Neither party to this case contends otherwise.

Fourth, the issue of whether service was effective was necessary to the New Jersey Court's determination of whether the Default Judgment was void. July Order at 5–6. The Court held that "other than voidness due to service, relief under Rule 4:50-1 [the rule which permits New Jersey courts to vacate judgments] is precluded." *Id.* at 5. Thus, in the Collection Action, the New Jersey Court must have determined that service was effective, as it did, to support its determination that the Default Judgment was not void. *Neal v. ASTA Funding, Inc.*, Civ. A. No. 13-3438, 2019 WL 522095, at *9 (D.N.J. Feb. 8, 2019) (finding plaintiff's employment relationship with defendant "was essential to the prior judgment, because it had to be determined in order for the arbitrator to determine whether the ITS Agreement's arbitration clause gave him jurisdiction to adjudicate claims against Neal"); *Fields v. Dickerson*, Civ. A. No. 14-778, 2016 WL 3619119, at *5 (D.N.J. July 6, 2016) ("A matter is essential when it was necessary to support the judgment rendered in the final action.").

**\*12** Finally, the party against whom the preclusion doctrine is asserted here, Annette Kamal, was a party in the Collection Action.

Based on these factors and the New Jersey case law principles encouraging "finality and repose" and "avoidance of duplication," Kamal is precluded from arguing in this case that service in the Collection Action was improper. *New Jersey Div. of Youth*, 207 N.J. at 115, 23 A.3d at 368. As a result, Kamal is precluded from asserting any of her three causes of action since each is dependent on that premise.

First, Kamal is precluded from asserting her claim under RICO. To establish a violation under RICO, a plaintiff must show (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (citing *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) and citing 18 U.S.C. § 1962). A plaintiff may establish such a pattern through fraudulent activity if they specify the statements it claims were false or misleading, give particulars as how the statements were fraudulent, state when and where the statements were made, and identify the individuals who made the statements. *Black v. Ganieva*, 619 F. Supp. 3d 309, 342 (S.D.N.Y. 2022), *aff'd*, No. 22-1524-CV, 2023 WL 2317173 (2d Cir. Mar. 2, 2023) (citing *Babb*

*v. Capitalsource, Inc.*, 588 F. App'x 66, 68 (2d Cir. 2015) and citing *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999) and citing Fed. R. Civ. P. 9(b)). Kamal asserts that Defendants violated RICO by forming an enterprise, making two fraudulent statements in the Collection Action, and generally engaging in fraudulent activity "as a matter of course" in other debt collection cases. FAC ¶¶ 6-8, 56–59, 44, 52–53, 81–101; Pl. Opp. at 20. The two statements Kamal alleges Defendants made in her case were affirmations to the Court that Kamal was properly served at the New Jersey address and later, that the New Jersey address was "no longer valid" when in reality (Plaintiff contends) the New Jersey address was never valid. FAC ¶¶ 56–59; Pl. Opp. at 20. Plaintiff cannot argue that these statements affirming the validity of service were false or fraudulent when she is precluded from arguing that service was in fact not proper. Further, to the extent Plaintiff seeks to litigate on behalf of others similarly situated in other purportedly fraudulent debt collection cases, Plaintiff is not competent to make the general assertions about fraudulent activity outside of her own case and, in any event, those claims of fraud are not plead with sufficient specificity pursuant to Rule 9(b). [8]

Second, Kamal is precluded from asserting her claim under New York's General Business Law. The Consumer Protection Law of New York prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. L. § 349(a). To plead a cause of action under Section 349, a plaintiff must show that a defendant has engaged in (1) "consumer-oriented" conduct that is (2) "materially misleading" and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice. *City of New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621, 911 N.E.2d 834, 838 (N.Y. 2009) (citing *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (N.Y. 2000)). Kamal alleges that Defendants' conduct was materially misleading and deceptive when they affirmed to the New Jersey Court that they had properly served Kamal when they in fact had not. FAC ¶¶ 57–59, 104; Pl. Opp. at 22. Similar to Kamal's RICO claim, since she is precluded from arguing that service is improper, Kamal could not adequately plead "materially misleading" statements sufficient to state a GBL Section 349 claim by alleging the falsity of Defendants' statement affirming that service in the Collection Action was proper.

