**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MATTHEW TAYLOR and REY MORELL, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>THE CITY OF YONKERS, TRANSIT AUTO TOWING INC.,<br>MICHAEL SPANO individually,<br>ANTHONY LANDI individually,<br>STEVEN LEVY individually,<br>CHRISTOPHER SAPIENZA individually,<br>AND JOHN DOES 1-5,<br><br>    Defendants. | (Electronically Filed)<br><br>Civil Case No.: 7-25-cv-05861 (KMK)<br><br><br>**DECLARATION IN SUPPORT OF OPPOSITION TO MOTIONS TO DISMISS** |

I, **NICHOLAS A. DUSTON**, of full age do hereby declare:

1.  I am a partner at the law firm of Norris McLaughlin, P.A., attorneys for Plaintiffs Matthew Taylor and Rey Morell ("Plaintiffs"), am duly admitted to practice law before the United States District Court for the Southern District of New York, and am the lead attorney on this file.

2.  I submit this declaration in support of Plaintiffs' Opposition to the pending Motions to Dismiss (ECF Nos. 36 and 39).

3.  Attached hereto as Exhibit A are the unpublished opinions on which Plaintiffs' Opposition Memorandum of Law relies.

1

I declare under penalty of perjury that the foregoing is true and correct.


Dated: December 19, 2025                    **NORRIS McLAUGHLIN, P.A.**
      Bridgewater, New Jersey

                                     By: *_/s/ Nicholas A. Duston_*
                                         Nicholas A. Duston, Esq.
                                         7 Times Square, 21st Fl.
                                         New York, NY 10036
                                         (908) 722-0700
                                         naduston@norris-law.com
                                         *Attorneys for Plaintiffs*

# EXHIBIT A

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 4 of 102

**Decastro v. City of New York, Not Reported in Fed. Supp. (2019)**

2019 WL 4509027
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Angel DECASTRO, Susan Calvo, and Kelly Macon, individually and on behalf of all others similarly situated, Plaintiffs,

v.

The CITY OF NEW YORK, and the New York City Taxi and Limousine Commission, Defendants.

No. 16-CV-3850 (RA)
|
Signed 09/19/2019

**Attorneys and Law Firms**

Jonathan Andrew Harris, Joseph Terence Gallagher, Yonaton Aronoff, Andrew M. St. Laurent, Harris, O'Brien, St. Laurent & Chaudhry LLP, Daniel Lee Ackman, New York, NY, for Plaintiffs Angel DeCastro, Susan Calvo.

Joseph Terence Gallagher, Yonaton Aronoff, Andrew M. St. Laurent, Harris St. Laurent LLP, Daniel Lee Ackman, New York, NY, for Plaintiffs Michael Walker, Yong Zhang.

Andrew M. St. Laurent, Harris St. Laurent LLP, New York, NY, for Plaintiff Iosif Mullaev.

Jonathan Andrew Harris, Joseph Terence Gallagher, Andrew M. St. Laurent, Harris, O'Brien, St. Laurent & Chaudhry LLP, New York, NY, for Plaintiff Kelly Macon.

Karen Beth Selvin, Angelie Thomas, New York City Law Department, New York, NY, for Defendants.

OPINION & ORDER

Ronnie Abrams, United States District Judge:

**\*1** Plaintiffs Angel DeCastro, Susan Calvo, and Kelly Macon brought this action against the City of New York and its Taxi and Limousine Commission (together, "the City") alleging that the City's enforcement of its regulations regarding the operation of vehicles for hire violated their constitutional rights. Plaintiffs were previously granted summary judgment on their claims that the City's practice of seizing vehicles belonging to certain groups of vehicle owners, on suspicion that the vehicles were being operated for hire without a license, was unconstitutional. Now before the Court is Plaintiffs' motion to certify this case as a class action. For the following reasons, the motion is denied.

**BACKGROUND**

This case's factual background was recounted in detail in the Court's prior decision granting in part and denying part the parties' cross-motions for summary judgment. *See DeCastro v. City of New York*, 278 F. Supp. 3d 753, 756–63 (S.D.N.Y. 2017) ("*DeCastro I*"). Familiarity with that opinion is assumed. Only those facts that are relevant to resolving the instant motion are set forth in this section.

**I. Regulatory Background**

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

Case 7:25-cv-05861-KMK     Document 43     Filed 12/19/25     Page 5 of 102

Central to this case are regulations promulgated by the New York City Taxi and Limousine Commission ("TLC") governing the use of vehicles "for hire" in New York City. *See* N.Y.C. Admin. Code §§ 19-506(b), (h). Section 19-506(b)(1) makes it a violation to knowingly operate or allow another to operate "for hire any vehicle as a taxicab, coach ... or for-hire vehicle in the city, without first having obtained or knowing that another has obtained a license for such vehicle[.]" Section 19-506(b)(2) makes it a violation to knowingly operate or allow another to operate "any vehicle licensed as a taxicab ... or for-hire vehicle in the city in a manner that is beyond the scope of the activities permitted by such vehicle's license[.]" These provisions respectively impose fines, imprisonment, or both, on those found guilty of violating them "upon conviction in criminal court." *See* N.Y.C. Admin. Code § 19-506(b). Section 19-506(e)(1), however, provides for civil penalties "[i]n addition to or as an alternative to the penalties provided for the violation of [§ 19-506(b)(1)]." Section 19-506(e)(2) provides for civil penalties solely "[a]s an alternative to the penalties provided for the violation of [19-506(b)(2)]."

The regulations set forth additional mechanisms to enforce § 19-506(b). As is relevant here, any officer or designated TLC employee may seize a vehicle "which he or she has probable cause to believe is operated ... without a vehicle license" in violation of § 19-506(b)(1), or without the appropriate license for such operation, in violation of § 19-506(b)(2). *See* § 19-506(h)(1). Unless the charges are dismissed, "no vehicle seized pursuant to [§ 19-506(h)(1)] shall be released until all fees for removal and storage and the applicable fine or civil penalty" are paid, or a bond is posted. In addition, an owner's interest in their vehicle, when operated in violation of § 19-506(b)(1) or (b)(2), is "subject to forfeiture" if the owner has been "convicted in the criminal court of, or found liable in accordance with [§ 19-506(e)]" for at least two such violations within a 36 month period. *See* § 19-506(h)(2).

## II. Background of Related Decisions

**\*2**  Plaintiffs' motion for class certification exists against the backdrop of various decisions in this case and in Judge Caproni's prior decisions in *Harrell v. City of N.Y.*, 138 F. Supp. 3d 479 (S.D.N.Y. 2015) ("*Harrell I*"), *reconsidered in part sub nom. Harrell v. Joshi*, No. 14-CV-7246 (VEC), 2015 WL 9275683 (S.D.N.Y. Dec. 18, 2015) ("*Harrell II*"); *Calvo v. City of N.Y.*, No. 14-CV-7246 (VEC), 2017 WL 4231431 (S.D.N.Y. Sept. 21, 2017) ("*Calvo I*"); and *Calvo v. City of N.Y.*, No. 14-CV-7246 (VEC), 2018 WL 1633565, at \*3 (S.D.N.Y. Apr. 2, 2018) ("*Calvo II*").

### A. *Harrell* and *DeCastro I*

In *Harrell I*, Judge Caproni held that the City's practice of seizing vehicles without a warrant was unconstitutional as applied to straight-plate vehicle owners (i.e., vehicle owners whose license plates are not issued by the TLC), who had not been convicted of, or found liable for, a violation of § 19-506(b)(1) in the preceding 36 months. 138 F. Supp. 3d at 484. *Harrell I* did not address whether the City's vehicle seizures, as applied to owners who did have such a record of § 19-506(b)(1) violations, were constitutional. Nor did it address the constitutionality of seizing TLC-plated vehicles for violations of § 19-506(b)(2). [1]

---

[1]     Judge Caproni granted in part and denied in part the City's motion to reconsider *Harrell I*, reaffirming her prior holding that "the City's policy of seizing the [straight tag] vehicles of first time violators" of § 19-506(b)(1) was unconstitutional, but concluding that two of the named plaintiffs were not entitled to summary judgment based on "evidence that they were not first time violators when the complained of seizures occurred." *Harrell II*, 2015 WL 9275683, at \*4. She subsequently denied the *Harrell* plaintiffs' motion to amend their complaint to add claims on behalf of second or subsequent violators of § 19-506(b), *see* February 9, 2016 Order, *Harrell v. City of New York*, No. 14-CV-7246 (VEC) (Dkt. 80), as well as the claims of Angel DeCastro, whose vehicle was seized for a first-time § 19-506(b)(1) violation, but which had a TLC license plate. *See* March 31, 2016 Order, *Harrell v. City of New York*, No. 14-CV-7246 (VEC) (Dkt. 96) (explaining that "[t]h[e] case was brought on the theory that straight tag vehicles were being improperly seized; it is too late in the case to alter the fundamental premise of the case.").

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 6 of 102

**Decastro v. City of New York, Not Reported in Fed. Supp. (2019)**

On August 26, 2016, Plaintiffs DeCastro, Calvo, and Macon filed the operative complaint in this action, on behalf of the following: straight-plate vehicle owners whose vehicles were seized based on second or subsequent violations of § 19-506(b)(1) within the preceding 36 months; TLC-plated vehicle owners whose vehicles were seized for violations of § 19-506(b)(1) (whether first-time or not); and TLC-plated vehicle owners whose vehicles were seized for violations of § 19-506(b)(2). Plaintiffs asserted that the City's practice of seizing the vehicles of such owners violated the Fourth and Fourteenth Amendments. *See* Am. Compl. ¶ 9 (Dkt. 27).

On February 3, 2017, Plaintiffs moved for summary judgment against the City based on their respective vehicle seizures, each of which occurred as a result of § 19-506(b)(1) violations. The constitutionality of the City's seizure practices as applied to TLC-licensed drivers who violate their licenses under § 19-506(b)(2) was not adjudicated. *DeCastro*, 278 F. Supp. 3d at 757 n.4. Because the vehicles of second or subsequent violators of § 19-506(b)(1) are subject to civil forfeiture, *see* § 19-506(h)(2), the City argued on its cross-motion for summary judgment that the "forfeiture exception" to the warrant requirement applied to the claims of Calvo and Macon.[2] The City, accordingly, maintained that those seizures were constitutional. *See DeCastro I*, 278 F. Supp. 3d at 769–70.

> [2] Only Plaintiffs Calvo and Macon had both been found liable for violations of § 19-506(b)(1) in the preceding 36 months from when the seizures at issue occurred. DeCastro, by contrast, was a first-time violator who was operating a TLC-plated vehicle—not a straight-plate vehicle—at the time it was seized. Because the vehicle had not yet been licensed as a for-hire vehicle by the TLC, however, it was not authorized to bear TLC license plates. DeCastro was therefore issued a summons for violating § 19-506(b)(1), as opposed to § 19-506(b)(2).

**\*3** On September 30, 2017, this Court concluded that the City had "provided no evidence that the TLC inspectors who effected the seizures at issue had any reasonable basis for believing that [plaintiffs] had been 'convicted' of or 'found liable' for any prior violations at the time of the seizures." *Id.* at 769. Because the City could not establish that its officers had probable cause to believe that the relevant vehicles were subject to civil forfeiture under § 19-506(h)(2), it could not invoke the "forfeiture exception" to the warrantless seizure of Calvo and Macon's vehicles. Those plaintiffs were therefore granted summary judgment on their Fourth Amendment claims.[3] Pertinent here, the Court further held that Plaintiffs Calvo and Macon had established "not only a violation of their constitutional rights," but also the "existence of a municipal policy" to unconstitutionally seize vehicles of second or subsequent violators of § 19-506(b)(1). That holding was based on the "the undisputed evidence," with respect to such seizures, "showing that TLC inspectors do not have probable cause to believe a vehicle is subject to forfeiture under § 19-506(h)(2)." 278 F. Supp. 3d at 772.

> [3] The Court nonetheless held that the City's post-seizure procedures for second or subsequent violations of § 19-506(b)(1) satisfied due process and thus granted Defendants' motion for summary judgment with respect to the Fourteenth Amendment claims asserted by Calvo and Macon.

As previously noted, DeCastro's vehicle was seized for a first-time violation of § 19-506(b)(1). The Court thus granted summary judgment as to both his Fourth and Fourteenth Amendment claims. Indeed, the City provided no reason why the fact that his vehicle had a TLC license plate altered the *Harrell* court's holding that warrantless seizures of vehicles based on first-time violations of § 19-506(b)(1) were unconstitutional.

### B. The Denial of Class Certification in *Calvo*

The plaintiffs that successfully obtained summary judgment against the City in *Harrell* filed a motion seeking to certify a class of straight-plate vehicle owners whose vehicles were seized for first-time violations of § 19-506(b)(1). *Calvo I*, 2017 WL 4231431, at *3.[4] The court initially declined to certify the class because Plaintiffs had "failed to propose a class that [was] defined in such a way that everyone within it had standing." *Id.* at *7. Hypothesizing that "[a] class consisting of registered owners who were either operating the vehicles at the time that they were seized or who retrieved the vehicles from the TLC

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 7 of 102

**Decastro v. City of New York, Not Reported in Fed. Supp. (2019)**

might be sufficient to narrow the class to those who have Article III standing," Judge Caproni permitted the plaintiffs to seek certification of a narrower class. *Id.*

4      In 2016, Plaintiff Harrell was dismissed from the *Harrell* actions with prejudice for failure to prosecute and failure to provide discovery, resulting in the opinion on the class certification motion being re-named *Calvo v. City of New York*, although the case remains captioned as *Harrell v. City of N.Y.* on ECF. *See* Order at Dkt. 160, No. 14-CV-7246 (S.D.N.Y. Nov. 14, 2016).

The *Calvo* plaintiffs then filed their second motion for class certification seeking to certify a class of "all registered owners of straight [plate] vehicles seized for alleged first-time violations of [§ 19-506] from September 8, 2011 to the present who were operating the vehicle at the time of the seizure, or who retrieved the vehicle personally or through an agent by paying towing and storage fees." *Calvo II*, 2018 WL 1633565, at *3. This time, although the court found that it was "unclear whether all members of the proposed class would have standing," it "assume[d] without deciding" that plaintiffs had defined a class in which every member had standing. *Id.* at *5. Nonetheless, Judge Caproni ultimately declined to certify the class because individual questions—pertaining primarily to proving membership in the class—predominated over common questions. *See id.* at *8. Concluding that the City's "credible evidence of widespread fraud in the registration of vehicles that were seized for violations of 19-506," precluded a finding that there was any "definable class that would satisfy Rule 23(b)(3)," the court denied plaintiffs' motion with prejudice. *Id.* at *9.

### C. Plaintiffs' Class Certification Motion

**\*4**  On November 8, 2017, Plaintiffs in this action filed a motion seeking to certify a class of "[a]ll registered owners of vehicles seized since September 8, 2011 for alleged second or subsequent violations of [§ 19-506(b)(1)]; or for any violation of Section 19-506 involving a vehicle bearing TLC license plates; who were operating the vehicle at the time of the seizure or who retrieved the vehicle personally or through an agent by paying towing and storage fees." Pls. Mem. at 4 (Dkt. 118). On June 5, 2018, Plaintiffs informed the court that they had filed a petition under Fed. R. Civ. P. 23(f) seeking immediate appellate review of the *Calvo II* decision. This Court subsequently stayed Plaintiffs' class certification motion pending the Second Circuit's decision on whether to grant the *Calvo* plaintiffs' Rule 23(f) petition. After the Circuit denied the petition, the parties filed supplemental letters addressing if and how Judge Caproni's ruling in *Calvo II* should impact the Court's decision on Plaintiffs' class certification motion here.

### LEGAL STANDARDS

To succeed on their motion for class certification, Plaintiffs must first surpass the threshold requirements of Article III standing and ascertainability. *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017). Plaintiffs must then demonstrate, "by a preponderance of the evidence that each of Rule 23's requirements have been met." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

To establish Article III standing, the "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "The filing of suit as a class action does not relax this jurisdictional requirement." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006). In addition, "Article III's jurisdictional requirements [apply] to each member of a class[—]no class may be certified that contains members lacking Article III standing." *In re Elec. Books Antitrust Litig.*, 12 Civ. 3394(DLC), 2014 WL 1641699, at *8 (S.D.N.Y. Apr. 24, 2014). The class, accordingly, must be "defined in such a way that anyone within it would have [Article III] standing." *Denney*, 443 F.3d at 264. To determine whether Plaintiffs have done so, the Court looks to the class definition and Plaintiffs' allegations. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 532 (S.D.N.Y. 2018).

The ascertainability requirement, which is a "modest threshold requirement ... consider[s] whether [the] proposed class is defined using objective criteria that establish a membership with definite boundaries." *Petrobras*, 862 F.3d at 269. A proposed class fails to be ascertainable only where the "class definition is indeterminate in some fundamental way." *Id.*

Assuming Plaintiffs can establish standing and ascertainability, they must then satisfy the Rule 23(a) requirements, which are that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a). More colloquially known as "numerosity, commonality, typicality and adequate representation," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011), "[a] class may be certified only if, 'after a rigorous analysis,' " these requirements are met. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).

In addition to Rule 23(a), the proposed class must also satisfy Rule 23(b). Here, Plaintiffs seek to certify a class under Rule 23(b)(3) which mandates that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In conducting the superiority inquiry, courts may consider: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

## DISCUSSION

### I. Standing

**\*5** It is ultimately not clear to the Court that Plaintiffs have met their burden of establishing that the threshold requirement of standing has been satisfied with respect to the proposed class, as explained in detail below. The Court nonetheless assumes, without deciding, that the proposed class has standing for purposes of this Opinion.

In assessing whether a plaintiff has Article III standing to challenge a seizure of property, "it is the *injury* to the party seeking standing that remains the ultimate focus." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (emphasis added). Thus, although "ownership and possession [of property] generally may provide evidence of standing" to contest its forfeiture, these attributes do not necessarily confer standing. *Id.* Indeed, where the owner of property merely "hold[s] title to it for somebody else"—often referred to as a "straw owner"—he or she "do[es] not ... suffer an injury when the property is taken." *Id.; see also United States v. One 1982 Porsche 928, Three-Door, License Plate 1986/NJ Temp./534807 (Auto.)*, 732 F. Supp. 447, 451 (S.D.N.Y. 1990) (recognizing that, "especially in the world of drug trafficking and other illegal operations[,]" individuals can arrange for others to serve as the record owner of property in an "attempt to disguise their interests in property by not placing title in their own names."). In other words, "[t]here must be some indicia of reliability or substance to claims of ownership to reduce the likelihood of a false or frivolous claim." *United States v. $829,422.42*, 561 Fed. App'x 100, 100 (2d Cir. 2014).

A court analyzing standing in a case contesting the seizure of property thus "looks beyond the formal title to determine whether the record owner is the 'real' owner or merely a 'strawman' set up either to conceal illegal dealings or to avoid forfeiture." *One 1982 Porsche*, 732 F. Supp. at 451. To do so, courts may consider evidence regarding who purchased the property, the source of funds used to do so, as well as payments to maintain the property. *See United States v. 500 Delaware St.*, 113 F.3d 310, 312 (2d Cir. 1997) (affirming that title holder of property was straw owner and that the real owner "made mortgage, property tax, and insurance payments, paid utility bills, and maintained the property and made repairs").

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 9 of 102

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

For the purposes of assessing standing here, Plaintiffs' proposed class of registered owners are analyzed in two groups, consistent with Plaintiffs' class definition: (1) registered owners who were not operating the vehicle when it was seized, but who retrieved the vehicle from the TLC either personally or through an agent; and (2) registered owners who were operating the vehicle when it was seized ("registered owner-operators").

With respect to the first group, Plaintiffs' class definition limits the registered owners to those who "retrieved the vehicle personally or through an agent *by paying towing and storage fees.*" Pls. Mem. at 4 (emphasis added). These payments indicate that those registered owners had some financial stake in the seized vehicles, suggesting that they were not merely nominal or straw owners—even though they were not operating the vehicles when they were seized. *See One 1982 Porsche,* 732 F. Supp. at 451 (noting that a true ownership interest in property can be demonstrated by various means including proof of a financial stake in the property). And to the extent these registered owners are the true owners of the vehicles, the payment of towing and storage fees provides evidence that they suffered an injury-in-fact in connection with the seizures. *See Maxineau v. City of New York,* No. 11-CV-2657, 2013 WL 3093912, at *11 (E.D.N.Y. Jun. 18, 2013) (concluding that even nominal damages under § 1983 are "sufficient ... redress for the purposes of Article III standing"). [5] At the same time, however, the City has submitted the declaration of a handwriting expert (originally submitted to and considered by the *Calvo* court) attesting that the signatures of registered owners did not match across their own documents, suggesting that at least some of these documents were forged. *See* Selvin Decl. Ex. C (Dkt.138-3). This evidence further suggests that the documented registered owner who supposedly paid the towing and storage fees to retrieve seized vehicles may not be the true owner of those vehicles, and would therefore lack standing to contest their seizure. The Court thus has concerns that some members of this subgroup of the class may not actually have standing as the class is defined. [6]

[5]    Of course, how to determine whether a registered owner actually paid for the towing and storage fees is a more difficult question. But it is one that goes to determining membership in the class, not standing.

[6]    In their reply, Plaintiffs contend that the City's focus on whether a registered owner is the "beneficial owner" of the vehicle "ignores the parameters of the class definition ... which encompasses only registered owners ... who suffered some cognizable injury-in-fact, be it a seizure while they were operating their own vehicle or their demonstrable payment (direct or through an agent) of towing and storage fees." Olson Decl. ¶ 5. But this misses the point: a straw owner of a vehicle who is operating it when it is seized, or who pays for its retrieval, is not injured in either scenario because he or she is a straw owner. *See Calvo II*, 2018 WL 1633565, at *4–5; *Cambio Exacto*, 166 F.3d at 527 (explaining that a straw owner of property "do[es] not suffer an injury when the property is taken").

**\*6**  With respect to registered owner-operator class members, Plaintiffs contend that "the City's interference with their use of the vehicle at the time of seizure readily establishes indicia of ownership and an injury in fact sufficient to confer standing." Pl.'s Mem. at 9. It is true that a person's exercise of dominion and control over property is evidence of a *bona fide* ownership interest in it, and that an interference with the use of one's property can constitute an injury-in-fact for standing purposes. *See, e.g.*, *500 Delaware St.*, 113 F.3d at 312. But the City has presented evidence that some registered owner-operators may have been straw owners, even though they were operating the vehicles when seized. For example, the City has identified instances where certain owner-operators retrieved their vehicles after they were seized a second time, but then subsequently abandoned the vehicles after they were seized a third time. *See* Murray Decl. Table a at ¶ 49 (Dkt. 137). As explained in *Calvo II*, this subsequent abandonment "raises a significant question of fact as to whether [the registered owner] was a straw owner all along and therefore never had a cognizable injury associated with the seizure of the vehicle." [7] 2018 WL 1633565, at *4.

[7]    To be sure, Plaintiffs acknowledge that the claims of a registered owner who abandons a vehicle after it is seized would not be part of the class. Pls. Mem. at 4; Olson Decl. ¶ 8. But this does not address those registered owners that *did* retrieve the vehicle after a second seizure, and then abandoned the vehicle after a *subsequent* seizure. The claims of such registered owners with respect to the second seizure would still be part of the class as Plaintiffs have defined it, even though those registered owners may have been straw owners for the reasons explained above.

Plaintiffs' class definition does not limit the group of registered owner-operators to those who actually paid the towing and storage fees. It is thus possible that these registered owners (for example, those who abandoned the vehicles after a subsequent seizure) had no financial stake in the vehicles themselves, again raising concerns about the legitimacy of their ownership interest. Even if the Court were to modify the class definition to limit the registered owner-operator group to those who paid the towing and storage fees, the City's evidence of registration fraud more broadly still raises a concern that members of this group may be nominal owners that suffered no injury from the vehicle seizures. [8] In any event, because the evidence of curious ownership records and fraud are more appropriately addressed in assessing class membership, the Court will, as the *Calvo* court did, assume without deciding that all members of the class have standing.

[8]    As additional support for the notion that registered owner-operators may be straw owners, the City asserts that one John Doe was the registered owner of at least 65 vehicles which the TLC seized 97 times between September 2011 and March 2015. *See* Murray Decl. ¶ 21 & Ex. P. The John Doe was the driver during just one of these seizures. He is thus a member of the "registered owner-operator" subclass with respect to that seizure, as it occurred after a previous § 19-506 violation. The City suggests that his ownership record raises questions about the legitimacy of his ownership interest even in the vehicle he was driving. The Court, however, is not so certain. The fact that an individual is the registered owner of a fleet of vehicles, and was operating one of them when they were seized by the City, does not on its face establish that the individual lacked a genuine ownership interest in the vehicle he was driving.

## II. Ascertainability

Defendants argue that the proposed class is not ascertainable for many reasons, namely, that Plaintiffs have failed to sufficiently define the class; that the class consists of straw owners; that the City has individual defenses to the seizures of putative class members' vehicles; and that individualized proof is required to determine class membership. The Court agrees that Plaintiffs have failed to sufficiently define the class, but only insofar as they have not included an end date to the proposed class period. The remainder of Plaintiffs' arguments do not bear on the question of ascertainability, but rather on whether common questions predominate over individual ones.

 **\*7**  Plaintiffs have defined the class based on objective criteria. To be a member of the class, a person must be (1) the registered owner of: a straight-plate vehicle that was seized by the City for a second or subsequent violation of § 19-506(b)(1), or a TLC-plated vehicle that was seized for any violation of § 19-506; (2) who paid towing and storage fees to retrieve the vehicle either themselves or through an agent. The challenges Plaintiffs may face in establishing that they actually paid for the towing and storage fees, and that the relevant seizure was unconstitutional, "more clearly weigh on the burden of identification, not the possibility." *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Trust Co.*, 2018 WL 1750595, at *10 (S.D.N.Y. Apr. 11, 2018) (emphasis omitted).

As for the relevant time period, however, Plaintiffs define the class period as beginning in September 8, 2011, but they do not specify a clear end date. This precludes a finding that the ascertainability requirement has been met. *See, e.g.*, *Bauer-Ramazzani v. Teachers Ins. & Annuity Ass'n of America-College Retirement & Equities Fund*, 290 F.R.D. 452, 462 (S.D.N.Y. 2013) ("An end date for the class period is necessary so the class members can be presently ascertained." (quotation omitted)). For the purposes of this Opinion only, the Court will select the date that the Complaint was filed, May 24, 2016, as the end date. *See Hart v. Rick's NY Cabaret Int'l, Inc.*, No. 09 CIV. 3043(PAE), 2013 WL 11272536, at *5 (S.D.N.Y. Nov. 18, 2013) (citing cases in which district courts used their discretion to set an end date for a class period, including the date the Complaint was filed). Having established a fixed temporal limitation, the class is now ascertainable.

## III. The Statute of Limitations

The City is correct that Plaintiffs' proposed class period is impermissibly overbroad because it encompasses claims that are barred by the statute of limitations.

Case 7:25-cv-05861-KMK  Document 43  Filed 12/19/25  Page 11 of 102

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

Plaintiffs' class period, as previously noted, begins on September 8, 2011. But the statute of limitations for § 1983 claims, which is governed here by New York State law, is three years. *See Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015). Plaintiffs filed this action on May 24, 2016. They nevertheless argue that, pursuant to *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), the filing of the *Harrell* action on September 8, 2014, tolled the statute of limitations for later-filed putative class actions on behalf of all persons encompassed by the initial *Harrell* complaint. The Supreme Court recently clarified, however, that "*American Pipe* does not permit the maintenance of a follow-on class action past expiration of the statute limitations." *China Agritech, Inv. v. Resh*, 138 S. Ct. 1800, 1804 (2018). Rather, *American Pipe* addresses "only putative class members *who wish to sue individually* after a class-certification denial." *Id.* at 1806 (emphasis added) (holding that a putative class representative could not bring his claims as a new class action after the statute of limitations expired). The claims of *all* putative class members here that arose prior to May 24, 2013, are therefore not subject to *American Pipe* tolling.[9]

[9] The initial complaint in *Harrell* addressed the seizure of vehicles based on first-time violations of § 19-506(b) in connection with the use of a vehicle "as an unlicensed taxi," and therefore did not encompass vehicles seized for first-time violations of § 19-506(b)(2). Nor would putative class members here whose vehicles were seized for second or subsequent violations of § 19-506(b)(1) have been a part of the *Harrell* complaint and thus, the claims of those plaintiffs existing prior to May 24, 2013, would be time-barred even under Plaintiffs' erroneous application of *American Pipe*.

**\*8** Plaintiffs separately argue that equitable tolling should apply to the claims of second or subsequent violators of § 19-506(b). The Court disagrees. The thrust of the equitable tolling doctrine "is that a statute of limitations does not run against a plaintiff who is unaware of his cause of action." *Lopez v. Nassau Cty. Sheriffs Dep't*, No. 17-CV-3722 (DRH) (GRB), 2018 WL 3321430, at \*4 (E.D.N.Y. July 5, 2018) (quoting *Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir. 1985)). The party seeking to invoke equitable tolling must demonstrate that they "acted with reasonable diligence during the time period [they] seek[ ] to have tolled," and must "prove[ ] that the circumstances are so extraordinary that the doctrine should apply." *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80–81 (2d Cir. 2003); *see also Lopez*, 2018 WL 3321430, at \*5 (E.D.N.Y. July 5, 2018) (citing cases permitting equitable tolling claims based on mental or physical impairments of plaintiffs that prevented them from handling their legal affairs and noting that "only in a limited number of cases do extraordinary circumstances exist" that warrant equitable tolling).

Here, Plaintiffs request equitable tolling on the ground that they "only learned of the uniform application of Defendants' seizure program regardless of prior convictions when the summary judgment motion in *Calvo* was briefed." Pls. Reply Mem. at 9. Essentially, they seek tolling of the claims of second or subsequent violators, because they were unaware that the City would not be able to prove that its officers had probable cause to seize the relevant vehicles until after discovery in the *Harrell* cases. But whether Plaintiffs were aware of the City's probable cause (or lack thereof) as to the seizures at issue is irrelevant to whether they had "actual knowledge of the facts that comprise [their] caus[e]s of action." *Cerbone*, 768 F.2d at 48. The absence of probable cause is not part of Plaintiffs' *prima facie* Fourth Amendment claims; rather, the existence of probable cause is part of the City's affirmative defense. *See U.S. v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 89 (2d Cir. 2002). Plaintiffs thus fail to offer any reason why they could not have asserted the claims of second or subsequent violators when they initially filed the *Harrell* case that could justify equitable tolling. *See Levy v. BASF Metals Ltd.*, No. 1:15-cv-7317-GHW, 2017 WL 2533501, at \*8 (S.D.N.Y. June 9, 2017) (declining to apply equitable tolling where plaintiff claimed that she was not aware of certain defendants' wrongdoing until a class action complaint was filed in another case because "she did not learn anything new about her injury or any potential claims supporting remuneration for her injury" from that complaint). Absent extraordinary circumstances, which Plaintiffs have not alleged, that could explain why they did not assert the claims of second or subsequent violators of § 19-506(b) when they were aware of those class members' injuries, equitable tolling is not warranted.

Accordingly, the claims of proposed class members existing before May 24, 2013 are barred by the statute of limitations. The Court will now consider whether Plaintiffs' proposed class, with the class period modified to begin on May 24, 2013, and end on May 24, 2016, meets the certification requirements.

### IV. Rule 23 Analysis

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 12 of 102

Plaintiffs have met the numerosity, commonality, and typicality requirements, and the Court assumes, again without deciding, that adequacy of representation is also satisfied. The proposed class nevertheless fails to satisfy the predominance requirement of Rule 23(b)(3). Plaintiffs' motion is thus denied on that basis.

### A. Numerosity

Numerosity under Rule 23(a)(1) is presumed satisfied when there are more than 40 class members. *See, e.g.*, *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011). Plaintiffs estimate that the class is comprised of at most 14,000 seizures and presumably thousands of registered owners. [10] Although the Court has narrowed the class period to begin on May 24, 2013, the City does not contest numerosity. Plaintiffs have met this requirement.

[10]    Plaintiffs have submitted quarterly reports that the TLC produced pursuant to § 19-506(m) which indicate that over 24,000 summonses for vehicle seizures were issued between the fourth quarter of 2012—not of 2011, as Plaintiffs state —and the first quarter of 2016. *See* Gallagher Decl. Ex. 2 (Dkt. 120-2). Plaintiffs estimate that 10,000 of those seizures are not part of the class because they were associated with straight-plate first-time violations of § 19-506(b)(1).

### B. Commonality

**\*9**  To establish commonality under Rule 23(a)(2), Plaintiffs must show that class members "have suffered the same injury" and that there is at least one question common to the class that is capable of "classwide resolution." *Wal-Mart*, 564 U.S. at 350. A question is common to the class "if it is susceptible to generalized, class-wide proof." *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006) ("*In re Nassau Cty.*").

Plaintiffs have established commonality. The proposed class members have allegedly suffered the same injuries, primarily, the payment of fees, as a result of "a specific policy promulgated by Defendants, namely that Defendants ... established a practice" of seizing vehicles for violations of § 19-506(b) without a warrant. Common questions of law and fact therefore exist because "the claims of the proposed class stem from the same alleged unconstitutional conduct of the defendants." *Stinson v. City of New York*, 282 F.R.D. 360, 370 (S.D.N.Y. 2012) (commonality satisfied where plaintiffs challenged the constitutionality of the NYPD's alleged practice of issuing summonses without probable cause in order to meet quota requirements). It is true that this Court has already held that "the undisputed evidence shows that TLC inspectors do not have probable cause to believe a vehicle [operated or owned by a second or subsequent violator of § 19-506(b)(1)] is subject to forfeiture under § 19-506(h)(2)," rendering those class members' vehicle seizures unconstitutional. *DeCastro I*, 278 F. Supp. 3d at 772. But the Court must still consider common questions—even if they have already been resolved in certain Plaintiffs' favor—in the class action analysis. *See Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, No. 96 CV 8414(KMW), 2013 WL 4647190, at *6 (S.D.N.Y. Aug. 29, 2013); *see also In re Nassau Cty.*, 461 F.3d at 227 (requiring that common question of the constitutionality of defendant's strip search policy be considered in the Court's commonality analysis even though defendant had already conceded the policy was unconstitutional). Simply put, "[t]his cases raises, at a minimum, a common question as to the legality of Defendants' vehicle seizures." *Calvo II*, 2018 WL 1633565, at *5 n.18. Commonality is, therefore, satisfied.

### C. Typicality

Typicality under Rule 23(a)(3) exists "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Vincent v. Money Store*, 304 F.R.D. 446, 455 (S.D.N.Y. 2015) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). In analyzing typicality, the Court looks "not at the plaintiffs' behavior, but rather at the defendant's actions." *Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 132 (S.D.N.Y. 2014).

Plaintiffs have established typicality. As previously noted, the class members' claims arise from the same course of events—namely, the City's seizure of vehicles for which they were the registered owner, and for which they had to pay towing and storage fees to have them retrieved.

The City argues that class members who violated § 19-506(b)(2) are not similarly situated to class members whose vehicles were seized for second or subsequent violations of § 19-506(b)(1). In support of this argument, it contends that, unlike registered owners of unlicensed vehicles, the owners of TLC-licensed vehicles have: (1) "voluntarily consented to the agency's strict oversight," and (2) fulfilled "requirements pertaining to insurance and other financial responsibilities." Defs. Mem. Opp. at 16. The City does not explain, however, why these differences would impact Plaintiffs' Fourth Amendment arguments with respect to the City's seizure of vehicles that are premised on violations of § 19-506(b)(2). [11]

[11]    There is a difference in the probable cause analysis between class members who are first-time violators of § 19-506(b)(1) or (2), on the one hand, and class members who are second or subsequent violators of either provision, on the other hand. The vehicles in the latter group are subject to civil forfeiture under § 19-506(h)(2), leaving open the possibility that such an exception to the warrant requirement applies, whereas the vehicles in the former group are not. But it is ultimately the City's burden of demonstrating whether a particular vehicle seizure based on second or subsequent violations of § 19-506(b)(1) or (b)(2) was based on a reasonable belief that the vehicles were subject to civil forfeiture. *See U.S. v. $557,933.89*, 287 F.3d at 89. Thus, the difference between first-time violators of § 19-506(b)(2), and second or subsequent violators of § 19-506(b)(1) or 19-506(b)(2), suggests a difference in the City's available defenses for the seizures, not a difference in whether the claims of these class members "arise from the same course of events." *Cf. Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 CIV. 9936 (LGS), 2017 WL 3868803, at *7 (S.D.N.Y. Sept. 5, 2017) (typicality satisfied where named plaintiffs, who were current or former participants in certain 401(k) plans, sued defendants for mismanagement of the plans under ERISA, including plans for which they were not participants even though absent class members were).

**\*10**  It is true that no Court has yet to address whether the application of the City's seizure policy, as codified in § 19-506(h)(1), to enforce violations of § 19-506(b)(2)—as opposed to (b)(1)—is unconstitutional. Indeed, *Harrell* addressed only the constitutionality of the City's seizure of straight-plate vehicles for first-time violations of § 19-506(b)(1). *DeCastro I* addressed the same only for second or subsequent violations of § 19-506(b)(1), and for first-time violations of § 19-506(b)(1) for TLC-plated vehicles. But as noted, the typicality inquiry focuses on the nature of the putative class members' claims, and whether they arise from the same course of conduct. It does not require a uniform finding of liability as to every class member prior to certification. *Cf. Waggoner v. Barclays PLC*, 875 F.3d 79, 88, 107 (2d Cir. 2017) (affirming certification of class prior to judgment of liability). The fact that a liability determination has not been made as to a subset of the putative class members is, in the Court's view, an issue more appropriately addressed in the predominance requirement. Typicality is satisfied here because: (1) the named Plaintiffs seek to hold Defendants liable for the same conduct that is the basis of the claims of all class members, and (2) the § 19-506(b)(2) violators make the same legal arguments with respect to the constitutionality of the seizures as the § 19-506(b)(1) violators.

### D. Adequacy of Representation

"Adequacy of representation is evaluated in two ways ... by looking to the qualifications of plaintiffs' counsel; and ... by examining the interests of the named plaintiffs." *Flores v. Anjost Corp.*, 284 F.R.D. 112, 128–29 (S.D.N.Y. 2012) (citing *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)). Although Plaintiffs' counsel is qualified to represent the class, it is less clear whether Plaintiffs have satisfied their burden of demonstrating that the same is true for the named Plaintiffs. Because the Court ultimately concludes that the proposed class fails to satisfy Rule 23(b)(3), however, it will assume, without deciding, that the named Plaintiffs are sufficient class representatives.

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 14 of 102

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

### 1. Class Counsel

First, the City argues that Plaintiffs' counsel lacks the requisite qualifications to represent the class. In addition to questioning Mr. St. Laurent and Mr. Ackman's experience, the City notes that the Court previously had to order Plaintiffs Calvo and Macon to provide witness contact information requested by Defendants—over counsel's objections—and that counsel's motions for class certification in the *Calvo* cases were unsuccessful. The Court is not persuaded. Although it is undisputed that Mr. St. Laurent has not previously been personally certified as class counsel, and that Mr. Ackman's experience as class counsel is limited, their firm, Harris, St. Laurent & Chaudhry LLP, has substantial litigation class action experience. *See* Pl.'s Reply, Harris Decl., ¶¶ 5–8. Moreover, based on the quality of the advocacy of Plaintiffs' counsel to date, the Court is satisfied that counsel is sufficiently "qualified, experienced and generally able to conduct th[is] litigation." *Maliarov v. Eros Int'l PLC*, 15-CV-8956 (AJN), 2016 WL 1367246, at *6 (S.D.N.Y. Apr. 5, 2016).

The City further alleges that Mr. Ackman has falsely represented his class action experience to other federal judges, and that one federal judge noted at oral argument in another matter that he had falsely characterized the holding of a case in his briefing. It is true that Mr. Ackman filed declarations in two unrelated cases attesting that he was "lead counsel" in prior class actions—even though not every one of those prior actions was certified as such. While each of them was either brought as a putative class action, or had a class certification motion pending at some point, Mr. Ackman's declarations could have been more precise. It is also true that another federal judge remarked on the record that Mr. Ackman had mischaracterized the holding of a case in his submissions. But while Defendants' concerns are not entirely without merit, absent more compelling evidence of any prior unethical conduct—and considering that similar evidence has not been produced with respect to his co-counsel in this case—Mr. Ackman will not be disqualified on the current record.

**\*11** Finally, the City argues that Mr. Ackman has a conflict of interest with those members of the class that operate black cars such as Uber and Lyft. Mr. Ackman represents medallion taxi owners in other lawsuits against the TLC and the City, which allege in part that the City's decision to allow Uber vehicles to operate in New York City was unlawful (*see* Selvin Decl., Exs. S, U, V, W). The City thus contends that Mr. Ackman's representation of Uber drivers here is prohibited under Rule 1.7 of the New York State Rules of Professional Conduct. Nothing in the record, however, supports a finding that the relief Mr. Ackman seeks in those actions—which includes compensatory and punitive damages against the City—is adverse to the interests of Uber drivers here. The City also cites no authority in which a court disqualified an attorney under Rule 23 due to an alleged conflict based on representing different plaintiffs in unrelated actions against the same defendants. To the extent Mr. Ackman seeks damages from the same defendants in different actions may suggest that the "plaintiffs are theoretically in competition with one another to recover on their judgments," such a conflict can be re-visited in the damages phase of these proceedings, if necessary. [12] *See Seijas v. Republic of Argentina*, 606 F.3d 53, 57 (2d Cir. 2010). Plaintiffs have met their burden of demonstrating the adequacy of class counsel.

12    Moreover, "most courts ... have directed the defendants to bring any ethical complaints they have in the proper legal disciplinary forums and have not barred class certifications grounded on any determination of the merits of such ethical complaints." 1 Newberg on Class Actions § 3:78 (5th ed. 2018) (citing cases).

### 2. Interests of Plaintiffs

In assessing whether the named Plaintiffs can adequately represent the class, the Court considers "whether there is a conflict between the interests of the named plaintiff[s] and the rest of the class[,]" and "whether the named plaintiff[s] have sufficient knowledge of the facts of [their] claim[s]." *See Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 164 (S.D.N.Y. 2014).

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 15 of 102

### a. Intra-Class Conflict

At this stage of the litigation, the existence of intra-class conflict, if any, would not preclude a finding that the named Plaintiffs can represent the interests of the absent class members. To defeat a motion for certification, intra-class conflicts "must be fundamental," *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009), and not "hypothetical and speculative," *Cokely v. N.Y. Convention Ctr. Operating Corp.*, No. 00 Civ. 4637 (CBM), 2004 WL 1152531, at *8 (S.D.N.Y. May 21, 2004).

The City contends that, since the named Plaintiffs were issued summonses for violations of § 19-506(b)(1), their interests are not aligned with class members who received summonses for violations of § 19-506(b)(2). In the City's view, because unlicensed for-hire vehicle owners (i.e., the § 19-506(b)(1) violators) "stole trips, customers, and income from licensed for-hire vehicles," (i.e., the § 19-506(b)(2) violators), those class members have conflicting interests. But the interests of § 19-506(b)(1) and (b)(2) violators with respect to the outcome of this litigation are nonetheless aligned—both groups seek to hold the City liable for vehicle seizures, and the success of each group's claims does not impact the other. *See In re Flag*, 534 F.3d at 36–37 (affirming decision to permit plaintiffs with claims for violations of the 1933 Securities Exchange Act to represent and proceed in the same class as plaintiffs with claims for violations of the 1934 Securities Exchange Act where district court had concluded that the "the two sets of claims are not antagonistic to each other because proof of one does not negate an essential element in the other"). [13]

[13]     To be sure, the district court had analyzed the purported conflict between the two groups of plaintiffs in the context of typicality. On appeal, however, the Second Circuit noted that with respect to "any antagonistic interests" between the two groups of plaintiffs, insofar as the plaintiffs with claims under the 1934 Act would have to prove loss causation, while those with claims under the 1933 Act would not, the difference did not "constitute the type of 'fundamental' conflict that renders the class uncertifiable" under grounds of inadequate representation. *In re Flag*, 574 F.3d at 35.

**\*12**  Additionally, there is no proposed class settlement "reflect[ing] essential allocation decisions" between the § 19-506(b)(1) and (b)(2) violators in which the lack of a representative of the (b)(2) class members could render their representation inadequate. *Cf. Amchem Prods. Inc.*, 521 U.S. at 627 (holding that, in a class action settlement, class members with manifested injuries from asbestos exposure could not represent class members who were exposed to asbestos but had yet to be injured because "for the currently injured, the critical goal [wa]s generous immediate payments" which "tug[ged] against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future"). In any event, if there were such a settlement pending, the Court could resolve the issue by certifying a subclass of § 19-506(b)(2) violators and appointing their own counsel to ensure their adequate representation. *See* Fed. R. Civ. P. 23(c)(5); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d at 250.

### b. Knowledge and Credibility of Named Plaintiffs

Although the requirement that the class representative have knowledge of the facts of the case is a "modest one," the Court cannot certify a class representative where they "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possible competing interests of attorneys." *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 203 (S.D.N.Y. 2018). "Where the court finds the class representative is not credible, adequacy of representation is absent." *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 41 (E.D.N.Y. Jan. 31, 2008) (citing *Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983)).

The Court has concerns that the named Plaintiffs may not be sufficiently knowledgeable and credible to represent the class. For example, DeCastro testified that he did not review the Complaint before it was filed, nor Plaintiffs' initial disclosures before they were served on the City. *See Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356 (S.D.N.Y. 2004)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 16 of 102

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

(declining to find a named plaintiff could represent a class based in part on him "not ha[ving] seen the complaint prior to his deposition"). Compounding this concern, Plaintiffs have not included any deposition testimony in their reply to rebut the City's argument that DeCastro does not have sufficient knowledge of the case to be an adequate representative, suggesting that he might simply be "the willing pawn of counsel." *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 136 (S.D.N.Y. 2008). [14]

> [14]  The City also suggests that DeCastro is not a class member at all, or at least not representative of class members, because he "was not a multiple violator of ... 19-506, nor was he driving a licensed vehicle that was permitted to have T&LC license plates on it." Defs. Mem. Opp. at 19. But the class definition clearly includes registered owners of vehicles seized "for *any* violation of Section 19-506 involving a vehicle bearing TLC license plates." Pls. Mem. at 4 (emphasis added). Thus, if DeCastro paid the towing and storage fees to retrieve his vehicle he is a member of the class.

As to Calvo and Macon, the City argues that their deposition testimony demonstrates that neither is sufficiently credible to serve as a class representative. The City further argues that Calvo and Macon's purported failure to cooperate in discovery proves that they cannot fulfill their duty as class representatives to comply with discovery requests. Calvo and Macon's deposition testimony, which attests that they were not operating their vehicles for hire, but were merely giving rides to friends, even though they eventually pled guilty to their summonses, may raise questions about their credibility. *See* Selvin Decl. Exs. M, Q. And Macon too testified that he did not review the Amended Complaint before it was filed. *See* Selvin Decl., Ex. Q at 117:1–10. Since the Court declines to certify the class on other grounds, however, it need not decide whether the City has demonstrated that the named Plaintiffs are adequate representatives.

### E. Predominance

**\*13**  The essence of the predominance inquiry under Rule 23(b)(3) is whether proposed classes are "sufficiently cohesive to warrant adjudication by representation." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 469 (2013). A putative class satisfies this requirement if (i) "resolution of any material 'legal or factual questions ... can be achieved through generalized proof,' " and (ii) "these [common] issues are more substantial than the issues subject only to individualized proof." *Petrobras*, 862 F.3d at 270 (alterations in original) (quoting *Mazzei v. The Money Store*, 829 F.3d 260, 270 (2d Cir. 2016)). This analysis requires district courts to weigh the prevalence of individual questions (i.e., questions where "members of a proposed class will need to present evidence that varies from member to member") against common questions (i.e., questions where "the same evidence will suffice for each member to make a prima face showing or the issue is susceptible to generalized class-wide proof"). *Id.* In other words, the Court asks "whether issues susceptible to generalized proof outweigh individual issues." *Johnson v. Nextel Comms. Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (quotation omitted). This assessment is "more qualitative than quantitative, and must account for the nature and significance of the material common and individual issues in the case." *In re LIBOR*, 2018 WL 1229761, at \*5 (alterations and quotations omitted).

In this case, individual questions pertaining to class membership eligibility, to proving liability in light of the City's potential defenses, and to damages, compel the conclusion that common questions do not predominate over individual ones.

### 1. Proving Class Membership

Courts in this Circuit have recognized that the extent to which determining whether someone is a member of a class requires individualized inquiry is an important factor in the predominance analysis. "If too much individual inquiry is required to determine whether someone is a member of the class, then a court could find that class issues do not predominate over individual issues." *Vogel*, 2017 WL 4712791, at \*5; *see also Petrobras*, 862 F.3d at 268 (noting that the issue of whether classes "require highly individualized determinations of member eligibility" belongs to the predominance requirement). Assessing membership eligibility in plaintiffs' proposed class—specifically, whether a putative class member paid the towing and storage fees—entails

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 17 of 102

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

individualized inquiry. And in light of the City's evidence of registration fraud and straw ownership, discussed further below, proving that registered owners actually paid the towing and storage fees, for many putative class members, will be no easy feat.

### a. Registered Owners Using Third-Party Claimants

First, as to registered owners who were not driving the vehicles when they were seized, and who purportedly authorized third-parties to retrieve their vehicles, the Court is not satisfied that the third-party authorization form establishes that the registered owner paid the towing and storage fees. This is because the City has submitted evidence that these forms were forged. *See* Murray Decl. ¶¶ 32–34; Selvin Decl., Ex. C. For example, the analysis of the City's seizure records shows that some third-party claimants used the same third-party authorization form (i.e., including the same date) more than once to pick up different vehicles on different dates. *See id.* Sometimes the signature of the purported registered owner differed dramatically across the third-party authorization forms; and sometimes the signature on the vehicle *registration* forms differed dramatically from the purported signature of the registered owner on the third-party authorization forms. *See id.* Those differences raise questions about the validity or reliability of the forms as evidence of genuine ownership interest in, and of financial injury associated with, the seized vehicles.

Additionally, the City has presented evidence that some of these registered owners are straw owners, who may not have advanced their own fees to retrieve the vehicles, as required for class membership. In one instance, a vehicle seized three times was registered to a John Doe at the time of the first seizure, but was then registered to a corporate entity at the time of the second and third seizures; the same John Doe retrieved the vehicle after each seizure, however, using the same third-party authorization form. *See* Murray Decl. ¶ 36. This suggests that the transfer of ownership to the entity was illusory, and that the funds used to retrieve the vehicle may not have come from the entity. Some individuals also served as serial third-party claimants for the same registered owner of multiple vehicles. *See id.* ¶¶ 25–27. A significant number of seized vehicles with out-of-state registration addresses were similarly retrieved only by third-party claimants, and the registered owners of those vehicles never operated them at the time of the seizure. *See id.* ¶ 35. While not determinative, this too may suggest that certain registered owners lacked a genuine interest in the vehicles, raising questions about whether they actually paid the towing and storage fees. In light of this evidence, relying on the City's records alone to determine who actually paid the towing and storage fees will not suffice. [15]

[15] The City also maintains that some instances in which registered owner-operators authorized third parties to reclaim the vehicles are "questionable." Murray Decl. ¶ 46. Specifically, it provides an example of a vehicle registered in Philadelphia in which the registered owner operated the vehicle during two seizures, but used a third party both times to reclaim the vehicle. The City argues that this example "is suspect" because the vehicle registration address is the same as that of another putative class member, and because the two third-party claimants are also registered owners of other vehicles that were seized. *Id.* But it is not clear to the Court that those facts necessarily suggest that the registered owners did not pay the towing and storage fees or otherwise lacked a legitimate ownership interest in the vehicles.

### b. Registered Owners who Personally Retrieved the Vehicles

**\*14** Second, as to registered owners who were not operating the vehicles when they were seized, but who personally retrieved the vehicles, the City's evidence of straw ownership similarly raises doubts that these owners would have advanced their own funds to pay the fees. Some registered owners, for example, after being found guilty of a § 19-506(b)(1) violation, transferred their vehicles to a certain John Doe who is the registered owner of at least 65 vehicles. *See* Murray Decl. ¶ 23. Although this John Doe would retrieve the vehicles after a second or subsequent seizure, they were nonetheless driven by the original registered owners at the time of those seizures. The seemingly illusory transfer of ownership to this John Doe, coupled with the fact that he is a prolific registered owner, may suggest he is a straw owner, even though he personally retrieved the vehicles. *See* Murray Decl. ¶¶ 37–40. As such, the registered owner may very well not have been the one to pay to retrieve the vehicles.

While credit card records or bank statements could suffice to prove who paid the towing and storage fees, the City's records reflect that they were more commonly paid in cash. Although a putative class member could submit a sworn affidavit testifying that he or she paid the fees, as Judge Caproni previously recognized, *see Calvo I*, 2017 WL 4231431, at *5 n.10, the fact-finder would still need to analyze the individual affidavits. Moreover, to the extent the City contested the credibility of a particular affiant—which is likely, given that many putative class members appear to be involved in the illegal business of unlicensed for-hire vehicle operations—more process would be required before a final conclusion that the affiant is a member of the class could be made.

It is true that the City has shown that they possess copies of various documents—the summonses issued to registered owners, vehicle seizure notices and release forms, and receipts of payments of towing and storage fees—which can show who picked up the vehicle from the tow pound, the amount they paid to retrieve the vehicle, and the method of payment used. *See* Olson Decl. ¶ 4. Nevertheless, for many putative class members, establishing membership in the class will require sworn affidavits. And because their credibility is put into doubt by the City's evidence of fraud, the individualized inquiries entailed in determining whether those registered owners are legitimate class members, threaten to predominate over the common questions of liability. *See Mazzei*, 829 F.3d at 270 (finding plaintiffs failed to meet predominance requirement where "the fact-finder would have to look at every class members' loan documents to determine who did and who did not have a valid claim"); *Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.*, No. 14-CV-09764 (KPF)(SN), 2018 WL 739580, at *14 (S.D.N.Y. Jan. 10, 2018) (noting absence of "class-wide proof" as to which putative plaintiffs had litigation rights as required for class membership "militates against a finding of predominance with regard to issues of who actually has a claim"). Proving class membership thus requires additional evidence to establish that the registered owners paid the towing and storage fees.

## 2. Individual Liability Defenses and Damages

The extent to which Defendants have liability defenses that are unique to certain class members is also an important factor in the predominance analysis. *See In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 129 (2d Cir. 2001). "Although a defense may arise and may affect different class members differently, this does not compel a finding that individual issues predominate over common ones." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010) (quotations and alterations omitted). "As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification under Rule 23(b)(3)." *Id.* Similarly, while individual issues pertaining to each class members' damages should be considered "when weighing predominance issues," such "individualized damages determinations alone cannot preclude certification." *Roach*, 778 F.3d at 408–9 (2d Cir. 2015); *Royal Park*, 2018 WL 1831850, at *8 ("[I]ndividualized damages inquiries remain a factor that a court may consider in undertaking the predominance analysis.").

 **\*15**  Despite the combined holdings in *Harrell I* and *DeCastro I*—that the City's seizure policy encoded in § 19-506(h) as applied to violations of § 19-506(b)(1) is unconstitutional (*see* 138 F. Supp. 3d at 488–92; 278 F. Supp. 3d at 768–72)—the City nevertheless argues that it has individualized probable cause defenses to liability as to specific class members. Because the Court is persuaded that at least some of the City's proffered grounds for a probable cause defense may apply to certain putative class members, some individual inquiry into the circumstances surrounding each seizure will be necessary. While these individual questions do not provide a stand-alone basis to find that the class fails to pass muster under Rule 23(b)(3), they nonetheless contribute to the conclusion that individual issues predominate over common ones.

The City's first argument in this regard is that TLC officers, in some instances, may have had probable cause to believe that a vehicle was subject to civil forfeiture under § 19-506(h)(2), based on knowledge that the registered owner had a prior conviction under § 19-506(b) in the preceding 36 months. The Court disagrees. In *DeCastro I*, the Court found that "the undisputed evidence shows that TLC inspectors do not have probable cause to believe a vehicle is subject to forfeiture under § 19-506(h)(2) when they seize vehicles for suspected violations of § 19-506(b)(1)." 278 F. Supp. 3d at 772. That finding was based in part on deposition testimony of the TLC's Deputy Chief of Enforcement that inspectors "don't look" at "whether or not [a] vehicle or [a] driver has been cited for a violation of Section 19-506" when seizing vehicles. *See id.* (citing St. Laurent Decl. Ex. 3 at 77:6–13 (Dkt. 61)).

**Decastro v. City of New York, Not Reported in Fed. Supp. (2019)**

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 19 of 102

Now, in a second attempt to provide contrary evidence of its policy, the City produces four summonses associated with seizures based on second or subsequent violations of § 19-506(b)(1). *See* Murray Decl. Ex. HH. The City argues that these summonses demonstrate that the officers had knowledge of the registered owners' prior convictions, sufficient to establish probable cause on forfeiture grounds. *See* § 19-506(h)(2). Yet this new evidence does not help the City. Two of the summonses indeed indicate that the registered owners of the vehicles were either an "unlicensed entity" with a "prior record" or had "prior records of unlicensed activity." Murray Decl. Ex. HH, at 7152, 7276. But they do not indicate whether the registered owner had been *convicted* of a § 19-506(b)(1) violation within the preceding 36 months, as would be required for the vehicle to be subject to forfeiture. *See DeCastro I*, 278 F. Supp. 3d at 770 (explaining that a summons "is not a reliable indicator of a conviction or a finding of liability"). Another summons states that the TLC officer "seized th[e] vehicle one month prior" but doesn't state whether the registered owner was convicted. Murray Decl. Ex. HH, at 9856. Although the final summons states that the "[d]river said he has been caught before with the vehicle and the owner went and plead guilty," it doesn't indicate whether the conviction occurred within the preceding 36 months. *See id.* at 3837. Thus, the Court is not persuaded that many individual inquiries would be required to determine whether the officers had probable cause to believe the vehicles were subject to civil forfeiture under § 19-506(h)(2). [16]

[16] For vehicle seizures occurring after December 2016, the City explains that the software in the handheld devices used by TLC inspectors to issue summonses was updated to allow officers to "personally search the violation history of a vehicle owner at the time of the stop to determine if the owner violated [§ 19-506(b)]" within the preceding 36 months. Murray Decl. ¶ 54. The City claims that, since the new software was introduced, the TLC has seized approximately 50 vehicles that were subject to forfeiture under § 19-506(h)(2) and that the vehicle seizure notice issued with the summons at the time of the violation lists the owners' prior § 19-506(b)(1) violations. While this constitutes persuasive evidence that the City has genuine forfeiture-based probable cause defenses as to vehicle seizures based on § 19-506(b)(1) violations occurring after December 2016, such seizures are beyond the date of the class period that the Court has set for the purposes of this Opinion.

**\*16** The Court *is* persuaded, however, that the City may possess other unique probable cause defenses for a certain subset of class members. The City, for example, has shown through Mulero's testimony that some vehicle seizures occurred for purposes other than, or in addition to, suspected violations of § 19-506(b)(1). [17] *See* Selvin Decl. Ex. E at ¶ 4 (asserting that "[it] is not unusual for other illegal activity to be observed at the time of a [§ 19-506] summons" including aggravated unlicensed operation of a vehicle, criminal possession of a weapon, narcotics offenses, prostitution, among others). The presence of such other illegal activity in connection with a § 19-506 violation could conceivably provide the City with additional probable causes defenses to justify a seizure in those circumstances. The seizures of putative class members' vehicles would therefore need to be individually assessed to determine if the seizure occurred in conjunction with other activity that provided the City with probable cause to seize the vehicles. This could require individual hearings. *See Vogel*, 2017 WL 4712791, at \*6 (determining whether defendants had probable cause for each putative class member's arrest solely for possession of a gravity knife would require "individualized inquiry [ ]in the form of hearings or mini-trials"). And such hearings would further add to the number of individual inquiries necessary to determine which class members are entitled to damages. *See MacNamara v. City of New York*, 275 F.R.D. 125, 144–45 (S.D.N.Y. 2011) (holding that "individualized probable cause inquiries would dictate the course of litigation with respect to" two subclasses because the underlying arrests were "conducted by officers exercising individual discretion rather than following mass arrest orders"). Although Plaintiffs argue that such individuals would not be part of the class, the class definition is not limited to vehicles seized *only* for § 19-506(b) violations: registered owners whose vehicles were seized for additional reasons therefore appear to fit within the class definition. In any event, even if the class definition were modified to specifically exclude such individuals, the Court would then need to assess whether a vehicle seizure occurred in connection with other illegal activity in order to determine membership in the class. [18]

**Decastro v. City of New York, Not Reported in Fed. Supp. (2019)**

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 20 of 102

17    Although Mr. Mulero's affidavit cites "19-506" generally, and not § 19-506(b)(1) specifically, the Court construes his testimony to apply only to § 19-506(b)(1) seizures. This is because the testimony references only vehicles seized for "unlicensed for-hire activity" as opposed to activity concerning licensed vehicles acting beyond the scope of their license.

18    The Court is not persuaded by the City's argument that the question of whether the instrumentality of crime exception to the warrant requirement applies as to those class members that were issued criminal (as opposed to civil) summonses for § 19-506(b)(1) violations. For substantially the same reasons provided in *DeCastro I*, and on the record when this Court denied Plaintiffs' motion for reconsideration (*see* Oct. 25, 2018 Hr'g Tr. Dkt. 13), whether or not the City issues a civil summons for a § 19-506(b)(1) violation, as opposed to a criminal one, should not alter the fact that the instrumentality of crime exception does not apply to the underlying vehicle seizure. In any event, the Court need not, and does not, decide the issue as the other individual questions discussed in this Opinion predominate over common questions.

Moreover, with respect to damages, the City correctly notes that claims for lost income, lost use of vehicle, and emotional distress would likely need to be assessed on an individualized basis which further adds to the number of individualized inquiries. *See Augustin v. Jablonsky*, 819 F. Supp. 2d 153 (E.D.N.Y. 2011) (concluding that emotional distress damages of class members subjected to an unconstitutional strip search policy could not be determined on a class-wide basis).

To be clear, the existence of individual defenses based on conduct occurring in conjunction with a § 19-506 violation, and the existence of individual damages would not, independently, preclude a finding that predominance has been satisfied. Where, as here, Plaintiffs have established that Defendants applied a uniform unconstitutional policy, courts in this Circuit have found that individual affirmative defenses, and individual damages, will not outweigh the common questions underlying the defendants' conduct. *See, e.g.*, *In re Nassau Cty.*, 461 F.3d at 229–230. But when combined with the individual issues associated with determining whether someone is a member of the class, in this case, individual questions ultimately predominate over common ones. Plaintiffs have thus failed to satisfy Rule 23(b)(3). [19] *See Vogel*, 2017 WL 4712791, at *6.

19    Although a Court can certify a liability only class pursuant to Fed. R. Civ. P. 23(c)(4), and have damages proceed individually, the Court is not convinced that doing so could save the fundamental predominance problems with this class.

Finally, additional issues would need to be addressed as to the subset of class members who were issued summonses for § 19-506(b)(2) violations. As the City highlights, the Court has not decided whether the City's seizure policy encoded in § 19-506(h), as applied to seizures based on § 19-506(b)*(2)* violations, is unconstitutional. The Court's decision in *DeCastro I* was based on factual evidence concerning the City's enforcement practices only with respect to violations of § 19-506(b)(1). At this time, the Court is skeptical that there are material differences with respect to the City's enforcement practices of § 19-506(b)(2), and with respect to the Fourth Amendment analysis regarding those putative plaintiffs' claims. But the Court cannot rule on whether the City's codified policy in § 19-506(h), as applied to vehicles seized for violations of § 19-506(b)(2), is unconstitutional, let alone as applied to a vehicle seizure of any individual Plaintiff, absent a factual record on that issue. As a result, even though the Court has already found that the proposed class fails the predominance requirement for the reasons sated above, the issues of liability that may apply uniquely to class members with § 19-506(b)(2) violations add to the predominance problem of Plaintiffs' proposed class. [20]

20    Because the Court declines to certify the class on predominance grounds, it does not address whether a class action would be a superior method of adjudication.

* * *

**\*17**    Due to the difficulties of proving class membership based on the evidence of fraud and straw ownership associated with violators of § 19-506(b)(1), it appears unlikely that there is a definable class as to those violators that can satisfy Rule 23. [21] A class of *only* § 19-506(b)(2) violators may have fewer predominance issues given the lack of evidence of fraud and straw ownership with respect to those putative class members. Nevertheless, because there has been no determination as to whether the City has engaged in a pattern or practice of unconstitutionally seizing vehicles of § 19-506(b)(2) violators, it is difficult

Decastro v. City of New York, Not Reported in Fed. Supp. (2019)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 21 of 102

to predict whether common questions would predominate over individual ones in such a hypothetical class. Moreover, were Plaintiffs to seek certification of a class comprised of only § 19-506(b)(2) violators, they would need to persuade the Court that they should be granted leave to amend the Complaint to add new named plaintiffs, as the current ones would not fit within this narrower class definition. [22]

[21]    In their supplemental briefing addressing the *Calvo II* decision, Plaintiffs requested that the court also consider a class of: "(a) all registered owners of TLC-plate vehicles and registered owners of straight-plate vehicles with one or more prior Section 19-506 violations within the previous 36 months and (b) whose car was seized by the TLC (c) while the registered owner was driving it, or which was personally retrieved by the registered owner after its seizure." The Court is not persuaded that this definition satisfies the predominance requirement of Rule 23(b)(3), however, for the same reasons addressed above. In addition, the absence of a limitation with respect to the payment of towing and storage fees in that alternative definition amplifies the Court's concerns that not every member of such a class would have standing, again for reasons previously explained.

[22]    The operative Complaint included named plaintiffs whose vehicles were seized for violations of § 19-506(b)(2). Those plaintiffs have since accepted Rule 68 offers of judgment, however, and are thus no longer part of the case. *See* Dkts. 36, 37.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification is DENIED. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 117. No later than October 4, 2019, the parties shall submit a joint letter to the Court proposing next steps in this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4509027

---

**End of Document**                                                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Giggetts v. County of Suffolk, Not Reported in Fed. Supp. (2022)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 22 of 102

2022 WL 1046311

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Ramel GIGGETTS, Plaintiff,

v.

COUNTY OF SUFFOLK, Sert. Officer Maxwell Edwards (Shield No. 1584), Sert. Officer Matthew Gernemia (Shield No. 1461), Sgt. Sclafani (Shield No. 5-274), Lt. Robret Peraino (Shield No. L-1B), Lt. Adeline Ayres (Shield No. L112), Lt. Kevin Daley (Shield No. L118), D/S Moraangio (Shield No. 460), C.O. Michael DeRosa (Shield No. 1259), C.O. Justin Francis (Shield No. 1447), C.O. Peter Lambert (Shield No. 1319), C.O. Jamie Rice (Shield No. 1167), C.O. Alex Mylett (Shield No. 1378), C.O. Mark Magnani (Shield No. 775), RN Jadick (I.D. No. 71), LPN Alarcon (I.D. No. 1), Thomas Troiano M.D., Vincent Geraci D.O., Barunjaiswal M.D., and Soumitra Chatterjee M.D. (all in their individual and official capacities as employees), Defendants.

2:19-cv-4885 (DRH) (ST)

|

Signed 04/07/2022

**Attorneys and Law Firms**

LAW OFFICES OF FREDERICK K. BREWINGTON, Attorneys for Plaintiff, 556 Peninsula Boulevard, Hempstead, NY 11550, By: Frederick K. Brewington, Esq.

DENNIS M. COHEN, SUFFOLK COUNTY ATTORNEY, Attorneys for the County of Suffolk, H. Lee Dennison Building, 100 Veterans Memorial Highway, P.O. Box 6100, Hauppauge, NY 11788, By: Stacy A. Skorupa, Esq.

## **MEMORANDUM AND ORDER**

HURLEY, Senior District Judge:

## **INTRODUCTION**

**\*1** Plaintiff Ramel Giggetts brings this civil rights action against the captioned Defendants under 42 U.S.C. § 1983, the American with Disabilities Act and Rehabilitation Act, and state law, arising from an alleged assault he suffered while he was a pretrial detainee at the Riverhead and Yaphank Correctional Facilities. Presently before the Court is Defendant Dr. Thomas Troiano, M.D.'s motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), all causes of action lodged against him. For the reasons below, Troiano's motion is granted. Plaintiff's request for leave to amend his Amended Complaint, raised in his opposition, is respectfully referred to Magistrate Judge Steven Tiscione.

## **BACKGROUND**

The following facts are taken as true from the Amended Complaint. (See Am. Compl. ("AC") [DE 38]). Dr. Thomas Troiano is the only moving defendant and, accordingly, only those facts necessary to understand his position are included.

At all relevant times, Plaintiff was a pretrial detainee [1] at Riverhead Correctional Facility suffering from schizophrenia. (AC ¶¶ 34, 38, 40). His schizophrenic condition led to his hospitalization at Stony Brook Medical Center "twice in or about 2017

**Giggetts v. County of Suffolk, Not Reported in Fed. Supp. (2022)**

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 23 of 102

and 2018." (*Id.* ¶¶ 35, 36). Despite knowing this, Defendants allegedly "regularly denied [him] access to his medication to treat his condition without cause or justification." (*Id.* ¶ 37). On August 30, 2018, several correction officers allegedly, without provocation, "grabbed Plaintiff by his shirt and forcefully slammed his body against the wall" and his "head into the ground multiple times." (*Id.* ¶¶ 43, 45). The alleged attack caused Plaintiff "to bleed profusely" from "his head, mouth" and other "clearly visible" areas. (*Id.* ¶ 46). In lieu of providing him immediate medical treatment, the correction officers handcuffed, shackled, and mocked Plaintiff. (*Id.* ¶¶ 47, 49–51).

---

1    Neither the Amended Complaint nor the parties' briefing identify the crime for which Plaintiff was detained.

Two nurses—Defendants RN Jadick and LPN Alarcon—arrived to treat Plaintiff but they "downplayed [his] injuries and characterized them as minor." (*Id.* ¶¶ 52–54). After three hours, Plaintiff was brought to Peconic Bay Medical Center; their staff too failed to treat him. (*Id.* ¶¶ 55–57). He was then sent to North Shore University Hospital – Northwell Health, whose doctors diagnosed him with, among other injuries, face and mouth fractures, fractured ribs, blackened eyes, a broken nose, and loosened teeth. (*Id.* ¶¶ 58, 60). On September 1, 2018, Plaintiff underwent surgery to, in part, "reconstruct his face." (*Id.* ¶¶ 61–62).

Plaintiff spent September 2018 at Yaphank Correctional Facility. (*Id.* ¶¶ 63, 81). Plaintiff advised a sergeant on duty about "lack of immediate and adequate medical treatment," but the Yaphank staff allegedly failed to take any action in response and even caused him to miss a follow-up appointment with his surgeon. (*Id.* ¶ 64). Plaintiff transferred back to Riverhead Correctional Facility on October 11, 2018, where he spent twenty-three hours a day "in a 'box' alone" and wore a "spit mask" in order to cover "the blood that was continuously flowing from" his mouth. (*Id.* ¶¶ 68, 71, 81).

**\*2**  At both facilities, Defendant Dr. Thomas Troiano, M.D. served as one of Plaintiff's healthcare providers. Allegedly, he "regularly denied Plaintiff access to his medication" and failed to provide proper medical treatment" for Plaintiff's assault-related injuries. (*Id.* ¶¶ 81, 183, 191–92).

On October 22, 2018, Plaintiff was admitted to Kirby Forensic Psychiatric Center, whose medical staff immediately diagnosed him with "serious infections of the wounds located to [his] head, eyes, nose, and face." (*Id.* ¶¶ 74–75). Within twenty-four hours, Kirby transferred Plaintiff to Bronx-Lebanon Hospital Center where he underwent a second surgery. (*Id.* ¶¶ 76–78). He spent more than two weeks in recovery. (*Id.* ¶ 79).

When Plaintiff returned to Riverhead Correctional Facility on April 18, 2019, he was put on suicide watch and placed in isolation for twenty-three-and-a-half hours per day until May 10, 2019. (*Id.* ¶¶ 83–84). On May 31, 2019 Plaintiff was sentenced on the charges for which he was detained. He got probation. (*Id.* ¶ 85).

Plaintiff brought this action on August 26, 2019. [DE 1]. On December 9, 2019, then-presiding Magistrate Judge A. Kathleen Tomlinson entered a scheduling order with a March 5, 2020 deadline to move to amend the pleadings. [DE 12]. She later extended that deadline to May 18, 2020. *See* Order dated May 7, 2020. Plaintiff did so move and the briefing completed on July 13, 2020. [DEs 24, 27–28]. Judge Tomlinson granted in part and denied in part Plaintiff's motion to amend on March 31, 2021, and Plaintiff filed his Amended Complaint on April 16, 2021.

The Amended Complaint identifies several previously unnamed defendants and asserts eleven causes of action: (1) a § 1983 count against all defendants for violations of the right to Equal Protection and Due Process, (2) a § 1983 count against the correction officer defendants for excessive force, (3) a § 1983 count against all defendants for negligent supervision, (4) an American with Disabilities ("ADA") and Rehabilitation Act ("RA") count against all defendants for disability discrimination, (5) a § 1983 count against all defendants for failure to intervene, (6) a § 1983 count for municipal liability, (7) an assault and battery count against defendant Edwards, (8) a negligence count against all defendants, (9) a negligent infliction of emotional distress count against Defendant Edwards, (10) an intentional infliction of emotional distress count against Defendant Edwards, and (11) punitive damages against all defendants.

Defendant Troiano submitted the instant motion to dismiss on October 5, 2021. [DE 53].

## LEGAL STANDARD

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiff[']s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). The plausibility standard is guided by two principles. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *accord Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009).

First, the principle that a court must accept all allegations as true is inapplicable to legal conclusions. Thus, "threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. A plaintiff must provide facts sufficient to allow each named defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery. *See Twombly*, 550 U.S. at 555.

**\*3** Second, only complaints that state a "plausible claim for relief" can survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that defendant acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line' between possibility and plausibility of 'entitlement to relief.' " *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal citations omitted); *see In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). Determining whether a complaint plausibly states a claim for relief is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *accord Harris*, 572 F.3d at 72.

## DISCUSSION

The Court's Memorandum proceeds in the following order. The Court begins with Plaintiff's (I) § 1983 Due Process, Equal Protection, Negligent Supervision, and Failure to Intervene causes of action; (II) ADA and RA cause of action; and (III) negligence cause of action, all as asserted against movant Troiano. The Court ends with (IV) Plaintiff's request for leave to amend his complaint a second time.

### I. § 1983 Claims: Due Process, Equal Protection, Negligent Supervision, and Failure to Intervene

The nature of the arguments leads the Court to address together Plaintiff's § 1983 Due Process and Equal Protection claims in Count I, his § 1983 negligent supervision claim in Count III, and his § 1983 claim for failure to intervene in Count V.

All three causes of action suffer an infirmity in that they do not mention Troiano or connect any particular action to Troiano. *See* AC ¶¶ 87–116, 130–53, 195–209. Rule 8(a) requires a complaint to "give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.' " *Atuahene v. City of Hartford*, 10 Fed. App'x 33, 34 (2d Cir. 2001) (quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)); *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000) ("[A] plaintiff must disclose sufficient information to permit the defendant 'to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.' " (quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991))). "Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial." *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) (quoting 2A Moore's Federal Practice ¶ 8.13, at 8–58 (2d ed. 1994)).

Not a single allegation names Troiano nor mentions any conduct reasonably attributable to him. Paragraphs 92 and 135 represent an ostensible, but unsuccessful, effort to so allege, in that certain defendants purportedly knew of Plaintiff's schizophrenia and yet "regularly denied access to his medication." AC ¶¶ 92, 135. But those certain defendants do not include Troiano. In Paragraph 92, Plaintiff refers to "the staff members of Defendant Riverhead" – but "Defendant Riverhead" is an undefined term and a related defined term, "Riverhead Medical Staff," included only "Defendants RN Jadick and LPN Alarcon" and not Troiano. *Id.* ¶¶ 7, 92 (capitalization omitted). Paragraph 135 refers to the staff members of "Defendant [Suffolk] County's Sheriff's Department," to which no allegations imply Troiano belonged. *See id.* ¶¶ 13, 55, 135. Accordingly, Paragraphs 92 and 135 do not refer to Troiano's conduct.

"[W]ithout any specification of any particular activities" of Troiano, these causes of actions are deficient as a matter of law. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007); *Atuahene*, 10 Fed. App'x at 34 ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, Atuahene's complaint failed to satisfy [the] minimum standard" of Rule 8.). "[A] complaint that lumps all the defendants together by means of a sweepingly general allegation of wrongdoing does not plausibly allege a claim for relief against any one defendant and denies each individual defendant fair notice of what the plaintiff alleges that the individual defendant did wrong." *Alejandro v. Quiros*, 2021 WL 5324905, at *5 (D. Conn. Nov. 16, 2021).

**\*4** Plaintiff declines to confront Troiano's arguments to this end, instead requesting leave to amend his complaint again. *See* Pl. Opp. at 7, 10. The Court addresses this request in Discussion Section IV. Plaintiff's § 1983 Due Process and Equal Protection, § 1983 negligent supervision, and § 1983 failure to intervene claims against Troiano are dismissed.

## II. Disability Discrimination

Plaintiff's ADA and RA cause of action contains his most robust allegations against Troiano. Plaintiff contends Troiano discriminated against him because Troiano knew of Plaintiff's schizophrenia and yet regularly denied him access to his medication. AC ¶¶ 160, 192. Troiano also allegedly "failed to provide proper medical treatment" for Plaintiff's injuries suffered on August 30, 2018. *Id.* ¶¶ 183, 185, 191. His allegations fail as a matter of law.

A prima facie violation under the ADA and RA entails showing (1) the plaintiff is a qualified individual with a disability; (2) the defendant is an entity subject to the ADA and RA; and (3) the plaintiff was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities or the defendant otherwise discriminated against him by reason of his disability. *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). As Troiano correctly observes, Plaintiff's allegations do not satisfy the third element – namely that Troiano discriminated against Plaintiff "by reason of [Plaintiff's] disability." Troiano Opening at 13 [DE 53-5]; Troiano Reply at 9 [DE 55].

In *Tardif v. City of New York*, the Second Circuit decided that the failure "to provide custodial medical services to [a plaintiff] in a timely and adequate manner" does not, "by itself, constitute a failure to make a reasonable accommodation 'by reason of' an individual's disability under the ADA." 991 F.3d 394, 404 (2d Cir. 2021). Tardif's framing of the issue, like Plaintiff's, avoided the question of whether he "was denied medical services *because* [he] has a disability." *Id.* at 405 (emphasis in original). His framing instead revolved around whether he "received adequate medical treatment in police custody *for* [his] disability." *Id.* (emphasis in original). This theory is not cognizable under the ADA or the RA. *Id.* "Neither the ADA nor the [RA] establish an obligation to meet a disabled person's particular needs vis-à-vis the needs of other handicapped individuals, but mandate only that the services provided by [defendants] to non-handicapped individuals not be denied to a disabled person because he is handicapped." *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998) (discussing the holding in *Flight v. Gloeckler*, 68 F.3d 61, 64 (2d Cir. 1995)).

Specific to his medication-related claims, an "unexplained failure to provide medication, by itself, does not allow for a reasonable inference that it was 'by reason of' the individual's disability." *Tardif*, 991 F.3d at 407 (emphasis removed); *McNair v. Harlem Hosp. Med. Dir.*, 2019 WL 3937663 (S.D.N.Y. Aug. 20, 2019), *adhering to* 2019 WL 2176299 (S.D.N.Y. May 17,

2019). Defendant's awareness of Plaintiff's schizophrenia, in and of itself, does not elevate withholding of medication "for" that condition into withholding of medication "because of" it. *See* Pl. Opp. at 8–9.

And no allegations connect Plaintiff's disability—schizophrenia—to Troiano's alleged inaction towards Plaintiff's physical injuries inflicted on August 30, 2018. The Amended Complaint does not suggest Troiano's "decision was motivated by considerations that are unrelated to proper medical decision-making about the case," e.g., discriminatory animus. *See McGugan v. Aldana-Bernier*, 752 F.3d 224, 231–32 (2d Cir. 2014) (discussing *United States v. University Hospital*, 729 F.2d 144 (2d Cir. 1984)); *Schnauder v. Gibens*, 679 Fed. App'x 8, 11 (2d Cir. 2017) ("[B]ecause he has not pleaded facts showing that denial of treatment was attributable to bias based on disability, his pleadings do not admit an inference of proscribed discrimination." (internal citations omitted)). Like a parallel ADA claim in Tate v. City of New York, the failure to treat Plaintiff's injuries "sustained as a result of ... [an] assault" was "not properly brought under the ADA as [P]laintiff has not alleged that [D]efendants' failure to treat his injuries were related to his disability, much less that [D]efendants failed to treat his injuries 'by reason of' his disability." 2017 WL 10186809, at *4 (E.D.N.Y. Sept. 29, 2017) (internal citations omitted) (citing *Wright*, 831 F.3d at 72 and *Henrietta D. v. Bloomberg*, 331 F.3d 261, 278 (2d Cir. 2003)).

**\*5** At bottom, "a doctor who administers a medical treatment to a patient (or withholds it) because the doctor's medical training leads her to conclude that the treatment is medically appropriate (or inappropriate)" does not run afoul of the ADA or RA – "even if the doctor's medical understanding is flawed and her knowledge is deficient." *McGugan*, 752 F.3d at 231–32. The ADA and RA are not avenues to litigate medical malpractice claims. *Tardif*, 991 F.3d at 405.

The ADA and RA claim against Troiano is dismissed.

## III. Negligence

Troiano moves to dismiss Plaintiff's state law cause of action for negligence as time-barred pursuant to Judge Tomlinson's March 31, 2021 decision granting in part and denying in part Plaintiff's motion to amend. *See* Mem. & Order dated March 31, 2021 ("Mar. 31, 2021 Decision") [DE 36]. Judge Tomlinson permitted Plaintiff to bring a "state law negligence claim arising from conduct that occurred in April and May 2019." *Id.* at 11–18. She denied Plaintiff's amendment "as to his remaining state law claims because they are time-barred and do not 'relate-back' to the original Complaint." *Id.*

According to the Amended Complaint, Plaintiff was "severely beaten" on August 30, 2018 and, as a result, suffered "clearly visible" injuries "to his head, mouth, and other areas" – requiring surgery on September 1, 2018. AC ¶¶ 240–45, 255, 258–59. Roughly two months later, on October 22, 2018, Plaintiff was transferred to Kirby Forensic Psychiatric Center, whose medical staff immediately observed "serious infections" in Plaintiff's head, eyes, nose, and face wounds. AC ¶¶ 271–72. Troiano's alleged negligence traces to this two-month period. *Id.* ¶ 278. In that timeframe, Plaintiff contends, Troiano failed to provide "proper care for [Plaintiff's] surgical wounds" apparent to the Kirby staff. *Id.*

But the "more than two-month" period preceding his October 22, 2018 admission to Kirby covers, at the most, August, September and October 2018. Pursuant to Judge Tomlinson's order, then, negligence occurring in this period is time-barred and Plaintiff may not base his negligence claim against Troiano thereon.

Plaintiff lodges no other allegations of negligence against Troiano. *See* AC ¶¶ 232–86. As the entirety of Plaintiff's negligence claim against Troiano stems from events untimely under the statute of limitations, the claim is dismissed against Troiano *in toto*.

## IV. Leave to Amend

In lieu of responding to many arguments, Plaintiff requests leave to amend his pleading a second time. Pl. Opp. at 7, 10–13. The first amendment "focused on identifying and naming John/Jane Does." *Id.* As to this second amendment, "Plaintiff is only asking for leave to amend as to Defendant Troiano." *Id.*

This second request to amend, like the first, comes after Judge Tomlinson's deadline to amend the pleadings. As chronologized in her March 31, 2021 Memorandum and Order, Judge Tomlinson extended three times the deadline to initiate the process for amendment of pleadings – ultimately to May 18, 2020. Plaintiff's second request to amend comes in his motion to dismiss opposition brief served in September 2021. It is almost sixteen (16) months after the May 18, 2020 deadline, almost fifteen (15) months after Plaintiff served his first proposed amended Complaint on June 1, 2020, and five (5) months after Judge Tomlinson granted Plaintiff leave to amend.

A plaintiff wishing to amend his pleading after the deadline set by a scheduling order "must satisfy both [Rules] 15 and 16 to be permitted to amend." *Pasternack v. Shrader*, 863 F.3d 163, 174 & n.10 (2d Cir. 2017) (internal quotation marks omitted). Under Rule 15, district courts "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Prejudice results from an amendment requiring "the opponent to expend significant additional resources to conduct discovery and prepare for trial" or an amendment causing significant delay to the resolution of the dispute. *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725–26 (2d Cir. 2010) (internal quotation marks omitted). Under Rule 16, if a scheduling order's deadline to amend pleadings has passed, a plaintiff must show "good cause"—viz. "diligence" in seeking to amend. *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009) (quoting *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2003)).

**\*6** With respect to his disability discrimination and negligence claims against Troiano, Plaintiff is denied leave to amend. The problem there "is substantive; better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). "[R]epleading would thus be futile." *Id.*

But leave to amend his remaining claims against Troiano raises a thornier question. On the one hand, amendments should be freely granted. Fed. R. Civ. P. 15(a). Discovery has not yet closed. *See* Status Report dated Aug. 26, 2021 [DE 50]. And Troiano's strongest argument against permitting Plaintiff to amend—Plaintiff's delay in seeking to amend a second time—alone cannot suffice to deny leave to amend. *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)

On the other hand, Plaintiff offers no Rule 16 "good cause" despite the scheduling order's lapsed deadline. *See* Mar. 31, 2021 at 9–10. Plaintiff is likewise silent on what "new material [he] wishes to plead." *Cuoco*, 222 F.3d at 112; *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (leave to amend may be denied where plaintiff "fails to specify ... how amendment would cure the pleading deficiencies in [his] complaint"). On its own, each omission can be fatal. Additionally, "the longer the period of an unexplained delay," the less required of the nonmoving party "in terms of a showing of prejudice." *Block*, 988 F.2d at 350.

As evidenced by the thorough March 31, 2021 Memorandum and Order, the presiding magistrate has handled leave to amend in this action. It makes sense to stick to that practice, for the present request implicates the magistrate's scheduling order. Accordingly, Plaintiff's request is denied without prejudice to addressing the request directly to now-presiding Magistrate Judge Steven Tiscione.

## CONCLUSION

For the reasons discussed above, Defendant Troiano's motion to dismiss is granted. Plaintiff's Counts I, III, and V are dismissed for failure to plead allegations against Troiano; Plaintiff's ADA and RA claim is dismissed as it is not cognizable under those statutes; and his negligence claim is dismissed as time barred. These claims are dismissed as against Troiano only.

The Court refers to Judge Tiscione Plaintiff's request for leave to amend his complaint a second time. Within two weeks of this Order, Plaintiff shall re-raise this request directly to Judge Tiscione.

Giggetts v. County of Suffolk, Not Reported in Fed. Supp. (2022)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 28 of 102

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1046311

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 919505

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Annette O. KAMAL and Hany M. Kamal, individually, and on behalf of all others similarly situated, Plaintiffs,

v.

PRESSLER, FELT & WARSHAW, LLP and LVNV Funding LLC, Defendants.

1:23-cv-10487-MKV

|

Signed March 25, 2025

**Attorneys and Law Firms**

Andrew J. Brown, Law Offices of Andrew J. Brown, San Diego, CA, Karim H. Kamal, The Law Office of Karim H. Kamal, New York, NY, for Plaintiff Annette O. Kamal.

Karim H. Kamal, The Law Office of Karim H. Kamal, New York, NY, for Plaintiff Hany M. Kamal.

Jacquelyn Alena DiCicco, Jonathan M. Robbin, J. Robbin Law PLLC, Armonk, NY, for Defendants.

## OPINION & ORDER GRANTING MOTION TO DISMISS

MARY KAY VYSKOCIL, United States District Judge:

**\*1**  Plaintiffs Annette O. Kamal and Hany M. Kamal filed a complaint against Defendants Pressler, Felt & Warshaw, LLP ("Pressler"), and LVNV Funding LLC ("LVNV") asserting claims on behalf of Plaintiffs and others similarly situated under the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* ("FDCPA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), and the New York Consumer Fraud Act, NYGBL §§ 349, *et seq.* ("GBL"), arising from the allegedly defective service and subsequent fraudulent default judgment rendered against them in an action in New Jersey state court captioned, *LVNV Funding LLC, Successor in Interest [Citibank, N.A. (AT&T), Original Creditor] v. Annette O. Kamal*, No. MON-DC-009195-22 (the "Collection Action"). This case is in essence a collateral attack on the state court proceeding.

Defendants move to dismiss the operative amended complaint for lack of standing pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, for lack of personal jurisdiction pursuant to Rule 12(b)(2), for failure to state a claim and under the doctrines of res judicata and collateral estoppel pursuant to Rule 12(b)(6), and because the claims are barred by the abstention doctrines of Rooker-Feldman and Colorado River. For the reasons below, the motion to dismiss is GRANTED.

## FACTUAL BACKGROUND [1]

1    The facts as stated herein are drawn from Plaintiff's First Amended Complaint [ECF No. 21] ("FAC"), and for purposes of this motion, are accepted as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Some of the facts asserted in this section are contrary to findings in a prior opinion in the Collection Action. The Court addresses this issue later in the opinion.

Defendant Pressler, Felt & Warshaw, LLP ("Pressler") is a law firm that has filed thousands of consumer credit actions, or debt collection actions, throughout New York, New Jersey, and Pennsylvania on behalf of buyers of debt. FAC ¶¶ 2, 52. Pressler represents LVNV, an investor in domestic and international debt, in most of the debt collection lawsuits it brings. FAC ¶¶ 2–3. The vast majority of these lawsuits result in default judgments in favor of LVNV. FAC ¶ 3. [2]

[2]    Pressler is a New Jersey Limited Liability Partnership with a principal place of business in Morris County, New Jersey and LVNV Funding, LLC is a Delaware Limited Liability Company with a principal place of business in New Castle County, Delaware. FAC ¶¶ 17–18.

Nearly a decade ago, the Consumer Financial Protection Bureau instituted a $1 million penalty against Pressler's predecessor, Pressler & Pressler LLP, and its two principal partners Sheldon Pressler and Gerard Felt. for their role in filing deceptive debt collection lawsuits on behalf of a debt buyer, New Century Financial Service, Inc. FAC ¶ 4. Pressler & Pressler later reorganized as Pressler, Felt & Warshaw LLP, one of the defendants here. FAC ¶ 4. According to Plaintiffs, Defendants practice "sewer service" by filing lawsuits to collect purchased debt, and failing properly to serve the summons and complaint, and then filing fraudulent affidavits of service to achieve default judgments. FAC ¶¶ 6–7. After Defendants obtain default judgments, they seek to enforce them by restraining bank accounts, garnishing wages, or threatening to seize personal property. FAC ¶ 8.

**\*2**  In February 2023, LVNV brought a lawsuit through its attorneys at Pressler against Plaintiff Annette Kamal in Superior Court of New Jersey (the "Collection Action"). FAC ¶ 55. Pressler affirmed that it had sent a copy of the summons and complaint to Annette Kamal via U.S. mail to an address in New Jersey (the "New Jersey address") and affirmed that service was proper. FAC ¶ 57.

Hany and Annette Kamal are a married couple who have lived in New York County since 1968. FAC ¶¶ 14, 54, 56. Annette is 91 and Hany is 83. FAC ¶ 54. Hany and Annette Kamal allege that they have never been residents of New Jersey and were never served with a summons and complaint in the Collection Action. FAC ¶ 56. They allege that Pressler had "no reasonable basis for claiming valid service would be, could be, or was actually achieved by mailing documents to the New Jersey address." FAC ¶ 57.

When Annette Kamal did not appear in the Collection Action, Defendants obtained a default judgment against her. FAC ¶ 58; [ECF No. 26 ("DiCicco Decl.") Ex. G ("Default Judgment")]. Plaintiffs allege the motion for a default judgment and the resulting default judgment also were not properly served. FAC ¶ 58. Defendants sought to enforce the judgment by attaching Annette's personal account at her NYC Chase Bank account. FAC ¶ 58. This is how Annette and Hany Kamal became aware of the judgment in the Collection Action. FAC ¶ 58.

Several months after the Collection Action was commenced, Plaintiff filed this action bringing claims against Pressler and LVNV. [ECF No. 1 ("Compl.")]. Plaintiffs allege that about a month later Pressler learned Annette Kamal did not and never had resided in New Jersey, rendering false its affidavits of service. FAC ¶ 59. On December 11, 2023, Pressler advised the New Jersey Court that Plaintiff's "address provided on the writ for the defendant *is no longer* valid as the defendant has relocated," and called Kamal's New York City address her "new home address," suggesting that the New Jersey address was valid at the time of service. FAC ¶ 59 (emphasis added); [ECF No. 32 ("Kamal Decl.") Ex. B ("Address Change Notice")]. [3] Rather than notifying the New Jersey Court that Annette Kamal had never lived at the New Jersey address and seeking to have the judgment set aside, Pressler and LVNV asked the Court for leave to serve the default judgment on Annette Kamal at her New York residence. FAC ¶ 59; Address Change Notice.

[3]    The Court takes judicial notice of the filings in the Collection Action where appropriate as they are either "public records," "incorporated by reference" in the Amended Complaint, or "integral" to the Amended Complaint since it "relies heavily upon [their] terms and effect." *See Int'l Strategies Grp., Ltd. v. Ness*, 645 F.3d 178, 180 (2d Cir. 2011); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).

In March 2024, while briefing on Defendants' motion to dismiss was ongoing in this action, the New Jersey Court granted Annette Kamal's motion to vacate the Default Judgment in the Collection Action. Kamal Decl. Ex. C ("Vacating Order"). The New Jersey Court held that "the Court is convinced that Defendant was not properly served with notice of the legal proceeding." *Id.* at 6. However, soon after, the New Jersey Court held that Annette Kamal's attorney—one of the attorneys who represents Plaintiffs here—had committed unauthorized practice of law by filing the motion to vacate and thus granted a motion filed by LVNV to reconsider the Vacating Order. [ECF No. 33 ("DiCicco Aff.") Ex. 2 ("LVNV Mot. for Reconsideration")]; [ECF No. 35 ("Defendants' Supp. Letter"), Ex. A]. The New Jersey Court allowed Annette sixty days to file a proper motion to vacate. Defendants' Supp. Letter Ex. A.

**\*3** In July 2024, the New Jersey Court denied Annette Kamal's second motion to vacate. [ECF No. 35, Ex. A ("July Order")]. In doing so, the Court applied New Jersey Rule of Court 4:50-1 which sets out several permitted reasons for relieving a party from a final judgment including that "the judgment or order is void[.]" The Court ruled that the Default Judgment was not void based on ineffective service. *Id.* at 5–6. In fact, the Court affirmatively found that "[s]ervice was effective." *Id.* at 5–10. The Court held that Kamal came forward with "no admissible proof supporting [her] counsel's contention that she never lived in New Jersey," specifically noting that Annette Kamal provided no certification from her, a family member, friend or neighbor, no documentary proof of her residence at the time the litigation was commenced, no leases, no mail, no driver's license, no utility bills, no voter registration, and no bank statement that showed she lived in New York. *Id.* at 7–8. Instead, the Court found that the record indicated that "Kamal resided in New Jersey at the address in question" and service on her there was proper. *Id.* at 6, 8 (citing billing statements, two credit bureau reports, the fact that initial service was not returned, and that service of the Default Judgment was signed for at the New Jersey address). The Court later denied Annette Kamal's motion to reconsider the order denying the motion to vacate. [ECF No. 37 Ex A. ("Kamal Reconsideration Order")].

## PROCEDURAL HISTORY

Plaintiff initiated this putative class action by filing a Complaint. [ECF No. 1 ("Compl.")]. With leave of Court, Plaintiff filed an Amended Complaint, in response to the issues raised in Defendants' first pre-motion letter seeking leave to move to dismiss the case. [ECF Nos. 15, 17, 21]. Thereafter, Defendants moved to dismiss the Amended Complaint, filing a memorandum of law, [ECF Nos. 25, 27 ("Def. Mem.")], and a declaration in support which attached several exhibits. *See* DiCicco Decl. In opposition, Plaintiff filed a memorandum of law, [ECF No. 31 ("Pl. Opp.")], and a declaration which also attached several exhibits. *See* Kamal Decl. Defendants filed a reply, [ECF No. 34 ("Def. Reply")], and an affidavit in further support which attached two additional exhibits, *see* DiCicco Aff. The parties thereafter filed three letters advising the Court on the status on the Collection Action. [ECF Nos. 35–37].

## LEGAL STANDARD

### I. Federal Rule of Civil Procedure 12(b)(1) – Lack of Standing

Dismissal of an action under Rule 12(b)(1) is warranted whenever a district court " 'lacks the statutory or constitutional power to adjudicate it,' such as when ... the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 417 (2d. Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). A plaintiff bears the burden of establishing its standing by a preponderance of the evidence. *See Makarova*, 201 F.3d at 113. "In assessing the plaintiff's assertion of standing, '[courts] accept as true all material allegations of the complaint[ ] and ... construe the complaint in favor of the complaining party.' " *Cortlandt St. Recovery*, 790 F.3d at 417 (quoting *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008)). Courts may also consider evidence outside of the pleadings in assessing a Rule 12(b)(1) standing motion. *Cortlandt St. Recovery*, 790 F.3d at 417; *Makarova*, 201 F.3d at 113.

### II. Federal Rule of Civil Procedure 12(b)(2) – Lack of Personal Jurisdiction

To survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure, the plaintiff must make a *prima facie* showing that the Court has personal jurisdiction over the defendant. *See Penachio v. Benedict*, 461 F. App'x 4, 5 (2d Cir. 2012); *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). To make a *prima facie* showing of personal jurisdiction, a plaintiff "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013); *see also S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010)

In assessing personal jurisdiction, the Court must "construe the pleadings and any supporting materials in the light most favorable" to the plaintiff. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013). Still, the Court cannot "draw argumentative inferences in the plaintiff's favor" and need not accept conclusory legal statements. *O'Neill v. Asat Trust Reg.*, 714 F.3d 659, 673 (2d Cir. 2013).

**\*4** It is well settled that, in deciding a motion to dismiss a complaint for want of personal jurisdiction, the Court may consider materials outside the pleadings. *Fleming v. ISCO Indus., Inc.*, 750 F. App'x 62, 63–64 (2d Cir. 2019) (citing *Dorchester Fin. Sec.*, 722 F.3d at 86 ("[W]e have made clear that a district court may [consider materials outside the pleadings] without converting a motion to dismiss for lack of personal jurisdiction into a motion for summary judgment.")). Where, as here, jurisdictional discovery has not been conducted, the plaintiff need only make a *prima facie* showing by his pleadings and affidavits that jurisdiction is proper. *Id.* at 85; *see also Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727–28 (2d Cir. 2012). "If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *In re Terrorist Attacks*, 714 F.3d at 673. The court must "construe the pleadings and affidavits in the light most favorable to [the plaintiff], resolving all doubts in [its] favor." *V&A Collection, LLC v. Guzzini Props. Ltd.*, 46 F.4th 127, 131 (2d Cir. 2022).

There are three traditional bases for the exercise of personal jurisdiction over a defendant. First, a court may exercise general jurisdiction over a defendant that is "essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 119 (2014). Second, a court may exercise "specific or conduct-linked jurisdiction" where there is a sufficient link between the defendant's conduct in the forum and the conduct at issue in the case. *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014). Third, a defendant can consent to the exercise of personal jurisdiction. *Rabinowitz v. Kelman*, 75 F.4th 73, 83 (2d Cir. 2023); *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006). In all cases, the exercise of personal jurisdiction must comport with fundamental notions of due process. *See Daimler*, 571 U.S. at 117.

### III. Federal Rule of Civil Procedure 12(B)(6) – Failure to State a Claim

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While the Court "must accept as true all of the allegations contained in a complaint," this "tenet ... is inapplicable to legal conclusions." *Id.*

The "plausibility standard" articulated in *Iqbal* "is not akin to a 'probability requirement,' but it does ask "for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* At bottom, Plaintiff must "nudg[e] [his] claim[ ] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 569. Otherwise, the complaint must be dismissed. *Id.*

## DISCUSSION

**I. Plaintiff Hany Kamal's Claims Must be Dismissed Because He Fails to Allege Standing**

Defendants assert that Hany Kamal and Annette Kamal lack standing to pursue their claims. Def. Mem. at 8–9. Defendants assert that Hany Kamal was not a named defendant in the Collection Action and thus he was not damaged in any way by the enforcement of the Collection Action. Def. Mem. at 8. Defendants assert that Annette Kamal lacks standing because, in the Collection Action, one of her attorneys purported to have power of attorney over her and that attorney asserted that she is "an incompetent" as a 91-year-old "in the final stages of ...Progressive Supranuclear Palsy." Def. Mem. at 8–9 (citing DiCicco Decl. Ex. L); Def. Reply at 4 n.5. Thus, Defendants urge that Annette Kamal "cannot proceed without a guardian ad litem." Def. Mem. at 8–9.

 **\*5**  To have standing to sue, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338 (citing, *inter alia, Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). At the pleading stage, "the plaintiff must 'clearly ... allege facts demonstrating' each element" of standing. *Id.* (citation omitted).

Plaintiff Annette Kamal clearly has standing to pursue her claims. The Amended Complaint alleges the Defendants injured Annette Kamal by fraudulently obtaining and enforcing a judgment procured in the Collection Action against her, attaching her personal bank account in New York. FAC ¶¶ 55, 58, 59. The Amended Complaint makes no allegation that Annette is incompetent and the Court may not take judicial notice of documents filed in the Collection Action for the truth of the statement that Annette Kamal is "an incompetent." *See, e.g., Arkansas Pub. Emps.*, 28 F.4th at 352. Regardless, if Defendants believe that Annette Kamal is incompetent to defend her rights in court, the proper course of action would be to file a motion to appoint a guardian *ad litem* pursuant to Rule 17(c) of the Federal Rules of Civil Procedure, so that she may be properly represented. *Ferrelli v. River Manor Health Care Ctr.*, 323 F.3d 196, 200 (2d Cir. 2003) (quoting Fed. R. Civ. P. 17(c)). No such motion has been filed, and this Court cannot make a finding with the requisite sufficient evidence to establish the mental incompetency of Plaintiff and appoint a guardian *ad litem. Lucido v. U.S. Legal Support, Inc.*, No. 23-CV-1389 (DEH), 2024 WL 687288, at \*1 (S.D.N.Y. Feb. 20, 2024) (citing *Neilson v. Colgate-Palmolive Co.*, 199 F.3d 642, 652 (2d Cir. 1999) (affirming the appointment of a guardian *ad litem* for plaintiff where defendant made the motion to appoint such a guardian)). Defendants cite no law to support their outrageous assertion that a Court must dismiss a plaintiff's case, rather than appoint her a guardian *ad litem*, if the plaintiff is truly incompetent to represent herself. *See* Def. Mem. 8–9.

Defendants are correct, however, that Hany Kamal does not have standing to pursue claims in this case. The Amended Complaint includes no allegation that Hany himself was a defendant in the Collection Action or suffered an injury as a result of the Collection Action. *See* FAC. Moreover, the caption of the Collection Action indicates that Annette Kamal was the only defendant. *See* DiCicco Decl. Ex. M. The only factual allegations in the Amended Complaint regarding Hany Kamal involve his marriage to Annette Kamal, his age, languages, employment status, residence, and income. FAC ¶¶ 14, 54, 56. Plaintiffs argue that Hany Kamal has standing because New York divorce laws divide marital property and debt equally and that New York banking laws indicate that when spouses own a joint account, courts presume that the parties are entitled to equal shares of the account. Pl. Opp. at 10–11. However, the Amended Complaint includes no allegation that Hany and Annette Kamal are divorced and no allegation that Hany Kamal was a joint owner of Annette Kamal's bank account that was attached pursuant to the judgment in the Collection Action. *See* FAC. Hany Kamal does not have standing based solely on an injury to his wife. *See, e.g., Meimaris v. Royce*, No. 19-3339-CV, 2021 WL 5170725, at \*2 (2d Cir. Nov. 8, 2021) ("a spouse does not have standing merely on the basis of her marital status to sue for an injury suffered by her spouse"). Accordingly, Hany Kamal lacks standing, and his claims are dismissed. [4]

---

[4]     As such, where the Court names "Kamal" below, the Court refers to only Annette Kamal.

## II. Personal Jurisdiction Over Defendants

**\*6** In response to Defendants' motion to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure, Kamal asserts that Defendants are subject to both general and specific jurisdiction in New York. *See* Pl. Opp. at 8–10. Kamal fails to make a *prima facie* case for general jurisdiction over defendants but does make a *prima facie* showing that Defendants are subject to specific jurisdiction in New York with respect to her claims.

### A. Plaintiff Fails to Establish General Jurisdiction

General personal jurisdiction subjects a defendant to suit on all claims. *See Daimler*, 571 U.S. at 127. Under the Due Process Clause, a corporation can "be subject to general jurisdiction in a state only where its contacts are so 'continuous and systematic' ... that it is 'essentially at home' in that state." *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014) (quoting *Daimler*, 571 U.S. at 139). Under this test, a corporate defendant is "essentially at home" only where it is incorporated or where it maintains its principal place of business "[e]xcept in a truly 'exceptional' case." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) (quoting *In re Roman Catholic Diocese of Albany, N.Y., Inc.*, 745 F.3d 30, 38-39 (2d Cir. 2014)); *Gucci America, Inc.*, 768 F.3d at 135 (quoting *Daimler*, 571 U.S. at 139 & n.19).

Pressler is a New Jersey Limited Liability Partnership with a principal place of business in Morris County, New Jersey and LVNV Funding, LLC, is a Delaware Limited Liability Company with a principal place of business in New Castle County, Delaware. [5] FAC ¶¶ 17–18. Since neither Defendant is "at home" in New York, general jurisdiction in New York over either is improper absent truly exceptional circumstances. *Brown*, 814 F.3d at 627.

[5]    Defendants assert that LVNV is also domiciled South Carolina. Def. Reply at 6. For the purposes of this analysis whether LVNV is domiciled in South Carolina is irrelevant.

Kamal alleges that Pressler markets itself on its website as doing business in New York, has filed thousands of cases in New York, maintains a law office in New York, where one lawyer works, [6] and works with LVNV which also has an office in New York at the same address. Pl. Opp. at 9 (citing Kamal Decl. Exs. A, D). Kamal alleges that LVNV purchases debts of New York residents, regularly sues those residents in New York court, is licensed to do business in New York and "at least one of those licenses lists" a New York City address, the same address as the Pressler's New York office. Pl. Opp. at 9–10 (Kamal Decl. ¶¶ 7, 8, 10, Ex. F).

[6]    Pressler disputes that a lawyer works at its New York office. Def. Mem. at 6. However, as previously explained, on a motion to dismiss for lack of personal jurisdiction, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *In re Terrorist Attacks,* 714 F.3d at 673.

These contacts do not establish that either Defendant is "essentially at home" in New York. The fact that Defendants operate some business in New York is insufficient on its own to establish general jurisdiction. *See, e.g.*, *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d at 226 (explaining that even a "substantial, continuous, and systematic course of business," including negotiations, transactions, and an office in New York, was insufficient to warrant exercise of general jurisdiction (internal quotation marks omitted)). Further, a foreign defendant does not consent to general personal jurisdiction in New York by registering to do business in the state. *See Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 499 (2d Cir. 2020); *D'Amico Dry D.A.C.* v. *Primera Mar. (Hellas) Ltd.*, 348 F.Supp.3d 365, 387 (S.D.N.Y. 2018) (quoting *Chatwal Hotels & Resorts LLC v. Dollywood Co.*, 90 F. Supp. 3d 97, 105 (S.D.N.Y. 2015)). [7]

[7]    Though the registration to do business in New York does not constitute consent to general jurisdiction in the state, it may be that attorneys who are licensed to practice in New York or admitted *pro hac vice* in New York have consented to jurisdiction in New York. However, Plaintiff does not allege sufficient facts for the Court to make such a finding with

respect to Pressler. Kamal attaches to her attorney's declaration, just one New York state court filing which includes the signature of an attorney associated with Pressler and lists a New York address in his signature block. Pl. Opp. at 9 (citing Kamal Decl. Ex. D). Kamal includes no facts about this person's admission to practice in New York. In any event, the Court need not resolve that inquiry since, as discussed below, defendants are subject to specific jurisdiction with respect to the claims in this case.

**\*7** Instead, Defendants' business in New York must be viewed relative to their overall activity "nationwide and worldwide." *See Daimler*, 571 U.S. at 139 n.20; *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 333 (2d Cir. 2016); *see also Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 629 (2d Cir. 2016) (finding no general jurisdiction in Connecticut where "[Defendant's] business in Connecticut, while not insubstantial, constitutes only a very small part of its portfolio."); *Gucci America*, 768 F.3d at135 (finding no general jurisdiction over the Bank of China, which had branch offices in New York but was "incorporated and headquartered elsewhere" and conducted only a small portion of its worldwide business within the forum); *Corley v. Vance*, 365 F. Supp. 3d 407, 434 (S.D.N.Y. 2019), *aff'd sub nom. Corley v. Wittner*, 811 F. App'x 62 (2d Cir. 2020) (finding no general jurisdiction where defendant had an office in New York but less than 7% of their global workforce is located that office).

Kamal has alleged no facts about the magnitude and nature of the nationwide or worldwide activity of Pressler and LVNV, except the general assertion that PWF has filed "thousands of 'consumer credit actions,' or debt collection actions, throughout NY-NJ-PA" and Pressler represents LVNV in most of the debt collection lawsuits they bring. FAC ¶¶ 2–3. Accordingly, the Court has insufficient context with which to determine whether either defendant is "essentially at home" in New York. *See Great W. Ins. Co. v. Graham*, No. 18-CV-6249 (VSB), 2020 WL 3415026, at \*11 (S.D.N.Y. June 22, 2020) ("[Plaintiff's allegations] do not provide any detail about WSFS' national business. Without that context, I cannot properly assess the significance of WSFS' New York contacts with respect to its 'overall activity.' "). Plaintiff has failed to meet her burden to demonstrate that this is an "exceptional case" in which a corporation is "essentially at home" in a foreign forum. *See Brown*, 814 F.3d at 627 (quotation marks omitted).


## B. Plaintiff Establishes Specific Jurisdiction over Defendants

District courts deciding a motion to dismiss for lack of personal jurisdiction engage in a two-part analysis to determine whether there is specific jurisdiction over the defendant. First, the Court must determine whether the law of the forum state, here, New York's long-arm statute, would subject the Defendant to personal jurisdiction. *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128 (2d Cir. 2013); *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) ("To determine personal jurisdiction over a non-domiciliary in a case involving a federal question," the Court first "appl[ies] the forum state's long-arm statute."). If New York law would permit the exercise of jurisdiction over the Defendant, the Court must also evaluate whether the exercise of jurisdiction would comport with due process. *See Daimler AG v. Bauman*, 571 U.S. 117, 117 (2014); *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 90 (2d Cir. 2017).

Though Kamal asserts that this Court has specific jurisdiction over Defendants, she fails to identify the pertinent section of the New York long-arm statute. Since Plaintiff alleges that "Defendants conducted business within the State of New York," *see* FAC ¶ 13, and "avail themselves of the laws and benefits of operating their businesses in the state of New York," *see* Pl. Opp. at 8, the Court analyzes specific jurisdiction under CPLR § 302(a)(1). This subsection permits a court to "exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent: ... transacts any business within the state or contracts anywhere to supply goods or services in the state[.]" CPLR § 302(a)(1).

**\*8** To determine the existence of jurisdiction under section 302(a)(1) a court must decide (1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action "aris[es] from" such a business transaction. *American Girl, LLC v. Zembrka*, 118 F.4th 271, 277 (2d Cir. 2024), *cert. denied*, No. 24-653, 2025 WL 247472 (Jan. 21, 2025); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007); *see Deutsche Bank Securities, Inc. v. Montana Bd. of Investments*, 7 N.Y.3d 65, 71, 850 N.E.2d 1140, 1142, 818 N.Y.S.2d 164, 166 (N.Y. 2006). Ordinarily, in evaluating whether the defendant transacts business, "[c]ourts look to 'the totality of the defendant's activities within the forum" to decide whether the defendant engaged in "purposeful activity" in New York. *Best Van Lines*, 490 F.3d at 246 (quoting *Sterling National Bank & Trust Co. of*

*N.Y. v. Fidelity Mortgage Investors*, 510 F.2d 870, 873 (2d Cir. 1975)). The second element of § 302(a)(1) is satisfied "when there exists an articulable nexus or a substantial relationship between transactions occurring within the state and the cause of action sued upon." *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 643 (2d Cir. 2023).

The decision of the Second Circuit in *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015), is instructive here. In that case, defendant, a law firm attempted to collect a New York resident's debt on behalf of a Pennsylvania-based client by filing a suit in Pennsylvania state court. *Id.* at 166–67. When the New York state resident filed suit in New York alleging violations of FDCPA, the Second Circuit reversed the District Court's dismissal for lack of personal jurisdiction under § 302(a)(1). The Second Circuit held that collecting debt constituted "a major aspect of [Defendant's] mission—part of its principal reason for being." *Id.* at 168. (citing *Deutsche Bank Sec.,* 7 N.Y.3d at 72). Further, it found the defendant's conduct in New York—mailing one debt collection notice to Plaintiff, engaging in one debt collection phone call with Plaintiff, and mailing a summons and complaint to Plaintiff—was sufficient to establish personal jurisdiction under § 302(a)(1) because the Defendant "initiated debt collection efforts in an active (rather than responsive) attempt to collect money from two New York residents." *Id.* (citing *Paterno v. Laser Spine Inst.,* 24 N.Y.3d 370, 377–78, 998 N.Y.S.2d 720 (2014)). Finally, the Second Circuit found that Plaintiffs' FDCPA claims arose directly from those communications into New York. *Id.* (citing *Bates v. C & S Adjusters, Inc.,* 980 F.2d 865, 868 (2d Cir. 1992) ("[R]eceipt of a collection notice is a substantial part of the events giving rise to a claim under the [FDCPA].")).

The facts alleged here are very similar. Kamal brings a FDCPA claim—and two other claims based on the same conduct—against a law firm and its debt investor client that Plaintiff alleges participate in a "fraudulent enterprise" with a shared goal "to obtain default judgments through fraudulent means" by filing thousands of "consumer credit actions" throughout New York, New Jersey, and Pennsylvania. FAC ¶¶ 2, 3, 84. Kamal alleges that, in the Collection Action, Defendant requested service of the Default Judgment to an address in New York and attempted to enforce the Default Judgment through an attachment of Kamal's New York-based bank account. FAC ¶¶ 58–59. Though Defendants initially attempted service in New Jersey and they did not call or write letters to New York residents as the Defendant did in *Eades*, Defendants' conduct here was in deliberate furtherance of debt collection efforts purposefully availing itself of the privilege of transacting business in New York. *See Eades*, 799 F.3d at 168. Further, just as in *Eades*, Plaintiffs' claims of fraudulent debt collection, violations of RICO, and violations of the New York Consumer Fraud Act all arise out of Defendants' pursuit of debt collection from Plaintiff. Accordingly, Kamal has averred facts that, if credited, establish personal jurisdiction over Defendants pursuant to 302(a)(1).

 **\*9**  The exercise of personal jurisdiction also comports with the Constitution's due process protections. "[D]espite the fact that section 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive, and that personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases to be rare." *Eades*, 799 F.3d at 168 (quoting *Licci*, 732 F.3d at 170). The Due Process Clause of the Constitution requires that (1) the defendant have sufficient "minimum contacts" with the forum and that (2) the exercise of jurisdiction over defendants does "not offend traditional notions of fair play and substantial justice." *Spetner*, 70 F.4th at 644–45.

As for the first requirement, courts assess the "quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test." *Eades*, 799 F.3d at 168 (citing *Licci*, 732 F.3d at 170 (quotation marks omitted)). Defendants have sufficient "minimum contacts" with the forum if they "purposefully availed [themselves] of the privilege of doing business in the forum and could foresee being haled into court there." *Id.* (quoting *Licci*, 732 F.3d at 170) (quotation marks and alterations omitted). Just as with the Defendant in *Eades*, the contacts with New York by Defendants here sufficiently satisfy the "minimum contacts" test. *See Eades*, 799 F.3d at 168. Defendants purposefully pursued debt collection from a person allegedly residing in New York by serving her in New York with a Default Judgment and attaching her New York-based bank account. FAC ¶¶ 58–59.

As for the second consideration, the inquiry into whether exercising jurisdiction comports with fair play and substantial justice reexamines five factors: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in

furthering substantive social policies. *American Girl*, 118 F.4th at 279 (citing *In re Platinum*, 61 F.4th at 273 (citation omitted)). Here, Defendants are located in New Jersey and Delaware, have offices in New York, routinely litigate in New York to pursue debts, and can easily defend themselves in New York. Moreover, New York has a "manifest interest in providing effective means of redress for its residents," and Kamal has an interest in adjudicating her case in the state where she claims she resides and where her assets are being impaired by Defendants' actions. *Chloé*, 616 F.3d at 173 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 105 S. Ct. 2174, 2182, 85 L. Ed. 2d 528 (1985)). The fourth factor is neutral in this case: the controversy could be resolved efficiently in either New York or New Jersey. Finally, the States share an interest in enabling plaintiffs to litigate FDCPA claims in their states of residence. *See, e.g., Sluys v. Hand,* 831 F.Supp. 321, 324 (S.D.N.Y. 1993) (noting that FDCPA plaintiffs should be able to file suit in their states of residence because "[o]therwise, [debt collectors] could invoke the protection of distance and send violative letters with relative impunity, at least so far as less well-funded parties are concerned"); *see also Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 348 (S.D.N.Y. 2015) (finding the fifth factor in a RICO case to be "neutral"); *Brady v. Anker Innovations Ltd.*, No. 18-CV-11396 (NSR), 2020 WL 158760, at *7 (S.D.N.Y. Jan. 13, 2020) (finding the fifth factor "neutral" in a case bringing a GBL claim). For these reasons, the Court has personal jurisdiction over Defendants pursuant to the New York long-arm statute and consistent with due process, and their motion to dismiss on the basis of lack of personal jurisdiction is denied.

### III. Kamal is Collaterally Estopped from Asserting her Claims

 **\*10**  Defendants argue that all of Kamal's claims are precluded under the doctrine of collateral estoppel based on rulings in the Collection Action. Def. Mem. at 9–11. Defendants argue that the Court in the Collection Action determined the issue of whether service was proper and that finding is preclusive of each of Kamal's claims. Def. Mem. at 10–11. Defendants assert that the initial Default Judgment and a subsequent Writ of Execution Against Goods & Chattels each affirm that service was proper and constitute a final judgment on the merits. *Id.*

In opposing Defendants' motion to dismiss this case, Kamal relies only on the then-current fact that the New Jersey Court had vacated the Default Judgment against her. Pl. Opp. at 11–12 (citing Vacating Order). However, since then, the New Jersey Court ruled Kamal's motion to vacate was improperly filed, permitted Kamal time to file a new motion to vacate, and permitted both parties time to submit additional briefing and evidence related to the vacatur motion. [ECF No. 35, Ex. A ("July Order")]. After reviewing the materials submitted by the parties, the New Jersey Court denied Kamal's request to vacate the Default Judgment and later denied Kamal's motion for reconsideration. *Id.*; Kamal Reconsideration Order. No further motions were filed and no further orders were issued in the New Jersey case. *See* Collection Action. Though the parties in this case notified this Court of these developments in the Collection Action, the parties did not move to file additional briefing in this case based on the subsequent New Jersey Court orders. [ECF Nos. 35–37]. Nevertheless, this Court can take judicial notice of orders in the Collection Action as public records, and analyzes collateral estoppel based on the *current* status of the Collection Action. *Simmons v. Trans Express Inc.*, 16 F.4th 357, 360 (2d Cir. 2021) (finding that a district court "properly took judicial notice of documents" in a state court action to analyze the preclusive effect of that court's holdings).

The doctrine of collateral estoppel, or issue preclusion, precludes a party from relitigating a factual or legal issue that the party previously litigated and lost in an earlier action. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 (1979). Federal courts apply the collateral estoppel rules of the state that rendered the prior judgment. *LaFleur v. Whitman*, 300 F.3d 256, 271 (2d Cir. 2002). Accordingly, the Court applies New Jersey law. Under New Jersey law, the party asserting collateral estoppel—Defendants here—must show that:

  (1) the issue to be precluded is identical to the issue decided in the prior proceeding;

  (2) the issue was actually litigated in the prior proceeding;

  (3) the court in the prior proceeding issued a final judgment on the merits;

  (4) the determination of the issue was essential to the prior judgment; and

(5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

*See, e.g.*, *Winters v. N. Hudson Reg'l Fire & Rescue*, 212 N.J. 67, 85, 50 A.3d 649, 659 (N.J. 2012); *Twp. of Middletown v. Simon*, 193 N.J. 228, 236, 937 A.2d 949, 954 (N.J. 2008); *see also W & D Imports, Inc. v. Lia*, 563 F. App'x 19, 22 (2d Cir. 2014) (applying New Jersey collateral estoppel law). In New Jersey, Courts also assess the benefits that flow from the doctrine, namely, "finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness." *New Jersey Div. of Youth & Fam. Servs. v. R.D.*, 207 N.J. 88, 115, 23 A.3d 352, 368 (N.J. 2011).

**\*11**  A central issue in this case, central to each of Plaintiff's claims, is whether Defendants fraudulently obtained the Default Judgment they seek to enforce against Plaintiff in New York by falsely contending she had been properly served in the New Jersey Collection Action. *See* FAC ¶¶ 6-8, 55–59, 44, 52–53, 76, 81–101, 104. The dispositive issue of whether service was proper at the New Jersey address meets each of the five elements necessary for a finding of collateral estoppel. First, it was the "identical issue" decided by the New Jersey Court in the July Order deciding not to vacate the Default Judgment. *Olivieri v. Y.M.F. Carpet, Inc.*, 186 N.J. 511, 522, 897 A.2d 1003, 1010 (N.J. 2006) ("A party is precluded by collateral estoppel from relitigating matters or facts which the party actually litigated and which were determined in a prior action, involving a different claim or cause of action."). In its opinion, the New Jersey Court described the issue before it this way—"[b]oiled to its core, Kamal contends that the default judgment should be vacated due to deficient service." July Order at 2. The Court held that the Default Judgment was not void because "[s]ervice was effective." *See* July Order at 6. The Court reached this determination, after briefing by both parties, based on the factual record before it, which showed that initial service was not returned, service of the Default Judgment was signed for at the New Jersey address, and billing statements and two credit bureau reports showed that Annette Kamal lived at the New Jersey address where the affidavit of service attested she had been served. *Id.* at 5–10. In finding that service was proper, the Court found that "documents in the record indicate that Kamal resided in New Jersey at the address in question." *Id.* at 8.

Second, the issue of the adequacy of service was "actually litigated." In fact, Kamal had three bites at the apple—her first motion to vacate Default Judgment, her second motion to vacate Default Judgment, and her motion to reconsider the Order denying her motion to vacate the Default Judgment. Both parties were permitted to file evidence in support of their positions on the issue of service. July Order at 1, 7–8. Based on a fulsome record, the Court found that Kamal presented "no admissible proof supporting counsel's contention that she never lived in New Jersey" and no proof for the contention that she lived in New York. July Order at 7–8. According to the Collection Action docket, oral argument was held on Kamal's second motion to vacate. *See* Collection Action. Accordingly, she had a "full and fair opportunity" to show that service was improper. See *Gannon v. American Home Prods., Inc.*, 211 N.J. 454, 474, 48 A.3d 1094, 1106 (N.J. 2012); *see also Allesandra v. Gross*, 187 N.J. Super. 96, 105, 453 A.2d 904, 908–09 (N.J. Super. Ct. App. Div. 1982) (stating an issue is "actually litigated" when "an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined").

Third, the New Jersey Court "issued a final judgment on the merits." In assessing whether a final judgment was made in a prior proceeding, a court will assess "whether the parties were fully heard, whether a reasoned opinion was filed, and whether that decision could have been, or actually was, appealed." *Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519, 541 (3d Cir. 2012); *Balik v. City of Bayonne*, No. A-1448-13T2, 2016 WL 3351942, at \*2 (N.J. Super. Ct. App. Div. June 17, 2016). Here, the New Jersey Court issued an eleven-page "reasoned opinion" detailing the evidence and rationale supporting the decision that the Default Judgment was not void because service was proper. *See* July Order. New Jersey law permits finding that a Default Judgment was a "final judgment on the merits" where the defendant in the prior case had "ample opportunity" to contest it. *First Union Nat. Bank v. Penn Salem Marina, Inc.*, 190 N.J. 342, 354, 921 A.2d 417, 425 (2007). That is certainly the case here. Further, the Court later denied Kamal's motion to reconsider, reaffirming that the July Order was its final judgment on the issue. *See* Kamal Reconsideration Order. Finally, neither the Collection Action docket nor searches of the New Jersey Superior Court Appellate Division docket reflect that any order in the Collection Action was appealed. *See* Collection Action; *Free Speech Coal*, 677 F.3d at 541. Neither party to this case contends otherwise.

Fourth, the issue of whether service was effective was necessary to the New Jersey Court's determination of whether the Default Judgment was void. July Order at 5–6. The Court held that "other than voidness due to service, relief under Rule 4:50-1 [the rule which permits New Jersey courts to vacate judgments] is precluded." *Id.* at 5. Thus, in the Collection Action, the New Jersey Court must have determined that service was effective, as it did, to support its determination that the Default Judgment was not void. *Neal v. ASTA Funding, Inc.*, Civ. A. No. 13-3438, 2019 WL 522095, at *9 (D.N.J. Feb. 8, 2019) (finding plaintiff's employment relationship with defendant "was essential to the prior judgment, because it had to be determined in order for the arbitrator to determine whether the ITS Agreement's arbitration clause gave him jurisdiction to adjudicate claims against Neal"); *Fields v. Dickerson*, Civ. A. No. 14-778, 2016 WL 3619119, at *5 (D.N.J. July 6, 2016) ("A matter is essential when it was necessary to support the judgment rendered in the final action.").

**\*12** Finally, the party against whom the preclusion doctrine is asserted here, Annette Kamal, was a party in the Collection Action.

Based on these factors and the New Jersey case law principles encouraging "finality and repose" and "avoidance of duplication," Kamal is precluded from arguing in this case that service in the Collection Action was improper. *New Jersey Div. of Youth*, 207 N.J. at 115, 23 A.3d at 368. As a result, Kamal is precluded from asserting any of her three causes of action since each is dependent on that premise.

First, Kamal is precluded from asserting her claim under RICO. To establish a violation under RICO, a plaintiff must show (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (citing *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) and citing 18 U.S.C. § 1962). A plaintiff may establish such a pattern through fraudulent activity if they specify the statements it claims were false or misleading, give particulars as how the statements were fraudulent, state when and where the statements were made, and identify the individuals who made the statements. *Black v. Ganieva*, 619 F. Supp. 3d 309, 342 (S.D.N.Y. 2022), *aff'd*, No. 22-1524-CV, 2023 WL 2317173 (2d Cir. Mar. 2, 2023) (citing *Babb v. Capitalsource, Inc.*, 588 F. App'x 66, 68 (2d Cir. 2015) and citing *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999) and citing Fed. R. Civ. P. 9(b)). Kamal asserts that Defendants violated RICO by forming an enterprise, making two fraudulent statements in the Collection Action, and generally engaging in fraudulent activity "as a matter of course" in other debt collection cases. FAC ¶¶ 6-8, 56–59, 44, 52–53, 81–101; Pl. Opp. at 20. The two statements Kamal alleges Defendants made in her case were affirmations to the Court that Kamal was properly served at the New Jersey address and later, that the New Jersey address was "no longer valid" when in reality (Plaintiff contends) the New Jersey address was never valid. FAC ¶¶ 56–59; Pl. Opp. at 20. Plaintiff cannot argue that these statements affirming the validity of service were false or fraudulent when she is precluded from arguing that service was in fact not proper. Further, to the extent Plaintiff seeks to litigate on behalf of others similarly situated in other purportedly fraudulent debt collection cases, Plaintiff is not competent to make the general assertions about fraudulent activity outside of her own case and, in any event, those claims of fraud are not plead with sufficient specificity pursuant to Rule 9(b). [8]

[8]   Moreover, the Court is not convinced that Kamal could state a claim under RICO, even if permitted to argue that Defendants' statements about service in the Collection Action were fraudulent since the Second Circuit has held that "[a]llegations of frivolous, fraudulent, or baseless litigation on their own cannot constitute a RICO predicate act." *Kim*, 884 F.3d at 104.

Second, Kamal is precluded from asserting her claim under New York's General Business Law. The Consumer Protection Law of New York prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. L. § 349(a). To plead a cause of action under Section 349, a plaintiff must show that a defendant has engaged in (1) "consumer-oriented" conduct that is (2) "materially misleading" and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice. *City of New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621, 911 N.E.2d 834, 838 (N.Y. 2009) (citing *Stutman v. Chemical Bank,* 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (N.Y. 2000)). Kamal alleges that Defendants' conduct was materially misleading and deceptive when they affirmed to the New Jersey Court that they had properly served Kamal when they in fact had not. FAC ¶¶ 57–59, 104; Pl. Opp. at 22. Similar to

Kamal's RICO claim, since she is precluded from arguing that service is improper, Kamal could not adequately plead "materially misleading" statements sufficient to state a GBL Section 349 claim by alleging the falsity of Defendants' statement affirming that service in the Collection Action was proper.

**\*13**  Finally, Kamal is precluded from asserting her claim under FDCPA for largely the same reasons. Congress enacted the FDCPA "to protect consumers from deceptive or harassing actions taken by debt collectors[.]" *Gabriele v. American Home Mortg. Servicing, Inc.*, 503 F. App'x 89, 93 (2d Cir. 2012). Section 1692e of the FDCPA prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." *Id.* (citing 15 U.S.C. § 1692e). The FDCPA's venue provisions also require that consumer debt collection actions are brought "only in the judicial district or similar legal entity ... in which [the] consumer resides at the commencement of the action." *Hess v. Cohen & Slamowitz LLP*, 637 F.3d 117, 120 (2d Cir. 2011) (citing 15 U.S.C. § 1692i(a)(2)(B)). Kamal asserts that Defendants violated the FDCPA under two theories: (1) Defendants filed fraudulent affidavits stating that service on Kamal was proper to obtain and enforce the Default Judgment, *see* FAC ¶¶ 57–59, 76, Pl. Opp. at 16, and (2) Defendants improperly brought the Collection Action in New Jersey when Kamal never lived there, FAC ¶¶ 55–56, Pl. Opp. at 15–16. Plaintiff's first theory here fails for the same reasons that Kamal's other claims fail—Kamal is precluded from contending that statements affirming proper service were false, deceptive, or misleading. The second theory presents a closer question—whether Plaintiff can assert that she lived in New York at the commencement of the action and thus the Collection Action was improperly brought in New Jersey Court. However, here too, issue preclusion bars Plaintiff from pursuing her claims under this theory. Implicit in and necessary to the New Jersey Court's finding that "service [on Kamal] was effective" at the New Jersey address is the finding that Kamal lived at that address at the commencement of the action. *See* July Order at 6. In fact, the New Jersey Court expressly found—based on an evidentiary record composed of submissions by both parties—that "Kamal resided in New Jersey at the address in question." *Id.* at 8. Accordingly, Kamal is precluded from asserting her FDCPA claim under either theory.

## CONCLUSION

For the foregoing reasons, the Defendant's motion to dismiss is GRANTED. The Court dismisses this case with prejudice. [9]

[9]  The Court denies Plaintiffs' request for leave to amend the Amended Complaint. *See* Pl. Opp. at 23. Plaintiffs were granted an opportunity to amend their complaint in response to issues raised in Defendants' initial pre-motion letter requesting leave to file a motion to dismiss based on the *res judicata* and collateral estoppel as well as the Rooker-Feldman doctrine. [ECF Nos. 15–17]. Plaintiffs took that opportunity and did not remedy the defects as described above and previewed in Defendants' pre-motion letter. *See* FAC. Second, though Plaintiffs requested leave to amend in their opposition to the pending motion to dismiss, *see* Pl. Opp. at 23, they made no effort to demonstrate to the Court that the opportunity to amend would not be futile. *See, e.g.*, *Treiber v. Aspen Dental Mgmt.*, Inc., 635 F. App'x 1, 4 (2d Cir. 2016).

**SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 919505

**End of Document**          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4817649
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

SANTANDER CONSUMER USA, INC., Plaintiff,

v.

The CITY OF YONKERS, A.P.O.W. Towing, LLC, and Yonkers Towing & Recovery LLC, Defendants.

No. 22-CV-8870 (KMK)
|
Signed November 18, 2024

**Attorneys and Law Firms**

Alexander Ryan Sokolof, Esq., Nicholas Andrew Duston, Esq., Norris McLaughlin, PA, New York, NY, Counsel for Plaintiff.

Darius Patrick Chafizadeh, Esq., Jared Andrew Kasschau, Esq., Jessica Molinares Kalpakis, Esq., White Plains, NY, Counsel for Defendant City of Yonkers.

Dennis E.A. Lynch, Esq., Blanchard & Wilson, LLP, White Plains, NY, Counsel for Defendant City of Yonkers.

Paul William Meyer, Esq., Law Office of Paul W. Meyer, Jr., Yonkers, NY, Counsel for Defendants A.P.O.W. Towing, LLC, and Yonkers Towing & Recovery LLC.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

**\*1** Santander Consumer USA, Inc. ("Plaintiff") brings this Action under 42 U.S.C. § 1983 ("Section 1983") against Defendants The City of Yonkers ("Yonkers"), and A.P.O.W. Towing, LLC, and Yonkers Towing & Recovery LLC (together, "YTR"), alleging constitutional and state law violations in connection with the seizure of Plaintiff's car. (*See generally* Am. Compl. (Dkt. No. 59).) Before the Court are: (1) Santander's Motion for Partial Summary Judgment, (2) Yonkers' Cross Motion for Summary Judgment, and (3) YTR's Cross Motion for Summary Judgment. For the reasons discussed below, Santander's Motion is granted in part and denied in part, Yonkers' Motion is granted in part and denied in part, and YTR's Motion is granted in part and denied in part.

I. Background

A. Factual Background

The following facts are taken from Plaintiff's 56.1 Statement ("Pl's 56.1") (Dkt. No. 82), YTR's Counter 56.1 Statement ("YTR's Counter 56.1") (Dkt. No. 90), Yonkers' 56.1 Statement ("Yonkers' 56.1") (Dkt. No. 98), Yonkers' Counter 56.1 Statement ("Yonkers' Counter 56.1") (Dkt. No. 99) [1], Plaintiff's Counter to Yonkers' 56.1 Statement ("Pl's Counter 56.1") (Dkt. No. 102-2), and the admissible evidence submitted by the Parties. [2]

1    Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph

in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). A court may not accept a conclusory denial in a Rule 56.1 counterstatement if the denial is not supported by admissible evidence. *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 354–55 (E.D.N.Y. 2015) (granting summary judgment where nonmoving party "relie[d] solely on his own general statements" rather than admissible evidence in disputing moving party's statement of material facts).

Here, Yonkers and YTR's counterstatements include denials where they cite no admissible evidence and simply state that they "ha[ve] no knowledge or information regarding" the disputed fact. (*See* Yonkers' Counter 56.1 ¶¶ 1, 6–7, 11; YTR's Counter 56.1 ¶¶ 1, 6–13, 17–19, 26, 29–32, 35–39, 41–42.) At the very least, because both Defendants have failed to specifically controvert material facts at paragraphs 1, 6, 7, and 11, they will be deemed admitted. *See Mae v. Quickway Estates LLC*, No. 22-CV-3048, 2023 WL 6162927, at *1 n.2 (S.D.N.Y. Sept. 21, 2023) (citing Local Civ. R. 56.1(c) and deeming facts admitted where defendants noted they had no information as to those facts).

Yonkers also includes a number of responses that admit the fact "for the limited purpose of this dispositive motion" but deny the fact "to the extent that it is a material fact relevant to Plaintiff's claims...." (*See* Yonkers' Counter 56.1 ¶¶ 8–10, 13.) Because Yonkers explicitly admits these facts, and because Yonkers' "denials" fail to specifically controvert the asserted fact, the Court will deem these facts admitted.

Finally, a number of Yonkers' denials completely miss the mark. For example, in response to a fact about how repossession of an impounded vehicle requires the party seeking possession to pay a fee and obtain a release, Yonkers responds: "Denied except to admit that as the subject vehicle was towed subsequent to the criminal arrest of the non-party registered owner and operator of the vehicle for driving while intoxicated, a District Attorney's Release was required to be obtained in order to retrieve the vehicle." (*Id.* ¶ 25.) That the vehicle was towed subsequent to an arrest does not address whether a party seeking repossession needs to pay a fee. Yonkers' Counter 56.1 Statement is littered with these kinds of denials. (*See id.* ¶¶ 25, 28, 36–40.) Yet, these denials do not specifically controvert Santander's asserted facts, and so the facts are deemed admitted to the extent the Court determines that they are supported by record evidence. *See Mae*, 2023 WL 6162927, at *1 n.2 (deeming facts to which defendant asserted general denials admitted once the Court "scrutinized [p]laintiff's submitted evidence to determine whether the evidence supports [p]laintiff's statements").

2    In response to Plaintiff's 56.1 Statement, YTR filed a Counter 56.1 Statement that fails to comply with the Court's Individual Rules of Practice § II.D, which requires that the opposing party "must reproduce each entry in the moving party's Rule 56.1 Statement and set out the opposing party's response directly beneath it." Instead, YTR simply numbers its admissions or denials in bullet form. YTR's "failure to reproduce [Plaintiff's] Rule 56.1 Statement defeats the purpose of [the Court's] individual [rule], which is designed to obviate the need to go back and forth between the two Rule 56.1 Statements." *Gilani v. Teneo, Inc.*, No. 20-CV-1785, 2021 WL 3501330, at *1 n.1 (S.D.N.Y. Aug. 4, 2021).

YTR's failure to comply with the rules does not end there. In moving for summary judgment itself, YTR was obligated to submit its own Rule 56.1 Statement. YTR's 56.1 Statement states in sum that, "[p]ursuant to the provisions of Federal Rule of Civil Procedure 56(f)(1) and Local Rule 56.1, [YTR] defer[s] to [Plaintiff's 56.1] and [YTR's Counter 56.1]." (*See* YTR's 56.1 Statement in Supp. of its Mot. (Dkt. No. 95) 1.) YTR offers no statements of material facts, undisputed or otherwise. Its citations are inapposite, as they do not relieve a movant of the burden to submit a Rule 56.1 statement. Plaintiff correctly notes that YTR's filing fails to comply with Rule 56.1. (*See generally* Pl's Counter to YTR's 56.1 Statement (Dkt. No. 102-3).)

Courts regularly deny summary judgment where a movant fails to comply with Rule 56.1, including when the movant fails to submit a 56.1 Statement. *See Antwi v. Health & Human Sys. (Ctrs.) F.E.G.S.*, No. 13-CV-835, 2014 WL 4548619, at *4 (S.D.N.Y. Sept. 15, 2014) ("The failure to file a Rule 56.1 Statement is, on its own, grounds for denial of a motion for summary judgment." (citation omitted)); *Bristol v. Schenk*, No. 14-CV-6647, 2017 WL 9485715, at *4–5 (E.D.N.Y. July 31, 2017) (collecting cases). However, the Court has "broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Commerzbank AG v. U.S. Bank, N.A.*, 100 F.4th 362, 377 (2d Cir. 2024) (citation omitted).

The Court will exercise its discretion here and overlook YTR's repeated deficiencies. The Court cautions YTR, however, that compliance with local rules and individual rules of practice is not a matter to be taken lightly or ignored and that any future transgressions may be met with sanctions.

### 1. Defendants' Policies, Customs, and Practice

**\*2** Yonkers' policies and procedures regarding the handling of impounded vehicles seized pursuant to the driver's arrest are derived in the first instance from Yonkers Police Department ("Yonkers P.D.") Policy 180-4. (*See* Decl. of Darius P. Chafizadeh in Supp. of Yonkers' Mot. ("Chafizadeh Decl."), Ex. 2 ("Vehicle Impound Policy") (Dkt. No. 97-2) 3.) Police officers decide whether to impound a vehicle in situations where the vehicle is inoperable, the vehicle is needed for evidence in connection with an investigation, or when the vehicle operator is "removed from a vehicle in connection with an arrest ... and no other person present can legally assume control of the vehicle." (*Id.* 3–4.) Yonkers P.D. keeps a tow list from which towing companies are summoned to impound vehicles. (*See id.* 3.) To join the list, towing companies enter into an "Emergency Towing & Impound Services" contract with Yonkers. (*See* Decl. of Nicholas A. Duston ("Duston Decl."), Ex. 4 ("Towing Contract") (Dkt. No. 80-6) 8.) Towing companies pay Yonkers annually to be included on the tow list. (*Id.* 14; *see also* Yonkers' Counter 56.1 ¶ 33.) Towing companies are to respond within 20 minutes of being called by Yonkers P.D. (Towing Contract 9.) The contract further dictates requirements for the towing company's impound lot to which vehicles are towed. (*Id.* 9–11.) The towing company "shall look to the owner of the vehicle for payment of all fees at the time the vehicle is release from the [i]mpound [l]ot." (*Id.* 12.) Vehicles may not be disposed of for a minimum of 60 days. (*Id.* 13.) The contract states that vehicles may be "authorized for disposal," but does not elaborate further on the process for authorization or disposal, except to say that the towing company "will dispose of abandoned and unclaimed vehicles in accordance with the law." (*Id.* 13–14.) Yonkers "will not be responsible for the payment of any fees and/or charges for privately owned vehicles that are towed, removed[,] or stored for any period of time." (*Id.* 12.)

All impounded vehicles are towed to the towing company's storage facility unless directed otherwise. (Vehicle Impound Policy 3.) Whenever a vehicle is impounded, Yonkers P.D. prepares a YPD-11 "Impound/Recovered Vehicle Report." (*Id.* 4–5.) The officer who impounds a vehicle is responsible for notifying the vehicle's listed owner via a YPD-44 "Impound Notification and Release Information Letter." (*Id.* 5.)

At the time of the seizure relevant to this Action, Policy 180-4 permitted, but did not require, notice via a YPD-44 letter to lienholders. (Pl's Counter 56.1 ¶ 18.) In 2022, Policy 180-4 was revised to require that a YPD-44 letter be sent to a vehicle's registered owners, titled owners, and lienholders. (*Id.*; *see also* Chafizadeh Decl., Ex. 12 ("Updated Vehicle Impound Policy") (Dkt. No. 97-12) 6.) The contract between the towing company and Yonkers does not explicitly require the towing company to notify an impounded vehicle's owner. (*See generally* Towing Contract.)

An individual who wishes to retrieve a vehicle impounded pursuant to this policy must receive a release from the Westchester County District Attorney's office (the "DA") that says that the vehicle is not needed in any prosecution as evidence, case enhancement, or discovery. (Pl's Counter 56.1 ¶ 5.) The DA release should be taken to Yonkers P.D., which then produces its own release that can be taken to the towing company. (*Id.* ¶ 14.) The towing company will release the vehicle if the owner or property interest holder provides a release from Yonkers P.D. and pays towing and storage fees. (Yonkers' Counter 56.1 ¶ 25.)

If the vehicle is not claimed and repossessed, Yonkers may deem a vehicle abandoned pursuant to N.Y. Vehicle and Traffic Law ("VTL") § 1224, which provides that vehicles are abandoned:

> if left unattended (a) with no number plates affixed thereto, for more than six hours on any highway or other public place; (b) for more than twenty-four hours on any highway or other public place, except a portion of a highway or public place on which parking is legally permitted; (c) for more than forty-eight hours, after the parking of such vehicle shall have become illegal, if left on a portion of a highway

or public place on which parking is legally permitted; (d) for more than ninety-six hours on property of another if left without permission of the owner.

VTL § 1224(1). "Ownership of such abandoned vehicles, if unclaimed, shall vest in such local authority from the date [notice to the last owner] is given." *Id.* § 1224(3)(c). Yonkers' custom is to then transfer the abandoned vehicle to the towing company, which can sell or auction the vehicle. (*See* Pl's Counter 56.1 ¶ 17.)

### 2. Seizure and Impounding

On April 23, 2021, a non-party car dealership sold Shamar Turner ("Turner") a 2018 Land Rover (the "Vehicle"). (Yonkers' Counter 56.1 ¶¶ 5–6.) The dealership and Turner entered into a retail installment contract that was assigned to Santander. (*Id.* ¶¶ 6–7.) By virtue of the assignment, Santander obtained a lien on the Vehicle, which it perfected via a title issued on June 9, 2021. (*Id.* ¶¶ 8–9.)

**\*3** The contract stated that Turner would default on its terms if he missed a payment or "expose[d] the [V]ehicle to ... seizure, confiscation, or involuntary transfer." (Decl. of Edward Vargas in Supp. of Pl's Mot., Ex. A (Dkt. No. 80-1) 8.) Santander reserved the right to repossess the Vehicle in the event of a default. (*Id.*)

On June 15, 2021, Turner was arrested for driving while intoxicated. (Yonkers' Counter 56.1 ¶ 14.) As a result, Yonkers seized the Vehicle, which YTR towed to its secure lot. (*Id.* ¶ 16; *see also* Duston Decl., Ex. 5 ("Yonkers' Resp. to Req. for Adm.") (Dkt. No. 80-7) 3 (admitting that YTR towed and stored the Vehicle pursuant to an agreement with Yonkers).)

### 3. Post-Impound Events

On June 18, 2021, Santander learned that the Vehicle was impounded. (Pl's Counter 56.1 ¶ 6.) Santander retained the services of PAR North America ("PAR") to retrieve the Vehicle from YTR. (*Id.* ¶ 9.) Santander and PAR were told that there was a "hold" placed on the Vehicle and that it could not be released without a release from the DA. (*Id.*) Santander received a letter from YTR dated July 13, 2021, that notified it of the Vehicle's impounding. (*Id.* ¶ 11.) Yonkers sent letters dated August 5, 2021, to Santander and Turner informing them that they had 10 days to claim the Vehicle, otherwise it would be "disposed of" in accordance with VTL § 1224. (*Id.* ¶ 12.)

The Parties dispute the reasons Santander and PAR did not successfully contact the DA to obtain a release, (*id.* ¶ 10 (disputing Santander and PAR's diligence in attempting to contact the DA via phone, mail, or visit)), but it is undisputed that neither Santander nor PAR successfully contacted the DA or obtained a DA release, (*id.* ¶ 15). It is similarly undisputed that Yonkers did not hold any hearing regarding the Vehicle. (Yonkers' Resp. to Req. for Adm. 6.)

On May 1, 2022, Yonkers deemed the Vehicle abandoned pursuant to VTL § 1224. (Pl's Counter 56.1 ¶ 17.) It appears that YTR titled the vehicle on or about June 29, 2022. (*See* Chafizadeh Decl., Ex. 10 (Dkt. No. 97-10) 3 (a bill of sale regarding the Vehicle listing YTR as the seller.) On September 1, 2022, YTR sold the Vehicle. (*Id.*)

### B. Procedural Background

Santander initiated this Action on October 18, 2022. (*See* Dkt. No. 1.) Defendants answered on November 14 and 15, 2022. (*See* Dkt. Nos. 13, 16.) While Defendants initially opposed Santander's Motion for Leave to File an Amended Complaint, (*see* Dkt. Nos. 41–43, 49–52), they later withdrew their Oppositions, (*see* Dkt. No. 54), and Plaintiff filed its Amended Complaint on July 11, 2023, (*see* Dkt. No. 59). Defendants filed their Answers on July 27 and August 8, 2023. (*See* Dkt. Nos. 63, 65.)

Following close of discovery, Santander filed a Motion for Partial Summary Judgment on March 28, 2024. (*See* Not. of Mot. (Dkt. No. 80).) On May 29, 2024, Defendants filed their Opposition and Cross-Motions for Summary Judgment. (*See* Dkt. Nos. 87–101.) On June 19, 2024, Santander and Yonkers each filed a Reply. (*See* Dkt. Nos. 102, 103.)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

  **\*4**  "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration, citation, and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion ..., [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,' " *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading ....").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Laby's. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.' " *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge ...."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

### B. Section 1983 (Counts I, II, and III)

Santander's first three causes of action are for "violation[s] of civil rights" pursuant to 42 U.S.C. § 1983 ("Section 1983"). (Am. Compl. ¶¶ 50–82.) Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ....

42 U.S.C. § 1983. To prevail on a claim arising under Section 1983, a plaintiff must prove that the conduct at issue was "committed by a person acting under color of state law" and "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quotation marks omitted).

**\*5** Santander argues that YTR was a state actor for Section 1983 purposes. (*See* Plaintiff's Mem. in Supp. of its Mot. ("Pl's Mem.") (Dkt. No. 81) 32–33.) Neither YTR nor Yonkers argues that YTR's towing of the Vehicle was not performed under color of state law. (*See generally* YTR's Mem., Yonkers' Mem. in Opp. to Santander's Mot. and in Supp. of its Cross-Mot. ("Yonkers' Mem.") (Dkt. No. 100).) Even if Defendants' briefing could be read to infer such an argument, it fails to carry the day. "Actions of a private entity are attributable to the State if there is a sufficiently close nexus between the State and the challenged action of the entity so that the action of the latter may be fairly treated as that of the State itself." *Barrows v. Becerra*, 24 F.4th 116, 135 (2d. Cir. 2022). The nexus exists "(1) when the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); [or] (3) when the entity has been delegated a public function by the state ('the public function test')." *Id.* (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (alteration and internal citation omitted)). A private entity does not become a state actor for the purposes of Section 1983 merely on the basis of licensing by the government. *See Fabrikant*, 691 F.3d at 207. "The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the [state actors]." *Forbes v. City of New York*, No. 05-CV-7331, 2008 WL 3539936, at \*5 (S.D.N.Y. Aug. 12, 2008) (quoting *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)).

Here, there is more than mere licensing—YTR's towing of the Vehicle is joint action with and directed by Yonkers. (*See* Yonkers' Counter 56.1 ¶ 3–4 (admitting that Yonkers contracts with entities, including YTR, "to tow certain vehicles when [Yonkers] resources do not provide for that activity," and that YTR towed the Vehicle at Yonkers' direction).) *See Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting ... 'under color' of law for purposes of [Section] 1983 actions."); *see also Ali ex rel. Cofield v. Liggett*, No. 22-CV-944, 2022 WL 17478264, at \*5 n.1 (N.D.N.Y. Sept. 20, 2022) ("[T]here is authority finding that a tow truck operator is a state actor for purposes of a Section 1983 claim."), *report and recommendation adopted*, 2022 WL 16918289 (N.D.N.Y. Nov. 14, 2022); *Walters v. T&D Towing Corp.*, No. 17-CV-681, 2018 WL 1525696, at \*5 n.5 (E.D.N.Y. Mar. 28, 2018) (same). Courts outside the Second Circuit have also held towing companies to be state actors. *See, e.g.*, *Stypmann v. City & County of San Francisco*, 557 F.2d 1338, 1341–42 (9th Cir. 1977) (finding a towing company a state actor where it was "a willful participant in a joint activity with the State or its agents" (quoting *United States v. Price*, 383 U.S. 787, 794 (1966))); *Tarantino v. Syputo*, No. 03-03450, 2006 WL 1530030, at \* 7 (N.D. Cal. June 2, 2006) ("[T]owing companies are deemed to be state actors because they tow vehicles in response to orders by law enforcement officials").

Related to YTR's status, the Court must determine whether Yonkers is subject to municipal liability pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Neither YTR nor Yonkers argues that Santander has failed to establish such liability. (*See generally* YTR's Mem., Yonkers' Mem.) "The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020). "Inherent in the principle that a municipality can be liable under [Section] 1983 only where its policies are the moving force behind the constitutional violation, is the concept that the plaintiff must show

a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Anilao v. Spota*, 27 F.4th 855, 874 (2d Cir. 2022) (quoting *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) (alteration adopted)).

Santander argues that Yonkers is liable because it was the "moving force behind the [alleged] constitutional violation," in that its policies formed the basis of the Vehicle's seizure and impounding. (Pl's Mem. 29–32.) Yonkers and YTR admit that the treatment of the Vehicle followed Yonkers' standard policies, practices, and customs for dealing with vehicle seized incident to arrest. (*See* Yonkers' Counter 56.1 ¶ 42; YTR Counter 56.1 ¶ 42; *see also* Pl's Counter 56.1 ¶¶ 2, 4–6, 11–12, 14, 17 (where Santander does not meaningfully dispute Yonkers' material facts that demonstrate that the treatment of the Vehicle complied with Yonkers' policies).) Courts have found municipal liability where the governmental entity admits that it acted pursuant to its policies. *See TD Auto Fin. LLC v. County of Putnam*, No. 21-CV-9080, 2023 WL 6295116, at *12 (S.D.N.Y. Sept. 27, 2023) (finding that "because the County admits that its treatment of the Vehicle followed its own standard policies, practices, and customs ... municipal liability attaches"); *Am. Honda Fin. Corp. v. Township of Aston*, 546 F. Supp. 3d 371, 383–84 (E.D. Pa. 2021) (finding *Monell* liability attaches "[b]ecause the Township admits that its treatment of the [vehicle] followed [the Township's] standard practice for dealing with vehicles seized similarly"). That YTR, not Yonkers, effected the seizure, does not defeat liability. Santander has demonstrated a "direct causal link" between Yonkers' policies and the alleged constitutional deprivation. As mentioned above, Yonkers concedes that the towing procedures executed by YTR "were consistent with their regular policies, customers, and/or practices." (Yonkers' Counter 56.1 ¶ 42.) This is sufficient to demonstrate the necessary causal link and expose Yonkers to municipal liability. *See Am. Honda Fin. Corp. v. City of Revere*, 471 F. Supp. 3d 399, 404 (D. Mass. 2020) (holding the defendant city liable under *Monell* where it admitted that a third-party towing company effected a seizure at the defendant city's direction and in compliance with its policies).

**\*6** Having determined that Yonkers and YTR may be liable, the Court now turns to the alleged constitutional violations.

  1. Fourth Amendment – Unreasonable Seizure (Count I)

Santander argues that Defendants' seizure of the Vehicle was unreasonable because they retained it longer than the justification for seizure warranted. (*See* Pl's Mem. 22–25.) Yonkers argues that there is no constitutional violation because the seizure was incident to an arrest and that there can be no Fourth Amendment claim for wrongful retention when property is lawfully seized in the first instance. (Yonkers' Mem. 4–5.)

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. "A seizure occurs when the Government interferes in some meaningful way with the individual's possession of property." *Kiss v. Torres*, No. 21-CV-10391, 2024 WL 1210941, at *13 (S.D.N.Y. Mar. 19, 2024) (quoting *United States v. Ganias*, 755 F.3d 125, 133 (2d Cir. 2014)). "The impoundment of a vehicle may implicate rights guaranteed by the Fourth Amendment's protection against unreasonable searches and seizures." *Vasquez v. Yadali*, No. 16-CV-895, 2020 WL 1082786, at *7 (S.D.N.Y. Mar. 5, 2020) (quoting *Bey v. Dist. of Columbia*, No. 17-CV-620, 2018 WL 5777021, at *5 (E.D.N.Y. Nov. 1, 2018)). "However, 'in the interests of public safety and what the Supreme Court has called community caretaking functions, automobiles are frequently taken into police custody.' " *Santander Consumer USA, Inc. v. Port Auth. of New York and New Jersey*, No. 20-CV-1997, 2022 WL 3099239, at *5 (E.D.N.Y. Aug. 4, 2022) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 368–69 (1976)) (alteration adopted) (internal quotation marks omitted); *see also United States v. Morris*, No. 20-CR-100, 2022 WL 1651408, at *4 (W.D.N.Y. Apr. 12, 2022) ("It is well established that police have the authority, despite the absence of a warrant, to seize and remove from the streets automobiles in the interests of public safety and as part of their community caretaking functions—an authority that is beyond reasonable challenge." (quoting *United States v. Lyle*, 919 F.3d 716, 728 (2d Cir. 2019))), *report and recommendation adopted*, 2022 WL 1645261 (W.D.N.Y. May 24, 2022). Vehicle impoundments "do not need to be justified by probable cause, but only on a showing of reasonableness." *United States v. Rivera*, 700 F. Supp. 3d 60, 73 (S.D.N.Y. 2023). "[W]hether a decision to impound is reasonable under the Fourth Amendment is based on all the facts and circumstances of a given case." *Lyle*, 919 F.3d at 731.

Under the totality of the circumstances, the initial seizure of the Vehicle was reasonable. It is undisputed that the Vehicle was seized incident to Turner's arrest for driving while intoxicated. (*See* Yonkers' Counter 56.1 ¶ 14.) Santander initially gestures

at an argument that the initial seizure was unreasonable, (*see* Pl's Mem. 22; Am. Compl. ¶¶ 54–55 (alleging that the seizure of the Vehicle was warrantless and that there was no legitimate exception to the warrant requirement)), but later concedes that the Court "may assume that Yonkers ... could remove the Vehicle from the roadway as part of its community caretaking function," (Pl's Mem. in Opp. to Yonkers' Cross-Mot. ("Pl's Opp.") (Dkt. No. 102) 3). And that is just as well, because, as noted, law enforcement does not need a warrant to seize vehicles "in the interests of public safety and as part of their community caretaking functions." *See Rivera*, 700 F. Supp. 3d at 73 (quoting *Lyle*, 919 F.3d at 728).

**\*7** Santander instead argues that the prolonged retention of the Vehicle "runs afoul of the Fourth Amendment." (Pl's Mem. 22 (quoting *Krimstock v. Kelly*, 306 F.3d 40, 50 (2d Cir. 2002), *abrogated on other grounds by Culley v. Marshall*, 601 U.S. 377 (2024)).)[3] Not so. The Second Circuit explicitly "concluded that a seizure claim based on the unlawful retention was too 'novel' a theory to warrant Fourth Amendment protection." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004) (citing *United States v. Jakobetz*, 955 F.2d 786, 802 (2d Cir. 1992)). The Second Circuit has since clarified that:

'Where ... an initial seizure of property was reasonable,' the government's 'failure to return the items does not ... state a separate Fourth Amendment claim of unreasonable seizure.' [*Shaul*, 363 F.3d at 187.] Consistent with this rule, it is unconstitutional for the government to keep property that was seized based on a warrantless arrest, as that basis is not 'sufficient by itself to ensure the legality of the initial seizure.' [*Krimstock*, 306 F.3d at 50.] But 'a seizure claim based [solely] on the unlawful retention' of property that was lawfully seized has been recognized as 'too novel to warrant Fourth Amendment protection.' *Shaul*, 363 F.3d at 187 (internal quotation marks omitted). Thus, '[t]o the extent the Constitution affords ... any right with respect to a government agency's retention of lawfully seized property, it would appear to be procedural due process." *Id.*

*Bennett v. Dutchess County, New York*, 832 F. App'x 58, 60 (2d Cir. 2020) (summary order); *see also Vasquez v. Warren*, 630 F. Supp. 3d 524, 542–43 (S.D.N.Y. 2022) (citing *Shaul*, 363 F.3d at 187, *Bennett*, 832 F. App'x at 60, and *Ahlers v. Rabinowitz*, 684 F.3d 53, 62 (2d Cir. 2012), for the proposition that the failure to return property that was lawfully initially seized does not state a Fourth Amendment claim of unreasonable seizure, but could sound in procedural due process). Santander argues that *Shaul* can be distinguished because it "involved a reasonable seizure resulting in *accidental loss* of property the government intended to return, *not* intentional detention accompanied by conditions for release." (Pl's Mem. 23 (emphases in original).) In Santander's view, "here, there is more than 'solely' retention, and the theory is no longer 'novel.' " (Pl's Opp. 7.) Importantly, Santander does not actually elaborate on how there is more than solely retention here and focuses primarily on the theory's novelty or lack thereof.

3    *Krimstock* represents a line of cases holding, inter alia, that in the case of vehicles seized in the case of crimes "for which a motor vehicle could be considered an instrumentality," 306 F.3d at 43, plaintiffs must "be afforded a prompt post-seizure, pre-judgment hearing before a neutral judicial or administrative officer," *id.* at 61. This holding, however, was abrogated by the Supreme Court in *Culley*, where it held that due process requires a timely forfeiture hearing, but not a separate preliminary hearing. *See* 601 U.S. at 393.

Santander claims that three Supreme Court cases, *Illinois v. Caballes*, 543 U.S. 405 (2005), *Rodriguez v. United States*, 575 U.S. 348 (2015), and *Manuel v. City of Joliet*, 580 U.S. 357 (2017), (*see* Pl's Opp. 7), indicate that the time has come for the theory that *Shaul* deemed "too novel"— a Fourth Amendment seizure claim based solely on the unlawful retention of property that was lawfully seized, (*see id.* 8). Yonkers is correct that these cases are inapposite and do not bear the weight that Santander puts upon them. (*See* Yonkers' Reply in Supp. of its Cross-Mot. ("Yonkers' Reply") (Dkt. No. 103) 1–3.) In *Caballes*, the Supreme Court held that a dog sniff during a lawful traffic stop does not violate the Fourth Amendment's proscription of unreasonable seizures. 543 U.S. at 408. In *Rodriguez*, another case about traffic stop lengths, the Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." 575 U.S. at 350. In *Manuel*, a case about a detainee's suit alleging that his arrest and detention violated the Fourth Amendment, the Supreme Court held that "the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of the legal process." 580 U.S. at 369. These cases about the length of lawful traffic stops and the application of the Fourth Amendment to pretrial detention do not herald changes in *Shaul*'s "intellectual and precedential underpinnings." (Pl's Opp. 8.) Yes, these four

cases concern the Fourth Amendment. But that is where their similarities end. Most notably, *Caballes, Rodriguez,* and *Manuel* do not, in any way, concern seizure of *property.* The Court finds that, despite Santander's reading of the caselaw, a seizure claim based solely on the unlawful retention of property that was lawfully seized remains too novel to warrant Fourth Amendment Protection. *See Shaul,* 363 F.3d at 187; *Vasquez,* 630 F. Supp. 3d at 543; *Bennett,* 832 F. App'x at 60.

**\*8** Santander pivots again, arguing that Second Circuit caselaw following *Shaul* concerns property that the Government failed to return to its owner through negligence, whereas this Action involves intentional conduct. (Pl's Opp. 8.) But Santander offers no support for the proposition that this distinction matters or that it should lead the Court away from the Second Circuit's caselaw. It is undisputed that the initial seizure of the Vehicle was lawful, so a Fourth Amendment seizure claim based on the Vehicle's unlawful retention cannot stand. *See Shaul,* 363 F.3d at 187. Accordingly, summary judgment is granted to Defendants on Santander's Fourth Amendment claim. But Santander is not without recourse, for the Fourteenth Amendment affords it a "right with respect to a government agency's retention of lawfully seized property." *Shaul,* 363 F.3d at 187; *see also Bennett,* 832 F. App'x at 60. 2. Fourteenth Amendment – Procedural Due Process (Count II) Turning to Santander's procedural due process claim, Santander argues that Yonkers' Vehicle Impound Policy is unconstitutional because it fails to provide adequate notice or an opportunity for a hearing. (*See* Pl's Mem. 12–21.) YTR largely fails to address the constitutionality of the Vehicle Impound Policy in either its Opposition or its own Cross-Motion, (*see generally* YTR Opp; YTR's Mem.), except to say that Santander received adequate notice, (YTR's Opp. 7; YTR's Mem. 7). [4] Yonkers argues that its policy is constitutional because requiring a DA release is common practice and because Santander and PAR were aware of, but failed to undertake, the necessary steps to successfully repossess the Vehicle. (Yonkers' Mem. 6–9.) Yonkers further argues that Santander received "constitutionally adequate notice," (*id.* 9), and that it was not required to hold a hearing, (*see* Yonkers' Resp. to Req. for Adm. 6).

[4]    YTR's Opposition and Memorandum in support of its Cross-Motion are essentially identical, with a few words changed or added throughout. Both briefs argue that a warrantless search of a vehicle impounded incident to an arrest is proper, (YTR's Opp. 4–6; YTR's Mem. 4–6), that Santander "failed to mitigate damages" and so is not entitled to any damages, (YTR's Opp. 8–10; YTR's Mem. 8–10), and that issues of material fact, (YTR's Opp. 7; YTR's Mem. 7), preclude granting Santander's motion and require granting YTR's cross-motion.

YTR's discussion of exceptions to warrantless searches and seizures is inapposite, especially in light of Santander's concession that the initial seizure was valid under the community caretaking exception. (*See* Pl's Opp. 3.)

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. XIV § 1. "In adjudicating due process claims, '[courts] consider two distinct issues: 1) whether plaintiffs possess a liberty or property interest protected by the Due Process Clause; and, if so, 2) whether existing state procedures are constitutionally adequate.' " *Ford Motor Credit Co. v. N.Y.C. Police Dep't,* 503 F.3d 186, 190 (2d Cir. 2007) (quoting *Kapps v. Wing,* 404 F.3d 105, 112 (2d Cir. 2005)).

Here, it is beyond dispute that Santander had a protected "property interest in the present value" of the Vehicle. *Id.* at 191; *see also TD Auto Fin. LLC,* 2023 WL 6295116, at *7 (holding that a lienholder in a vehicle had protected property interest for procedural due process purposes); *Santander Consumer USA, Inc. v. County of Suffolk,* No. 20-CV-2656, 2021 WL 4480574, at *6–7 (E.D.N.Y. Sept. 30, 2021) (same); *Am. Honda Fin. Corp.* (Aston), 546 F. Supp. 3d at 379 (same). Yonkers and YTR's "seizure and retention of the [Vehicle] impaired [Santander's] property interests, ... depriving [Santander] of the collateral for its lien while the collateral's value steadily depreciated." *Am. Honda. Fin. Corp.* (Aston), 546 F. Supp. 3d at 379; *see also TD Auto Fin.,* 2023 WL 6295116, at *7 ("[D]elays in the eventual disposition of a seized asset can amount to a deprivation of a lienholder's property interest ... as the vehicle depreciates over time." (citing *Ford Motor Credit Co.,* 503 F.3d at 192)). YTR's towing and storage fees "effectively subordinat[ed] the priority of [Santander's] lien." *Am. Honda. Fin. Corp.* (Aston), 546 F. Supp. 3d at 379 (citing, inter alia, *Connecticut v. Doehr,* 501 U.S. 1, 12 (1991) ("[O]ur cases show that even the temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection.")).

The question then is whether Yonkers' procedures are constitutionally adequate. In evaluating the constitutional adequacy of procedural due process, courts apply the *Mathews v. Eldridge* framework, under which the Court must balance:

> **\*9**  (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Toyota Lease Trust v. Village of Freeport*, No. 20-CV-2207, 2023 WL 4443992, at \*9 (E.D.N.Y. Jan. 24, 2023), *report and recommendation adopted*, 2023 WL 4449333 (E.D.N.Y. Mar. 30, 2023) (quoting *Santander Consumer USA, Inc.*, 2021 WL 4480574, at \*8 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976))). While "due process is flexible," *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011) (citation omitted), "[i]n general, 'individuals must receive notice and an opportunity to be heard before the Government deprives them of property,' " *TD Auto Fin.*, 2023 WL 6295116, at \*7 (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993)).

"The Second Circuit [has] held that a policy that places the burden of taking action to recover property on a claimant is a [per se] due process violation." *Toyota Lease Tr.*, 2023 WL 4443992, at \*9 (citing *McClendon v. Rosetti*, 460 F.2d 111, 115–16 n.4 (2d Cir. 1972) ("It seems to me a shocking thing that our police can seize a citizen's property and then when he seeks to get it back challenge him to prove his title to the satisfaction of a jury.") (citation omitted), and *HVT, Inc. v. Port Auth. of New York and New Jersey*, No. 15-CV-5867, 2018 WL 3134414, at \*9 (E.D.N.Y. Feb. 15, 2018), *report and recommendation adopted*, 2018 WL 1409821 (E.D.N.Y. Mar. 21, 2018) ("[T]he question is whether [d]efendant can summarily deprive [p]laintiff of its property without any opportunity for a hearing. The law is quite clear that it cannot.")). Procedures related to seized vehicles should include prompt notice upon seizure to "titled owners, registered owners[,] and record lienholders," and an opportunity for a hearing arranged and conducted by the Government. *See HVT*, 2018 WL 3134414, at \*11 (citing *Krimstock*, 306 F.3d at 68, *Ford Motor Credit Co.*, 394 F. Supp. 2d at 611, and *Fuentes v. Shevin*, 407 U.S. 67, 80–81 (1972)).

### a. Notice of the Seizure

It is undisputed that on or about July 13, 2021, Santander was notified by YTR by letter that it held the Vehicle in its impound lot. (Pl's Counter 56.1 ¶ 11.) It is also undisputed that on or about August 5, 2021, Santander was notified by Yonkers via letter that the Vehicle had been impounded on June 15, 2021, and that Santander had until August 25, 2021, to repossess the Vehicle. (*Id.* ¶ 12.) The delay between seizure and notice ranges from 28 days in the case of YTR's notice and 51 days in the case of Yonkers' notice.

It is clear that the "substantial delay in notifying [Santander] of the seizure of the Vehicle does not comport with due process." *TD Auto Fin.*, 2023 WL 6295116, at \*8; *see also Spinelli v. City of New York*, 579 F.3d 160, 172 (2d Cir. 2009) ("The fact that Spinelli's counsel eventually learned of the specific nature of the charges after meeting on various occasions with the City does not obviate the City's failure to provide adequate notice of those charges."); *Ford Motor Credit*, 503 F.3d at 192 (explaining that "delay" implicates a lienholder's Fourteenth Amendment rights in this context).

 **\*10**  At the time of the Vehicle's seizure, Yonkers did not require notice to lienholders—this has changed with the updated policy, which now requires notice to registered owners, titled owners, lienholders, and all interested parties. (*Compare* Vehicle Impound Policy 5, *with* Updated Vehicle Impound Policy 8.) The updated policy still has no provisions regarding timeliness of notice, and there is nothing in the updated language that indicates that notice of seizure would be more timely today than under the previous policy. (*See generally* Updated Vehicle Impound Policy.) Thus, the Court concludes that Yonkers' standard policies, practices, and customs resulted in substantial and unacceptable delay of numerous weeks before Santander was notified

by Yonkers or its towing companies that the Vehicle had been seized. *See Toyota Lease Tr.*, 2023 WL 4443992, at *10 (49-day delay between seizure and notice did not comport with due process); *Am. Honda. Fin. Corp.* (Aston), 546 F. Supp. 3d at 381 (finding that a "delay of twenty-five days before even attempting to notify lienholders" did not comport with due process); *HVT*, 2018 WL 3134414, at *15 (period for "proper notice and a hearing" is no more "than a few days").

That Santander learned of the seizure prior to notice does not excuse the notice's delay. *See TD Auto Fin.*, 2023 WL 6295116, at *9 (The fact that the lienholder "fortuitously learned that the Vehicle had been seized from [the registered owner] did not relieve [the Government] of its obligation to provide adequate notice to [lienholder] regarding the seizure."); *Toyota Lease Tr.*, 2023 WL 4443992, at *10 ("Even if [the private towing company] provided notice via letter five days after it impounded the Vehicle, it did not provide opportunity for a hearing, and as [the village defendant] admits, [the towing company] did not have authority to release the Vehicle pursuant to its towing agreement with the Village."); *Ezagui v. City of New York*, 726 F. Supp. 2d 275, 289 n.11 (S.D.N.Y. 2010) ("The relevant inquiry ... is whether [d]efendants complied with their obligation to provide the proper notice at the time of the seizure.").

### b. Opportunity to Be Heard Prior to Permanent Deprivation

"The law is clear that some form of hearing is required—either pre-or post-seizure—before an individual or entity is finally deprived of a property interest, and that the absence of any hearing whatsoever necessarily will fail the *Mathews* balancing test." *TD Auto Fin.*, 2023 WL 6295116, at *9 (citing *Mathews*, 424 U.S. at 333); *see also HVT, Inc.*, 2018 WL 3134414, at *9 ("[T]he question is whether [d]efendant can summarily deprive [p]laintiff of its property without any opportunity for a hearing. The law is quite clear that it cannot.").

It is undisputed that Yonkers policy provides no opportunity for a hearing. (*See* Yonkers' Resp. to Req. for Adm. 6 (Yonkers asserts that there was no requirement to "commence any proceeding before a neutral decision-maker regarding the propriety of" the Vehicle's seizure, impounding, and the conditions set by Yonkers and YTR regarding its repossession).) There are no forfeiture proceedings whatsoever in relation to an impounded vehicle—instead, Yonkers allows a lienholder to repossess a vehicle in exchange for fees paid to the towing company, without a hearing before a neutral arbiter to determine the propriety of the lienholder's paying those fees. Yonkers' final step is to deem the vehicle abandoned and permit the towing company to obtain a clean title to the vehicle, effectively destroying the lienholder's interest in the Vehicle. (*See* Pl's Counter 56.1 ¶ 12.) There are no other means by which a lienholder can challenge Yonkers. Yonkers' policy clearly places the burden on the vehicle owner or lienholder to take action to recover a vehicle, which is a per se due process violation. *See Toyota Lease Tr.*, 2023 WL 4443992, at *9.

Yonkers argues that there is no due process violation here because Santander and PAR were aware of the process by which they could repossess the Vehicle, but failed to follow the proper procedures. (Yonkers' Mem. 8–9.) Yonkers further argues that Yonkers was "willing to turn over possession of the [V]ehicle," (*id.* 9), that it "had no intention of retaining the [V]ehicle," (Yonkers' Reply 5), and that it "repeated[ly] offer[ed] to return the [V]ehicle," (*id.* 4). That Santander failed to follow Yonkers' procedure is of no moment where the procedure failed to comport with procedural due process. *See Ford Motor Credit Co.*, 503 F.3d at 193 ("[A] party's ability to take steps to safeguard its interests does not relieve the State of its constitutional obligation." (quoting *Mennonite Bd. of Mission v. Adams*, 462 U.S. 791, 799 (1983)). Further, "[t]here was nothing preventing [Yonkers] from filing a forfeiture action as to the Vehicle had it sought to do so, other than the reality that its standard policies, practices, and customs did not contemplate such a filing." *TD Auto Fin.*, 2023 WL 6295116, at *10.

**\*11** At bottom, consistent with and as a result of Yonkers' policies, practices, and customs, Santander did not have any formal opportunity to be heard regarding its interest in the Vehicle.

c. The *Mathews* Factors

Application of the *Mathews* factors clearly demonstrates that Yonkers failed to provide due process of law to Santander.

First, as to the private interest at stake, Santander's interest in the present value of the Vehicle is "considerable." *Ford Motor Credit*, 503 F.3d at 194 ("[lienholder's] interest in the present value of a seized vehicle ... is still considerable").

Second, "the erroneous risk of deprivation" is high because, while the updated policy provides notice, there is no provision for *timely* notice. Putting the timeliness of notice aside, the lienholder still has no opportunity to present arguments before a neutral arbitrator about whether Yonkers and its licensed towing companies are entitled to possess, assess fees, and dispose of a seized vehicle. *See TD Auto Fin.*, 2023 WL 6295116, at *11.

Third, the Court must balance Yonkers' legitimate interests against the burden that would be placed on Yonkers if it were required to place additional procedural safeguards. At no point in its briefing does Yonkers address the *Mathews* factors. (*See generally* Yonkers' Mem.; Yonkers' Reply.) In any case, Yonkers' interest in refusing additional procedural safeguards do not sanction "fully deny[ing] lienholders any opportunity to be heard with respect to the propriety of the seizure, the continued retention of the vehicle, the appropriateness of charging an administrative fee in exchange for return of the vehicle, or the disposition of the Vehicle." *TD Auto Fin.*, 2023 WL 6295116, at 11; *cf. Toyota Lease Tr.*, 2023 WL 4443992, at *10 ("Applying the *Mathews* factors, [p]laintiff's property interests in the Vehicle outweighs [the village defendant's] interest in collecting fines, and the undisputed lack of hearing requirement under the ... policy violates due process.").

Applying these factors, the Court finds that Yonkers did not provide Santander with due process of the law as required by the Fourteenth Amendment. Yonkers' policy is deficient for failing to timely notice Santander and to provide an opportunity to be heard at all. Accordingly, Santander's Motion for Summary Judgment on its Fourteenth Amendment claim is granted

2. Fifth Amendment – Taking (Count III)

Santander argues that Yonkers' deeming the Vehicle abandoned and titling the same in YTR's name effected a taking of Santander's property interest in the Vehicle. (Pl's Mem. 25–29.) YTR has no response on this point. (*See generally* YTR's Opp.) Yonkers instead argues that Santander's Motion fails on this point because the Vehicle was confiscated pursuant to Yonkers' police powers, not its eminent domain power, and that Santander failed to follow Yonkers' policies in repossessing the Vehicle. (Yonkers' Mem. 9–11.)

The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. This is known as the Takings Clause, which is "applied to the States through the Fourteenth Amendment." *LaForgia v. Hoch*, No. 15-CV-8589, 2018 WL 4682019, at *4 n.2 (S.D.N.Y. Sept. 28, 2018) (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 481 n.10 (1987)); *Kelo v. City of New London, Conn.*, 545 U.S. 469, 472 n.1 (2005) (same). "The government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain." *Bennis v. Michigan*, 516 U.S. 442, 452 (1996) (citing *United States v. Fuller*, 409 U.S. 488, 492 (1973)). "As a result, 'it has long been settled that if the government acts pursuant to a forfeiture statute, it may seize personal property without compensating the owner.' " *United States v. Davis*, 648 F.3d 84, 97 (2d Cir. 2011) (quoting *Redford v. U.S. Dep't of Treasury*, 691 F.2d 471, 473 (10th Cir. 1982)).

**\*12** As previously discussed, "a security interest is indisputably a property interest." *Ford Motor Credit Co.*, 503 F.3d at 191; *see also 1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 263 (2d Cir. 2014). The next inquiry is whether there was a taking. "The Supreme Court has recognized two branches of Takings Clause cases: physical takings and regulatory takings." *1256 Hertel Ave. Assocs.*, 761 F.3d at 263 (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002)). A physical taking occurs when there is "a condemnation or a physical appropriation of property." *Id.* A regulatory

taking occurs "where even absent a direct physical appropriation, governmental regulation of private property 'goes too far' and is 'tantamount to a direct appropriation or ouster.' " *Id.* (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005)). The Supreme Court has held that the "total destruction by the Government of all value of [a] lien[ ] ... has every possible element of a Fifth Amendment 'taking.' " *Armstrong v. United States*, 364 U.S. 40, 48 (1960). There is "no magic formula [that] enables a court to judge, in every case, whether a given government interference with property is a taking." *Ark. Game and Fish Comm'n v. United States*, 568 U.S. 23, 32 (2012); *see also Messing v. Town of Hamden*, 459 F. Supp. 3d 464, 467 (D. Conn. 2020) (same).

When Yonkers "deemed" the Vehicle abandoned on May 1, 2022, ownership in the Vehicle vested in Yonkers. (*See* Pl's Counter 56.1 ¶ 17; Updated Vehicle Impound Policy 2.) *See also* VTL § 1224(3)(c) ("Ownership of such abandoned vehicles ... shall vest in such local authority ten days from the date ... notice is given ..."). Yonkers then "transferred" the Vehicle to YTR. (*See* Decl of Harold Wuestenhoefer, Ex. 1 (Dkt. No. 89-1) at 20:13–23 ("The car was transferred to [YTR].").) The Court has reviewed the record and can find no explanation of the process by which Yonkers transfers abandoned vehicles to towing companies.[5] Regardless, it is undisputed that YTR obtained title to the Vehicle and subsequently sold it. (*See id.* ("[YTR] titled the [V]ehicle and [then] sold it at auction."); Pl's Counter 56.1 ¶ 17.)

[5]    VTL § 1224(6)(a) permits a municipality to "convert to its own use ... [abandoned vehicles]" or may "by sale or gift, transfer title ... to any other municipal[ity]." Here, of course, YTR is not a municipal entity under which such a transfer is permitted.
   VTL § 1224(5)(a) permits municipalities to sell abandoned vehicles at public auction "if [it] is suitable for operation on the public highways." While municipalities are permitted to convey inoperable abandoned vehicles to contracted towing companies, "[a]bandoned vehicles which are suitable for operation on the public highway ... must be sold at public auction." 1991 N.Y. Op. Att'y Gen. (Inf.) 1049 (1991). "Directly conveying these operable vehicles to the contractor, without a public auction, would violate [S]ection 1224." *Id.*

Here, the process of deeming a vehicle abandoned is akin to condemnation, destroying Santander's property interest in the Vehicle. *See Armstrong*, 364 U.S. at 48. Santander alleges that the taking is, in effect, payment to towing companies like YTR for their services. (*See* Pl's Mem. 29; Pl's Opp. 18.) The Parties dispute that Yonkers' transferring abandoned vehicles to towing companies is a kind of payment to the towing companies. (*See* Yonkers' Counter 56.1 ¶ 41; *see also* Yonkers' Reply 6 (arguing that Yonkers receives no proceeds or benefits from a towing company's sale of an abandoned vehicle). Yonkers' briefing attempts to paint itself out of this process: "the [V]ehicle was sold by YTR with no proceeds from the abandoned vehicle going to [Yonkers]." (Yonkers' Mem. 11; *see also* Yonkers' Reply 6 ("[Yonkers] does not receive any proceeds from ... YTR's sale of the [V]ehicle.").)

In essence, Yonkers argues that there was no public use or purpose to the taking here. Fatal to this argument, however, is the proposition that "[t]he 'public use' requirement is ... coterminous with the scope of a sovereign's police powers." *Goldstein v. Pataki*, 488 F. Supp. 2d 254, 280 (E.D.N.Y. 2007) (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 240 (1984)); *UMB Bank, N.A. v. City of Winooski, Vt.*, No. 17-CV-231, 2018 WL 4080384, at *12 (D. Vt. Aug. 27, 2018) (same). "Municipalities are authorized to adopt laws relating to, [inter alia], the 'government, protection, order, conduct, safety, health and well-being of persons or property therein.' " *Assoc. of Home Appliance Mfrs. v. City of New York*, 36 F. Supp. 3d 366, 372 n.1 (S.D.N.Y. 2014) (quoting N.Y. Const. art. IX, § 2(c)(10)). However, the exercise of police power must be reasonable. *See id.* at 373 (citing *Good Humor Corp. v. City of New York*, 49 N.E.2d 153, 155 (N.Y. 1943)). Yonkers' deeming the vehicle abandoned pursuant to VTL § 1224 was an exercise of police power that suffices as a public use under the Takings Clause. *Cf. Forty-Second Street Co. v. Koch*, 613 F. Supp. 1416, 1426 (S.D.N.Y. 1985) (holding that condemnation for a proper purpose is a valid exercise of police power); *Phillips v. Satellite Auto Parts, Inc.*, 393 N.Y.S.2d 234, 234 (N.Y. App. Term. 1977) (removal of abandoned vehicles is a valid exercise of police power because the government entity has a "legitimate interest in removing derelict vehicles from the [government's] streets").

**\*13**  Finally, it is undisputed that there was no compensation to Santander. There was, therefore, an unlawful taking of Santander's property interest. Accordingly, Santander's Motion for Summary Judgment on its Fifth Amendment claim is granted.

## C. New York State Constitution (Count IV)

Yonkers moves for summary judgment as to Santander's claim in Count IV of the Complaint, which is brought pursuant to the New York State constitution. (Yonkers' Mem. 11.) "The New York State Constitution's guarantees of equal protection [and due process] are virtually coextensive with those of the federal Constitution." *Imperato v. Otsego Cnty. Sheriff's Dep't*, No. 13-CV-1594, 2016 WL 1466545, at *31 (N.D.N.Y. Apr. 14, 2016) (quoting *Febres v. City of New York*, 238 F.R.D. 377, 392 (S.D.N.Y. 2006)); *TD Auto Fin.*, 2023 WL 6295116, at *13 (same). "District courts in this [C]ircuit have consistently held that there is no private right of action under the New York State Constitution where, as here, remedies are available under [Section] 1983." *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 520 (S.D.N.Y. 2013) (quotation marks omitted) (collecting cases); *accord Santander Consumer USA, Inc. v. City of Yonkers*, No. 20-CV-4553, 2022 WL 4134718, at *9 (S.D.N.Y. Sept. 12, 2022).

Because the Court already has determined that Santander is entitled to summary judgment on its Section 1983 claim based on the Yonkers' procedural due process violations, Yonkers' motion for summary judgment is granted as to Santander's claim brought under the New York State Constitution and Count IV of the Complaint is dismissed.

## D. Declaratory Relief (Count V)

Santander argues that Yonkers' policies "create an ongoing controversy" every time Yonkers seizes a vehicle and seeks a declaratory judgment that Yonkers' policies, practices, and customs are unconstitutional. (*See* Pl's Mem. 35.) Yonkers responds that this claim is mooted by the 2022 revisions to its policies. (*See* Yonkers' Mem. 12.)

The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, permits courts to "declare the rights and other legal relations of any interested party seeking such a declaration" "[i]n a case of actual controversy." 28 U.S.C. § 2201(a). The Declaratory Judgment Act is "procedural only ... and does not create an independent cause of action." *Chevron Corp v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012) (citations and quotation marks omitted). To the extent Santander asserts declaratory relief as a standalone claim, it is dismissed. *See TD Auto Fin.*, 2023 WL 6295116, at *13. The Court will, however, assess whether declaratory relief is appropriate. *See id.*

Declaratory relief is appropriate "when the judgment sought (1) 'will serve a useful purpose in clarifying and settling the legal relations in issue,' and (2) 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.' " *U.S. Bank Nat'l Assoc. v. Triaxx Asset Mgmt. LLC*, No. 18-CV-4044, 2021 WL 4993895, at *5 (S.D.N.Y. Oct. 26, 2021) (quoting *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969)); *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 432 (S.D.N.Y. 2002) (quotation marks omitted), *aff'd*, 346 F.3d 357 (2d Cir. 2003) (same). Parties do not have a right to obtain a declaratory judgment; the decision remains within the discretion of the Court. *See Doyle v. U.S. Dep't of Homeland Sec.*, 331 F. Supp. 3d 27, 66 (S.D.N.Y. 2018).

**\*14** The Court finds that declaratory relief is appropriate here because Yonkers' policies violate the Fourteenth Amendment procedural due process rights of lienholders. Courts in very similar circumstances have found that such relief "serves the useful purpose of clarifying legal relations and providing relief from uncertainty." *See TD Auto Fin.*, 2023 WL 6295116, at *14; *see also Toyota Lease Tr.*, 2023 WL 4443992, at *12 (granting declaratory relief where court determined state statute did not provide sufficient due process protections); *Am. Honda Fin. Corp.* (Revere), 471 F. Supp. 3d at 410 (same). Accordingly, the Court enters declaratory judgment in favor of Santander, and against Yonkers, as follows:

> The City of Yonkers' policies, practices, and customs of impounding vehicles that have been seized in connection with arrests without providing prompt notice to any lienholders with interests in the vehicles, and without providing such lienholders with an opportunity to be heard at any time in connection with

the seizure or potential release of such vehicles, violates the protection against deprivations of property without due process of law enshrined in the Fourteenth Amendment to the U.S. Constitution.

The Court will allow Yonkers to revise its policies, practices, and customs consistent with this decision. Ideally, Yonkers will adopt formal written procedures to promote clarity and to ensure that appropriate due process protections are extended to all interested parties at every relevant stage.

E. Damages

The Court next turns to the question of damages. Santander argues that it is entitled to the value of the Vehicle at the time of seizure on June 16, 2021, and provides a J.D. Power estimate of the Vehicle's value at that time. (*See* Pl's Mem. 34.) Yonkers fails to address the damages issue in its initial brief. (*See generally* Yonkers' Mem.) In its reply, Yonkers argues that "Santander's claim for damages against [Yonkers] fails because [Yonkers] has not violated any of Santander's rights." (Yonkers' Reply 8.) Yonkers also suggests that, should the Court award damages, the amount should be the Vehicle's "substantiated market value ... at the alleged time Santander's possessory interest was allegedly impeded." (*Id.*)

"Under New York law, plaintiffs can recover for the 'loss of use' of their vehicle in the event a vehicle is damaged or destroyed." *Toyota Lease Tr.*, 2023 WL 4443992, at *13 (quoting *Quiller, Inc. v. United States*, No. 20-CV-2513, 2022 WL 4225542 (S.D.N.Y. Sep. 13, 2022) (citing *Koninklijke Luchtvaart Maatschaapij, N.V. v. United Techs. Corp.*, 610 F.2d 1052, 1055–56 (2d Cir. 1979))). "The Second Circuit has held, however, that a lienholder's property interest in a seized vehicle is its present value." *Id.* (citing *Ford Motor Credit Co.*, 503 F.3d at 191–92).

Santander argues for using the J.D. Power estimate of $33,318 (which it then lowered to $22,000 in its Opposition to Yonkers' motion, (Pl's Opp. 22)), but Yonkers disputes whether this amount was, at the relevant time, the value of the Vehicle, (*see* Yonkers' Counter 56.1 ¶¶ 43–45.) There is also a dispute concerning the condition of the Vehicle, which affects its value. (*See* Decl of Harold Wuestenhoefer, Ex. 1 at 50:4–23.) As such, the record before the Court is insufficient to determine as a matter of law the amount of damages owed to Santander. *See TD Auto Fin.*, 2023 WL 6295116, at *16.

III. Conclusion

For the reasons set forth above, Santander's Motion for Summary Judgment is granted in part and denied in part and Defendants' Motions for Summary Judgment are granted in part and denied in part. Specifically, summary judgment is granted for Santander as to Counts II and III. Summary judgment is granted for Defendants as to Counts I and IV. While Count V is dismissed as procedurally improper, Santander's request for declaratory relief is granted.

**\*15**  The Clerk of the Court is respectfully directed to terminate the pending Motions at Dkt. Nos. 80, 91, and 96. A telephonic status conference is hereby scheduled for November 20, 2024, at 10:00 AM.

SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 4817649

---

**End of Document**                                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Stone #1 v. Annucci, Not Reported in Fed. Supp. (2021)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 56 of 102

2021 WL 4463033
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jane STONE #1; Jane Stone #2; Jane Stone #3; Jane Stone #4; Jane Stone #5; Jane Stone #6, Plaintiffs,

v.

Anthony J. ANNUCCI, et al., Defendants.

No. 20-CV-1326 (RA)
|
Signed 09/28/2021

**Attorneys and Law Firms**

Daniel Adam McGuinness, Law Offices of Daniel A. McGuinness, P.C., Victoria Nicole Medley, Law Office of Zachary Margulis-Ohnuma, New York, NY, Zachary Margulis-Ohnuma, ZMO Law PLLC ZMO Law PLLC, New York, NY, for Plaintiffs.

OPINION & ORDER

Ronnie Abrams, United States District Judge

 **\*1**  This action is brought by six women who are or were incarcerated at four prison facilities operated by the New York State Department of Corrections and Community Supervision (DOCCS) and who were allegedly raped and sexually abused at the hands of correction officers. Proceeding anonymously, they brought suit pursuant to 42 U.S.C. § 1983 and New York law against Anthony J. Annucci, the Acting Commissioner of DOCCS; Jason Effman, the Associate Commissioner and Prison Rape Elimination Act Coordinator for DOCCS; Susan Squires, the superintendent of Albion Correctional Facility; Sabina Kaplan, the superintendent of the Bedford Hills Correctional Facility; Brian Kubik, the superintendent of Lakeview Shock Incarceration Correctional Facility; Tanya Mitchell-Voyd, superintendent of the Taconic Correctional Facility; fourteen correction officers; and two DOCCS investigators.[1] Plaintiffs assert that some of the correction officers subjected them to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, and that other defendants, including the senior prison officials, were deliberately indifferent to serious risks to their safety. Before the Court is a motion filed by Defendants Annucci, Effman, Kaplan, Kubik, and Squires (the "Supervisory Defendants") seeking (1) to dismiss the claims against Annucci and Effman for failure to state a claim or to grant them qualified immunity; (2) to dismiss the claims against Kaplan as untimely; and (3) to dismiss the claims against Squires and Kubik for improper venue or alternatively to sever those claims and transfer them to the Western District of New York.[2] See Memorandum of Law in Support of Supervisory Defendants' Motion ("Def. Mem."), Dkt. 83. For the following reasons, the Court declines to dismiss the claims against Annucci and Effman, dismisses the claims against Kaplan (as well as other untimely claims brought by Jane Stone #5), and severs and transfers to the WDNY the claims against Squires and Kubik.

---

[1]    The correction officers sued are James W. Castonguay, Jordan Middlebrooks, Willie Smith, David Stupnick, Naresh Deosarran, Jose Guzman, Tiffany Paige, Rasheen Smalls, Matthew Antolini, James Beam, Juan Vasquez, Nancy Lopez, Keffion Lovelace, and Pedro Norde. The investigators sued are Melinda Hanzlian and Alvi Castro.

[2]    Tanya Mitchell-Voyd, the superintendent of Taconic, did not move to dismiss or transfer the claims against her, and filed an answer on May 5, 2021. See Dkt. 90.

Stone #1 v. Annucci, Not Reported in Fed. Supp. (2021)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 57 of 102

**BACKGROUND**

**A. Factual Background**

The following facts are drawn from Plaintiff's Second Amended Complaint, Dkt. 56 (the "Complaint" or "SAC"), and are assumed to be true for the purpose of resolving this motion. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

The Complaint alleges a series of rapes and sexual assaults committed by correction officers against inmates at four DOCCS facilities: Albion Correction Facility in Albion, New York ("Albion"); Bedford Hills Correctional Facility in Bedford Hills, New York ("Bedford Hills"); Taconic Correctional Facility in Bedford Hills, NY ("Taconic"); and Lakeview Shock Incarceration Correctional Facility in Brocton, New York ("Lakeview"). The Albion, Bedford Hills, and Taconic facilities house exclusively female inmates. Albion and Lakeview are located in the Western District of New York; Taconic and Bedford Hills are located in the Southern District of New York. SAC ¶¶ 9-14.

**\*2** Plaintiff Jane Stone #1 was incarcerated during the relevant time periods at Albion and Taconic. Plaintiff Jane Stone #2 was incarcerated at Albion. Plaintiff Jane Stone #3 was incarcerated at Taconic. Plaintiff Jane Stone #4 was incarcerated at Lakeview and Taconic. Plaintiff Jane Stone #5 was incarcerated at Bedford Hills, Albion, and Taconic. Plaintiff Jane Stone #6 was incarcerated at Albion. *Id*. ¶¶ 15-21.

Defendant Annucci was at all relevant times the acting commissioner of DOCCS, in which capacity he was "responsible for enacting policies and procedures to protect the safety of inmates incarcerated in DOCCS and ensuring that the policies and practices are enforced in DOCCS facilities." *Id*. ¶¶ 22, 468. Defendant Effman was at all relevant times an associate commissioner for DOCCS and the official designated as DOCCS' Prison Rape Elimination Act ("PREA") coordinator pursuant to 28 C.F.R. § 115.11(b), which requires the agency to employ an upper-level official "with sufficient time and authority to develop, implement, and oversee agency efforts to comply with PREA standards in all its facilities." *Id*. ¶¶ 23, 469. Defendant Squires was at all relevant times the superintendent of Albion; Defendant Kaplan was at all relevant times the superintendent of Bedford Hills; Defendant Kubik was at all relevant times the superintendent of Lakeview. *Id*. ¶¶ 24-26.

Although each Plaintiff experienced sexual abuse at the hands of different prison officers on different occasions between 2015 and 2019, they commonly allege that they were regularly guarded by male officers who were "barely supervised and left alone with women under their control for long periods of times in unmonitored areas of the prisons." *Id*. ¶ 2. The officers also "had a system of warning each other if a supervisor was approaching and created a climate of fear and intimidation against any woman who complained about sexual attention from an officer." *Id*. Correction officers at the facilities where Plaintiffs were incarcerated frequently "groomed" their victims by spending extensive time speaking to them, allowing them to break prison rules, and gifting them material items such as soap, razor blades, or illegal drugs. *Id*. ¶ 48. Although such grooming can deceive inmates "into believing that such contact is consistent with a normal romantic relationship," *id.*, the law recognizes that an inmate cannot consent to sexual activity with an officer, *id*. ¶ 2. *See* N.Y. Penal Law § 130.05(3)(e); *Morris v. Eversley*, 205 F. Supp. 2d 234, 242 (S.D.N.Y. 2002); *Cash v. Cty. of Erie*, 654 F.3d 324, 337 (2d Cir. 2011) ("[A]s a matter of New York state law, *any* sexual contact between a guard and a prisoner"—whether "assaultive" or "non-assaultive"—"is deemed non-consensual due to the inherent power differential between guards and prisoners.").

**Jane Stone #1** was incarcerated at Albion in 2019, where she suffered sexual abuse on the part of Defendant CO James Castonguay. On May 12, Castonguay entered the area where she was taking a shower, with his body camera turned off, and questioned her while she was unclothed. Later that night, Castonguay entered her "cube," pulled out his penis, and instructed her to perform oral sex on him. He then turned her around on her bed and vaginally penetrated her from behind. He told her to get dressed and to go to the laundry room, where he raped her again. Jane Stone #1 called the PREA Hotline to report the incident. In January 2020, Castonguay was indicted for raping her and Jane Stone #6. *See* SAC ¶¶ 194–235.

Stone #1 v. Annucci, Not Reported in Fed. Supp. (2021)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 58 of 102

**\*3** **Jane Stone #2** was incarcerated at Albion from 2017–2019, where she was continuously subjected to illegal sexual contact by Defendant CO David Stupnick. Stupnick would go out of his way to speak to Jane Stone #2, engaging her in personal conversations. During Stupnick's shifts, he was the only officer assigned to the unit where Jane Stone #2 was housed, and correction officers on other units would routinely radio ahead to warn other correction officers when supervisory rounds were about to occur. Although Jane Stone #2 was occasionally transferred to different dormitory units, Stupnick continued to spend long periods of time speaking with her and swapped assignments with other officers in order to be able to work in proximity to her. Over the course of many months, from early 2018 to January 2019, Stupnick continuously would take Jane Stone #2 to a cube or a stairwell and engage in illegal sexual contact with her, including by digitally penetrating her vagina. Stupnick met with Jane Stone #2's sister outside of the facility and gave the sister money to be placed in plaintiff's commissary account; he also smuggled personal items for her into the facility and bought her jewelry. By February 2019, Stupnick was entering her cube each night and making her perform oral sex on him. After their relationship was reported to prison authorities, two investigators from the DOCCS Office of Special Investigations ("OSI"), Defendants Investigators Melinda Hanzilian and Alvi Castro, questioned Jane Stone #2 and threatened her with criminal charges and other unspecified consequences if she did not provide information about her relationship with Stupnick. Even as the authorities investigated him, Stupnick continued to work in proximity to Jane Stone #2 and continued to direct her to engage in sexual activity with him. In March 2019, Jane Stone #2 was transferred to Taconic. Stupnick subsequently confessed to sexually assaulting plaintiff and was criminally charged. *See id.* ¶¶ 236-301.

**Jane Stone #3** was transferred to Taconic in May 2018, where she met Defendant CO Pedro Norde while working in the caustics department. Norde frequently swapped shifts to be able to work in the caustics department in order to spend time with Jane Stone #3. He was frequently left alone with her. In July 2018, Norde masturbated and ejaculated in front of Jane Stone #3. On fifteen other occasions, Norde instructed Jane Stone #3 to finish other duties early and to come visit him in the caustics department, where he would masturbate in front of her. On another occasion in the 81 Basement, when Norde was left alone with Jane Stone #3, he took her to the staff bathroom and orally and vaginally raped her. The camera positioned outside the staff bathroom was not monitored. After learning that Norde had infected her with herpes, she filed a PREA complaint against him. Corrections staff retaliated by conducting additional pat frisks and cell searches on Jane Stone #3. Plaintiffs believe that no disciplinary action has been taken against Norde. *See id.* ¶¶ 302-336.

In January 2017, **Jane Stone #4** arrived at Lakeview, which employs a six-month boot-camp-like program to "shock" inmates into changing their behavior. Defendant CO James Beam took an interest in her and made sure to substitute in for Defendant CO Juan Vasquez, the platoon leader, whenever he could. Beam began confiding in Jane Stone #4 and discussing personal issues with her. Vasquez overheard one such personal conversation, about Beam's girlfriend, and told Jane Stone #4 that this was an inappropriate officer-inmate conversation. Vasquez never reported any of the personal interactions he observed. In July 2017, Beam cornered Jane Stone #4 in the Bubble and tried to kiss her. She wanted to report this but feared doing so due to the lack of confidential reporting channels. The phones at Lakeview are locked and require the involvement of a CO to unlock them; officers generally ask why an inmate wants to use the phone or stands by to overhear the phone conversation. Beam continued on other occasions to try to kiss Jane Stone #4. On July 27, 2017, Jane Stone #4 and another inmate (Jane Sand), who had also been subjected to physical advances from a corrections officer, were told that they were the only two inmates to fail the shock program. They were kept at Lakeview for three more weeks before being transferred. During that time, plaintiff overheard Jane Sand having sex with Defendant CO Matthew Antolini. Antolini pressured Jane Stone #4 to engage in a sexual relationship with Beam. Beam later cornered Jane Stone #4, forcibly kissed her, and pressed his clothed, erect penis against her body. Beam later brought plaintiff and Jane Sand goods and allowed them to take a lengthy shower. After the shower, Beam directed Jane Stone #4 to have sex with him. She was subsequently transferred to Taconic, where Beam continued to contact her. Beam and Antolini were subsequently criminally prosecuted. *Id.* ¶¶ 337-392.

**\*4** **Jane Stone #5** was incarcerated at Bedford Hills beginning in 2011. In late 2014 and early 2015, she met Defendant CO Rasheen Smalls, who began to groom her for illegal sexual activity. Defendant CO Naresh Deosarran observed Jane Stone #5's interactions with Smalls and warned her that she was spending too much time talking to him, but he did not report the interactions. Starting in the winter of 2014, Smalls began to sexually exploit Jane Stone #5, including by ordering her into a utility closet that was known to be unmonitored and engaging in sexual acts with her. Smalls was not afraid of being caught by

Stone #1 v. Annucci, Not Reported in Fed. Supp. (2021)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 59 of 102

a supervisor because correction officers routinely radioed each other to warn the unit officers when a supervisor was coming. Other officers, including Defendant CO Tiffany Paige and Defendant CO Jose Guzman, knew of Jane Stone #5's relationship with CO Smalls but did not report it to any supervisor or advise her to file a PREA complaint. Jane Stone #5 was transferred to Albion, where at some point investigators confronted her, handcuffed her, and questioned her about her relationship with Smalls, threatening her with consequences for failing to cooperate. Although she was initially fearful to disclose anything about the relationship, she eventually provided investigators with a statement about it, which she was told would be kept confidential. In the winter of 2015, Jane Stone #5 was brought to Taconic and told by DOCCS staff that she had to testify in grand jury proceedings against Smalls. While at Taconic, inmates and correction officers made derogatory comments to her about her relationship with Smalls, and two male officers cornered her and called her a "snitch." She feared continued retaliation and avoided leaving her cell before being returned to Albion. In the summer of 2016, after her release from prison, she received a subpoena and testified at Smalls's criminal trial, after which Smalls was found guilty of criminal sexual act in the third degree. *See id.* ¶¶ 393-466.

**Jane Stone #6** was housed in the M1 dorm building at Albion from November 2018 to September 2019. After she moved into the dorm, Defendant CO Willie Smith asked her personal questions, peered over her cube wall after she showered, and on several occasions asked her to touch his penis. In those situations, he did not fear being caught because he would receive a phone call from other units warning him of supervisor rounds. Jane Stone #6 sought to transfer out of the dorm to avoid Smith's sexual advances, but her applications were denied. In April 2019, Jane Stone #6 met CO Castonguay who had also begun working in the M1 dorm. One evening, while she was working a shift in the laundry room, Castonguay entered the laundry room, turned off the light, and asked her to perform oral sex on him. He then had sex with her and ejaculated on the laundry room floor. The next evening, Castonguay entered Jane Stone #6's cube in the middle of the night, woke her up, and directed her to masturbate. That month, he sexually abused her on two further occasions in the laundry room. Jane Stone #6 kept a piece of paper and a paper towel containing traces of Castonguay's semen, and eventually turned that evidence over to OSI investigators. On several occasions in May 2019, CO Smith directed Jane Stone #6 to have sex with another inmate while he watched. Jane Stone #6 was also sexually assaulted by Defendant CO Jordan Middlebrooks. From February to September 2019, on more than ten occasions, Middlebrooks entered Jane Stone #6's cube to view and fondle her naked body. Jane Stone #6 did not report Smith, Middlebrooks, or Castonguay through the PREA hotline because she would have had to use her Departmental Identification Number, and feared that her identity would be revealed. She had learned that Jane Stone #1 had faced retaliation after making a PREA complaint. When Jane Stone #6 eventually told an OSI investigator about the times and dates of the assaults, OSI was unable to recover camera recordings corroborating the attacks. To Plaintiffs' knowledge, no disciplinary action has been taken against CO Middlebrooks or CO Smith. *See id.* ¶¶ 52-193.

Plaintiffs allege that the Supervisory Defendants were responsible for preventing sexual abuse by guards against inmates; on notice of the serious risk of abuse; and failed to enact and enforce policies that would have prevented the abuse. Plaintiffs support their contention that the Supervisory Defendants were aware of the risk of female inmates being sexually abused with the following allegations: (1) statistical reports on prison rape, including a 2018 DOCCS annual report documenting hundreds of complaints of staff sexual abuse, disproportionately at female-only institutions, SAC ¶¶ 481-485, 491-493; (2) the steps taken by several states and local correctional institutions to require the presence of female staff to guard women prisoners, and to remove men from guarding women prisoners in housing areas, *id.* ¶ 490; (3) the fact that Annucci and Effman have themselves been party to a number of lawsuits brought in state and federal courts by imprisoned women who have been the victims of staff sexual abuse, *id.* ¶ 494; and (4) the fact that staff sexual misconduct at DOCCS facilities has resulted in numerous prosecutions, *id.* ¶ 495-496. Plaintiffs further allege that the Supervisory Defendants, through action and inaction, disregarded these risks by keeping in place policies that failed to prevent sexual abuse by male staff against female inmates. In particular, Plaintiffs argue that the following policies or practices caused constitutional violations: (1) permitting the assignment of male staff to posts where they had opportunities for one-on-one unmonitored contact with female inmates, *id.* ¶¶ 503-515; (2) failing to enact and enforce adequate rules to ensure that supervisors would conduct unannounced and unpredictable rounds, *id.* ¶¶ 516-534; (3) failing to maintain sufficient numbers of cameras in facilities and to require that cameras be monitored, *id.* ¶¶ 535-548; (4) allowing officers to switch assignments informally with one another to allow them to choose to be near particular inmates, *id.* ¶¶ 549-554; (5) creating a culture in which warning signs of sexual abuse were ignored and not reported, *id.* ¶¶ 555-575; (6)

Stone #1 v. Annucci, Not Reported in Fed. Supp. (2021)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 60 of 102

failing to remove correction officers who developed inappropriate relationships with inmates, *id.* ¶¶ 576-579; (7) allowing a culture of intimidation and fear about reporting sexual abuse, *id.* ¶¶ 580-597; and (8) failing to institute policies that would prevent COs from bringing in contraband to prison facilities in aid of grooming inmates, *id.* ¶¶ 598-602.

### B. Procedural Background

**\*5** Plaintiffs filed suit on February 14, 2020. Dkt. 1. On February 18, 2020, Judge Cote, acting in her Part One capacity, granted Plaintiffs permission to proceed anonymously. Dkt. 5. The operative second amended complaint was filed on October 6, 2020. Against the individual correction officers and investigators, the Complaint raises claims including Eighth Amendment claims for cruel and unusual punishment, deliberate indifference to inmate safety, and a failure to protect; and New York law claims for rape, sexual abuse, and battery. As to the Supervisory Defendants, the Complaint charges them with deliberate indifference to the serious risk of inmate sexual abuse, in violation of the Eighth Amendment. The basis for the deliberate indifference claims against Annucci and Effman, the two senior-most DOCCS officials named as defendants, is that they were responsible for inmate safety in DOCCS facilities, aware of sexual abuse by male officers against female inmates at the four facilities, and failed to implement and enforce policies sufficient to protect imprisoned women at the four facilities.

On December 9, 2020, the Supervisory Defendants—represented by the office of the New York Attorney General—filed the instant motion. *See* Dkt. 74. Following the Second Circuit's decision in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Court adjusted the briefing schedule to allow the parties to address the impact of that decision—a subject the Court discusses in depth below. The Supervisory Defendants argue that (1) the claims against Annucci and Effman must be dismissed because of the lack of allegations that they were personally involved in any constitutional violations; (2) Jane Stone #5's claims against Superintendent Kaplan must be dismissed as untimely because they accrued more than three years prior to the filing of the complaint; and (3) the claims against Superintendents Squires and Kubik should be either dismissed for improper venue or severed and transferred to the Western District of New York. The Court will address each argument in turn.

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557). On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011) (citation omitted). In answering this question, the Court must "accept[ ] all factual allegations as true, but 'giv[e] no effect to legal conclusions couched as factual allegations.' " *Stadnick*, 861 F.3d at 35 (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).

## DISCUSSION

## I. Claims Against Annucci and Effman

The Supervisory Defendants first argue that the claims against Annucci and Effman must be dismissed because of insufficient allegations that either was directly and personally involved in any constitutional violation, which is a well-established prerequisite for Section 1983 liability. *See* Def. Mem. at 19. They acknowledge that this Court has allowed comparable allegations against Annucci and Effman to proceed past the motion to dismiss stage in another case. *See Pusepa v. Annucci*, No. 17-CV-7954 (RA), 2019 WL 690678 (S.D.N.Y. Feb. 19, 2019). But they argue that the basis for the *Pusepa* decision—that plaintiff had plausibly alleged that Annucci and Effman were liable for her sexual abuse because they created or maintained

policies or customs under which unconstitutional practices occurred—is no longer sound law in light of the Second Circuit's 2020 decision in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020). *See* Def. Reply Mem. at 8. Plaintiffs disagree, arguing that the legal framework governing their claims is essentially unchanged after *Tangreti*, and urge the court to hold, as it did in *Pusepa*, that Annucci and Effman can be liable for their creation and maintenance of policies under which Plaintiffs' constitutional rights were violated. *See* Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss, Dkt. 86 ("Pl. Mem."). In the Court's view, although Plaintiffs are mistaken in stating that the legal framework it applied in *Pusepa* is entirely unchanged, the Complaint nonetheless succeeds in stating a claim against Annucci and Effman.

**\*6**  The Court begins by reviewing the relevant legal landscape and how the *Tangreti* decision has affected it. It has long been settled law that to state a claim for a government official's liability pursuant to Section 1983, the plaintiff must allege that the defendant was personally involved in the constitutional deprivation at issue. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). The Second Circuit's test for such personal involvement was for many years governed by the factors set out in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995). In that case, the Second Circuit identified five ways in which a plaintiff may establish a supervisory defendant's "personal involvement" in a constitutional violation: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *See Colon*, 58 F.3d at 873.

The Supreme Court's 2009 decision in *Ashcroft v. Iqbal* called the *Colon* factors into some doubt. In holding that claims against the Attorney General and FBI Director for their alleged involvement in an unconstitutional discriminatory scheme were insufficiently pled, the Supreme Court explained that vicarious liability does not apply to *Bivens* and Section 1983 suits, and held that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The Supreme Court reemphasized that a government official, "his or her title notwithstanding, is only liable for his or her own misconduct" and rejected the claim that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id*.

The impact of this decision on the *Colon* factors was unclear, and the question divided courts in the Second Circuit. *See Staten v. Semple*, No. 3:18-CV-1251 (VAB), 2021 WL 1060225, at *19 (D. Conn. Mar. 19, 2021) (collecting cases); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but declining to resolve the issue). "[T]he majority of courts in this Circuit," however—including this one—"continued to apply the *Colon* factors" after *Iqbal*. *Pusepa*, 2019 WL 690678, at *4 (holding that Annucci and Effman could be liable in connection with a plaintiff-inmate's sexual assault because of their policymaking responsibility under the third *Colon* factor). This Court in *Pusepa* recognized the importance of *Iqbal*'s statement that a Section 1983 plaintiff "must show that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Id*. at *3 (quoting *Iqbal*, 556 U.S. at 678). The Court also recognized that "[w]hen a prison official is sued, 'mere linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Id*. at *3 (quoting *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003)). But the Court reiterated its view that after *Iqbal, Colon* "remain[ed] good law," and applied it to hold Annucci and Effman liable for creating or continuing policies that played a role in bringing about the plaintiff's sexual abuse at the hands of prison staff. *Id*. at *4.

Only recently, in the *Tangreti* case, did the Second Circuit expressly clarify the effect of *Iqbal* on its *Colon* precedent. In that case, the plaintiff alleged, like the plaintiffs here, that she was sexually abused by correction officers in prison. *Tangreti*, 983 F.3d at 612. She brought suit under Section 1983 against eight prison supervisors, including Christine Bachmann, a supervising counselor at the York Correctional Institute who oversaw a substance abuse program, alleging that they violated the Eighth Amendment through their deliberate indifference to the substantial risk of sexual abuse by three corrections officers. The district court denied Bachmann qualified immunity at summary judgment; it found she was "conceivably personally involved" in

Stone #1 v. Annucci, Not Reported in Fed. Supp. (2021)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 62 of 102

violations against the plaintiff because she "was grossly negligent in supervising the officers or because she failed to act on information indicating that Tangreti was at substantial risk of sexual abuse." *Id.* at 614-616. *See also Tangreti v. Semple*, No. 3:17-CV-01420 (MPS), 2019 WL 4958053, at *19 (D. Conn. Oct. 8, 2019) (district court opinion) ("Ms. Bachmann was conceivably personally involved in the violations against Ms. Tangreti under [the] fourth *Colon* category ... or the fifth category.").

**\*7** The Second Circuit rejected that conclusion and reversed. The Court noted that after *Iqbal*, there can be no "special rule for supervisory liability"—rather, as the Supreme Court made clear, each supervisor must have, through his or her own individual actions, violated the constitution. *Id.* at 612. "The focus is on what the *supervisor* did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.' " *Tangreti*, 983 F.3d at 618 (quoting *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (Gorsuch, J.)). Applying that principle, the Court concluded—at the summary judgment phase—that the plaintiff had not adduced sufficient evidence to support an inference that Bachmann, personally and "through her own actions, displayed deliberate indifference to the substantial risk of sexual abuse." *Id.* As the court noted, "for deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Id.* at 616 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Put another way, for a supervisory official to be liable, the official must "personally" know of and disregard "an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 619 (quoting *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020)).

In *Tangreti*, the only evidence that Bachmann subjectively knew of a risk to the plaintiff was that she observed the plaintiff interacting with a correction officer inappropriately on two occasions, but neither time did she observe a sexual interaction. She also heard complaints that the correction officer was "too familiar" with the plaintiff, "but not that they were sexually involved." On the basis of these facts, the Second Circuit concluded, the "most" that could be said is that Bachmann "could have or should have made an inference of the risk of sexual abuse," but there was no evidence that she in fact made such an inference. *Id.* at 619-620. Having established that *Iqbal* precluded the use of a "special test for supervisory liability" under Section 1983, the Circuit held that the mere fact that Bachmann could or should have known of a risk to inmate safety was inadequate, and therefore reversed with instructions to enter summary judgment for Bachmann.

The parties here dispute the state of the law in the wake of *Tangreti*. In particular, they disagree about whether the creation of policies by a supervisory defendant can constitute personal involvement in an underlying constitutional violation sufficient to establish Section 1983 liability. As noted above, whereas Defendants argue that the third *Colon* factor is no longer good law, *see* Def. Reply Mem. at 8, Plaintiffs argue that *Tangreti* "does not change the fundamental framework" governing their claims, *see* Pl. Mem. at 13-14.

At the outset, Plaintiffs' maximalist position—that "personal involvement of supervisors can still be established by the five factors articulated in *Colon*," *id.* at 15—is clearly not correct. Although it is true that *Tangreti* did not expressly state, "We are overruling *Colon*," it made clear that plaintiffs seeking to hold supervisors liable "cannot rely on a separate test of liability specific to supervisors"—i.e., exactly what the five-factor *Colon* test was. *See Tangreti*, 983 F.3d at 619. Going forward, a plaintiff must establish that each defendant's own conduct violated the constitution, and such liability can no longer be solely premised on a defendant's "supervision of others who committed the violation." *Id.* This clear direction from *Tangreti* plainly abrogates the fourth *Colon* factor, which allowed liability for a defendant who was "grossly negligent in supervising subordinates who committed the wrongful acts." *Colon*, 58 F.3d at 873. The *Tangreti* decision also makes clear that a plaintiff must show that each supervisor himself or herself possessed the requisite *mens rea* to be held liable for the constitutional violation, *e.g.*, in a case like this, that he or she "acted with deliberate indifference—meaning that [the defendant] personally knew of and disregarded an excessive risk to [plaintiff's] health or safety." *Tangreti*, 983 F.3d at 619 (citations omitted).

**\*8** District courts applying *Tangreti* in the months since it was decided have generally stated that the five-factor *Colon* test is no longer good law. *See Reid v. City of New York*, No. 20-CV-644 (GBD) (JLC), 2021 WL 3477243, at *7 (S.D.N.Y. Aug. 6, 2021) ("In *Tangreti*, the Second Circuit overturned its decision in *Colon*."); *Smith v. Westchester Cty.*, No. 19-CV-03605

(NSR), 2021 WL 2856515, at *6 (S.D.N.Y. July 7, 2021) (After *Tangreti*, "to hold [an] official liable under Section 1983, in the context of the Fourteenth Amendment, the standards for supervisory liability set out in *Colon* may not be used, and Plaintiff must demonstrate, through factual allegations, that each individual Defendant meets *all* elements required for a Section 1983 conditions of confinement claim"); *Cook v. Dubois*, No. 19-CV-8317 (CS), 2021 WL 91293, at *4 (S.D.N.Y. Jan. 11, 2021) (*Tangreti* "clarified that under the Supreme Court's ruling in *Iqbal*, the *Colon* test is invalid"); *Mazyck v. Keller*, No. 6:20-CV-06055 (EAW), 2021 WL 1201224, at *11 (W.D.N.Y. Mar. 31, 2021) ("[T]he theories of supervisory liability delineated in *Colon* are no longer controlling following the Second Circuit's decision in *Tangreti*."); *Zielinski v. Annucci*, ––– F. Supp. 3d ––––, 2021 WL 2744684, at *8 (N.D.N.Y. July 2, 2021) ("*Tangreti* ... recognized the Supreme Court's abrogation of the more plaintiff-friendly test that had long been used by courts in this circuit."); *Everett v. Dean*, No. 3:20-CV-1260 (GTS) (ML), 2021 WL 3038390, at *6 (N.D.N.Y. June 2, 2021), *report and recommendation adopted*, 2021 WL 3032690 (N.D.N.Y. July 19, 2021), ("District courts discussing *Tangreti* agree that the decision invalidated the *Colon* test"). It is simply not plausible, then, for Plaintiffs to argue that the old *Colon* test survived *Tangreti* in its entirety.

At the same time, however, the Court disagrees with Defendants about the fate of policymaker liability under Section 1983 after *Tangreti*. Although the Second Circuit generally rejected *Colon, Tangreti* does not suggest that *Colon*'s third factor—whereby a defendant can be said to be personally involved in a constitutional violation if he "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom," 58 F.3d at 873—could never form the basis of an official's liability. The Court reaches this conclusion for several reasons.

First, *Tangreti* did not involve policymaker liability under the third *Colon* factor. The district court there had premised Bachmann's liability on *Colon* factors four and five, prompting the Second Circuit to reverse on the basis that she could not be liable "by reason of [her] supervision of others who committed the violation." *Tangreti*, 983 F.3d at 619. An individual who creates a policy or custom whereby the constitution is violated, however, is more directly and personally involved in the constitutional violation than someone who is only negligent in his supervision of the official committing the underlying offense. Holding a policymaker liable for his or her personal handiwork—the creation or maintenance of a policy or custom—is not the same as holding a supervisor vicariously liable for the actions of his subordinates. Indeed, as the Tenth Circuit has noted, "[i]mposing liability upon officials for their promulgation of a policy the enforcement of which violates individuals' federally protected rights holds such officials 'responsible for their own wrongs rather than on the basis of respondeat superior liability' and, therefore, comports with *Iqbal*." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (quoting Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses*, § 7.19[C] (4th ed. 2010)). To be clear, *Tangreti* made clear that the requisite *mens rea* for a supervisor under Section 1983 "can be no less than the *mens rea* required of anyone else." *Id*. at 618; *see also Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 405 (1997) (internal quotation marks omitted) ("Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right."). But where a plaintiff can establish that a senior official promulgated an unconstitutional policy with a culpable mental state —in this case, deliberate indifference—the Court is of the view that such official could be deemed to be personally involved in a constitutional violation.

 **\*9**  Second, the principle that policymakers can still be liable under Section 1983 after *Iqbal* is consistent with the case law, including post-*Tangreti* district court decisions and the decisions of other Courts of Appeals. To begin with, none of the district court cases cited above that remarked on *Tangreti*'s general abrogation of *Colon* held that Plaintiff can no longer establish a defendant's personal involvement by way of showing that the defendant—acting with the sufficient *mens rea* to constitute deliberate indifference—created an unconstitutional policy. Indeed, some courts post-*Tangreti* appear to have entertained claims on that basis. *See Zielinski*, 2021 WL 2744684, at *7 (noting that it is "true as a general matter" that a defendant could still be held personally responsible for creating an unconstitutional policy, but finding that the summary judgment record was devoid of evidence that the defendant " 'personally knew of and disregarded an unreasonable risk of serious harm' to plaintiff's health as a result of his conduct") (quoting *Tangreti*, 983 F.3d at 619). Similarly, in *Abernathy v. Comm'r of Correction*, No. 3:20-CV-00628 (VAB), (D. Conn. Apr. 2, 2021), Judge Bolden addressed a post-*Tangreti* claim that a prison commissioner and warden could be held liable for their "creat[ion] [of a] policy [of] broken ventilation and procedures implemented for excessive heat" that allegedly caused the plaintiff's injury. *Abernathy*, 2021 WL 1240018, at *6. While seemingly accepting the possibility that

Stone #1 v. Annucci, Not Reported in Fed. Supp. (2021)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 64 of 102

creation of an unconstitutional policy could be the basis for liability, the court dismissed claims against the commissioner and warden because the complaint did not provide facts "suggesting ... that either the Warden or the Commissioner had subjective knowledge that this [policy] posed a substantial risk of serious harm." *Id*.

Similarly, some of the appellate decisions cited with approval in *Tangreti* recognized that even after *Iqbal*, an official can be held liable under Section 1983 for his or her involvement in the promulgation of an unconstitutional policy. *See Dodds*, 614 F.3d at 1199 (internal quotation marks omitted) ("Whatever else can be said about *Iqbal,* and certainly much can be said, we conclude the following basis of § 1983 liability survived it ...: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which subjects, or causes to be subjected that plaintiff to the deprivation of any rights ... secured by the Constitution."); *OSU Student All. v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012) (agreeing with the Tenth Circuit decision in *Dodds*); *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011) ("Beyond [a government official's] own conduct, the extent of his liability as a supervisor is similar to that of a municipality that implements an unconstitutional policy."). A district court decision also cited in *Tangreti* held that while most of the *Colon* factors were invalidated by *Iqbal*, policymaking could still be the basis for a senior official's liability under Section 1983. *See Bellamy v. Mount Vernon Hosp.*, No. 07-CV-1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("*Iqbal*'s 'active conduct' standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal*'s muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated—situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.").

Reading *Tangreti* and these other decisions together, the Court concludes that a senior prison official can still be held liable for his role in creating a policy by which violations of the Eighth Amendment occurred, but only if he can be shown to have acted with the necessary *mens rea* of deliberate indifference—that is, only if the pleadings or record evidence "permit the inference that [he] had subjective knowledge of the risk of the sexual abuse inflicted on [plaintiffs] and that [he] decided to disregard that risk." *Tangreti*, 983 F.3d at 619. In this sense, although Plaintiffs' contention that *Colon* in its entirety survives *Tangreti* is certainly wrong, the framework applied by this Court in *Pusepa* is still largely applicable. There, this Court noted that a plaintiff adequately pleads a defendant's involvement in an unconstitutional policy by alleging facts showing "that the defendant had policymaking responsibility and that, after notice of an unconstitutional practice, the defendant created the improper policy or allowed it to continue, causing the harm." *Pusepa*, 2019 WL 690678, at *4. To the extent *Tangreti* bears on this framework, it is by making clear that mere "notice" of an unconstitutional practice may be inadequate. After all, "the *mens rea* required of [a supervisor] to be held liable ... can be no less than the *mens rea* required of anyone else." *Tangreti*, 983 F.3d at 618; *see also id*. at 616 ("[F]or deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it."). The requisite inference of *mens rea* cannot be established merely by showing that a supervisory defendant "*should have known*" of the substantial risk of sexual abuse." *Id*. at 612 (emphasis in *Tangreti*). This language from *Tangreti* suggests that merely being on notice of sexual abuse in prison, or having constructive knowledge thereof, is not necessarily enough—rather, the defendant-official must subjectively know of the risk of sexual abuse and consciously disregard that risk.

 **\*10** The distinction between actual subjective knowledge and mere notice, however, may not be especially significant at the pleadings stage. *Tangreti* was decided at summary judgment, and so it was appropriate for the court to hold plaintiff to her obligation to come forward with record evidence establishing that Bachmann acted with the requisite *mens rea*. The Second Circuit found that on the record before it, "at most it may be said that Bachmann could have or should have made an inference of the risk of sexual abuse." *Tangreti*, 983 F.3d at 619. At summary judgment, this was clearly insufficient under the legal standards articulated by the court. But at the pleadings stage, courts recognize the common-sense principle that a plaintiff will often not be equipped to come forward with direct evidence of a defendant's subjective or actual knowledge or his intent. As the Second Circuit noted earlier this year, "A complaint is allowed to contain general allegations as to a defendant's knowledge, because a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Kaplan v. Lebanese Canadian*

Stone #1 v. Annucci, Not Reported in Fed. Supp. (2021)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 65 of 102

*Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (citations omitted). *See also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). At the motion to dismiss stage, a plaintiff is required only "to include allegations of the facts or events they claim give rise to an inference of knowledge." *Kaplan*, 99 F.3d at 864.

Against this backdrop, the Court concludes that the allegations against Annucci and Effman suffice to state a claim that they were personally involved in the creation and maintenance of unconstitutional policies, that they acted with the requisite *mens rea*, and that these policies or customs proximately caused the plaintiffs' injuries.

First, as in *Pusepa*, the Court concludes that Plaintiffs have "plausibly alleged that [Annucci and Effman] bore the responsibility for creating or allowing the continuance of policies and customs that allowed sexual violence at [DOCCS facilities] to occur." *Pusepa*, 2019 WL 690678, at *5. As the Complaint alleges, Annucci as acting commissioner was at all relevant times responsible for enacting policies governing inmate safety and ensuring that such policies are enforced, and Effman had specific statutory duties under the PREA to "develop, implement, and oversee agency efforts to comply with PREA standards in all its facilities." *See* SAC ¶¶ 467-469. Annucci and Effman also had responsibility for the DOCCS unit charged with investigating allegations of sexual abuse. *Id.* ¶ 50. These facts suffice to allege that Annucci and Effman "had the authority to create or allow the continuance of [DOCCS] policies that led to sexual violence or allowed it to continue." *Pusepa*, 2019 WL 690678, at *5.

Second, the Complaint sufficiently pleads, as required by *Tangreti*, that Annucci and Effman knew of and disregarded a serious risk of sexual abuse in Albion, Lakeview, Bedford Hills, and Taconic, in that the complaint "include[s] allegations of the facts or events [Plaintiffs] claim give rise to an inference of knowledge." *Kaplan*, 999 F.3d at 864. Here, those "facts or events" include: (1) statistical reports on prison rape, including DOCCS reports of which Annucci and Effman were likely aware, SAC ¶¶ 481-485, 491-493; (2) the steps taken by several states and local correctional institutions to require the presence of female staff to guard women prisoners, and to remove men from guarding women prisoners in housing areas, *id.* ¶ 490; (3) the fact that Annucci and Effman are named defendants in multiple suits in which imprisoned women have brought claims of being sexually abused by staff in DOCCS facilities, *id.* ¶ 494; and (4) the fact that staff sexual misconduct at DOCCS facilities has resulted in numerous prosecutions and convictions of correction officers, *id.* ¶ 495-496. The Court thus concludes, as it did in *Pusepa*, that "it is plausible that this evidence of sexual abuse ... would have put the Supervisory Defendants on notice that existing policies ... were deficient." 2019 WL 690678, at *7.

One caveat is worth emphasizing: going forward past the pleadings stage, merely showing that defendants were on notice of previous instances of sexual abuse will not necessarily be enough to establish their liability. *Cf. Brown v. Dep't of Corr.*, No. 3:16-CV-00376 (WIG), 2021 WL 124417, at *17 (D. Conn. Jan. 13, 2021) (granting summary judgment to defendants where the record evidence did "not support the inference that Defendants ... had the required subjective knowledge that Plaintiff was at a substantial risk of serious harm."). As *Tangreti* makes clear, a prison official charged with deliberate indifference must both (1) be aware of facts from which the inference could be drawn that there was a substantial risk of serious harm to inmates; and (2) actually draw that inference. *Tangreti*, 983 F.3d at 619. At summary judgment, Plaintiffs will no longer benefit from Rule 9(b)'s recognition that knowledge and intent can be alleged generally. But for now, the allegations, viewed in the light most favorable to Plaintiffs, give rise to a reasonable inference that Annucci and Effman subjectively knew of a serious risk of sexual abuse of female inmates by staff in DOCCS facilities that was not being adequately addressed by the existing policies or the way they were being enforced.

 **\*11**  Finally, the Court finds that Plaintiffs have adequately described a series of policies, customs, or enforcement practices within Annucci and Effman's areas of responsibility that are linked to the sexual abuse allegedly suffered by Plaintiffs. For example, the allegation that male staff were permitted regular, unmonitored one-on-one access to female inmates is plausibly alleged to have proximately caused the sexual abuse of Jane Stone #1 at the hands of CO Castonguay, Jane Stone #2 at the hands of CO Stupnick, Jane Stone #3 at the hands of CO Norde, Jane Stone #4 at the hands of CO Beam, Jane Stone #5 at the hands of CO Smalls, and Jane Stone #6 at the hands of COs Smith, Middlebrooks, and Castonguay. *See* SAC ¶¶ 509-515. Another policy or practice, the lack of unpredictable and unannounced supervisor rounds, is plausibly alleged to have allowed correction officers to engage in illegal sexual activity without fear of getting caught. *See id.* ¶¶ 516-534; *id.* ¶ 244 ("During CO Stupnick's

Stone #1 v. Annucci, Not Reported in Fed. Supp. (2021)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 66 of 102

shift, correction officers on other units would routinely radio ahead to warn other correction officers when supervisory rounds were about to occur."); *id.* ¶ 61 ("CO Smith was not afraid that he would get caught [abusing Jane Stone #6] because he would get a phone call from the other units warning him that a supervisor was about to make rounds."). Similarly, the inadequate placement and monitoring of cameras is plausibly alleged to have allowed the correction officer defendants to engage in sexual abuse without fear of being discovered. *See id.* ¶¶ 535-548; *id.* ¶ 330 (the camera outside the staff bathroom at Taconic, where Jane Stone #3 was raped, was not monitored). The policy or custom of allowing correction officers to swap assignments with each other informally is plausibly alleged to have allowed officers to seek out particular inmates for abuse. *See id.* ¶¶ 549-554; *id.* ¶ 257 (CO Stupnick regularly swapped his bids in order to work in proximity to Jane Stone #2); *id.* ¶ 306 (CO Norde regularly swapped bids to spend more time with Jane Stone #3). Moreover, failing to require more rigorous screening of what officers brought into the facilities is plausibly alleged to have allowed them to coerce Plaintiffs into engaging in sexual activity by providing them with contraband. *See id.* ¶¶ 598-602; *id.* ¶ 379 (CO Beam brought Jane Stone #4 shampoo). "Although any one of these examples alone may be insufficient to state a cause of action, together they plausibly connect the Supervisory Defendants' policies to a reasonably foreseeable consequence": the sexual abuse of the plaintiffs. *Pusepa*, 2019 WL 690678, at *8.

For these reasons, the Court concludes that Plaintiffs have succeeded in stating a claim that Annucci and Effman were personally involved in the constitutional deprivations they suffered by enacting or failing to enact policies and practices that resulted in a violation of their rights. Although Plaintiffs will face a greater evidentiary burden as this case proceeds to establish that Annucci and Effman acted with the requisite deliberate indifference, the allegations are at this stage sufficient. Defendants also seek to establish that Annucci and Effman are qualifiedly immune. But as discussed above, Plaintiffs have pled facts that could conceivably establish their liability, and it has long been clearly established that a prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Constitution. *See Farmer*, 511 U.S. at 828. As in *Pusepa*, which acknowledged that qualified immunity is typically a fact-specific defense addressed at summary judgment, the Court finds that "[w]hether Defendants in fact acted in conformity with their constitutional obligations cannot be decided on the basis of the pleadings." *Pusepa*, 2019 WL 690678, at *17. Annucci and Effman are accordingly not entitled to qualified immunity at this time.

## II. Claims Against Superintendent Kaplan

The Supervisory Defendants also move to dismiss Jane Stone #5's claims against Sabina Kaplan, the superintendent of Bedford Hills, as untimely. The Complaint alleges that Jane Stone #5 was sexually assaulted by CO Smalls at Bedford Hills in 2014 and 2015, and that she remained in prison until the summer of 2016, but the action was not filed until February 2020. Defendants accordingly argue that, whether Jane Stone #5's claims accrued from the time of the sexual abuse or upon her release from prison, they were not brought within the applicable three-year limitations period. *See Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) ("Section 1983 actions filed in New York are ... subject to a three-year statute of limitations."). Plaintiffs appear to agree that the statute of limitations has lapsed, but argue that "extraordinary circumstances" justify the equitable tolling of the statute of limitations. *See* Pl. Mem. at 2 (quoting *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005)). The Court agrees with Defendants that Jane Stone #5's claims must be dismissed as untimely.

Courts in this Circuit apply the doctrine of equitable tolling "only in 'rare and exceptional circumstances,' where ... 'extraordinary circumstances' prevented a party from timely performing a required act, and [where] the party acted with reasonable diligence throughout the period he [sought] to toll." *Jastremski*, 430 F.3d at 564 (quoting *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004)). "The term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011). Here, the basis advanced by Plaintiffs for equitable tolling is that Jane Stone #5 was prevented from coming forward sooner. At the time she experienced the alleged abuse, she was an inmate in the custody of Bedford Hills, where Defendant Kaplan was the superintendent. Plaintiffs point to the Complaint's allegations that Jane Stone #5 did not feel safe reporting her sexual abuse, that she worried about retaliation, and that she specifically feared that if she complained while still in prison she could be subject to retaliation that could have delayed her release date. Pl. Mem. at 3 (citing SAC ¶¶ 444, 498). She further alleges that when she was made to testify before a grand jury about CO Smalls's conduct, she faced bullying from both inmates and correction officers at Taconic. *See* SAC ¶¶ 451–453.

**\*12** In *Davis v. Jackson*, a 2016 case involving an inmate who argued that his fear of retaliation prevented him from timely filing his claims, Judge Karas explained that in many scenarios, such as the employment discrimination context, "fear of retaliation is not a valid ground for equitable tolling." *Davis v. Jackson*, No. 15-CV-5359 (KMK), 2016 WL 5720811, at *9 (S.D.N.Y. Sept. 30, 2016) (collecting Title VII and ADA cases). Judge Karas persuasively concluded, however, that a different result is warranted in the prison context. Because of "the substantial control that correction officers exert over inmates[,] ... inmates may show extraordinary circumstances for purposes of equitable tolling where they allege specific facts showing that a reasonable fear of retaliation prevented them from filing a timely complaint." *Davis*, 2016 WL 5720811, at *11.

The Court accepts as true the allegations that Jane Stone #5 had legitimate and specific reasons to fear coming forward with her claims of sexual abuse while she was incarcerated. *See id.* (internal citations and quotation marks omitted) (because "a correctional officer controls an inmate's life inside of prison, ... the specter of retaliation [is] a real and ever-present force in an inmate's life"). The problem with Plaintiffs' argument, however, is that Jane Stone #5 was released from prison in 2016, SAC ¶ 460, when her claim would still have been timely. At that point, she was no longer under the "substantial control" of the defendant correction officers and supervisory officials, and accordingly no longer subject to the "unique psychological environment" of incarceration that supported Judge Karas's conclusions in *Davis*. *See* 2016 WL 5720811, at *10. The Court does not doubt that the trauma of sexual abuse, particularly by one's jailers, can and often does persist for many years. *Cf.* SAC ¶ 235 (describing Jane Stone #1's ongoing depression and PTSD). But under existing law, a plaintiff's experience of trauma, even significant trauma, cannot on its own legally justify the potentially indefinite tolling of a statute of limitations. To the extent Jane Stone #5's fear of retaliation in prison equitably tolled the statute of limitations while she was incarcerated, she would nonetheless "bear[ ] the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling ... claim have ceased to be operational." *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) (internal quotation marks omitted).

Even if fear of retaliation could be the basis for equitable tolling *after* an inmate's release, Plaintiffs do not allege facts establishing that Jane Stone #5 continued to have a specific and credible basis to fear retaliation once she was released from prison in the summer of 2016. *See Pratt v. Stop & Shop Supermarket Co., LLC*, No. 09-5417 (JFB), 2011 WL 579152, at *5 (E.D.N.Y. Feb. 9, 2011) ("Assuming arguendo that equitable tolling can be based on a reasonable fear of retaliation, plaintiffs generalized allegations of fear are insufficient to warrant equitable tolling.") (citing *Olson v. Fed. Mine Safety & Health Review Comm'n*, 381 F.3d 1007, 1014-15 (10th Cir. 2004)). Plaintiffs' opposition memorandum argues that Jane Stone #5 was, at the time of the filing of this action, "still on parole and ... afraid that officials [would] fabricate a way to violate her so that she returns to prison." Pl. Mem. at 4 (citing SAC ¶¶ 464-466). But the cited paragraphs of the Complaint do not provide the required support for that assertion; instead they note that Jane Stone #5's supervised release status "could [have been] revoked, and she could [have been] returned to DOCCS custody," SAC ¶ 465, as well as that she feared that "*if* she were returned to DOCCS custody, she would face retaliation," *id.* ¶ 466 (emphasis added). The mere possibility of being found to have violated supervised release and being returned to prison does not, in the Court's view, amount to an extraordinary circumstance justifying equitable tolling. The Complaint also does not provide factual support for Plaintiffs' assertion in their opposition memorandum that Jane Stone #5 had reason to believe that, had she raised her Section 1983 claims in a timely fashion, state actors would have fabricated a way to find her in violation of supervised release and brought her back into DOCCS custody where she would be subject to further retaliation. The Court accordingly agrees with Defendants that Jane Stone #5 was not "prevented ... from timely performing a required act," *Jastremski*, 430 F.3d at 564, and therefore that she cannot rely on equitable tolling to salvage her untimely claim. The claims against Defendant Kaplan are accordingly dismissed. For the same reasons, the Court *sua sponte* dismisses as untimely Jane Stone #5's claims against Annucci and Effman as well as the other officers alleged to have been directly responsible for or deliberately indifferent to her 2014 and 2015 sexual abuse: Defendant CO Smalls, Defendant CO Guzman, Defendant CO Paige, and Defendant CO Deosarran.

## III. Venue

**\*13** The Supervisory Defendants further argue that the claims against Superintendents Squires (Albion) and Kubik (Lakeview) are not properly venued in the Southern District of New York ("SDNY"), since the claims did not arise in substantial part in

Stone #1 v. Annucci, Not Reported in Fed. Supp. (2021)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 68 of 102

this District and are based on events taking place in the Western District of New York ("WDNY"). Defendants argue that the claims should be dismissed pursuant to Rule 12(b)(3) for improper venue, or in the alternative that they should be severed and transferred to the WDNY.

The Court agrees with the Supervisory Defendants that venue is not proper in this District for the claims against Defendants Squires and Kubik. Pursuant to 28 U.S.C. § 1391(b), a civil action may be brought in:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). Where a plaintiff asserts multiple claims, "venue must be proper as to each of the claims asserted, but a common factual basis between a claim where venue is proper and one where venue is improper may defeat dismissal of a claim for improper venue." *Cartier v. Micha, Inc.*, No. 06-CV-4699, 2007 WL 1187188, at *2 (S.D.N.Y. Apr. 20, 2007) (citing *E.P.A. ex rel. McKeown v. Port Auth. of N.Y. & N.J.*, 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001)). When the claims involve multiple different parties, however, "venue must be proper ... as to each party," and "[t]he fact that a claim for some of the plaintiffs or against some of the defendants arose in a particular district does not make that district a proper venue for parties as to whom the claim arose somewhere else." Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3807 (4th ed.). *See also Walker v. U.S. Dep't of Com.*, No. 1:11-CV-01195 (AWI), 2012 WL 1424495, at *1 (E.D. Cal. Apr. 24, 2012) ("When there are multiple parties and/or multiple claims in an action, the plaintiff must establish that venue is proper as to each defendant and as to each claim.").

Here, only Plaintiffs Jane Stone #1, Jane Stone #2, and Jane Stone #6 assert claims against Squires, the superintendent while they were incarcerated at Albion. *See* SAC ¶¶ 735-744. Only Plaintiff Jane Stone #4 asserts claims against Kubik, the superintendent while she was incarcerated at Lakeview. *See id.* ¶¶ 755-760. Both Albion and Lakeview are located in the WDNY. Thus for none of these claims did "a substantial part of the events or omissions giving rise to the claim occur[ ]" in the SDNY. *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005); SAC ¶¶ 15-21.[3] Moreover, neither the plaintiffs bringing these claims nor the defendants reside in the SDNY. *See* Def. Mem. at 15 (noting that Jane Stone #1 resides in the NDNY, Jane Stone #2 resides in the WDNY, Jane Stone #4 resides in the EDNY, and Jane Stone #6 resides in the WDNY; Kubik and Squires both work and reside in the WDNY.) For these reasons, the claims of Jane Stone #1, Jane Stone #2, and Jane Stone #6 against Squires, and the claims of Jane Stone #4 against Kubik, are not properly venued in this District.

[3]    Although Jane Stone #4, who was allegedly sexually abused by CO Beam at Lakeview (in the WDNY), was later transferred to Taconic (in the SDNY), and although CO Beam continued to send letters to Jane Stone #4 at Taconic, there is no allegation in the Complaint that Kubik had any reason to know of such contact. In any event, the mere fact that an officer from Lakeview sent letters to Jane Stone #4 at Taconic is insufficient to establish that "a *substantial* part of [the] acts or omissions" giving rise to Jane Stone #4's claims against Kubik occurred at Taconic in the SDNY. *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005) (emphasis added). *See also Blakely v. Lew*, 607 F. App'x 15, 17 (2d Cir. 2015) (quoting *Gulf Ins. Co.*, 417 F.3d at 357) ("In performing [venue] analysis, courts must take seriously the adjective substantial" and 'construe the venue statute strictly.' ")

**\*14** In resisting this conclusion, Plaintiffs appear to conflate two distinct questions, namely (1) whether venue for these claims is proper and (2) whether the parties and claims were properly joined pursuant to the Federal Rules of Civil Procedure. In arguing against dismissal of the claims against Squires and Kubik, Plaintiffs never actually defend the propriety of venue for those claims, instead arguing that the claims were properly *joined*. *See* Pl. Mem. at 6-7. Plaintiffs point to Fed. R. Civ. P. 20(a) (2)'s statement that multiple defendants may be joined in a single action if "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions

Stone #1 v. Annucci, Not Reported in Fed. Supp. (2021)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 69 of 102

or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a) (2). Plaintiffs maintain that because the claims brought by all plaintiffs against Annucci and Effman are indisputably properly venued in the SDNY, and because those claims share common questions of fact and law with the claims against Squires and Kubik, the claims against Squires and Kubik are "properly joined in this action." Pl. Mem. at 6-7. But even assuming that all parties were properly joined in this action pursuant to the Federal Rules of Civil Procedure, and recognizing that there are common questions of law and fact to the claims against all the Supervisory Defendants, that does not mean that venue was proper as to each party. *See* Fed. R. Civ. P. 82 (the Federal Rules of Civil Procedure "do not extend or limit the jurisdiction of the district courts or the venue of actions in those courts."); *Locke Mfg. Co. v. Sabel*, 244 F. Supp. 829, 830–31 (W.D. Ky. 1965) ("Rule 82 ... means that where due to a failure of venue an action could not by itself have been brought in a particular federal court, neither can it be brought by reason of joinder with another claim."). Plaintiffs have accordingly failed to establish that the claims against Kubik and Squires can properly be maintained in this District.

Pursuant to 28 U.S.C. § 1406(a), when an action has not been brought in an appropriate venue, a district court may either dismiss the claim "or if it be in the interest of justice, transfer [it] to any district or division in which it could have been brought." *Gonzalez v. Hasty*, 651 F.3d 318, 324 (2d Cir. 2011). "The district court's decision whether to dismiss or transfer a case 'lies within the sound discretion of the district court.' " *Blakely v. Lew*, 607 F. App'x 15, 18 (2d Cir. 2015) (quoting *Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir.1993)). "A 'compelling reason' for transfer is generally acknowledged when a plaintiff's case, if dismissed, would be time-barred on refiling in the proper forum." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 435 (2d Cir. 2005) (quoting *Phillips v. Seiter*, 173 F.3d 609, 610 (7th Cir. 1999)). In this case, the Court opts to transfer the claims against Squires and Kubik to WDNY rather than dismiss them. The Court has no reason to conclude that the claims are a "sure loser," *Moreno–Bravo v. Gonzales*, 463 F.3d 253, 263 (2d Cir.2006), and further finds that Plaintiffs could be prejudiced by dismissal instead of transfer. For example, Jane Stone #4's alleged abuse at the hands of CO Beam occurred in 2017, which means that her claims arguably would be time-barred upon refiling in the WDNY. *See* SAC ¶¶ 337-392. Accordingly, as detailed in the following paragraph, the claims against Squires and Kubik are to be severed pursuant to Fed. R. Civ. P. 21 and transferred pursuant to 28 U.S.C. § 1406(a).

Furthermore, in the interests of justice and judicial economy, the Court is inclined to sever and transfer to the WDNY not merely the claims against Squires and Kubik but all the claims of Plaintiffs Jane Stone #1, Jane Stone #2, Jane Stone #4, and Jane Stone #6. *See Delgado v. Villanueva*, No. 12 CIV. 3113 (JMF), 2013 WL 3009649, at *3 (S.D.N.Y. June 18, 2013) (cleaned up) ("A court may transfer a case *sua sponte* where such transfer would be for the convenience of parties and witnesses, and in the interest of justice, so long as the case is transferred to another district or division where it might have been brought."). Those additional claims would include the claims of Jane Stone #1, Jane Stone #2, Jane Stone #4, and Jane Stone #6 against the correction officers at Albion and Lakeview, DOCCS investigators Hanzlian and Castro, and Commissioners Annucci and Effman. Were the Court to sever and transfer those claims alongside the claims against Squires and Kubik, the only claims remaining in the SDNY action would be the claims asserted by Jane Stone #3 (the Court having dismissed as untimely the claims asserted by Jane Stone #5). "[O]rdinarily," however, " 'a court may *sua sponte* transfer an action under 28 U.S.C. § 1404(a)' only after giving both parties notice and an opportunity to be heard." *Id.* at *4, n.3 (quoting *Bona v. Barasch*, No. 01 Civ. 2289 (MBM), 2003 WL 1395932, at *36 (S.D.N.Y. Mar. 20, 2003)). Accordingly, within thirty days of the date of this order, the parties are directed to confer and notify the Court whether they consent to the transfer of all of the claims of Jane Stone #1, Jane Stone #2, Jane Stone #4, and Jane Stone #6 to the WDNY, and if not, to explain why doing so would not serve the interests of justice and judicial economy (keeping in mind that the claims against Kubik and Spires will be transferred). Until the parties make such submission, the Court will refrain from directing the Clerk of Court to transfer out the claims against Kubik and Squires such that, in the event that the parties agree or that the Court opts to transfer other claims, it can effectuate such transfer in a single order.

## CONCLUSION

Stone #1 v. Annucci, Not Reported in Fed. Supp. (2021)

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 70 of 102

**\*15**  For the foregoing reasons, the Supervisory Defendants' motion is denied in part and granted in part, as follows: (1) the motion to dismiss all Plaintiffs' claims against Defendants Annucci and Effman is denied; (2) the motion to dismiss as untimely Jane Stone #5's claims against Defendant Kaplan is granted, and the Court further *sua sponte* dismisses Jane Stone #5's other claims; and (3) Defendants' motion to sever and transfer to the WDNY the claims against Squires and Kubik is granted. As noted above, before effectuating such severance and transfer, the Court will give the parties an opportunity to be heard on whether the other claims of Plaintiffs Jane Stone #1, Jane Stone #2, Jane Stone #4, and Jane Stone #6 should similarly be severed and transferred to the WDNY, and such submissions are due within thirty days of the date of this order. The Supervisory Defendants' deadline to answer the complaint is stayed pending resolution of which claims will be transferred and which claims will remain part of the SDNY action.

The Clerk of Court is respectfully directed to (1) terminate Defendants Kaplan, Smalls, Guzman, Paige, and Deosarran; and (2) close the motion pending at Dkt. 74.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4463033

---

**Footnotes**

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.    15

2025 WL 1707174
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Geoffrey BOWSER, individually and on behalf of all others similarly situated, Plaintiff,
v.
The CITY OF NEW YORK, Dermot F. Shea, in his individual capacity, Keechant Sewell,
in her individual capacity, and Edward A. Caban, in his individual capacity, Defendants.

23 Civ. 6183 (DG) (VMS)
|
Signed February 25, 2025

**Attorneys and Law Firms**

Janet Walsh, Pfister Energy, Inc., Hawthorne, NJ, Anthony P. Mastroianni, Locks Law Firm PLLC, New York, NY, Jeffrey A. Klafter, Jessica Rado, Seth R. Lesser, Klafter Lesser LLP, Rye Brook, NY, for Plaintiff.

Samantha Michelle Schonfeld, James Faust Cullen, Taylor Anvid, New York City Law Department, New York, NY, Mary O'Flynn, Corporation Counsel of the City of New York, New York, NY, for Defendants.

**REPORT AND RECOMMENDATION**

Vera M. Scanlon, United States Magistrate Judge:

**\*1** Before the Court is a motion filed by Defendants The City of New York (the "City"), Dermot F. Shea ("Mr. Shea") in his individual capacity, Keechant Sewell ("Ms. Sewell") in her individual capacity, and Edward A. Caban ("Mr. Caban") in his individual capacity (Mr. Shea, Ms. Sewell and Mr. Caban, collectively, the "Commissioners" and, with the City, "Defendants") to dismiss the amended complaint filed by Geoffrey Bowser ("Plaintiff"), individually and on behalf of all others similarly situated. For the reasons discussed below, the Court respectfully recommends that the motion be granted in part and denied in part.

## I. FACTUAL BACKGROUND [1] [2]

[1]     The facts recited herein are drawn directly from the amended complaint and are assumed to be true for purposes of this motion. Plaintiff states that, "except for the facts specifically alleged regarding Plaintiff," the allegations are made on information and belief. ECF No. 22 ¶ 1.

The Court has not included in its factual recitation Plaintiff's allegations that amount to legal conclusions.

The Court has also not included in its factual recitation any hypothetical situations raised by Plaintiff. See, e.g., ECF No. 22 ¶ 19 (referring to a hypothetical vehicle owner whose vehicle is "booted" on West 58th Street, who must then travel to the tow pound in Brooklyn, wait on long lines, and pay the boot fee within two hours to resolve the violation and avoid towing).

The Court has not included Plaintiff's allegations related to the first claim in the amended complaint asserted pursuant to New York City Administrative Code § 19-169.2(h), as Plaintiff has abandoned that claim. See ECF No. 34 at 9 n.2 (stating that, "[u]pon consideration of the authorities set forth in Defendants' memorandum, Plaintiff does not challenge their motion to dismiss his First Cause of Action for violation of New York Administrative Code § 19-169.2(h)"). As such, the Court respectfully recommends dismissal thereof.

2    Defendants include a section entitled "Applicable Law and Rules," which cites to a City website and a sample parking ticket, as opposed to applicable law, in their memorandum of law accompanying their moving papers. See ECF No. 33 at 11-12. Information from and citations to this extrinsic material are peppered elsewhere throughout Defendants' memorandum of law. Defendants have not provided the Court with a legal basis to support consideration of this extrinsic material at this juncture, and, as such, the Court has not considered this extrinsic material in issuing this report and recommendation. Defendants' subsequent citations to legal provisions relating to appeals of hearing determinations, see id. at 14, are not cited as they are not relevant, as at issue is an initial hearing, rather than the process to appeal any adverse decision reached at such hearing.

Each day, "hundreds of cars are towed in New York City" by the City's Marshals because of unpaid parking tickets or by the NYPD for parking violations. ECF No. 22 ¶ 11.

As to the process used by the City's Marshals in relation to unpaid parking tickets, the boots "contain a keyboard that accepts a code to unlock the boot," with the necessary code being provided for immediate release of the boots after the "vehicle owners ... pay the outstanding parking tickets and the boot fee online or via phone." Id. ¶ 22. The City's Marshals allow forty-eight hours from the time of booting to engage in this boot-release process prior to towing and to provide "a meaningful opportunity to obtain a pre-deprivation hearing." Id. ¶¶ 22, 49.

 **\*2**  As to the process used by the NYPD in relation to parking violations, on which Plaintiff's claims are based, the process is one in "which the NYPD boots motor vehicles and then by written policy[,] ... within two hours, causes them to be towed to a tow pound ([ ] in the Bronx, in Brooklyn, or in Queens, depending on the location of the motor vehicle at the time the boot is placed." Id. ¶¶ 3, 15. The process "afforded by the NYPD for avoiding a tow and tow fee was designed to collect both a boot fee and a tow fee," as well as "potentially related expenses such as storage," in a "substantial number of, if not virtually all, booting situations." Id. ¶¶ 19, 24.

As to Plaintiff's personal experience, on April 3, 2023, at approximately 7:16 AM, NYPD Officer D. Thomas issued a Notice of Parking Violation (the "Ticket")[3][4] for Plaintiff's vehicle (the "Vehicle"), which was "parked opposite 395 Cumberland St., Brooklyn, New York."[5] Id. ¶ 12. The Ticket "only referred to the underlying traffic violation and did not provide specific notice of the right to a hearing at which booting or tow fees could be challenged." Id. ¶ 13.

3    Defendants include a copy of the Ticket with their moving papers, see generally ECF No. 32-1, which the Court may consider, as the Ticket is integral to the amended complaint and is referenced and relied upon therein. See Lively v. WAFRA Invest. Advisory Grp., 6 F.4th 293, 305 (2d Cir. 2021) (reciting the general rule that "courts may on a Rule 12(c) motion – just as on a Rule 12(b)(6) motion – consider extrinsic material that the complaint incorporate[s] by reference, that is integral to the complaint, or of which courts can take judicial notice" (citation & quotations omitted)).

4    The Ticket, entitled "Notice of Parking Violation," provides information about the Vehicle, cites the violation of "NYC Traffic Rules, Section: 4-08(d)," notes the place of the violation, lists the date and time of the violation, provides for a fine of $60.00, contains the name of the officer issuing the Ticket and the signature of the officer who issued the Ticket indicating that he observed the violation and properly served the Ticket, states that the recipient of the Ticket must answer it within thirty days, provides instructions for pleading guilty to the violation and paying the Ticket or pleading not guilty to the violation and requesting a hearing, and warns the recipient of the consequences of failure to respond to the Ticket, namely that failure to respond will be deemed an admission of liability, that penalties and interest will be added to the Ticket amount, that a default judgment may be entered, and that booting or towing may occur.

5    Defendants' memorandum of law and reply state in various places, either without citation, with citation generally to the entirety of the amended complaint, or with citation to inapplicable portions of the amended complaint, that "Plaintiff does not dispute that he violated the City's parking laws." ECF No. 33 at 9, 12, 17; ECF No. 35 at 5 n.1. The Court's

review of the amended complaint has not revealed any concession by Plaintiff that he violated one or more parking laws or that he paid the Ticket.

On April 3, 2023, at approximately 7:18 AM, a Warning (the "Warning") was placed on the windshield of the Vehicle, informing Plaintiff (1) that "[t]his vehicle violate[d] the NYC Traffic Rules & Regulations section 4-08," (2) that "[t]he resulting obstruction of traffic cause[d] unnecessary delays," (3) that "this vehicle [was] ... immobilized" pursuant to the same provision, (4) that "[a]ny attempt to move this vehicle may result in damage to the vehicle." Id. ¶¶ 12-13. The Warning instructed Plaintiff to pay $185.00 "at the Brooklyn Tow Pound within TWO (2) HOURS of the boot time listed above" at the address listed above and warned that, if Plaintiff did not do so, his "vehicle w[ould] be towed for an additional fee of $185.00." [6] Id. ¶ 12.

> [6]    The Court notes that the Warning provided by Plaintiff in the amended complaint appears to be incomplete, as the portion of the Warning contained therein does not list the boot time or the address for the tow pound. See ECF No. 22 ¶ 12.

**\*3**  Prior to having the opportunity to retrieve the Vehicle or review the Ticket, on April 3, 2023, at approximately 9:55 AM, the Vehicle was towed. Id. ¶ 14. Plaintiff paid $499.80, consisting of a $185.00 boot fee, a $185.00 tow fee, and the remainder for storage fees, for which he was provided a receipt, at the tow pound. See id. ¶¶ 13, 25-26. [7]  Plaintiff did not see the Warning because it had been "taken away with the towed" Vehicle. Id. ¶ 15. Plaintiff was not provided with "notice of an ability to challenge the boot or tow fines at a hearing before or after paying the outstanding fees." Id. ¶ 26.

> [7]    The Court is uncertain as to how the addition of $185.00 each for booting and towing, pursuant to 34 NYCRR § 4-08(9)(iii) and 34 NYCRR § 4-08(9)(vi)(A), respectively, and $20.00 daily increments for storage fees, pursuant to 34 NYCRR § 4-08(9)(vii), can be added to achieve the sum of $499.80. Neither side explained the arithmetic of Plaintiff's situation.

The conduct of the NYPD was "adopted and/or maintained" by the Commissioners "and/or by other agents of the NYPD and/or the City of New York on behalf of New York City" and was "a conscious and calculated choice" that is "routinely carried out by NYPD officers or other agents of the NYPD and/or the City" and "permitted" by the City. Id. ¶¶ 2, 15, 21, 31.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a party to assert the defense of failure to state a claim upon which relief can be granted by motion. Courts addressing motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) must "accept[ ] all factual allegations as true and draw[ ] all reasonable inferences in favor of the" plaintiff. New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo, 122 F.4th 28, 39 (2d Cir. 2023) (citation omitted), reh'g denied, No. 20-1643, 2025 WL 47744 (2d Cir. Jan. 7, 2025). A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Sierra Club v. Con-Strux, LLC, 911 F.3d 85, 88 (2d Cir. 2018) (citation & quotations omitted).

## III. DISCUSSION

The Court first discusses Plaintiff's federal claims then discusses Plaintiff's state claims.

### A. Plaintiff's Federal Claims

The Court first discusses Defendants' contention that the federal claims against the Commissioners should be dismissed for failure to sufficiently allege personal liability then discusses the substance of each of the federal claims.

#### 1. Personal Liability Of The Commissioners [8]

> [8]    The Court notes that, "[i]n an official capacity suit, the real party in interest is the governmental entity and not the named official," whereas, "[b]y contrast, individual capacity suits seek to impose individual liability upon a government officer

for [her] actions under color of [ ] law." <u>Tanvir v. Tanzin</u>, 894 F.3d 449, 458-59 (2d Cir. 2018) (citations & quotations omitted), <u>aff'd</u>, 592 U.S. 43 (2020). Claims "against officers in their official capacity ... are directed at the office itself" and "generally seek injunctive relief," whereas claims "against public officers [in their individual capacities] that seek damages are directed at the particular officer whose allegedly unlawful actions are claimed to have caused damage to plaintiffs." <u>Id.</u> at 459 n.7 (citation omitted).

Here, Plaintiff named the Commissioners only in their individual capacities, and not in their official capacities, such that he may only seek relief in the form of damages, as opposed to injunctive relief, from the Commissioners. Accordingly, to the extent that Plaintiff seeks injunctive relief from the Commissioners, the Court respectfully recommends the denial of such request.

**\*4**  As a preliminary matter, Defendants seek to dismiss Plaintiff's federal claims, brought pursuant to 42 U.S.C. § 1983, against the Commissioners because, in their view, "the [a]mended [c]omplaint is completely devoid of any specific allegations of wrongdoing by any of the individually-named defendants." ECF No. 33 at 31. Plaintiff opposes this request. <u>See</u> ECF No. 34 at 28.

Plaintiff's allegations as to the Commissioners are as follows: (1) that "[t]his is a putative class action arising out of the illegal conduct on the part of the NYPD, adopted and/or maintained by each successive NYPD Commissioner Defendant, and permitted by the City of New York," ECF No. 22 ¶ 2; (2) that "[t]he NYPD Commissioner Defendants ... were the NYPD Commissioners during the time periods relevant herein, and each was, during their tenure in office as Commissioner, responsible for the booting and towing policies and/or customs of the NYPD at issue here," having "policy-making authority, including, as relevant herein, establishing and/or maintaining the boot-and-tow policy at issue"; (3) that "[t]he Warning placed on Plaintiff's windshield by the NYPC, which was taken away with the towed car, was pursuant to a written NYPD policy in effect at all times relevant hereto adopted and/or maintained by the relevant NYPD Commissioner Defendants, and/or by other agents of the NYPD and/or the City of New York on behalf of New York City," <u>id.</u> ¶ 15; (4) that the "NYPD's policy is a conscious and calculated choice by the NYPD, the City of New York and/or the NYPD Commissioner Defendants, and/or by other agents of the NYPD and/or the City of New York, who, during all relevant time periods hereto, have ignored possible lawful alternatives to enforce New York City's parking regulations without trampling on the Constitutional rights of motor vehicle owners," <u>id.</u> ¶ 21; (5) that "the NYPD Commissioner Defendants, or other agents of the NYPD have adopted and/or maintained a policy which violates two provisions of the New York City Administrative Code, in order to ensure that for each act of booting they will receive both the boot fee and the towing fee and potentially related expenses such as storage," <u>id.</u> ¶ 24; (6) that "[t]he boot-and-tow policy utilized by the NYPD is an official, written policy of the NYPC, authorized or maintained by the NYPD Commissioner Defendants as an agent of New York City, and/or by other agents of the NYPD and/or the City, and routinely carried out by NYPD officers or other agents of the NYPD and/or the City, in the deliberate indifference of the Defendants," <u>id.</u> ¶ 31; and (7) that "the NYPD Commissioner Defendants on behalf of the City of New York and/or by other agents of the NYPD and/or the City of New York" had "adopted and maintained" the "policy, practice, and custom [of the NYPD] of seizing vehicles[, without warrants,] without judicial process in connection with issuing notices of parking violation," <u>id.</u> ¶¶ 50, 55.

The imposition of individual supervisory liability pursuant to 42 U.S.C. § 1983 requires that each such individual violated the Constitution though his or her own actions. <u>See</u> <u>Tangreti v. Bachmann</u>, 983 F.3d 609, 615-16, 618 (2d Cir. 2020) (deciding the "question[ ] of law" of whether, "following the Supreme Court's decision in <u>Iqbal</u>, the level of personal involvement necessary to establish that a prison supervisory official violated the Eight Amendment through deliberate indifference is not clearly established"; noting that "[t]his court articulated standards for supervisory liability in <u>Colon v. Coughlin</u>, 58 F.3d 865 (2d Cir. 1995), but the Supreme Court's decision in <u>Iqbal</u> called those standards into question and this court has not clarified whether or to what extent the <u>Colon</u> standards continue to apply"; interpreting <u>Iqbal</u> as "hold[ing] that a plaintiff may not rely on a special test for supervisory liability" and, instead, "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," with "[t]he factors necessary to establish a [§ 1983 violation] [to] ... vary with the constitutional provision at issue because the elements of different constitutional violations vary" (citations & quotations omitted)).

**\*5** Plaintiff's repeated use of "and/or" connectors and combining the allegations as to the Commissioners, among others, together, instead of making specific allegations against Mr. Shea, Ms. Sewell and Mr. Caban, runs afoul of Federal Rule of Civil Procedure 8(a). See Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001) (holding that "the district court did not abuse its discretion in dismissing the complaint because, "[a]lthough Fed.[ ]R.[ ]Civ.[ ]P. 8 does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests" such that "lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct ... failed to satisfy this minimum standard" (citations & quotations omitted)); Gigetts v. Cnty. of Suffolk, No. 2:19 Civ. 4885 (DRH) (ST), 2022 WL 1046311, at \*3 (E.D.N.Y. Apr. 7, 2022) (reasoning that "[a] complaint that lumps all the defendants together by means of a sweepingly general allegation of wrongdoing does not plausibly allege a claim for relief against any one defendant and denies each individual defendant fair notice of what the plaintiff alleges that the individual defendant did wrong" (citation & quotations omitted)). As such, this Court respectfully recommends that Plaintiff's federal claims against the Commissioners, which are the only claims that are the subject of this portion of this motion pertaining to the Commissioners, should be dismissed without prejudice, allowing Plaintiff the opportunity to replead these claims with sufficient clarity.

## 2. Substance Of The Federal Claims

The Court discusses each of Plaintiff's claims, pursuant to 42 U.S.C. § 1983, in turn below: first, violation of the right to procedural due process in violation of the Fourteenth Amendment to the U.S. Constitution (the "Fourteenth Amendment"); second, warrantless seizure in violation of the Fourth Amendment to the U.S. Constitution (the "Fourth Amendment"); and, third, excessive fines in violation of the Eighth Amendment to the U.S. Constitution (the "Eighth Amendment"). [9]

[9]    Given that the Court recommends denial of Defendants' motion as to each of Plaintiff's federal claims, the Court rejects Defendants' argument that "there can be no Monell liability" because "there is no underlying constitutional violation herein." ECF No. 33 at 28 (citations omitted).

### a. Claim For Violation Of The Right To Procedural Due Process In Violation Of The Fourteenth Amendment, Pursuant To 42 U.S.C. § 1983

The Court discusses the arguments of the parties and its analysis in turn below.

#### i. Arguments Of The Parties

In Defendants' memorandum of law accompanying their moving papers, Defendants' arguments related to procedural due process relate entirely to the opportunity for a hearing and not at all to the right to notice of such a hearing. See ECF No. 33 at 13-21.

In his opposition, Plaintiff contends (1) that "Defendants ... ignore Plaintiff's allegations that none of the information he received apprised him of any [right] ... to challenge the boot or tow fees" [10] and (2) that Defendants "misrepresent the very documents they proclaim provided such notice," as (a) the Ticket "only provides for the ticket fine (in this case $80) [11] to be paid or disputed by the NYC Mobile App" and "advises that a hearing can be requested to challenge the ticket fine," with "no reference on the ticket to paying, challenging or requesting any hearing with regard to booting or towing fees," and as (b) the Warning also failed to provide Plaintiff with notice of the right to challenge the boot and tow fees. ECF No. 34 at 11-12 (emphasis in original).

[10]    The Court understands Plaintiff's claims about boot and tow fees to include a challenge to storage fees as well.

[11]    This number may be an error, as the Ticket lists the fine as $60.00. See ECF No. 32-1 at 2.

In reply, Defendants argue that the notice of the right to a hearing provided to Plaintiff was sufficient, as (1) "the summons he received and paid sets forth the procedure for requesting a hearing before PVB" and as (2) "the underlying parking violation

is inextricably intertwined with the related booting and towing fees," such that, "[i]f Plaintiff were to challenge the underlying violation at PVB and [be] found not guilty, the booting and towing fees paid would be refunded to Plaintiff." ECF No. 35 at 6 (citations omitted).

### ii. Analysis [12]

[12]    Plaintiff's opposition clarifies that he is asserting only a notice-related procedural due process claim and not a hearing-related due process claim. See ECF No. 34 at 7 (stating that "Defendants attempt to avoid the heart of this case by parading decisions addressing incomparable government action" and that "[t]he critical difference is that, here, it is alleged the government provided no notice – either pre-or post-deprivation (towing) – thereby violating due process (emphasis in original)); id. at 12-13 (arguing that "parking violation procedures and the New York judicial system can have no application here in this case where Defendants provided no notice that they can be invoked to challenge a boot or tow fee," rendering "the decisions on which Defendants rely inapposite"); id. at 14, 19 (urging the Court that "[i]t is ... unnecessary for this Court to go through the Mathews balancing factors in these circumstances" and taking the position that "Mathews is not implicated"); Dusenbery v. U.S., 534 U.S. 161, 167-68 (2002) (reasoning that the Mullane reasonableness test should be used "when confronted with questions regarding the adequacy of the method used to give notice" and that the Mathews balancing test should be used to address the adequacy of hearing procedures (citations omitted)).

Fourth Amendment rights are also affected by the nature of Plaintiff's interest. See Santander Consumer USA, Inc. v. Cnty. of Nassau, 623 F. Supp. 3d 6, 16 (E.D.N.Y. 2023) (noting that, "[i]mmobilizing and towing the car interfered with the property interests of anyone with a present possessory interest in the car," such that "the registered owner with a present possessory interest in the car when it was booted and towed ... could potentially assert a due process claim challenging the constitutionality of the defendant's pre-seizure policies (citation omitted)). The Court notes that neither side addresses the question of whether the Court need consider both the Fourth Amendment claim and the Fourteenth Amendment claim, an issue that turns in part on Plaintiff's interest in the Vehicle. On this motion to dismiss, the Court addresses both claims but notes that this may become a significant point as the record develops. Compare Santander Consumer USA, 623 F Supp. 3d at 21 (declining to "decide whether the Boot and Tow Policy violates the plaintiff's Fourth Amendment rights," in view of the conclusion "that the defendant violated the plaintiff's due process rights"), with Santander Consumer USA, Inc. v. Port Auth. of N.Y. & N.J., No. 20 Civ. 1997 (MKB) & No. 20 Civ 1998 (MKB), 2023 WL 12028907, at *5-6 (E.D.N.Y. Dec. 4, 2023) (applying a Fourth Amendment analysis).

**\*6**   The Court respectfully recommends denial of Defendants' motion to dismiss Plaintiff's notice-related procedural due process claim.

The Fourteenth Amendment "provides that [n]o state shall ... deprive any person of ... property, without due process of law." Nnebe v. Daus, 931 F.3d 66, 80 (2d Cir. 2019) (quotations omitted). In conjunction with such a deprivation, the state government taking action must "provide the owner notice and opportunity for hearing appropriate to the nature of the case." Oneida Indian Nation of N.Y. v. Madison Cnty., 665 F.3d 408, 428 (citation & quotations omitted); see Jones v. Flowers, 547 U.S. 220, 226 (2006) (reasoning that, to comport with the procedural due process requirements of the Fourteenth Amendment, a state government must "provide notice reasonably calculated, under all the circumstances, to apprise the interested parties of the pendency of the action and afford them an opportunity to present their objections" (citation & quotations omitted)). [13]

[13]    The necessary antecedent to either a claim that notice of a hearing in relation to a deprivation of property by a state government was not provided or that an appropriate hearing in relation to a deprivation of property by a state government was not provided is, of course, a determination that the state government deprived the complaining party of property. See Nnebe, 931 F.3d at 80 (stating that, with respect to a procedural due process claim pursuant to 42 U.S.C. § 1983, "a court must first determine whether a property interest is implicated, and then, if it is, determine what process is due before the plaintiff may be deprived of that interest" (citation omitted)). In the amended complaint, Plaintiff refers to the Vehicle as "his." See, e.g., ECF No. 22 ¶ 12 (referring to "Plaintiff Geoffrey Browser's [sic] motor vehicle"); id. ¶

14 (referring to "Plaintiff's car"); id. ¶ 26 (referring to "his vehicle"). Unclear to the Court from the amended complaint is whether Plaintiff owned the Vehicle, leased the Vehicle, or had another interest in the Vehicle, but neither Plaintiff nor Defendants disputes that Plaintiff had a property interest in the Vehicle sufficient to trigger procedural due process protections or that the Vehicle was booted and towed by the NYPD. As such, the Court accepts the parties' positions. The Court notes that, in his opposition to the motion, which cannot serve to amend the amended complaint, Plaintiff confirms his property interest in the Vehicle by referring to himself as the owner thereof. See ECF No. 34 at 15 n.6 (describing Plaintiff as "the actual vehicle owner").

Fundamental to "due process of law is the opportunity to be heard," and "[t]his right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (citation & quotations omitted). Such "notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance." Id. (citations omitted); see Oneida Indian Nation of N.Y., 665 F.3d at 428 (reasoning that notice that complies with due process requirements "must be of such nature as reasonably to convey the required information" and that "[t]he notice provided must afford a reasonable time for those interested to make their appearance" (citations & quotations omitted)). Inherent in this assessment is a balancing of "the interest of the State against the individual interest sought to be protected by the Fourteenth Amendment." Oneida Indian Nation of N.Y., 665 F.3d at 428-29 (citation & quotations omitted). The constitutional requirements are satisfied if, "with due regard for the practicalities and peculiarities of the case[,] these conditions are reasonably met." Mullane, 339 U.S. at 314. The means for providing such notice "must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." Id. at 314-15.

**\*7** Neither the Ticket nor the Warning that was presented to the Court provided Plaintiff with notice of the right to challenge the boot fees or the tow fees at a hearing.

As to the Ticket, the only reference pertaining to the notice of a right to a hearing on the Ticket is the instructions "to plead not guilty and request a hearing," which instructions only include references to disputing a ticket for a parking violation. ECF No. 32-1 at 3 (capitalization altered) (quotations omitted). The only references on the Ticket to booting and towing are to potential booting and towing as a consequence for failing to respond to the Ticket, which appears to be a reference to the booting and towing process used by the City's Marshals in relation to accumulated past unpaid parking tickets. See ECF No. 32-1 at 2 (stating that "you must answer within 30 days of the date of this ticket" and that, "if you do not respond, penalties and interest will be added and your vehicle may be booted or towed" (capitalization altered)); id. at 3 (stating that "[f]ailure to answer as required shall be deemed an admission of liability," that "[a]dditional penalties will be charged and a default judg[ ]ment may be entered against you," and that "[v]ehicles with outstanding judg[ ]ments may be booted or towed"). The Ticket does not contain any reference to the boot and tow fees assessed against Plaintiff for an alleged recent parking violation. See ECF No. 32-1 at 2-3. The Ticket only refers to the $60.00 fine for the parking violation. See id. at 2 (referring to the "fine amount" of $60.00 (capitalization altered)).

As to the Warning, the Warning does not contain a notice of a right to a hearing. See ECF No. 22 ¶ 12. [14]

14      The Court reiterates that the Warning provided by Plaintiff in the amended complaint appears to be incomplete. See supra, n.5.

The Court rejects Defendants' argument that the Court should construe the notice of the right to a hearing as to the fine for the Ticket as notice of the right to challenge the boot and tow fees at the same hearing. Notice that a person can challenge one particular fee or violation cannot reasonably be understood to be notice of a right to challenge other fees. The omission of a notice may have very real consequences for the person accused of the violation. An individual, such as Plaintiff, may make the calculus that challenging a $60.00 fine for a ticket may not be worthwhile but may decide, if given notice of the right to a hearing to challenge a $185.00 boot fee, $185.00 tow fee, and/or related storage fees, that engaging in such hearing process would be worthwhile. If notice of the right to a hearing provides the recipient with notice of the right to challenge only some,

but not all, of the subject matters at issue, the notice is of no value to the recipient as to the subject matter not included in the notice, such that Defendants' argument is unpersuasive.

### b. Claim For Warrantless Seizure In Violation Of The Fourth Amendment, Pursuant To 42 U.S.C. § 1983

The Court discusses the arguments of the parties and its analysis in turn below.

#### i. Arguments Of The Parties

In their memorandum of law accompanying their moving papers, Defendants contend that "there is no doubt that the NYPD was acting pursuant to its community caretaking functions when it towed [P]laintiff's illegally parked vehicle from a busy street in Brooklyn at 7:18" AM, such that "the NYPD was clearly within its authority to tow the illegally parked vehicle as it was acting pursuant to applicable law and in the interest of public safety." ECF No. 33 at 24-25.

**\*8**  In his opposition, Plaintiff argues that Defendants' invocation of the community caretaking exception "is predicated on ignoring and directly controverting paragraphs 20 and 54 of the" amended complaint, ECF No. 34 at 21, which state that "[t]here are no exigent circumstances requiring the towing of a booted vehicle in two hours as there is no safety or traffic concern that would require a towing within two hours because, if there was, the vehicle would have been towed immediately without first booting it," ECF No. 22 ¶ 20, and that "[t]he warrantless seizure of the vehicle performed two hours after the boot is placed is not justified by any 'community caretaking function' as a booted car presents no safety, traffic issues or other exigent circumstances, as[,] had any been the case, the NYPD would have towed the vehicle as soon as possible and not booted it first," id. ¶ 54. Plaintiff also urges the Court to reject Defendants' allegations that Plaintiff was parked on a busy and highly trafficked street during rush hour. See ECF No. 34 at 21.

In their reply, Defendants assert that the factual allegations in the amended complaint referenced by Plaintiff are "false," in view of the "obvious safety risks and traffic concerns." ECF No. 35 at 11. Defendants also argue that "overwhelming amounts of case law in this [C]ircuit supports [sic] the NYPD's ability to remove vehicles from the streets in the interest of public safety and to keep traffic moving in an already crowded City." Id. at 12 (citations omitted).

#### ii. Analysis

The Court respectfully recommends denial of Defendants' motion to dismiss Plaintiff's Fourth Amendment claim.

The Fourth Amendment provides "that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Collins v. Virginia, 584 U.S. 586, 591 (2018) (quotations omitted). The Fourth Amendment therefore "prohibits only unreasonable searches and seizures," with "[t]he relevant test" not being "the reasonableness of the opportunity to procure a warrant" but rather "the reasonableness of the seizure under all the circumstances." South Dakota v. Opperman, 428 U.S. 364, 372-73 (1976) (emphasis in original) (citation & quotations omitted); see U.S. v. Lyle, 919 F.3d 716, 730-31 (2d Cir. 2019) (noting that "[t]he Supreme Court has repeatedly held that the touchstone of the Fourth Amendment is reasonableness, which[,] in turn, is measured in objective terms by examining the totality of the circumstances" (citations & quotations omitted)). Such test "cannot be fixed by per se rules; each case must be decided on its own facts." Opperman, 428 U.S. at 373 (citation & quotations omitted).

Vehicles "are 'effects' and [are] thus within the reach of the Fourth Amendment." Id. at 367 (citation omitted). As such, "whether a decision to impound is reasonable under the Fourth Amendment is based on all the facts and circumstances of a given case." Lyle, 919 F.3d at 731 (citation & quotations omitted). Although not necessary, "the existence of and an officer's adherence to a standardized criteria may be helpful in evaluating the reasonableness of an impoundment." Id. Nonetheless, [i]n the interests of public safety and as part of what the Court has called 'community caretaking functions,' automobiles are frequently taken into police custody." Opperman, 428 U.S. at 368 (citation omitted). One reason for police to "remove and impound automobiles" is to do so when they "violate parking ordinances and ... thereby jeopardize both the public safety and the efficient movement

of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." Id. at 368-69 (footnote omitted); see Lyle, 919 F.3d at 728 (stating that "[i]t is well established that police have the authority, despite the absence of a warrant, to seize and remove from the streets automobiles in the interests of public safety and as part of their community caretaking functions – an authority that is beyond reasonable challenge" (citation omitted)). The court must evaluate the reasonableness of the exercise of authority under the community caretaking function. Miranda v. City of Cornelius, 429 F.3d 858, 864 (9th Cir. 2005) (citation omitted).

 **\*9**  Determining the reasonableness of the seizure of the Vehicle at this juncture and based on the amended complaint would be inappropriate and premature. See Owens v. Fitzgerald, No. 23 Civ. 1280, 2024 WL 2315335, at \*1-2 (D. Conn. May 22, 2024) (assessing the reasonableness of the impoundment pursuant to the community caretaking function on a motion for summary judgment (citation omitted)). The Court lacks the necessary information to make the required case-specific reasonableness determination. Most importantly, and despite Defendants' assertions to the contrary, see supra, n.5, the amended complaint does not allege whether the Vehicle was, in fact, parked in an impermissible place and in violation of applicable parking laws or whether Plaintiff paid the Ticket and admitted to such a violation. For example, the Court may be called upon to consider the reasonableness of the seizure effectuated by the booting policy when, even by Defendants' own terms, the removal of the Vehicle from its allegedly unlawful and dangerous location would not occur for at least two hours after the Ticket was first left on the Vehicle. See Miranda, 429 F.3d at 964 (citation omitted); U.S. v. Duguay, No. 95 Crim. 1768, 93 F.3d 346, 353-54 (7th Cir. 1996) (citations omitted). This raises the question of whether the booting advances the alleged caretaking, safety and traffic concerns. The cases cited by Defendants relate to circumstances in which a vehicle is moved by towing, not where movement is purposefully prevented by booting or another mechanism before towing. See generally Opperman, 428 U.S. at 365-66 (describing the issuance of two tickets to an illegally parked vehicle, approximately seven hours apart, and the subsequent towing of the vehicle); Santander Consumer USA, Inc. v. Port Auth. of N.Y. & N.J., No. 20 Civ. 1997 (MKB) & No. 20 Civ. 1998 (MKB), 2022 WL 3099239, at \*1-2 (E.D.N.Y. Aug. 4, 2022) (describing the towing of four vehicles deemed abandoned by the Port Authority Police Department (citations omitted)); U.S. v. Colon, No. 10 Crim. 498 (RPP), 2011 WL 569874, at \*14 (S.D.N.Y. Feb. 8, 2011) (noting the impoundment of a vehicle following an arrest (citation omitted)); U.S. v. Barrios, No. 7 Crim. 658 (DLC), 2007 WL 3256945, at \*2 (S.D.N.Y. Nov. 1, 2007) (noting the impoundment of a vehicle following an arrest), aff'd, 374 F. App'x 56 (2d Cir. 2010); Rackley v. City of N.Y., 186 F. Supp. 2d 466, 468 (S.D.N.Y. 2002) (describing the seizure of a vehicle in two separate instances to satisfy multiple default judgments for alleged failure to pay fines and penalties arising from violations of parking rules and regulations (citation omitted)). If the Vehicle were permissibly parked when booted and towed, seizing and impounding the Vehicle, without another justification, may have been unreasonable.

   **c. Claim For Excessive Fines In Violation Of The Eighth Amendment, Pursuant To 42 U.S.C. § 1983**
The Court discusses the arguments of the parties and its analysis in turn below.

   **i. Arguments Of The Parties**
In their memorandum of law accompanying their moving papers, Defendants "[a]ssum[e] arguendo that the two fees paid by [P]laintiff (totaling $370 combined) were at least partly punitive." ECF No. 33 at 26. Defendants then assert (1) that, "[w]hether or not [P]laintiff views his own offense as minor, [P]laintiff acknowledges that the City tows 'hundreds of cars' every day and that many of those are for 'parking violations' "; (2) that "Plaintiff fits squarely within the class of people for whom 34 RCNY § 4-08(d) was principally designed," namely "those who are illegally parked"; (3) that "Defendants have no discretion to issue a lesser fine than what is set by [R]ule," namely $185.00 for booting and $185.00 for towing; and (4) that "[a] person remaining illegally parked causes harm to the City" in the form of increased congestion, blocking traffic, and undermining compliance with laws. Id. at 26-28 (citations omitted).

In his opposition, Plaintiff contends that Defendants' arguments "ignore the gravamen of Plaintiffs' [sic] Eighth Amendment Claim – that there is no reasonable opportunity to avoid paying both a boot and tow fee." ECF No. 34 at 22. Plaintiff also argues, without citation, that "determination of what is 'grossly disproportionate' is plainly a matter not determinable on a motion to

dismiss." Id. The Court rejects this argument. See, e.g., Lewis v. City of New York, No. 24 Civ. 2336 (AT) (RWL), 2025 WL 50291 (S.D.N.Y. Jan. 8, 2025); Beatty v. Gilman, 718 F. Supp. 3d 166 (D. Conn. 2024).

Plaintiff also contends (1) that Defendants "erroneously try to relate the two $185 fees to the underlying parking violation; (2) that, as to Plaintiff's culpability, the applicable provision for the parking violation "does not specify the mere two-hour window in which a booted vehicle owner has to find out what has happened to his vehicle and then make it to the correct tow pound within two hours to avoid a tow and resulting tow fee"; (3) that application of predetermined, codified fees does not render such application "appropriate" and that the codified provisions do "not say anything about or specify the mere two-hour window"; and (4) that Plaintiff was not a "frequent violator[ ]," minimizing harm to the City. Id. at 22-24 (citation omitted).

**\*10**  In their reply, Defendants assert that Plaintiff could have avoided the imposition of the tow fee by either "not violating the law in the first place" or "by paying a booting fee of $185 ... at the Brooklyn Tow Pound within two (2) hours of the boot time listed on the Warning." ECF No. 35 at 13 (citation & quotations omitted). Defendants also reiterate arguments made in their moving papers. See id. at 13-14.

### ii. Analysis

The Court respectfully recommends that Defendants' motion to dismiss Plaintiff's claim for excessive fines in violation of the Eighth Amendment be denied.

The Excessive Fines Clause in the Eighth Amendment "guards against abuses of government's punitive or criminal-law-enforcement authority and limit[s] the ability of the sovereign to use its prosecutorial power, including the power to collect fines, for improper ends." Reese v. Triborough Bridge and Tunnel Auth., 91 F.4th 582, 589 (2d Cir. 2024) (citations & quotations omitted). Assessing a claim for excessive fines is "a two-step inquiry." U.S. v. Viloski, 814 F.3d 104, 108 (2d Cir. 2016). First, a court must "determine whether the Excessive Fines Clause applies at all," id. at 109 (citation omitted), as "[t]he Excessive Fines Clause applies only to protect against 'punitive,' rather than 'remedial,' payments to the government." Reese, 91 F.4th at 589 n.2 (citation omitted). Punitive fines, of which a fine must be at least in part for the Excessive Fines Clause to apply, are "forfeitures for which a defendant is personally liable," whereas remedial fines are "those in rem forfeitures intended not to punish the defendant but to compensate the Government for a loss or to restore property to its rightful owner." Viloski, 814 F.3d at 109 (citations omitted). Second, if the response to the first question is affirmative, the court must "proceed to the second step and determine whether the challenged forfeiture is unconstitutionally excessive," meaning that "it is grossly disproportional to the gravity of a defendant's offense." Viloski, 814 F.3d at 109-10 (citations & quotations omitted). Making such a determination requires an analysis of four factors:

> (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

Id. at 110 (citation & quotations omitted). A fifth factor that may be considered is "whether the forfeiture would deprive the defendant of his livelihood." Id. at 111 (footnote & citation omitted).

### (a) First Question

As to the first question as to the applicability of the Excessive Fines Clause, Defendants do not contest its applicability, at least for purposes of this motion. As such, the Court assumes, without deciding, that the Excessive Fines Clause applies to the circumstances of this case for purposes of this motion. [15]

15    The Second Circuit has yet to resolve whether the Excessive Fines Clause applies to the circumstances of this case. See Torres v. City of N.Y., 590 F. Supp. 3d 610, 627 n.7 (S.D.N.Y. 2022) (noting that "some courts have determined that the Clause applies to municipal traffic and parking fines" but that "[t]he Second Circuit has yet to resolve this question" (citations omitted)). The Court has doubts as to its applicability here, in that the monies addressed may be fees, not fines, in view of the "Statement of Basis and Purpose in City Record," dated October 22, 2002, in relation to 34 NYCRR § 4-08:

> These rules set forth amendments to existing New York City Department of Transportation rules to raise the fees charged for illegally parked vehicles which are immobilized, towed, stored, and released, and to add new fees for towing or releasing heavy duty vehicles.

> The immobilization (booting) fee would increase from $75 to $185. Regular towing fees would be raised from $150 to $185. The storage fee would increase from $15 to $20. The vehicle release fee would increase from $75 to $100. Two new fees would be added, heavy duty towing and heavy duty release, at $370 and $200 respectively.

> In order to ensure that roadways and traffic lanes are open for efficient traffic flow, and especially to ensure that emergency vehicles such as fire engines, police vehicles and ambulances have swift and unobstructed movement through city streets to sites of emergencies, the City of New York maintains a Violation Tow Program to deter illegal parking and to remove illegally parked vehicles. The fees charged to persons who violate the parking rules were last fixed in 1989 and consequently do not reflect increased personnel and office equipment/space costs. Therefore, at present, the public and not the violator pays the difference between what the fees bring in and what is needed to pay for the program. The fee increases are based on User Service Cost Analyses of the New York City Office of Management and Budget to ensure that the fees charged are commensurate with the administrative costs needed to run the program. The two new fees for[ ]heavy duty towing and heavy duty release reflect the additional expense of utilizing heavier towing equipment, requiring more highly trained and qualified personnel, and the need for more space at the tow pound to store heavy or large vehicles and trucks.

**(b) Second Question**

**\*11**  As to the second question, an analysis of the factors leads to the conclusion that the challenged booting and towing fees may be grossly disproportionate to the gravity of Plaintiff's alleged offense.

As to the first factor, namely "the essence of the crime of the defendant and its relation to other criminal activity," Viloski, 814 F.3d at 110 (citation & quotations omitted), Plaintiff allegedly engaged in a parking violation for at least two hours and thirty-nine minutes, having been issued the Ticket at 7:16 AM on April 3, 2023, see ECF No. 22 ¶ 12, and having had the Vehicle towed at 9:55 AM on April 3, 2023, see id. ¶ 14. A "negligent or reckless parking violation [itself] may not entail a great degree of moral culpability." Tsinberg v. City of N.Y., No. 20 Civ. 749 (PAE), 2021 WL 1146492, at *8 (S.D.N.Y. Mar. 15, 2021).

As to the second factor, namely "whether the defendant fits into the class of persons for whom the statute was principally designed," Viloski, 814 F.3d at 110 (citation & quotations omitted), Plaintiff is plainly within the class of persons that the City's parking laws are designed to address, which is persons who allegedly violate the City's parking laws.

As to the third factor, namely "the maximum sentence and fine that could have been imposed," Viloski, 814 F.3d at 110 (citation & quotations omitted), 34 NYCRR § 4-08 does not provide discretion with regard to booting and towing fees and storage fees, as 34 NYCRR § 4-08(9)(iii) and 34 NYCRR § 4-08(9)(vi)(A) each provide for a fee of $185.00 for booting and towing, respectively, and as 34 NYCRR § 4-08(9)(vii) provides for a fee of $20.00 per day for vehicle storage, up to and including the date of release. Nonetheless, some degree of discretion necessarily lies with the NYPD officers who decide how to enforce alleged parking violations. Here, the booting fee, for $185.00, was applied only two minutes after the Ticket for $60.00 was issued, see ECF No. 22 ¶¶ 12-13, such that the initial cost of the alleged parking violation was effectively converted from $60.00, with such fine being prescribed by 19 NYCRR § 39-05, to $245.00; this conversion implicates the "[j]udgments about the appropriate punishment for an offense," which "belong in the first instance to the legislature." Oles v. City of N.Y., No. 21 Civ. 9393 (LGS), 2022 WL 1808905, at *8 (S.D.N.Y. June 2, 2022) (citation & quotations omitted), aff'd, No. 22 Civ. 1620,

2023 WL 3263620 (2d Cir. May 5, 2023). With the addition of towing fees, the cost of the alleged parking violation becomes $430.00. storage fees are on top of these costs.

As to the fourth factor, namely "the nature of the harm caused by the defendant's conduct," <u>Viloski</u>, 814 F.3d at 110 (citation & quotations omitted), prolonged illegal parking harms the City in its management of congestion and traffic flow.

Finally, Plaintiff has not invoked the potential fifth factor, namely "whether the forfeiture would deprive the defendant of his livelihood." <u>Id.</u> at 111 (footnote & citation omitted).

On balance, application of the aforementioned factors leads to the conclusion that such booting and towing fees may be grossly disproportionate to the gravity of the offense alleged. Plaintiff adequately pleaded that the NYPD's policy for addressing parking violations at issue is such that "the NYPD boots motor vehicles and then by written policy[,] ... within two hours, causes them to be towed to a tow pound ([ ] in the Bronx, in Brooklyn, or in Queens, depending on the location of the motor vehicle at the time the boot is placed," with such process being "designed to collect both a boot fee and a tow fee," as well as "potentially related expenses such as storage," in a "substantial number of, if not virtually all, booting situations." ECF No. 22 ¶¶ 3, 15, 19, 24. <u>See</u> <u>Farina v. Met. Trans. Auth.</u>, 409 F. Supp. 3d 173, 202-03 (S.D.N.Y. 2019) (reasoning that, "[a]t the motion to dismiss stage, the [defendant] ... has not had a full opportunity to detail the nature and magnitude of the harm caused by an E-Z Pass enrollee who ahs failed to replenish her account or update her credit card," with "[p]romoting deterrence, minimizing administrative expenses and obtaining reimbursement from those who increase expenses [being] ..., in the abstract, worthy goals," and holding that, "at the pleading stage and without the benefit of discovery, the Court is unable to conclude as a matter of law that fines of $1,305 are not grossly disproportional to the underlying offense (footnote omitted)); <u>but see</u> <u>Tsinberg</u>, 2021 WL 1146942, at *9 (reasoning that, "as to the booting, towing, and storage fees associated with the [v]ehicle – including the mandatory $20 daily storage fee that has been amassing since January 2019 as a result of Tsinberg's refusal to pay his debts to the City – Tsinberg fails to explain, except in conclusory terms, why those essential compensatory fees are unconstitutional," whereas, here, Defendants have accepted, for purposes of this motion, that the fees are at least partially punitive, and Plaintiff has explained in the amended complaint why the policy supporting the combination of fees, rather than the each individual fee, is unconstitutional). On the limited record here, on a motion to dismiss, the Court cannot conclude that the monies assessed are reasonable fees rather than excessive fees. In alleging that the NYPD's policy is designed to collect the amount of the ticket, a booting fee, a towing fee and storage fees, where either the amount of the ticket and a booting fee or the amount of the ticket, a towing fee and storage fees could be appropriate, Plaintiff sufficiently pleads that the combination of such fines is grossly disproportionate to a single parking violation.

### B. Plaintiff's New York Claims

**\*12**  The Court first addresses Plaintiff's state law claims then addresses Plaintiff's local law claims.

#### 1. State Law Claims

The Court first addresses Plaintiff's claim for violation of Article I § 12 of the New York State Constitution then addresses Plaintiff's claim for unjust enrichment.

##### a. Claim For Violation Of Article I § 12 Of The New York State Constitution

The only basis upon which Defendants seek to dismiss Plaintiff's claim for violation of Article I § 12 of the New York Constitution is that "[P]laintiff's federal claims fail" and that, as a result, the Court "should decline to exercise supplemental jurisdiction." ECF No. 33 at 29. Given that the Court recommends denial of Defendants' motion as to Plaintiff's federal claims, the Court rejects this argument and respectfully recommends denial of Defendants' motion as to this claim.

The protections afforded by Article I § 12 of the New York State Constitution to be free from unreasonable searches and seizures are broader than those afforded by the Fourth Amendment, <u>see, e.g.,</u> <u>Airbnb, Inc. v. City of N.Y.</u>, 373 F. Supp. 3d

467, 480, 480 n.5 (S.D.N.Y. 2019) (describing the two constitutional provisions as "largely parallel" but noting that "[c]ourts have held that this provision of the New York Constitution affords greater protection against warrantless searches than the U.S. Constitution" (citation & quotations omitted)), such that, given that the Court recommends that the motion to dismiss the Fourth Amendment claim be denied, the Court also recommends that the motion to dismiss this claim be denied. [16]

[16]    Some analysis suggests that a plaintiff cannot bring a Section 1983 claim and another claim, the subject matter of which is the same. See, e.g., Talarico v. Port Auth. of N.Y. & N.J., 367 F. Supp. 3d 161, 171 (S.D.N.Y. 2019) (stating that "[d]istrict courts in this circuit have consistently held that there is no private right of action under the New York State Constitution where, as here, remedies are available under [Section] 1983" (citation & quotations omitted)). This argument was not raised here.

#### b. Claim For Unjust Enrichment [17]

[17]    The Court notes that Plaintiff asserts this claim only against the City. See ECF No. 22 ¶ 67.

The only basis upon which Defendants seek to dismiss Plaintiff's claim for unjust enrichment is that "[P]laintiff's federal claims fail" and that, as a result, the Court "should decline to exercise supplemental jurisdiction." ECF No. 33 at 29. Given that the Court recommends denial of Defendants' motion as to Plaintiff's federal claims, the Court rejects this argument and respectfully recommends denial of Defendants' motion as to this claim.

#### 2. Local Law Claims

The Court first addresses Plaintiff's claim for violation of New York City Administrative Code § 19-169.2(h) then addresses Plaintiff's claim for violation of the Rules of the City of New York, Title 34, § 4-08(9)(v).

#### a. Claim For Violation Of New York City Administrative Code § 19-169.2(h)

The Court respectfully recommends that Defendants' motion to dismiss Plaintiff's claim for violation of New York City Administrative Code § 19-169.2(h), on consent. See supra, n.1.

#### b. Claim For Violation Of The Rules Of The City Of New York, Title 34, § 4-08(9)(v)

**\*13**    The Court discusses the arguments of the parties and its analysis in turn below.

#### i. Arguments Of The Parties

In their memorandum of law accompanying their moving papers, Defendants contend that "[D]efendants do provide individuals with an opportunity to challenge a parking violation and any underlying booting or towing fees at PVB" and that "the law does not require that the City provide a pre-deprivation hearing in impractical situations such as this, so long as there is meaningful post[-]deprivation process, which there is." ECF No. 33 at 30-31.

In his opposition, Plaintiff argues that "Defendants cannot pick and choose ... which provisions of 34 RCNY § 4-08(9) they have to comply[,] ... including subsection (9)(v), which guarantees the right to an immediate hearing to the owner of a booted vehicle." ECF No. 34 at 27.

Defendants do not make any related arguments in their reply.

#### ii Analysis

34 NYCRR § 4-08(9)(v) provides that "[t]he registrant, title holder or operator of any vehicle that has been immobilized shall have the right to an immediate hearing during regular business hours at the Parking Violations Bureau in relation to the immobilization."

The Court respectfully recommends that Defendants' motion to dismiss Plaintiff's claim for violation of 34 NYCRR § 4-08(9)(v) be denied.

The Vehicle was towed before an immediate hearing could be held as to the immobilization or the booting. See ECF No. 22 ¶¶ 12-15. From the amended complaint, it appears that the City does not have a structure available within which to conduct these immediate hearings, and it does not give any notice of this hearing right to those accused of parking violations. The Court rejects Defendants' argument as to the absence of a requirement for an immediate hearing and the legal sufficiency of a meaningful post-deprivation process, as Defendants appear to conflate the procedural due process requirements with the requirements of this provision of local law clearly entitling to individuals such as Plaintiff to an immediate hearing during business hours related to the booting.

Plaintiff alleges that he was not provided with "notice of an ability to challenge the boot or tow fines at a hearing before or after paying the outstanding fees," id. ¶ 26, let alone an immediate hearing, such that the City does not appear to have made available in such a hearing process and was denied a hearing under this provision of the City Code.

## IV. CONCLUSION

For the reasons discussed above, the Court respectfully recommends that the motion be granted in part and denied in part, as discussed more specifically herein: granted as to the injunctive relief, granted as to the federal claims asserted against the Commissioners with leave to replead as to the damages claim, denied as to the Fourteenth Amendment claim, denied as to the Fourth Amendment claim, denied as to the Eighth Amendment claim, denied as to the New York State Constitution Claim, denied as to the unjust enrichment claim, granted as to the New York City Administrative Code claim, and denied as to the Rules of the City of New York claim. The Court further respectfully recommends that Plaintiff be given leave to replead to remedy the deficiencies addressed herein, except as to the New York City Administrative Code claim, which Plaintiff has abandoned.

## V. OBJECTIONS

**\*14** Any written objections to this report and recommendation must be filed with the Clerk of the Court within fourteen days of service. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file objections within fourteen days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. See Miller v. Brightstar Asia, Ltd., 43 F.4th 112, 120 (2d Cir. 2022) (reasoning that, "although Rule 72 applies only to the district court's review of a report and recommendation, this court has adopted the rule that when a party fails to object timely to a magistrate's recommended decision, it waives any right to further review of that decision" (citation & quotations omitted)). Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen-day period for filing objections.

## All Citations

Slip Copy, 2025 WL 1707174

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 85 of 102

Calvo v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1633565

2018 WL 1633565
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Susan CALVO, John Peters Professional Limousines, Inc., Jacklyn Restrepo, Pedro Camacho,
Eamon Yuel and Yong Zhang individually and on behalf of all others similarly situated, Plaintiffs,
v.
CITY OF NEW YORK, Meera Joshi, David Yassky, and Raymond Scanlon, Defendants.

14-CV-7246 (VEC)
|
Signed 04/02/2018

**Attorneys and Law Firms**

Andrew M. St. Laurent, Jonathan Andrew Harris, Joseph Terence Gallagher, Harris, O'Brien, St. Laurent & Chaudhry LLP,
Daniel Lee Ackman, New York, NY, for Plaintiffs.

Karen Beth Selvin, Angelie Thomas, New York City Law Department, New York, NY, for Defendants.


OPINION & ORDER

VALERIE CAPRONI, United States District Judge

**\*1** This case involves the former policy and practice of Defendant City of New York ("City") to seize vehicles that were
suspected of being used illegally as vehicles for hire without a warrant and prior to a hearing. After this Court decided that the
City's practice was unconstitutional as applied to so-called first time violators, Plaintiffs sought class certification, which was
denied without prejudice because Plaintiffs failed to propose a class defined in such a way that everyone within it had standing.
Plaintiffs now seek class certification for a second time, but fail again, albeit for a different reason. For the following reasons,
Plaintiffs' motion for class certification is DENIED with prejudice.


**I. BACKGROUND**

The Court assumes the parties' familiarity with the facts of this case and directs readers to its prior opinions. *See Harrell v. City
of N.Y.* ("Harrell I"), 138 F. Supp. 3d 479 (S.D.N.Y. 2015); *Calvo v. City of New York* ("*Calvo I*"), No. 14-CV-7246 (VEC),
2017 WL 4231431 (S.D.N.Y. Sept. 21, 2017). For the purposes of this opinion, the following facts merit repetition.

Prior to this Court's summary judgment decision, when a police officer or Taxi and Limousine Commission ("TLC") inspector
had probable cause to believe that a vehicle was being operated as an unlicensed vehicle for hire in violation of N.Y. City
Administrative Code ("Code") § 19-506(b)(1), the officer or inspector seized the vehicle prior to an administrative hearing on
the alleged violation. *Harrell I*, 138 F. Supp. 3d at 484–85 (citing Code § 19-506(h)(1); 35 R.C.N.Y. §§ 68-23(b)(2), (c)(2)).
The TLC would issue a summons for the alleged violation, and the seized vehicle would not be released until the administrative
hearing, unless the owner or operator either (1) pleaded guilty to the Section 19-506(b)(1) violation and paid a fine or (2) posted
a bond. *Calvo I*, 2017 WL 4231431, at \*1 (citations omitted). In addition, the TLC required payment of the seized vehicle's
towing and storage fees before it would release the vehicle; if the Section 19-506(b)(1) violation was ultimately dismissed,
those fees would be returned. *Id.* (citations omitted).

The Court concluded that this practice was unconstitutional under the Fourth and Fourteenth Amendments as applied to vehicle
owners with no prior violations in the preceding 36 months ("first-time violators"), and granted Plaintiffs' cross-motion for

Calvo v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1633565

summary judgment as to liability relative to first-time violators. *Harrell I*, 138 F. Supp. 3d at 496. The Court reaffirmed its grant of summary judgment as to liability on reconsideration relative to Plaintiffs Michael Harrell, Jaclyn Restrepo, and Peter Camacho, but denied Plaintiffs' cross-motion for summary judgment as to liability relative to Plaintiffs Susan Calvo and John Peters Professional Limousines ("JPPL"). *Harrell v. City of N.Y.* ("*Harrell II*"), No. 14-CV-7246 (VEC), 2015 WL 9275683 (S.D.N.Y. Dec. 18, 2015). In so holding, the Court found that there were questions of fact whether Plaintiffs Calvo and JPPL were actually first-time violators at the time of their complained-of seizures. *Id.* at *4.

**\*2** Plaintiffs were granted leave to amend and added Eamon Yuel and Yong Zhang as plaintiffs. *Calvo I*, 2017 WL 4231431, at *2 (citation omitted). The parties proceeded through discovery before Plaintiffs moved for class certification. *Id.* The Court denied Plaintiffs' motion, concluding that they had "failed to propose a class that [was] defined in such a way that everyone within it [had] standing.... Under all of their proposed definitions, Plaintiffs [sought] to include all registered owners of vehicles that were seized by the City; Plaintiffs [ ] failed to rebut the City's compelling evidence that a subset of that class consists of 'straw' owners who did not suffer any injury in fact from the City's unconstitutional practice of seizing vehicles suspected of being used in violation of Section 19-506(b)(1) from first time violators." *Id.* at 7 (citations omitted). The Court granted Plaintiffs an opportunity to seek certification of a narrower class, hypothesizing that "[a] class consisting of registered owners who were either operating the vehicles at the time that they were seized or who retrieved the vehicles from the TLC might be sufficient to narrow the class to those who have Article III standing." *Id.* But the Court explicitly made "no finding relative to whether a class can be defined that would satisfy Article III and Rule 23, whether any of the named Plaintiffs would be a suitable class representative, nor whether Plaintiffs' counsel is qualified to be named as class counsel." *Id.*

Accepting the Court's invitation to try again, Plaintiffs moved for class certification, modifying somewhat the class definition that the Court had hypothesized might work from a standing perspective. *See* Plaintiffs' Memorandum of Law in Support of Plaintiffs' Second Motion for Class Certification ("Pls.' Mem.") [Dkt. 225]. Defendants oppose Plaintiffs' motion on a number of grounds, in particular with regard to Article III standing and satisfaction of the certification requirements under Federal Rule of Civil Procedure 23. *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Second Motion for Class Certification ("Opp.") [Dkt. 232]. For the reasons discussed below, the Court denies Plaintiffs' motion with prejudice.

## II. DISCUSSION

### A. The Court Will Assume Satisfaction of the Standing Requirement Although There Remain Questions Whether All Members of Plaintiffs' Proposed Class Would Have Article III Standing

Article III standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)) (internal quotation marks omitted). "The filing of suit as a class action does not relax this jurisdictional requirement." *Id.* (citation omitted). To establish Article III standing, the "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Because these Article III requirements are "an indispensable part of the plaintiff's case, each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)) (internal quotation marks omitted); *see also In re Elec. Books Antitrust Litig.*, Nos. 11 MD 2293 (DLC), 12 Civ. 3394 (DLC), 2014 WL 1641699, at *8 (S.D.N.Y. Apr. 24, 2014) (citing *Lewis*, 518 U.S. at 358). Accordingly, a plaintiff's burden to show Article III standing becomes higher as the case proceeds. *See Lewis*, 518 U.S. at 358 (quoting *Lujan*, 504 U.S. at 561). Here, at class certification, Plaintiffs must prove standing by a preponderance of the evidence. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) ("[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements....").

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 87 of 102

Calvo v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1633565

In connection with class certification, "[t]he class must [ ] be defined in such a way that anyone within it would have standing." *Denney*, 443 F.3d at 264. Although it is not necessary that each member of the putative class submit evidence of personal standing, "no class may be certified that contains members lacking Article III standing." *Id.* at 263–64. Put differently, "Article III's jurisdictional requirements [apply] to each member of a class." *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 116, 126 (2d Cir. 2007) (citing *Denney*, 443 F.3d at 264), *rev'd on other grounds*, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). Ultimately, the Article III standing inquiry must be examined through the prism of the class definition; in this Circuit, a class cannot be certified if any person captured within the class definition lacks Article III standing. *See Denney*, 443 F.3d at 263–64. [1]

[1]    Although other courts of appeals have adopted a test that "hinges exclusively on the Article III standing of the 'named plaintiffs' or 'class representatives' " and "ignore[s] the absent class members entirely," *In re Deepwater Horizon*, 739 F.3d 790, 800 (5th Cir. 2014) (discussing different circuit approaches to Article III standing inquiry at class certification), *Denney* quite clearly requires all class members to have standing.

**\*3**  The Second Circuit has made clear that in assessing Article III standing, "while ownership and possession generally may provide evidence of standing, it is the *injury* to the party seeking standing that remains the ultimate focus." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (emphasis added). Because of "the lack of proven injury," the Second Circuit has "denied standing to 'straw' owners who do indeed 'own' the property, but hold title to it for somebody else. Such owners do not themselves suffer an injury when the property is taken." *Id.* (citing *United States v. 500 Delaware Street*, 113 F.3d 310, 312 (2d Cir. 1997)). Thus, to demonstrate injury in fact sufficient for Article III standing, "one must be more than a mere 'straw owner[ ]' who holds title for some unknown person." *United States v. $829,422.42, Currency*, 561 Fed.Appx. 100, 100 (2d Cir. 2014) (citation omitted). Rather, "[t]here must be some indicia of reliability or substance to claims of ownership in order to reduce the likelihood of a false or frivolous claim." *Id.* (citation and internal quotation marks omitted).

The Plaintiffs' new proposed class includes "all registered owners of straight plate vehicles [2] seized for alleged first-time violations of New York City Administrative Code Section 19-506 from September 8, 2011 to the present who were operating the vehicle at the time of the seizure, or who retrieved the vehicle personally or through an agent by paying towing and storage fees." Pls.' Mem. at 3–4. In other words, Plaintiffs propose that there be three requirements to be a class member: (1) the person [3] was the registered owner of the straight-plate vehicle; (2) the vehicle was seized for a first-time violation of the relevant provision on or after September 8, 2011; and (3) the person (a) was operating the vehicle at the time of the seizure, or (b) paid the required towing and storage fees *and* retrieved the vehicle either (i) personally or (ii) through an authorized agent. [4]

[2]    A "straight plate" vehicle is a vehicle that is not registered as a "for hire" vehicle. *Harrell I*, 138 F. Supp. 3d at 485 n.3.

[3]    The Court uses "person" to indicate either a human owner or a corporate owner.

[4]    Plaintiffs insist that their proposed class definition makes it clear that there would need to be independent proof that the registered owner, if not the operator at the time of the seizure, paid for the recovery of the vehicle. Plaintiffs seem to argue that proof that the cost of retrieving the car came from the registered owner would demonstrate actual injury necessary for standing. Pls.' Mem. at 4–5. Plaintiffs do not explain how the class definition would work as to a registered owner who was not driving the vehicle at the time of seizure and was found not guilty of a violation so that payment of storage and towing fees were not required. Nor do they explain how, on a classwide basis, the Court would determine whether the funds necessary to pay the storage and towing fees actually originated with the registered owner, short of individualized fact finding associated with every single non-operator owner.

According to Plaintiffs, a registered owner's use of a vehicle at the time of its seizure proves that he or she was not a straw owner. Pls.' Mem. at 4. They also argue that paying towing and storage fees directly or through an agent shows a financial interest in the vehicle that demonstrates true ownership. *Id.* at 5. Plaintiffs believe that, by adopting the definition of the class that

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 88 of 102

Calvo v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1633565

the Court suggested might work, their definition resolves the concerns the Court had with their first proposed class definition by effectively "exclud[ing] any owner who elected not to recover their [sic] vehicle, as well as 'straw' owners who arguably suffered no cognizable injury," *id.* at 4, thus leaving in the class only individuals who have standing.

Plaintiffs' class definition raises problems of its own. Plaintiffs do not appear to account for registered owners who were operating the vehicle when seized (the "3(a)" group) but who abandoned the vehicle after the seizure—such individuals appear to fall *within* the class definition but nonetheless would appear to be "straw owners," as evidenced by their abandonment of the vehicle. Although not obvious by the bolded print definition of the class that appears in their brief, Plaintiffs assert that they intend to exclude from the class persons who might otherwise be included (*i.e.*, registered owner, first-time seizure, operator at the time of seizure) if the vehicle is abandoned. Pls.' Mem. at 4; Reply at 2. And while that clarification helps to narrow the class, Plaintiffs nevertheless clearly intend to include in the class persons whose vehicles were recovered after a first violation but then abandoned after a subsequent seizure. Although Plaintiffs give Defendants' argument related to such putative class members short shrift, *see* Declaration of Andrew St. Laurent ("St. L. Decl.") [Dkt. 243] ¶ 29, the Court agrees with Defendants that an owner who retrieves a vehicle once but then abandons it a month or two later appears likely to be a straw owner. *See* Declaration of Edward Murray [5] ("Murray Decl.") [Dkt. 261] ¶¶ 43–45.

[5]    Defendant was ordered to refile Murray's Declaration to include consistent pseudonyms for individuals and entities identified in the seizure records, but whose names were fully redacted in Murray's initial public filing. *See* Order, March 29, 2018 [Dkt. 260].

**\*4** The Court's facial concerns aside, Defendants also raise a number of issues with Plaintiffs' definition and its effectiveness in defining a class that contains only persons with standing. *See* Opp. at 2–9. Through the declaration of Edward Murray, TLC's Assistant General Counsel, Defendants argue that the class as redefined would still contain individuals who lack standing. [6] *Id.* at 3–7; Murray Decl. In particular, the Murray Declaration analyzes the seizure records that would be used to identify prospective members of the class, finding a variety of fact patterns that raise very real concerns: individuals who "serially retrieved" [7] multiple vehicles that were registered to different individuals, who (sometimes) lived at the same address [8] (¶¶ 6–8; 14–21); registered owners who had multiple cars registered at different addresses at virtually the same time [9] (¶ 10); registered owners who were operating the vehicle at the time of seizure but had the vehicle retrieved by a "serial retriever" [10] (¶ 20); vehicles that were seized multiple times but registered to different owners, raising questions about the validity of the registrations [11] and transfers [12] (¶¶ 23–27; ¶¶ 34–36); registered owners reclaimed vehicles after one seizure but then abandoned the vehicle after a subsequent seizure [13] (¶¶ 43–45); third-party authorizations to retrieve vehicles were used to allow a "serial retriever" to recover multiple vehicles, calling into question whether the registered owner was harmed by the seizure of the vehicle [14] (¶ 30); and corporate entities appear to have been used as alter-egos for individuals, making it difficult to ascertain the true owner of a vehicle and whether a violation was truly first-time [15] (¶¶ 46–51). Defendants also raised doubts as to the validity of registrations and third-party authorizations, noting through a proffered handwriting expert that signatures purportedly from the same registered owner did not match across the owner's documents. Opp. at 6 n.5; Declaration of Ruth Brayer ("Brayer Decl.") [Dkt. 235] ¶ 7. [16]

[6]    Additionally, Defendants suggest that vehicle seizures that resulted from criminal violations of § 19-506 or were carried out for other reasons would complicate the use of the proposed class definition. *See* Opp. at 7–8. The Court believes that such circumstances would preclude an individual from joining the class (as the vehicle would not have been seized for a first-time violation) rather than undermine standing. The Court notes that Plaintiffs argue that a criminal violation of § 19-506 could not support a warrantless seizure, *see* Plaintiffs' Reply Memorandum in Support of Plaintiffs' Second Motion for Class Certification ("Reply") [Dkt. 241] at 4; because the Court assumes the class satisfies the standing requirements and denies the motion to certify on predominance grounds, it need not determine whether a seizure connected to a criminal violation of § 19-506 would be lawful.

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 89 of 102

Calvo v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1633565

7    The Court uses "serial retriever" to refer to an individual, such as John Doe 62, who retrieved a number of different vehicles for which he was neither the registered owner nor operator at the time of seizure, which suggests to the Court that there was some sort of business arrangement associated with the serial retriever. *See* Murray Decl. ¶¶ 14–22.

8    Nine putative owners used one out-of-state registration address in Philadelphia, PA, eleven used another, and six used a third Philadelphia address; none of these individuals operated the vehicle at the time of seizure. *See* Murray Decl. ¶¶ 6–8.

9    John Doe 48 had vehicles registered at different Philadelphia, PA addresses simultaneously. *See* Murray Decl. ¶ 10.

10    John Doe 62 retrieved the vehicle for putative owner John Doe 74, who was operating the vehicle at the time of the seizure. *See* Murray Decl. ¶ 20.

11    Defendants also raise general concerns that registration documents may be insufficient to establish ownership, and that other documents, such as titles and leases, are needed to determine whether an individual had true ownership of the vehicle. Opp. at 8–9.

12    Defendants cite cases of a single vehicle being seized on multiple occasions and registered under different names, including examples of vehicles with different registered owners or claimed by different retrievers all while the operator of the vehicle remained the same. *See* Murray Decl.¶¶ 23–27; ¶¶ 34–36. For example, John Does 95, 97, and 99 appear to have transferred their vehicles to, respectively, John Does 96, 98, and 100 after each owner-operator's first seizure. Each vehicle was seized a second time, again operated by its original owner (*e.g.*, John Does 95, 97, and 99). *See* Murray Decl. ¶ 35.

13    Putative owners John Does 76 and 129—neither of whom operated their respective vehicles during the first or second seizure—each retrieved his vehicle after its first seizure but abandoned it after the second seizure. *See* Murray Decl. ¶ 44.

14    John Doe 3 used the same authorization to claim a vehicle registered to John Doe 6 that was seized in February 2014 and again in March 2014. *See* Murray Decl. ¶ 30.

15    On July 25, 2013, a vehicle registered to Company 3 and driven by John Doe 136 was seized. Approximately a year later, the same vehicle was again seized while being driven by John Doe 136, but by 2014 the vehicle was registered to John Doe 136 himself. Under Plaintiffs' class definition, both Company 3 *and* John Doe 136 would be class members, even though it is highly questionable that the subsequent seizure could be legitimately characterized as a "first-time" seizure. *See* Murray Decl. ¶ 47.

16    Plaintiffs objected to the Court's consideration of Ms. Brayer's Declaration on a variety of grounds, including that handwriting analysis is not based on established science. *See* Letter, December 14, 2017 [Dkt. 238]. Established science or not, it does not require a handwriting expert to look at the signatures on the various documents highlighted in Ms. Brayer's Declaration and to conclude that there is serious reason to doubt that the signatures are all from the same person.

**\*5**  Plaintiffs largely answer Defendants' arguments through a declaration from their lawyer, Andrew St. Laurent. *See* St. L. Decl. While the Declaration properly notes that some of the issues that Murray identifies speak to membership in the class rather than to standing, the Declaration also dismisses some of the concerns as irrelevant without any argument. *See id.* For example, St. Laurent declares that "Murray notes that some registered owners abandoned vehicles after certain seizures but not after others.... However, there is no logical basis to find a registered owner forfeited his or her right to press claims arising from the seizure of a vehicle he or she spent time and money to recover based on a prior or subsequent abandonment of a vehicle. This argument is accordingly irrelevant." *Id.* ¶ 29. This argument misses—or purposefully avoids—the point entirely: the fact that a vehicle is abandoned by a registered owner who previously retrieved it (or had it retrieved) raises a significant question of fact as to whether he was a straw owner all along and therefore never had a cognizable injury associated with the seizure of the vehicle.

In all, although the Plaintiffs' class definition could have been more thoughtfully drafted (particularly as to the exclusion for abandonment), most of the issues Defendants raise speak only to whether a person would be able to opt-in to the class—such as

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 90 of 102
Calvo v. City of New York, Not Reported in Fed. Supp. (2018)
2018 WL 1633565

whether the offense was truly first-time and whether a third-party authorization was valid—rather than to standing. Nonetheless, two issues suggest that some of the persons embraced by the proposed class definition may not have standing. First, the evidence of widespread registration fraud raises broad concerns about tying class membership, even partially, to being a registered owner. As Defendants suggest, other indicia of ownership, such as titles and leases, may be preferable and provide more certainty in proving vehicle ownership. Second, as discussed above, registered owners whose vehicles were retrieved once but abandoned when they were subsequently seized may be straw owners who suffered no injury. As discussed in *Calvo I*,

> [A] 'straw' owner—one who does not have a true ownership interest in the vehicle but merely has the vehicle registered in his or her name—is not *injured* by signing an authorization for someone else to retrieve the vehicle from the TLC. Signing an authorization has no impact on such an owner because he or she has no true ownership interest in the vehicle that was seized; there is no evidence that such an owner cared at all or experienced any harm (emotional or financial) in connection with the vehicle being seized.

2017 WL 4231431, at *6. It is not inconceivable that a straw owner might assist with the recovery of a vehicle the first time it is seized but would not expend such effort for a subsequent seizure (not to mention the role that forged registrations and authorizations might play in such a recovery-then-abandonment scenario). Of course, a *true* owner could abandon a vehicle for an understandable purpose—perhaps the vehicle was beyond repair and thus not worth recovering.

Ultimately, even though it is unclear whether all members of the proposed class would have standing, because many of Defendants' concerns speak more to difficulties in proving class membership than standing, the Court will assume without deciding that, for the purposes of this Opinion, Plaintiffs' have defined a class, all members of which would have standing.

### B. Plaintiffs' Proposed Class Fails to Satisfy Rule 23

#### i. The Rule 23(a) Requirements

Rule 23(a) establishes the prerequisites to maintaining a suit as a class action. Pursuant to Rule 23(a), a class action may be certified only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

Defendants have conceded numerosity. [17] While commonality [18] and typicality [19] appear easily satisfied despite Defendants arguments to the contrary, Defendants raise substantial concerns as to the adequacy of representation.

[17]   Based on their review of Defendants' seizure records, Plaintiffs estimate that their class would include at least 5,000 individuals. *See* Pls.' Mem. at 11–12. Defendants concede numerosity as to the current definition proposed by Plaintiffs. Opp. at 10 n.10. The Court thus finds that the numerosity requirement is satisfied. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (numerosity requirement satisfied with class of at least 40 members) (citations omitted).

[18]   Under Rule 23(a)(2), class members must have a "common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[E]ven a single common question will do." *Id.* at 359 (citation, internal quotation marks, and alteration omitted). This case raises,

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 91 of 102

Calvo v. City of New York, Not Reported in Fed. Supp. (2018)
2018 WL 1633565

at a minimum, a common question as to the legality of the Defendants' vehicle seizures (which, in fact, has already been decided in *Harrell I*). Accordingly, the commonality requirement is satisfied.

19    "To establish typicality under Rule 23(a)(3), the party seeking certification must show that each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citing *Robidoux v. Celani,* 987 F.2d 931, 936 (2d Cir. 1993)) (internal quotation marks omitted). Where the "same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented," the typicality requirement is satisfied. *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45 (S.D.N.Y. 2013) (citing *Robidoux*, 987 F.2d at 936–37) (internal quotation marks omitted).

Plaintiffs contend that the class representatives' claims are typical because, as with the commonality element, they arise from a uniform practice of unconstitutionally seizing vehicles, even though there are factual differences surrounding the circumstances of their seizures. Pls.' Mem. at 14. Defendants argue that the claims are not typical because the Court would have to conduct individualized examinations to decide whether each person was actually injured and his damages. Opp. at 10–12. They cite, out of context, a single case for the proposition that typicality cannot be satisfied if a court "must engage in a 'case-by-case evaluation of each encounter' in order to establish liability." *Id.* at 11 (quoting *Haus v. City of N.Y.*, 2011 U.S. Dist. LEXIS 155735, at *316 (S.D.N.Y. Aug. 31, 2011)). But in *Haus*, the court based its typicality determination on a finding that there was no uniform policy or practice to hold the plaintiffs' claims together. *Haus*, 2011 U.S. Dist. LEXIS 155735, at *317–20. Here, the Court has already determined that the Defendants engaged in an unconstitutional practice, and this same practice affected both the named Plaintiffs and the class sought to be represented. Defendants essentially misstate the legal standard for this element, and their arguments here relate to the standing issues discussed above and the predominance issues discussed below. Accordingly, the typicality requirement is satisfied.

**\*6** To find adequacy of representation, the Court must consider whether "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the [class representatives] and the members of the class; and (3) the [class representatives] ha[ve] a sufficient interest in the outcome of the case to ensure vigorous advocacy." *Kux —Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471, 477 (S.D.N.Y. 2016) (quoting *Foley v. Transocean Ltd.,* 272 F.R.D. 126, 131 (S.D.N.Y. 2011)). "A class representative is a fiduciary to the class and bears a responsibility to comply with discovery requests, ... to possess a basic knowledge of the facts, ... and to participate to some minimal degree in the lawsuit to ensure that the party is not simply lending his name to a suit controlled entirely by the class attorney." *In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 76 (S.D.N.Y. 1999) (citations and internal quotation marks omitted). *See also Koss v. Wackenhut Corp.*, No. 03 CIV. 7679 (SCR), 2009 WL 928087, at *7 (S.D.N.Y. Mar. 30, 2009) ("A class representative is a fiduciary to the entire class and bears a responsibility to comply with discovery requests.... Class certification may be [ ] denied where the plaintiffs have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class.") (citations and internal quotation marks omitted). "To judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff." *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (citing *Kline v. Wolf,* 702 F.2d 400, 402–03 (2d Cir. 1983) (citation omitted)).

Defendants challenge the adequacy of each of the named Plaintiffs, pointing to issues of unique defenses to and circumstances of their seizures, failures to comply with discovery requests, lack of familiarity with the Complaint, and questionable credibility as evidenced by deposition testimony. *See* Opp. at 12–20. Plaintiffs dispute and attempt to rebut these assertions, contending, *inter alia*, that the named Plaintiffs need not be perfect, that they are free of conflicts of interest, that they raised legitimate discovery objections while cooperating overall with discovery demands, and that they are sufficiently familiar with the case. *See* Reply at 5–9.

Defendants also challenge the adequacy of class counsel, alleging poor selection of plaintiffs, errors in the Complaint and briefs, obstruction of discovery, and class counsel's misrepresentation of their experience with class actions, which Defendants assert is actually quite limited. Opp. at 20–23. Plaintiffs dispute these contentions as well, claiming, *inter alia*, that the named Plaintiffs approached counsel and not *vice versa*, and that their attorneys' experience is genuine and sufficient. *See* Reply at 9–10.

Because the Court finds below that the proposed class fails to satisfy Rule 23(b)(3), the Court assumes without deciding that Rule 23(a) has been satisfied. The Court notes, however, that Defendants' arguments regarding the adequacy of the class representatives and class counsel are not wholly without merit and might have been a standalone basis to decline to certify the requested class.

### ii. The Proposed Class Fails to Satisfy Rule 23(b)(3) Because Individual Issues Predominate

In addition to satisfying Rule 23(a), a class action must fall within one of the types of class actions identified in Rule 23(b). *See* Fed. R. Civ. P. 23(b). Plaintiffs contend that certification of a class is appropriate under Rule 23(b)(3), which requires that "the court find[ ] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see* Pls.' Mem. at 17–22.

Rule 23(b)(3)'s predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)) (internal quotation marks omitted). Predominance "is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.' " *Id.* (quoting *Myers*, 624 F.3d at 547).

 **\*7**  If individualized questions as to membership in the proposed class predominate over common questions, class certification is precluded. In *Mazzei*, the Second Circuit affirmed the district court's decertification of a class, noting that "without *class-wide* evidence that class members *were* in fact in privity with [the defendant], the fact-finder would have to look at every class member's loan documents to determine who did and who did not have a valid claim." 829 F.3d at 272. "It was within the range of permissible decisions for the [district] court to determine that [the common] questions did not predominate over the individual questions of whether each class member was in a contractual relationship with defendants." *Id.* (citations and internal quotation marks omitted).

Similarly, in *Vogel v. City of New York*, the district court noted that if "too much individual inquiry is required to determine whether someone is a member of the class, then a court could find that class issues do not predominate over individual issues." [20] No. 14 CIV. 9171 (RMB), 2017 WL 4712791, at \*5 (S.D.N.Y. Sept. 19, 2017) (citations and internal quotation marks omitted). The court went on to do just that, finding that because "potentially thousands of individualized and elaborate inquiries would be required to identify who is part of the class, ... 'predominance' is not satisfied." *Id.* at \*7.

[20]   *See also Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.*, No. 14 CV 09764 KPF SN, 2018 WL 739580, at \*14 (S.D.N.Y. Jan. 10, 2018) ("To be a member of the putative class ... a current or former holder of a Certificate must show that it has retained the litigation rights associated with that Certificate. And without class-wide proof of litigation rights, 'the fact-finder would have to look at every class member's [transaction] documents to determine who did and who did not have a valid claim,' thereby defeating predominance.") (quoting *In re Petrobras Sec.*, 862 F.3d 250, 274 (2d Cir. 2017)).

As to superiority under Rule 23(b)(3), courts may consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 93 of 102
Calvo v. City of New York, Not Reported in Fed. Supp. (2018)
2018 WL 1633565

members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). In general, "Rule 23(b)(3) class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the prospect of recovery." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013) (citation omitted). When "substituting a single class action for numerous trials in a matter involving substantial common legal issues and factual issues susceptible to generalized proof will achieve significant economies of time, effort and expense, and promote uniformity of decision," the class action is a superior method of adjudicating disputes. *Id.* (citing Fed. R. Civ. P. 23 Advisory Committee's notes) (internal quotation marks omitted).

Defendants contend that, as in *Mazzei* and *Vogel*, individual issues involved in proving class membership will predominate over common class questions. They argue that the Court will have to examine each putative class member to ascertain whether he or she was actually injured by Defendants' unconstitutional policy, and whether there were other circumstances associated with the vehicle stop that otherwise justified the seizure. Opp. at 24–25. Defendants also note that damages calculations will require individualized examination. *Id.* at 25. In other words, certification will lead to "thousands of non-stop mini-trials...." *Id.*

**\*8** As to predominance, Plaintiffs' opening brief asserts that common questions predominate. Plaintiffs assert, *ipse dixit*, that "identification of class members is simple" through use of Defendants' seizure records and additional affidavits, and damage inquiries do not overwhelm the common questions.[21] *See* Pls.' Mem. at 17–21. Plaintiffs made no effort to respond to Defendants' predominance arguments in their Reply. *See generally* Reply.

[21] Plaintiffs argue that administrative feasibility is not relevant to class certification. Although courts previously required consideration of whether it was "administratively feasible for the court to determine whether a particular individual is a member," *Brecher v. Republic of Argentina*, 806 F.3d 22, 24–25 (2d Cir. 2015) (citation omitted), the Second Circuit later clarified that "a freestanding administrative feasibility requirement is neither compelled by precedent nor consistent with Rule 23" and declined to adopt such a requirement. *In re Petrobras Secs.*, 862 F.3d at 264. It did so, however, in part by recognizing that an independent administrative feasibility requirement would "risk[ ] encroaching on territory belonging to the predominance requirement, such as classes that require highly individualized determinations of member eligibility." *Id.* at 268 (citing *Mazzei*, 829 F.3d at 272). In other words, the Second Circuit has recognized that administrative concerns regarding individual assessments of membership eligibility may be properly considered as part of a predominance analysis—rather than as a separate administrative feasibility assessment—and *not* that such concerns are irrelevant to class certification writ large.

The Court agrees with Defendants that individual questions predominate. Proving membership in the class will be far from "simple," as illustrated by the unusual fact patterns discussed *supra* in Section II.A. Defendants have presented persuasive evidence that the Court will have to wade through possibly fraudulent and forged documents to determine whether any given person in the seizure records, on which Plaintiffs intend to rely, truly belongs in the class. For example, if the proposed class were certified, the Court would have to assess whether a person's purported first-time violation were truly his first, as there is evidence that some individuals were playing a shell game in which corporate forms and substance-less transfers of registration were used to hide true ownership of a vehicle. *See supra* note 15. The Court would have to assess the validity of third-party authorizations for any registered owner who authorized another person to retrieve his vehicle, as Defendants have presented credible evidence that some authorizations were forged. The Court would have to assess individual bank records of registered owners who purportedly underwrote the cost of reclaiming the vehicle. The Court would have to assess on a case-by-case basis whether a purported class member who retrieved his vehicle after his first violation but abandoned the vehicle after a subsequent violation is a true owner or a straw owner of the vehicle. And the Court would also have to address any unique circumstances of a particular seizure that might remove an individual from the class, namely whether a vehicle was seized for purposes other than a first-time violation of § 19-506.[22]

22    For example, named Plaintiff Yuel was issued a criminal summons pursuant to § 19-506(b)(1), and, according to Defendants, his vehicle was or could have been seized as an instrumentality of that crime. *See* Opp. at 7, 18–19.

**\*9**  In all, these inquiries would overwhelm the common question of law rooted in the unconstitutional seizure practice. Based on their assessment of the seizure records, Plaintiffs estimate that the class could include thousands of individuals, and evaluating whether each of those individuals actually belongs in the class would be highly fact-intensive for the Court, as well as the parties. The complexity of determining class membership in this case makes clear that individual questions predominate over the common questions in this case. Accordingly, Rule 23(b)(3) is not satisfied.

Because the Court finds that common questions do not predominate as required by Rule 23(b)(3), it denies Plaintiffs' motion for class certification, and does not reach the question of superiority under Rule 23(b)(3). [23]  Although district courts have discretion to modify the definition of the proposed class, *see, e.g.*, *Sanchez v. N.Y. Kimchi Catering, Corp.,* No. 16 CIV. 7784 (LGS), 2017 WL 2799863, at \*5 (S.D.N.Y. June 28, 2017) (citing *Robidoux*, 987 F.2d at 937), this Court declines to do so. Given the credible evidence of widespread fraud in the registration of vehicles that were seized for violations of § 19-506, the Court believes there is no definable class that would satisfy Rule 23(b)(3).

23    Rule 23 also contains an implicit ascertainability requirement that, in the Second Circuit, "requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d at 264. The Court also does not reach this issue.

### III. CONCLUSION

For the foregoing reasons, and because Plaintiffs have now twice failed to propose a class that can be certified, Plaintiffs' motion for class certification is DENIED with prejudice. The Clerk of Court is respectfully directed to terminate Docket Entry 224. The parties are directed to meet and confer and to propose a trial schedule to resolve the liability and damages issues as to Susan Calvo, John Peters Professional Limousines, Eamon Yuel, and Yong Zang, and to resolve the issue of damages as to Jaclyn Restrepo and Peter Camacho. The parties' proposed schedule must be filed on or before April 17, 2018.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1633565

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 7:25-cv-05861-KMK    Document 43    Filed 12/19/25    Page 95 of 102

Calvo v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4231431

2017 WL 4231431
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Susan CALVO, John Peters Professional Limousines, Inc., Jacklyn Restrepo, Pedro Camacho,
Eamon Yuel and Yong Zhang individually and on behalf of all others similarly situated, Plaintiffs,
v.
CITY OF NEW YORK, Meera Joshi, David Yassky, and Raymond Scanlon, Defendants.

14-CV-7246 (VEC)
|
Signed 09/21/2017

**Attorneys and Law Firms**

Andrew M. St. Laurent, Joseph Terence Gallagher, Harris, O'Brien, St. Laurent & Chaudhry LLP, Daniel Lee Ackman, New York, NY, for Plaintiffs.

Karen Beth Selvin, Angelie Thomas, New York City Law Department, New York, NY, for Defendants.

OPINION & ORDER

VALERIE CAPRONI, United States District Judge

**\*1** This case involves the former policy and practice of the Defendant City of New York ("City") to seize vehicles that were being used illegally as vehicles for hire without a warrant and prior to a hearing. Holding in hand this Court's decision that the City's policy was unconstitutional as applied to so-called first time violators, Plaintiffs now seek class certification. For the following reasons, Plaintiffs' motion for class certification is DENIED without prejudice.

**BACKGROUND**

The Court assumes the parties' familiarity with the facts of this case and directs readers to its prior opinion. *See Harrell v. City of N.Y. ("Harrell I")*, 138 F. Supp. 3d 479 (S.D.N.Y. 2015). For the purposes of this opinion, the following facts merit repetition.

Prior to this Court's summary judgment decision, when a police officer or Taxi and Limousine Commission ("TLC") inspector had probable cause to believe that a vehicle was being operated as an unlicensed vehicle for hire in violation of N.Y. City Administrative Code ("Code") § 19-506(b)(1), the officer or inspector was authorized to seize the vehicle prior to an administrative hearing on the alleged violation. *Harrell I*, 138 F. Supp. 3d at 485 (citing Code § 19-506(h)(1); 35 R.C.N.Y. §§ 68-23(b)(2), (c)(2)). The TLC would issue a summons for the alleged violation to the operator and the registered owner, if different from the operator, of the vehicle that was seized. Murray Decl. ¶ 4. [1] The seized vehicle was not released until the administrative hearing, unless the owner or operator either (1) pleaded guilty to the Section 19-506(b)(1) violation and paid a fine or (2) posted a bond. *Harrell I*, 138 F. Supp. 3d at 485 (citing Code § 19-506(h)(1); 35 R.C.N.Y. § 68-23(d)(2)). In addition, the TLC required payment of the seized vehicle's towing and storage fees before it would release the vehicle; if the Section 19-506(b)(1) violation was ultimately dismissed, those fees would be returned. *See* SJ Mem. 4; *see also* SJ Oral Arg. Tr. 10:9–12 ("There is no question that they all had to pay a towing and storage charge, which they get back if the case is dismissed, but everyone has to pay that to get their car back. I don't think there is any dispute about that.").

Calvo v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4231431

1    The Court uses the following abbreviations herein: Declaration of Edward Murray in Opposition to Plaintiffs' Motion
      for Class Certification (Dkt. 197) is "Murray Decl."; Declaration of Karen B. Selvin in Opposition to Plaintiffs'
      Motion for Class Certification (Dkt. 187) is "Selvin Decl."; Defendants' opening brief in support of its motion for summary
      judgment (Dkt. 32) is "SJ Mem."; Plaintiffs' opening brief in support of their motion for class certification (Dkt. 166) is
      "Mem."; Plaintiffs' reply brief in further support of motion for class certification (Dkt. 194) is "Reply"; the transcript of
      oral argument on Defendants' motion for summary judgment (Dkt. 55) is "SJ Oral Arg. Tr."; and the transcript of oral
      argument on Plaintiffs' motion for class certification is "Tr."

 **2**  The Court concluded that this policy was unconstitutional under the Fourth and Fourteenth Amendments as applied to
vehicle owners with no prior violations in the preceding 36 months ("first-time violators"), and granted Plaintiffs' cross-motion
for summary judgment as to liability relative to first-time violators. *Harrell I*, 138 F. Supp. 3d at 496. [2] Upon reconsideration, the
Court reaffirmed its grant of summary judgment as to liability relative to Plaintiffs Michael Harrell, Jaclyn Restrepo, and Peter
Camacho, but denied Plaintiffs' cross-motion for summary judgment as to liability relative to Plaintiffs Susan Calvo and John
Peters Professional Limousines ("JPPL"). *Harrell v. City of N.Y.* ("*Harrell II*"), No. 14-CV-7246 (VEC), 2015 WL 9275683
(S.D.N.Y. Dec. 18, 2015). In so holding, the Court found that there were questions of fact whether Plaintiffs Calvo and JPPL
were actually first-time violators at the time of their complained-of seizures. *Harrell II*, 2015 WL 9275683, at *4.

2    The City represents, and Plaintiffs do not dispute, that it ceased seizing first-time violators' vehicles after this Court's
      summary judgment decision. *See* Dkt. 59.

The Court then granted Plaintiffs leave to amend their complaint to add new plaintiffs. Dkt. 80. Plaintiffs filed a Second Amended
Complaint, adding Eamon Yuel and Yong Zhang as new plaintiffs. Dkt. 101. The parties completed fact discovery, including
discovery relevant to class certification. After receiving from the City spreadsheets listing all putative class members ("Class
Lists"), the parties were permitted to conduct discovery into one of every five of those putative class members.

Plaintiffs have moved for class certification. Dkt. 165. Defendants oppose Plaintiffs' motion on a variety of grounds, including
that the proposed class is not ascertainable, that members of the putative class lack Article III standing, and that the proposed
class fails to meet the requirements of Rule 23 of the Federal Rules of Civil Procedure. For the following reasons, the Court
denies Plaintiffs' motion without prejudice.


## DISCUSSION

Article III standing is "the threshold question in every federal case, determining the power of the court to entertain the suit."
*Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "The filing
of suit as a class action does not relax this jurisdictional requirement." *Id.* To establish Article III standing, the "plaintiff must
have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely
to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs.
of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Because these Article III requirements are "an indispensable part of the plaintiff's case, each element [of standing] must be
supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree
of evidence required at the successive stages of the litigation." *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (quoting *Lujan v.
Defenders of Wildlife*, 504 U.S. 555, 561 (1992)); *see also In re Elec. Books Antitrust Litig.*, Nos. 11 MD 2293 (DLC), 12 Civ.
3394 (DLC), 2014 WL 1641699, at *8 (S.D.N.Y. Apr. 24, 2014) (citing *Lewis*, 518 U.S. at 358). Accordingly, Plaintiff's burden
to show Article III standing becomes higher as the case proceeds:

Case 7:25-cv-05861-KMK   Document 43   Filed 12/19/25   Page 97 of 102

Calvo v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4231431

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

**\*3** *Lewis*, 518 U.S. at 358 (quoting *Lujan*, 504 U.S. at 561). Here, at class certification, Plaintiffs must prove standing by a preponderance of the evidence. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) ("the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements").

In connection with class certification, "[t]he class must [ ] be defined in such a way that anyone within it would have standing." *Denney*, 443 F.3d at 264. Although it is not necessary that each member of the putative class submit evidence of personal standing, "no class may be certified that contains members lacking Article III standing." *Id.* at 263–64. Put differently, "Article III's jurisdictional requirements [apply] to each member of a class." *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 116, 126 (2d Cir. 2007) (citing *Denney*), *rev'd on other grounds*, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). Ultimately, the Article III standing inquiry must be examined through the prism of the class definition, and, in this Circuit, a class cannot be certified if any person captured within that definition lacks Article III standing. *See Denney*, 443 F.3d at 263–64. [3]

[3]     Although other courts of appeals have adopted a test that "hinges exclusively on the Article III standing of the 'named plaintiffs' or 'class representatives' " and "ignore[s] the absent class members entirely," *In re Deepwater Horizon*, 739 F.3d 790, 800 (5th Cir. 2014) (discussing different circuit approaches to Article III standing inquiry at class certification), *Denney* quite clearly requires all class members to have standing.

Plaintiffs' class definition is like a magical shape-shifter; it changed form multiple times within Plaintiffs' own brief and even during oral argument. In their opening brief, Plaintiffs used various class definitions: they first proposed a class of "all 'straight plate' vehicle *owners* whose vehicles were seized ...," Mem. 1 (emphasis added); two pages later, the class definition morphed into "all *owners and operators* of 'straight plate' vehicles seized ...," Mem. 3 (emphasis added); [4] the definition later became "all *persons* who ... had *their* vehicle seized," Mem. 8 (emphases added). In their reply brief, Plaintiffs stated that their definition encompassed "all *persons* who ... had *their* vehicle seized," Reply 2 (emphases added), but that definition was offered under a section title stating "[t]he class comprises *owners*," Reply 2 (emphasis added), and Plaintiffs argued on the following page that they had standing because "everyone on the Class Lists is a *registered owner* of a seized vehicle," Reply 3 (emphasis added). At oral argument, Plaintiffs represented that they were abandoning a class definition that included the operators of the vehicles that were seized and that their desired class definition encompassed "only the registered owners." Tr. 4:12–19. But as oral argument continued, Plaintiffs proposed yet another class definition: "not only the people who were the registered owners but the people who were treated as the owners of the vehicles by the defendants in the course of the seizure program." Tr. 13:23–14:2.

[4]     A "straight plate" vehicle is a vehicle that is not registered as a "for hire" vehicle. *Harrell I*, 138 F. Supp. 3d at 485 n.3.

**\*4** The problem with Plaintiffs' class definition(s) is not just volatility—although that aspect is troublesome. All of Plaintiffs' proposed definitions identify the class according to the registered owners (or whom the City treated as the registered owners) of the vehicles that were seized. Defendants contend that, under the facts of this case, the mere fact that an individual is a registered owner of a vehicle is not sufficient for Article III standing to challenge that vehicle's seizure. The Court agrees.

The Second Circuit has made clear that in assessing Article III standing, "while ownership and possession generally may provide evidence of standing, it is the *injury* to the party seeking standing that remains the ultimate focus." *United States v. Cambio*

Case 7:25-cv-05861-KMK   Document 43   Filed 12/19/25   Page 98 of 102
Calvo v. City of New York, Not Reported in Fed. Supp. (2017)
2017 WL 4231431

*Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (emphasis added). Because of "the lack of proven injury," the Second Circuit has "denied standing to 'straw' owners who do indeed 'own' the property, but hold title to it for somebody else. Such owners do not themselves suffer an injury when the property is taken." *Id.* (citing *United States v. 500 Delaware Street*, 113 F.3d 310, 312 (2d Cir. 1997)). For example, "[a]n airline passenger ... who does not know that a bag seized from him contains money does not have standing to challenge a forfeiture of the funds because he has suffered no injury." *Id.* at 528. Thus, to demonstrate injury in fact sufficient for Article III standing, "one must be more than a mere 'straw owner[ ]' who holds title for some unknown person." *United States v. $829,422.42, Currency*, 561 Fed.Appx. 100, 100 (2d Cir. 2014). Rather, "[t]here must be some indicia of reliability or substance to claims of ownership in order to reduce the likelihood of a false or frivolous claim." *Id.* (citation and internal marks omitted).

Defendants have adduced compelling evidence that certain registered owners (who are captured under all of Plaintiffs' proposed class definitions) are in fact "straw" owners who lack a true ownership interest in the vehicles that were seized. For example, Defendants have adduced evidence showing that a number of vehicles were registered and titled in Michael Harrell's name in Pennsylvania, but that Harrell was living with his mother in New York when the vehicles were registered and lacked the financial resources to acquire those vehicles. [5] *See* Selvin Decl., ¶¶ 5–6, Exs. B–C. Defendants also have adduced evidence showing "hundreds of examples where a vehicle registered to a putative class member was also registered under someone else's name for a separate seizure." Murray Decl. ¶ 38. In one example, a putative class member was the registered owner of multiple vehicles, but was not driving any of the vehicles at the time the vehicle was seized and did not recover any of the vehicles from the TLC; certain of his vehicles had previously been (or subsequently were) registered in the names of at least six other putative class members. Murray Decl. ¶ 40. [6] Defendants thus have adduced evidence drawing into question whether certain individuals on Plaintiffs' Class Lists have a true or legitimate ownership interest in the vehicle that was seized by the City. Plaintiffs have offered no evidence to rebut the City's evidence that many individuals on the Class Lists are straw owners.

[5]     Harrell was formerly a named plaintiff in this case, but the Court vacated judgment in his favor and dismissed Harrell from the action because he failed on multiple occasions to appear for his deposition. Dkt. 160. Harrell remains, however, a putative class member in this case.

[6]     Additional evidence that certain putative class members are straw owners include the fact that some of the registered owners live out of state (and as far away as Texas) and yet have had multiple vehicles seized under Section 19-506(b)(1) and the fact that multiple vehicles are registered to multiple people at single locations far from New York City. *See* Murray Decl. ¶¶ 23–41. Many of these individuals were neither driving the vehicle when it was seized nor did they claim the vehicle from the TLC following the seizure. *See, e.g.*, Murray Decl. ¶¶ 24, 29–30, 33, 40.

**\*5** Citing *Cambio Exacto*, Plaintiffs contend that "every member of the proposed class has standing, even if a handful of class members ultimately prove to be 'straw owners' of their vehicles, because they incurred liability to Defendants in the form of fines, as well as towing and storage fees." Dkt. 219 at 1. But *Cambio Exacto* does not support Plaintiffs' argument for standing. In *Cambio Exacto*, the plaintiffs were money transmitters that held customer accounts from which funds were seized. [7] *Cambio Exacto*, 166 F.3d at 524–25. Without deciding whether the plaintiffs had an actual ownership interest in the funds that were seized from the plaintiffs' accounts, the Second Circuit concluded that the plaintiffs had Article III standing "because they had a liability to their customers in an amount equal to the forfeited funds" that exposed them to economic injury. *Id.* at 528. *Cambio Exacto* was decided at the motion to dismiss stage, requiring the plaintiffs only to allege plausibly that they had standing, *id.* at 524, and the Second Circuit's conclusion was based on its express finding that the plaintiffs were, in fact, liable to their customers for the funds that were seized, *id.* at 528.

[7]     "Money transmitters" are "in the business of sending money: collecting it from customers and, for a commission, delivering it to a designated recipient, typically in another country." *Cambio Exacto*, 166 F.3d at 524.

Plaintiffs do not appear to dispute that their proposed class may include registered owners who were "straw" owners of the vehicles seized, instead shrugging off Defendants' evidence as reflective of "a relatively small percentage of the seizures."

2017 WL 4231431

Tr. 25:3–4. But under *Denney*, "no class may be certified that contains members lacking Article III standing." *Denney*, 443 F.3d at 264. And despite Defendants' compelling evidence that Plaintiffs' proposed class (under all of Plaintiffs' proposed class definitions) includes "straw" owners, Plaintiffs have failed to adduce *any* evidence tending to show that these proposed class members suffered any injury at all as a result of the seizures.

At oral argument, Plaintiffs argued that "straw" owners suffered an injury in fact from the vehicle seizures because: (a) they were legally responsible for the towing and storage fees incurred in connection with the seizure of the vehicles, Tr. 46:23–47:5; (b) they were legally responsible for the fines imposed for violating Section 19-506(b)(1), Tr. 15:2–9; and (c) each registered owner had to authorize a representative to do so if he or she did not appear to reclaim the vehicle from the TLC, Tr. 14:21–15:2, 17:7–12, 51:14–16. None of these arguments is persuasive.

Plaintiffs argue that the registered owner was responsible for towing and storage fees, Tr. 46:23–47:5, but Plaintiffs have not adduced evidence tending to show that the City actually pursued the registered owners for those fees. Tr. 47:6–8 (Q: "Is there any evidence that the City pursues towing fees if the car is abandoned?" A: "Not to my knowledge, your Honor, no."). [8] Defendants' subsequent written representation that "the City has never filed any liens relating to towing and storage fees" associated with the seizures, Dkt. 220 at 2 n.3, is consistent with Plaintiffs' lack of evidence that the City actually pursued the registered owners for those fees in connection with abandoned vehicles. And, for a vehicle registered in the name of a "straw" owner but retrieved by the vehicle's operator or someone else, Plaintiffs have failed to adduce any evidence showing that the straw owner, in fact, actually paid the towing and storage fees.

[8]     If the vehicle was claimed from the TLC, the individual claiming the vehicle was required to pay those fees before the vehicle would be released. SJ Oral Arg. Tr. 10:9-12. Thus, the liability on which Plaintiffs rely exists, even theoretically, only for individuals who abandoned the vehicle after seizure.

Plaintiffs further contend that "straw" owners suffered an injury because they were liable for fines assessed by the TLC in connection with the Section 19-506(b)(1) violation. That may be so, but it is irrelevant to this case. This Court has held that the City's practice of seizing vehicles, suspected of violating Section 19-506(b)(1) and as applied to first-time violators, was unconstitutional. *See Harrell I*, 138 F. Supp. 3d 479. The Court made no finding relative to the constitutionality of Section 19-506(b)(1), the statute that imposes fines on owners and, if different, operators of vehicles that are illegally used for hire. Put differently, the City's seizure of the vehicles is an entirely separate issue from the City's prosecution of the Section 19-506(b)(1) violation; this case and the Court's summary judgment decision concerned the former, not the latter. Indeed, Plaintiffs' suggestion that the registered owners were injured because they had to pay fines associated with the summons ignores this Court's order denying Plaintiffs' request for class discovery related to payment of Section 19-506 fines. [9] Dkt. 120. In any event, Plaintiffs also have adduced no evidence that the straw purchasers paid the fines (which also was required before the vehicles would be released from the TLC), [10] or that, as to abandoned vehicles, the City pursued registered owners for the fines. Tr. 15:12–14 (Q: "Do you have any evidence that for the abandoned cars the City pursues the registered owners?" A: "No, your Honor, I don't....").

[9]     At the discovery stage, Plaintiffs failed to articulate why they were entitled class discovery of the fines. Plaintiffs' request for discovery of the Section 19-506 fines "rest[ed] on their contention that the process of seizing vehicles was inherently coercive for *all* owners–ones who were innocent of the violation as well as those who were guilty of the violation." Dkt. 120 at 3. The Court was not persuaded by Plaintiffs' theory and denied their request for class discovery relative to fines paid. Dkt. 120.
        Here, Plaintiffs wrap their theory on the fines in a different package: Plaintiffs argue that the Section 19-506 fines are evidence of owners' injuries in fact because the owners were liable for those fines. During discovery, the Court was not persuaded that the fines were evidence of damages incurred as a result of the City's policy of seizing vehicles, *see id.*, and the Court remains unpersuaded.

[10]    At oral argument, Plaintiffs suggested that the fine was paid by the registered owner because the registered owner, if he or she did not appear before the TLC, authorized a representative to pay the fine on his behalf. Tr. 16:20–25. Plaintiffs

Calvo v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4231431

fine, however, that it was "an impossible proof" to "sourc[e] the cash, which was almost always what was used to pay the fine" because counsel could not "wind back the clock and trace the funds that went into pay[ing] these fines." Tr. 16:25–17:3. The Court rejects Plaintiffs' theory that the owner authorization resulted in an injury in fact for the reasons discussed *infra*. The Court also rejects Plaintiffs' contention that it is impossible to source the money used to pay the fine: an owner's sworn testimony, for example, would have been evidence that the owner him- or herself paid the fine. Plaintiffs apparently made a strategic decision not to gather such evidence from members of the putative class, despite being on notice that Defendants were going to argue that there were straw purchasers in the putative class. That was Plaintiffs' choice to make, but failing to do necessary legwork so that a fact can be proven does not transmute the fact into something that is impossible to prove.

**\*6** Relatedly, Plaintiffs also suggest that "straw" owners suffered an injury in fact because, in response to the summons for the Section 19-506(b)(1) violation, those owners authorized representatives "to act as agents of the registered owner to pay the fines." Tr. 16:22–25. But a "straw" owner—one who does not have a true ownership interest in the vehicle but merely has the vehicle registered in his or her name—is not *injured* by signing an authorization for someone else to retrieve the vehicle from the TLC. Signing an authorization has no impact on such an owner because he or she has no true ownership interest in the vehicle that was seized; there is no evidence that such an owner cared at all or experienced any harm (emotional or financial) in connection with the vehicle being seized.

None of the cases that Plaintiffs cite in their letters to the Court supports their claim that all of their putative class members have Article III standing. In *United States v. Any and All Funds on Deposit in Account No. 12671905, Held in the Name of Landlocked Shipping Company at Wells Fargo Brokerage Services*, the district court noted that mere "straw" owners of funds would not have standing to challenge the forfeiture of those funds, but found that the claimants had adduced sufficient evidence that they had suffered injury in fact; for example, the claimants had purchased and sold, or paid taxes on and rented, the property that was the source of the funds sought to be forfeited. *See Account No. 12671905*, No. 09 CV 3481 (HB), 2010 WL 3185688, at \*6 (S.D.N.Y. Aug. 10, 2010). And in *United States v. Any and All Funds on Deposit in Account Number XXXXX-XXXXXXXX at HSBC Bank PLC*, the district court also noted that mere possession of legal title was insufficient to establish Article III standing, but found (on a motion to dismiss) that the plaintiff had alleged an injury in fact because the plaintiff's "personal use of the funds [was] a sufficient indicia of her control over the property to dispute that she is merely a nominal owner." 87 F. Supp. 3d 163, 167 (D.D.C. 2015).

Plaintiffs contend that under *Denney*, "even a remote possibility of future economic harm is sufficient to confer Article III standing on the person threatened by such harm." Dkt. 221 at 1 (citing *Denney*, 443 F.3d at 265 (quoting 7AA CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FED. PRAC. & PROC. § 1785.1 (3rd ed. 2005) ("If plaintiff can show that there is a possibility that defendant's conduct may have a future effect, even if injury has not yet occurred, the court may hold that standing has been satisfied."))). Plaintiffs quote *Denney* out of context. The Second Circuit's discussion of future economic harm was in the context of describing class members who had not been audited for faulty tax strategies but were at risk of being audited by the IRS in the future. *Denney*, 443 F.3d at 264–65. The Second Circuit held that the *Denney* class members had suffered injuries in fact because they "by definition[,] received allegedly negligent or fraudulent tax advice, and took some action in reliance on that advice." *Id.* at 265. They, for example, had "taken costly and time-consuming steps to rectify errors in their past or future tax filings, and paid fees for the advice." *Id.* at 265. In addition, *Denney* considered the Article III standing question in the context of a class settlement that was at the pleading stage; at that stage, the *Denney* plaintiffs needed only to allege plausibly that they had suffered an injury in fact. *See id.* at 263.

Although it is "not require[d] that each member of a class submit evidence of personal standing[,] [a]t the same time, no class may be certified that contains members lacking Article III standing." *Denney*, 443 F.3d at 264 (citations omitted). Defendants have adduced compelling evidence that the putative class includes individuals who were the registered owners of vehicles that were seized, but who lacked a true ownership interest in the vehicle because they held bare legal title. Although they were confronted with evidence of putative class members *sans* Article III standing, Plaintiffs have adduced no evidence that any of these individuals actually suffered an injury in fact by virtue of the City's seizure of the vehicle. It is Plaintiffs' burden to show that the class they seek to certify satisfies Article III's jurisdictional requirements, *see Denney*, 443 F.3d at 263–65; *see also*

2017 WL 4231431

*Lewis*, 518 U.S. at 358, but Plaintiffs have adduced *no* evidence showing that the subset of their proposed class consisting of "straw" owners suffered an injury in fact.

**\*7**  The Court concludes that Plaintiffs have failed to propose a class that is defined in such a way that everyone within it has standing. *See Denney*, 443 F.3d at 264. Under all of their proposed definitions, Plaintiffs seek to include all registered owners of vehicles that were seized by the City; Plaintiffs have failed to rebut the City's compelling evidence that a subset of that class consists of "straw" owners who did not suffer any injury in fact from the City's unconstitutional practice of seizing vehicles suspected of being used in violation of Section 19-506(b)(1) from first time violators. A registered owner might have suffered an injury in fact if he or she was operating the vehicle at the time that it was seized or if he or she retrieved the vehicle from the TLC after it was seized. But given the City's evidence of straw owners, Plaintiffs cannot simply rely on the fact that the vehicle was registered in a person's name to demonstrate that the person suffered an injury from the vehicle's seizure. *See id.*; *see also $829,422.42, Currency*, 561 Fed.Appx. at 100. [11]

[11]   At oral argument, Plaintiffs attempted to side-step *Denney* by arguing that they had class standing under *NECA-IBEW Health & Welfare Fund v. Goldman Sachs Co.*, 693 F.3d 145 (2d Cir. 2012). Tr. 48:1–49:9. But class standing is different from Article III standing, and "whether [Plaintiff] has 'class standing'—that is, standing to assert claims *on behalf of* [the class members] does not turn on whether [Plaintiff] would have ... Article III standing...." *NECA-IBEW*, 693 F.3d at 158. Plaintiffs also argued that whether individual class members were "straw" owners was an issue "capable of determination in a[n] administrative proceeding at a later stage in this case ... on a case-by-case basis" and was "not the kind of question that so infects this body of cases as to prevent class certification." Tr. 35:23–36:4. Article III justiciability, however, is a threshold question, and this Circuit has made clear that "Article III's jurisdictional requirements [apply] to each member of a class." *In re Literary Works*, 509 F.3d at 126.

Although courts have discretion to modify the definition of the putative class, *see Sanchez v. N.Y. Kimchi Catering, Corp.,* No. 16 CIV. 7784 (LGS), 2017 WL 2799863, at *5 (S.D.N.Y. June 28, 2017), this Court declines to do so. Instead, the Court grants Plaintiffs' request to move to certify a more narrow class. A class consisting of registered owners who were either operating the vehicles at the time that they were seized or who retrieved the vehicles from the TLC might be sufficient to narrow the class to those who have Article III standing. It is unclear, however, whether a narrower class would satisfy Rule 23(a)'s numerosity requirement. In all events, the Court makes no finding relative to whether a class can be defined that would satisfy Article III and Rule 23, whether any of the named Plaintiffs would be a suitable class representative, nor whether Plaintiffs' counsel is qualified to be named as class counsel. Because Plaintiffs' proposed class definition(s) include(s) members that lack Article III standing, the Court denies without prejudice Plaintiffs' motion for class certification.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion is DENIED without prejudice. If Plaintiffs would like to move again for class certification, they must file their motion on or before **November 1, 2017**. Defendants must file their opposition brief on or before **December 1, 2017**. Plaintiffs may file a reply brief on or before **December 20, 2017**. The Clerk of Court is respectfully directed to terminate Docket Entry No. 165. [12]

[12]   If the parties would like a referral to Magistrate Judge Freeman for a settlement conference in lieu of briefing a revised motion for class certification at this time, they must seek a joint referral to Magistrate Judge Freeman before **October 20, 2017**.

**SO ORDERED.**

Calvo v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4231431

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4231431

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.