**\*13** Finally, Kamal is precluded from asserting her claim under FDCPA for largely the same reasons. Congress

enacted the FDCPA "to protect consumers from deceptive or harassing actions taken by debt collectors[.]" *Gabriele v. American Home Mortg. Servicing, Inc.*, 503 F. App'x 89, 93 (2d Cir. 2012). Section 1692e of the FDCPA prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." *Id.* (citing 15 U.S.C. § 1692e). The FDCPA's venue provisions also require that consumer debt collection actions are brought "only in the judicial district or similar legal entity ... in which [the] consumer resides at the commencement of the action." *Hess v. Cohen & Slamowitz LLP*, 637 F.3d 117, 120 (2d Cir. 2011) (citing 15 U.S.C. § 1692i(a)(2)(B)). Kamal asserts that Defendants violated the FDCPA under two theories: (1) Defendants filed fraudulent affidavits stating that service on Kamal was proper to obtain and enforce the Default Judgment, *see* FAC ¶¶ 57–59, 76, Pl. Opp. at 16, and (2) Defendants improperly brought the Collection Action in New Jersey when Kamal never lived there, FAC ¶¶ 55–56, Pl. Opp. at 15–16. Plaintiff's first theory here fails for the same reasons that Kamal's other claims fail—Kamal is precluded from contending that statements affirming proper service were false, deceptive, or misleading. The second theory presents a closer question— whether Plaintiff can assert that she lived in New York at the commencement of the action and thus the Collection Action was improperly brought in New Jersey Court. However, here too, issue preclusion bars Plaintiff from pursuing her claims under this theory. Implicit in and necessary to the New Jersey Court's finding that "service [on Kamal] was effective" at the New Jersey address is the finding that Kamal lived at that address at the commencement of the action. *See* July Order at 6. In fact, the New Jersey Court expressly found—based on an evidentiary record composed of submissions by both parties—that "Kamal resided in New Jersey at the address in question." *Id.* at 8. Accordingly, Kamal is precluded from asserting her FDCPA claim under either theory.

## CONCLUSION

For the foregoing reasons, the Defendant's motion to dismiss is GRANTED. The Court dismisses this case with prejudice. [9]

**SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 919505

## Footnotes

1    The facts as stated herein are drawn from Plaintiff's First Amended Complaint [ECF No. 21] ("FAC"), and for purposes of this motion, are accepted as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Some of the facts asserted in this section are contrary to findings in a prior opinion in the Collection Action. The Court addresses this issue later in the opinion.

2    Pressler is a New Jersey Limited Liability Partnership with a principal place of business in Morris County, New Jersey and LVNV Funding, LLC is a Delaware Limited Liability Company with a principal place of business in New Castle County, Delaware. FAC ¶¶ 17–18.

3    The Court takes judicial notice of the filings in the Collection Action where appropriate as they are either "public records," "incorporated by reference" in the Amended Complaint, or "integral" to the Amended Complaint since it "relies heavily upon [their] terms and effect." *See Int'l Strategies Grp., Ltd. v. Ness*, 645 F.3d 178, 180 (2d Cir. 2011); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).

4    As such, where the Court names "Kamal" below, the Court refers to only Annette Kamal.

5    Defendants assert that LVNV is also domiciled South Carolina. Def. Reply at 6. For the purposes of this analysis whether LVNV is domiciled in South Carolina is irrelevant.

6    Pressler disputes that a lawyer works at its New York office. Def. Mem. at 6. However, as previously explained, on a motion to dismiss for lack of personal jurisdiction, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *In re Terrorist Attacks*, 714 F.3d at 673.

7    Though the registration to do business in New York does not constitute consent to general jurisdiction in the state, it may be that attorneys who are licensed to practice in New York or admitted *pro hac vice* in New York have consented to jurisdiction in New York. However, Plaintiff does not allege sufficient facts for the Court to make such a finding with respect to Pressler. Kamal attaches to her attorney's declaration, just one New York state court filing which includes the signature of an attorney associated with Pressler and lists a New York address in his signature block. Pl. Opp. at 9 (citing Kamal Decl. Ex. D). Kamal includes no facts about this person's admission to practice in New York. In any event, the Court need not resolve that inquiry since, as discussed below, defendants are subject to specific jurisdiction with respect to the claims in this case.

8    Moreover, the Court is not convinced that Kamal could state a claim under RICO, even if permitted to argue that Defendants' statements about service in the Collection Action were fraudulent since the Second Circuit has held that "[a]llegations of frivolous, fraudulent, or baseless litigation on their own cannot constitute a RICO predicate act." *Kim*, 884 F.3d at 104.

9    The Court denies Plaintiffs' request for leave to amend the Amended Complaint. *See* Pl. Opp. at 23. Plaintiffs were granted an opportunity to amend their complaint in response to issues raised in Defendants' initial pre-motion letter requesting leave to file a motion to dismiss based on the *res judicata* and collateral estoppel as well as the Rooker-Feldman doctrine. [ECF Nos. 15–17]. Plaintiffs took that opportunity and did not remedy the defects as described above and previewed in Defendants' pre-motion letter. *See* FAC. Second, though Plaintiffs requested leave to amend in their opposition to the pending motion to dismiss, *see* Pl. Opp. at 23, they made no effort to demonstrate to the Court that the opportunity to amend would not be futile. *See, e.g.*, *Treiber v. Aspen Dental Mgmt.*, Inc., 635 F. App'x 1, 4 (2d Cir. 2016).

**Kamal v. Pressler, Felt & Warshaw, LLP, Slip Copy (2025)**

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---